**LOBEL WEILAND GOLDEN FRIEDMAN LLP**
Jeffrey I. Golden, State Bar No. 133040
jgolden@lwgfllp.com
Alan J. Friedman, State Bar No. 132580
afriedman@lwgfllp.com
Beth E. Gaschen, State Bar No. 245894
bgaschen@lwgfllp.com
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Telephone:   (714) 966-1000
Facsimile:   (714) 966-1002

Attorneys for Debtor and Debtor-in-Possession
David Tudor Chamberlain

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SANTA ANA DIVISION

| | |
|---|---|
| In re | Case No. 8:17-bk-11370-CB |
| DAVID TUDOR CHAMBERLAIN, | Chapter 11 |
| Debtor and Debtor-in-Possession. | **DISCLOSURE STATEMENT DESCRIBING CHAPTER 11 PLAN OF REORGANIZATION** |
| | **Disclosure Statement Hearing:** <br> **DATE:   August 2, 2017** <br> **TIME:    10:00 a.m.** <br> **CTRM:   5D** |
| | **Plan Confirmation Hearing:** <br> **DATE:   To Be Set** <br> **TIME:** <br> **CTRM:** |

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION...................................................................................................1

　　A.   The Purpose of This Document...............................................................4

　　B.   Deadlines for Voting and Objecting; Date of the Plan
　　　　 Confirmation Hearing ............................................................................5

　　　　 1.   Time and Place of the Confirmation Hearing ...................................5

　　　　 2.   Deadline for Voting for or Against the Plan .....................................5

　　　　 3.   Deadline for Objecting to the Confirmation of the Plan....................5

　　　　 4.   Identity of Person to Contact for More Information
　　　　　　  Regarding the Plan .........................................................................6

　　C.   Disclaimer...............................................................................................6

II.  BACKGROUND .................................................................................................6

　　A.   The Debtor's Real Property Assets ........................................................8

　　　　 1.   The Surfside Property ......................................................................8

　　　　 2.   The LaSalle Street Property ............................................................9

　　　　 3.   The Comstock Avenue Property ......................................................9

　　　　 4.   The New Hampshire Property ........................................................10

　　　　 5.   The Nevada Property......................................................................11

　　　　 6.   The Vonnie Lane Property ..............................................................11

　　　　 7.   The N. Olive Street Property...........................................................11

　　　　 8.   The Newman Street Property .........................................................12

　　　　 9.   The Del Amo Blvd. Property ...........................................................13

　　　　 10.  The Denni Street Property ..............................................................14

　　　　 11.  The Bishop Street Property ............................................................15

　　　　 12.  The San Alto Way Property ............................................................15

　　　　 13.  The Stratton Court Property............................................................16

　　　　 14.  The 8479 Cedarview Court Property ..............................................16

　　　　 15.  The 8475 Cedarview Court Property ...............................................17

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF CONTENTS (cont.)

**Page**

B.    The Debtor's Personal Property Assets ......................................................17

C.    The Debtor's Income and Budget Motion ..................................................19

D.    The Events that Led to the Chapter 11 Filing ............................................19

E.    Significant Events During the Bankruptcy Case .......................................20

    1.    Bankruptcy Proceedings .................................................................20

    2.    The Appeal ......................................................................................22

    3.    The Fern Litigation ..........................................................................28

    4.    Other Legal Proceedings .................................................................29

    5.    Actual and Projected Recovery from Avoidance Actions and Causes of Action ......................................................................29

III.    SUMMARY OF THE PLAN ......................................................................30

A.    Overview of the Plan ...............................................................................30

B.    What Creditors Will Receive Under the Proposed Plan ............................31

    1.    Unclassified Claims .........................................................................32

    2.    Classified Claims .............................................................................36

C.    Means of Effectuating the Plan ...............................................................46

    1.    Funding the Plan ..............................................................................46

    2.    Disbursing Agent .............................................................................50

    3.    The Reorganized Debtor ..................................................................50

D.    Risk Factors ...........................................................................................50

E.    Provisions Governing Distributions ..........................................................52

    1.    Dates of Distributions ......................................................................52

    2.    Manner of Distribution .....................................................................52

    3.    Delivery of Distributions in General .................................................52

    4.    Rounding Payments .........................................................................53

    5.    Interest on Claims ...........................................................................54

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

## TABLE OF CONTENTS (cont.)

**Page**

6. Compliance with Tax Requirements ................................................54

7. De Minimis Distributions .................................................................55

8. Setoffs .............................................................................................55

9. Limitation on Liability .....................................................................55

F. Other Provisions of the Plan....................................................................56

1. Claim Objections and Disputed Claims...........................................56

2. Executory Contracts and Unexpired Leases...................................57

3. Changes in Rates Subject to Regulatory Commission Approval........................................................................................58

4. Preservation of Causes of Action and Avoidance Actions...........................................................................................58

5. Retention of Jurisdiction .................................................................60

6. Tax Consequences of the Plan.......................................................61

7. Exemption from Transfer Taxes......................................................62

IV. CONFIRMATION REQUIREMENTS AND PROCEDURES................................62

A. Who May Vote or Object ..........................................................................63

1. Who May Object to Confirmation of the Plan..................................63

2. Who May Vote to Accept/Reject the Plan.......................................63

3. Who is Not Entitled to Vote.............................................................65

4. Who Can Vote in More Than One Class..........................................65

5. Votes Necessary to Confirm the Plan.............................................65

6. Votes Necessary for a Class to Accept the Plan ............................66

7. Treatment of Nonaccepting Classes................................................66

8. Request for Confirmation Despite Nonacceptance by Impaired Class.................................................................................66

B. Liquidation Analysis..................................................................................66

C. Feasibility ................................................................................................67

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

1120604.2

DISCLOSURE STATEMENT

## TABLE OF CONTENTS (cont.)

**Page**

V.    EFFECT OF CONFIRMATION...................................................................................69

    A.    Discharge .......................................................................................................69

    B.    Exculpation and Releases ..............................................................................71

    C.    Vesting of the Assets .....................................................................................71

    D.    Plan Creates New Obligations........................................................................71

    E.    Creditor Action Restrained ............................................................................71

    F.    Material Default Defined .................................................................................72

    G.    Modification of the Plan ..................................................................................72

    H.    Post-Confirmation Status Report ....................................................................72

    I.    Quarterly Fees................................................................................................72

    J.    Post-Confirmation Conversion/Dismissal ......................................................73

    K.    Final Decree ...................................................................................................73

**Lobel Weiland Golden Friedman LLP**
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

# TABLE OF AUTHORITIES

**Page(s)**

## STATUTES

11 U.S.C § 365 ................................................................................................................ 57

11 U.S.C § 524(a)(3) ....................................................................................................... 29

11 U.S.C. § 101 ................................................................................................................. 1

11 U.S.C. § 108 .............................................................................................................. 60

11 U.S.C. § 346 .............................................................................................................. 60

11 U.S.C. § 362(a) .......................................................................................................... 73

11 U.S.C. § 502 .............................................................................................................. 70

11 U.S.C. § 502(g) .......................................................................................................... 70

11 U.S.C. § 502(h) .......................................................................................................... 70

11 U.S.C. § 502(l) ........................................................................................................... 70

11 U.S.C. § 505 .............................................................................................................. 60

11 U.S.C. § 506(b) .......................................................................................................... 33

11 U.S.C. § 507(a) .......................................................................................................... 45

11 U.S.C. § 507(a)(2) ................................................................................................ 32, 65

11 U.S.C. § 507(a)(3) ................................................................................................ 45, 65

11 U.S.C. § 507(a)(4) ...................................................................................................... 45

11 U.S.C. § 507(a)(5) ...................................................................................................... 45

11 U.S.C. § 507(a)(6) ...................................................................................................... 45

11 U.S.C. § 507(a)(7) ...................................................................................................... 45

11 U.S.C. § 507(a)(8) ............................................................................................ 34, 35, 65

11 U.S.C. § 510 .............................................................................................................. 60

11 U.S.C. § 511 ......................................................................................................... 33, 35

11 U.S.C. § 521 .............................................................................................................. 21

11 U.S.C. §§ 523(a) ........................................................................................................ 29

11 U.S.C. § 525 .............................................................................................................. 60

**Lobel Weiland Golden Friedman LLP**
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

DISCLOSURE STATEMENT

## **TABLE OF AUTHORITIES (cont.)**

**Page(s)**

11 U.S.C. § 543 ................................................................................................................. 60

11 U.S.C. § 544 ........................................................................................................... 29, 60

11 U.S.C. § 545 ................................................................................................................. 60

11 U.S.C. § 547 ................................................................................................................. 60

11 U.S.C. § 548 ................................................................................................................. 60

11 U.S.C. § 549 ................................................................................................................. 60

11 U.S.C. § 550 ........................................................................................................... 29, 60

11 U.S.C. § 551 ................................................................................................................. 60

11 U.S.C. § 553 ........................................................................................................... 55, 60

11 U.S.C. § 1006 ............................................................................................................... 21

11 U.S.C. § 1107 ............................................................................................................... 21

11 U.S.C. § 1112(b) ........................................................................................................... 73

11 U.S.C. § 1123 ............................................................................................................... 57

11 U.S.C. § 1125 ................................................................................................................. 1

11 U.S.C. § 1125(e) ........................................................................................................... 70

11 U.S.C. § 1126(g) ........................................................................................................... 63

11 U.S.C. § 1127(a) ........................................................................................................... 72

11 U.S.C. § 1127(b) ........................................................................................................... 72

11 U.S.C. § 1129(a)(7) ....................................................................................................... 66

11 U.S.C. § 1129(a)(8) ....................................................................................................... 66

11 U.S.C. § 1129(b) ........................................................................................................... 66

11 U.S.C. § 1141 ............................................................................................................... 70

11 U.S.C. § 1141(b) ........................................................................................................... 71

11 U.S.C. § 1144 ............................................................................................................... 73

11 U.S.C. § 1146 ............................................................................................................... 60

11 U.S.C. § 1146(a) ........................................................................................................... 62

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

vi                    DISCLOSURE STATEMENT

## TABLE OF AUTHORITIES (cont.)

**Page(s)**

28 U.S.C. § 1930(a)(6)..................................................................................72

## RULES

Federal Rule of Bankruptcy Procedure 9019 ..................................................57

Federal Rule of Bankruptcy Procedure 3022 ..................................................73

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

DISCLOSURE STATEMENT

## TABLE OF DEFINITIONS

**"8479 Cedarview Court Property"** means the real property located at 8479 Cedarview Court, Cypress, California 90630, as more fully described in Section II.A.14 of the Disclosure Statement.

**"8475 Cedarview Court Property"** means the real property located at 8475 Cedarview Court, Cypress, California 90630, as more fully described in Section II.A.15 of the Disclosure Statement.

**"Administrative Claim"** means a Claim against the Debtor for administrative costs or expenses that are allowable under Bankruptcy Code § 503(b).

**"Administrative Tax Claim"** means an Administrative Claim or other Claim that is not an Allowed Secured Claim that a government unit asserts against the Debtor for taxes (or for related interest or penalties) for any tax period that, either in whole or in part, falls within the period beginning on the Petition Date and ending on the Effective Date.

**"Allowed Claim"** means a Claim against the Debtor, other than an Administrative Claim, to the extent that:

    a.    Either: (i) a Proof of Claim was Filed by the Bar Date; or (ii) a Proof of Claim is deemed timely Filed either under Bankruptcy Rule 3003(b)(1) or by a Final order; and

    b.    Either: (i) the Claim is not a Disputed Claim; (ii) the Claim is allowed by a Final Order; or (iii) the Claim is allowed under the Plan.

**"Allowed [Class Designation and/or Secured, Priority, or General Unsecured] Claim"** means an Allowed Claim in the specified Class and/or of the specified type.

**"Amended Schedules I and J"** means the Debtor's amended Schedules I and J filed with the Court on June 5, 2017 [Docket No. 98].

**"Appeal"** means the Debtor's appeal of the Tarnutzer Judgment, as discussed in Section II.E.2. of the Disclosure Statement.

1120604.1

DISCLOSURE STATEMENT

1    **"Appellate Court"** means the appellate court entering a Final Order with respect to

2    the Appeal.

3    **"Assets"** means all tangible and intangible assets and property of every kind and

4    nature of the Debtor and/or his Estate, and all proceeds thereof, existing as of the

5    Effective Date.

6    **"Avoidance Action"** means Causes of Action arising under 11 U.S.C. §§ 510,

7    541, 542, 544, 547, 548, 549, 550, 551, and/or 553, or under related state or federal

8    statutes and common law, including, without limitation, fraudulent transfer laws, whether

9    or not litigation is commenced to prosecute such Causes of Action.

10    **"Bankruptcy Code" or "Code"** means Title 11 of the United States Code, as

11    amended.

12    **"Bankruptcy Rules"** means the Federal Rules of Bankruptcy Procedure.

13    **"Bar Date"** means the last date for filing Proofs of Claim in the Debtor's Case.  The

14    Bar Date has been established as June 26, 2017 (as to creditors other than governmental

15    units) and October 6, 2017 (as to governmental units).

16    **"Bar Date Notice"** means the notice of the Bar Date served on creditors of the

17    Estate on May 22, 2017.

18    **"Bishop Street Property"** means the real property located at 5532 Bishop Street,

19    Cypress, California 90630, as more fully described in Section II.A.11 of the Disclosure

20    Statement.

21    **"Business Day"** means any day, other than a Saturday, a Sunday or a "legal

22    holiday" as defined in Rule 9006(a) of the Bankruptcy Rules.

23    **"Case"** means the Debtor's case under chapter 11 of the Bankruptcy Code that is

24    pending before the United States Bankruptcy Court for the Central District of California,

25    Santa Ana Division, as Case No. 8:15-bk-11370-CB.

26    **"Cash"** means legal tender of the United States of America.

27

28

1120604.1                                                          DISCLOSURE STATEMENT

**"Cash Collateral Motions"** has the meaning ascribed to such term in Section II.E.1.b. of the Disclosure Statement.

**"Cause of Action"** means, without limitation, any and all actions, causes of action, controversies, liabilities, obligations, rights, suits, damages, judgments, Claims (as defined in Code § 101(5)) and demands whatsoever, whether known or unknown, reduced to judgment, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured, assertable directly or derivatively, existing or hereafter arising, in law, equity, or otherwise that the Debtor and/or the Estate may hold against any Person as of the Effective Date, including, without limitation, the Tarnutzer Litigation and the Appeal.

**"CFTB"** means the California Franchise Tax Board.

**"Claim"** means a claim, as the term "claim" is defined in Bankruptcy Code § 101(5), against the Debtor.

**"Class"** or **"Class of Claims"** means a group of Claims as classified in the Plan.

**"Comstock Avenue Property"** means the real property located at 7632 Comstock Avenue, Whittier, California 90602, as more fully described in Section II.A.3 of the Disclosure Statement.

**"Confirmation Date"** means the date on which the Court enters the Confirmation Order on its docket.

**"Confirmation Hearing"** means the hearing held by the Court on the confirmation of the Plan.

**"Confirmation Order"** means the Court order confirming the Plan under Bankruptcy Code § 1129.

**"Court"** means the United States Bankruptcy Court for the Central District of California, Santa Ana Division.

**"Debtor"** refers to David Tudor Chamberlain.

1120604.1

DISCLOSURE STATEMENT

1    **"Debtor's Commissions"** means the monthly gross wages and commissions

2   earned by the Debtor as discussed in Section II.C. of the Disclosure Statement and as

3   reflected on Exhibit "1" to the Disclosure Statement.

4    **"Debtor's Income"** means, collectively, the Debtor's Commissions, the OCTSC

5   Income and the Net Real Property Income as discussed in Section II.C. of the Disclosure

6   Statement and as reflected on Exhibit "1" to the Disclosure.

7    **"Del Amo Blvd. Property"** means the real property located at 12350 Del Amo

8   Blvd., Suite 169, Lakewood, California 90713, as more fully described in Section II.A.9 of

9   the Disclosure Statement.

10    **"Denni Street Property"** means the real property located at 9062-9062.5 Denni

11   Street, Cypress, California 90630, as more fully described in Section II.A.10 of the

12   Disclosure Statement.

13    **"Disclosure Statement"** means the Debtor's Disclosure Statement Describing

14   Chapter 11 Plan of Reorganization, including any modifications or amendments to the

15   Disclosure Statement.

16    **"Disputed Claim"** means a Claim that has not been allowed or disallowed and to

17   which either: (i) a Proof of Claim has been Filed or deemed Filed and the Debtor or

18   another party in interest has Filed an objection; (ii) no Proof of Claim has been Filed and

19   the Claim was not scheduled or the Debtor has scheduled such claim as disputed,

20   contingent, unliquidated or unknown.

21    **"Distribution"** means any distribution pursuant to the Plan to the Holders of an

22   Allowed Claim.

23    **"Distribution Date"** means the date upon which the Distribution was made.

24    **"Domingo Villas"** means Domingo Villas, Inc.

25    **"DV Bankruptcy Case"** means that chapter 11 bankruptcy case filed by Domingo

26   Villas on September 1, 2011 in the United States Bankruptcy Court for the Central District

27

28

1120604.1                                                    DISCLOSURE STATEMENT

1  of California, Case No. 8:11-bk-22391-CB, which bankruptcy case was closed in June

2  2012.

3        **"DV Property"** means the real property previously owned by Domingo Villas, and

4  sold in the DV Bankruptcy Case.

5        **"DV Sale Proceeds"** means the proceeds from the sale of the DV Property in the

6  DV Bankruptcy Case.

7        **"Effective Date"** means the first Business Date that is at least 15 days after the

8  entry of the Confirmation Order.

9        **"Effective Date Payments"** means Distributions or payments required by the Plan

10 to be made by the Debtor on the Effective Date.

11       **"Estate"** means the bankruptcy estate created in the Debtor's case under

12 Bankruptcy Code § 541.

13       **"Fern"** means, collectively, Martin D. Fern and Linda Taylor-Fern, individually and

14 as Trustees of the Fern-Taylor Family Trust.

15       **"Fern State Court Action"** means that action commenced by the Debtor against

16 Fern and First Realm on December 22, 2015, in the Orange County Superior Court,

17 entitled <u>Chamberlain v. Fern, et. al</u>, Case No. 30-2015-00826601-CU-BC-CJC, as

18 discussed in Section II.E.3. of the Disclosure Statement.

19        **"Fern Non-Dischargeablility Action"** means that Complaint to Determine

20 Nondischargeability of Debts Pursuant to 11 U.S.C. §§ 523(a) and 524(a)(3), filed by Fern

21 on June 9, 2017, with respect to Fern's claims against the Debtor, as discussed in Section

22 II.E.3. of the Disclosure Statement.

23       **"Fern Litigation"** means, collectively, the Fern State Court Action, the Fern Non-

24 Dischargeablility Action and any claims against the Debtor asserted by Fern by way of a

25 Proof of Claim in the Debtor's Case [Claim No. 12], or otherwise, as discussed in Section

26 II.E.3. of the Disclosure Statement.

27

28
    1120604.1                                                    DISCLOSURE STATEMENT

1       **"File," "Filed," or "Filing"** means duly and properly filed with the Court and
2  reflected on the Court's official docket.

3       **"Final Order"** means an order or judgment of the Court or the Appellate Court
4  entered on the Court's or the Appellate Court's docket.

5       a.    That has not been reversed, rescinded, stayed, modified, or amended;

6       b.    That is in full force and effect; and

7       c.    With respect to which (i) the time for appeal or to seek review, remand,
8       rehearing, or a writ of certiorari has expired and as to which no timely Filed
9       appeal or petition for review, rehearing, remand, or writ of certiorari is
10      pending, or (ii) any such appeal or petition has been dismissed or resolved
11      by the highest court to which the order or judgment was appealed or from
12      which review, rehearing, remand, or a writ of certiorari was sought.

13      **"First Realm"** means First Realm, LLC.

14      **"Force 10"** means Force 10 Partners LLC.

15      **"General Unsecured Claim"** means an unsecured Claim against the Debtor,
16 however arising, not entitled to priority under Section 507 of the Bankruptcy Code.

17      **"Holder"** means an entity holding a Claim.

18      **"Interpled DV Sale Proceeds"** means the DV Sale Proceeds that were interpled
19 in the State Court Action which are held in an interest-bearing account and total
20 approximately $1.82 million, as discussed in Section II.E.2. of the Disclosure Statement.

21      **"IRS"** means the Internal Revenue Service.

22      **"LaSalle Street Property"** means the real property located at 8832-8846 LaSalle
23 Street, Cypress, California 90630, as more fully described in Section II.A.2 of the
24 Disclosure Statement.

25      **"Liquidating Agent"** means the person that may be, under the circumstances set
26 forth in Article II.D.1.b. of the Plan, appointed to conduct the Sale and/or Refinancing of
27 the Real Property in place of the Debtor.  Prior to the Confirmation Hearing, the Debtor

28

1120604.1                                                    DISCLOSURE STATEMENT

1  shall submit to the Court the identity of the Liquidating Agent and an agreement with the

2  Liquidating Agent setting forth the terms of such appointment.

3       **"LWGF"** means Lobel Weiland Golden Friedman LLP.

4       **"N. Olive Street Property"** means the real property located at 728 N. Olive Street,

5  Anaheim, California 92805, as more fully described in Section II.A.7 of the Disclosure

6  Statement.

7       **"Nevada Property"** means the real property located at 321-325 Cincinnati Avenue,

8  Las Vegas, Nevada, as more fully described in Section II.A.5 of the Disclosure Statement.

9       **"New Hampshire Property"** means the real property located at 281-289

10  Merrimack & 274 Amory, Manchester, New Hampshire, as more fully described in Section

11  II.A.4 of the Disclosure Statement.

12       **"Newman Street Property"** means the real property located at 5623 Newman

13  Street, Cypress, California 90630, as more fully described in Section II.A.8 of the

14  Disclosure Statement.

15       **"OCTSC Income"** means the Debtor's monthly income from OCTSC Partners I,

16  LLC as discussed in Section II.C. of the Disclosure Statement and as reflected on Exhibit

17  "1" to the Disclosure Statement.

18       **"ORAP Lien"** means that the lien allegedly created on certain of the Debtor's pre-

19  petition non-exempt personal property by the service of an order to appear for a judgment

20  debtor exam by Tarnutzer related to the Tarnutzer Judgment.

21       **"Net Real Property Income"** means the Debtor's monthly net income from the

22  Real Property as discussed in Section II.C. of the Disclosure Statement and as reflected

23  on Exhibit "1" to the Disclosure Statement.

24       **"Non-Ordinary Course Administrative Claims"** means Administrative Claims

25  that are not Ordinary Course Administrative Claims, Administrative Tax Claims, or

26  Professional Fee Claims, including Claims that may arise from agreements entered into

27  with the Estate after the Petition Date other than trade agreements.

28

1120604.1                                              DISCLOSURE STATEMENT

1     **"Ordinary Course Administrative Claims"** means Administrative Claims other

2 than Administrative Tax Claims, Professional Fee Claims, and Non-Ordinary Course

3 Administrative Claims, based upon liabilities that the Debtor incurs in the ordinary course.

4     **"OUST"** means the Office of the United States Trustee, Santa Ana Division.

5     **"Pacific Time"** means the time in Orange County, California.

6     **"Page Firm"** means The Law Office of Gregory S. Page.

7     **"Person"** means any individual, corporation, general partnership, limited

8 partnership, limited liability company, association, joint-stock company, joint venture,

9 estate, trust, government, political subdivision, governmental unit (as defined in the

10 Bankruptcy Code), official committee appointed by the OUST, unofficial committee of

11 creditors, or entity.

12     **"Petition Date"** refers to the petition date of the Debtor, April 9, 2017.

13     **"Plan"** means the Debtor's Chapter 11 Plan of Reorganization, including any

14 modifications or amendments to the Plan.

15     **"PPB Cash Collateral Stipulation"** has the meaning ascribed to such term in

16 Section II.E.1.b. of the Disclosure Statement.

17     **"PPB Cross-Collateralized Secured Claim"** means the secured claim asserted

18 by Pacific Premier Bank against the Newman Street Property, the Bishop Street Property,

19 the Del Amo Blvd. Property and the Denni Street Property, as discussed in Sections

20 II.A.8.-11. of the Disclosure Statement.

21     **"PPB UCC-1"** means the UCC-1 filed by Pacific Premier Bank with the California

22 Secretary of State on December 4, 2014, as Instrument No. 13-7389473570, against

23 personal property related to the Newman Street Property, the Bishop Street Property, the

24 Del Amo Blvd. Property and the Denni Street Property, as discussed in Sections II.A.8.-

25 11. of the Disclosure Statement.

26     **"Priority Claim"** means an Allowed Claim entitled to priority against the Estate

27 under Bankruptcy Code §§ 507(a)(3)-(7).

28

1120604.1                                      DISCLOSURE STATEMENT

1    **"Priority Tax Claim"** means an Allowed Claim entitled to priority against the Estate

2    under Bankruptcy Code § 507(a)(8).

3    **"Professionals"** collectively means the persons and entities employed by the

4    Debtor pursuant to order of the Court in accordance with Bankruptcy Code §§ 327 or

5    1103.

6    **"Professional-Fee Claim"** means:

7    a.    A Claim under Bankruptcy Code §§ 327, 328, 330, 331, 503, or 1103 for

8          compensation for professional services rendered or expenses incurred on

9          the Estate's behalf, or

10   b.    A Claim either under Bankruptcy Code § 503(b)(4) for compensation for

11         professional services rendered or under Bankruptcy Code § 503(b)(3)(D) for

12         expenses incurred in making a substantial contribution to the Estate.

13   **"Proof of Claim"** means a written statement filed in a Case by a creditor in which

14   the creditor sets forth the amount of its Claim, in accordance with Rule 3001 of the

15   Bankruptcy Rules.

16   **"Real Property"** means, collectively, the Surfside Property, the LaSalle Street

17   Property, the Comstock Avenue Property, the New Hampshire Property, the Nevada

18   Property, the Vonnie Lane Property, the N. Olive Street Property, the Newman Street

19   Property, the Del Amo Blvd. Property, the Denni Street Property, the Bishop Street

20   Property, the San Alto Way Property, the Stratton Court Property, the 8479 Cedarview

21   Court Property and the 8475 Cedarview Court Property, each as more particularly

22   described in Section II.A. of the Disclosure Statement.

23   **"Real Property Income"** means the monthly gross income from the Real Property

24   as discussed in Section II.C. of the Disclosure Statement and as reflected on Exhibit "1" to

25   the Disclosure Statement.

26   **"Real Property Lenders"** means, collectively, the lenders with respect to each of

27   the Real Property.

28

**"Refinance"** means the refinancing of some or all of the Real Property to pay the Allowed Claims of Tarnutzer, Fern and/or Effective Date payments, in full, as provided by the Plan.

**"Reorganized Debtor"** means the Debtor post-confirmation.

**"Request for Payment"** means a request for the payment of an Ordinary Course Administrative Claim or a Non-Ordinary Course Administrative Claim as described in Section II.B.1 of the Plan.

**"Sale"** means the sale of some or all of the Real Property to pay the Allowed Claims of Tarnutzer, Fern and/or Effective Date payments, in full, as provided by the Plan.

**"San Alto Way Property"** means the real property located at 6844 San Alto Way, Buena Park, California 90620, as more fully described in Section II.A.12 of the Disclosure Statement.

**"Schedules"** means the Schedules of Assets and Liabilities filed by the Debtor in the Case, as required by § 521(1) of the Code, Bankruptcy Rules 1007(a)(3) and (b)(l), and Official Bankruptcy Form No. 106, as the Schedules may be amended from time to time.

**"Secured Claim"** means a Claim that is secured by a valid and unavoidable lien against property in which the Estate has an interest or that is subject to setoff under Bankruptcy Code § 553.  A Claim is a Secured Claim only to the extent of the value of the Claim Holder's interest in that property or to the extent of the amount subject to setoff, as applicable, as determined under Bankruptcy Code § 506(a).

**"SOFA"** means the Debtor's statements of financial affairs.

**"Stratton Court Property"** means the real property located at 10418 Stratton Court, Cypress, California 90630, as more fully described in Section II.A.13 of the Disclosure Statement.

1120604.1

DISCLOSURE STATEMENT

1      **"Surfside Property"** means the real property located at 103 Surfside Avenue A,

2 Surfside, California 90743, as more fully described in Section II.A.1 of the Disclosure

3 Statement.

4      **"Tarnutzer"** means Rick Tarnutzer, as trustee of the 1997 Troy Trust.

5      **"Tarnutzer Judgment"** means the judgment against the Debtor in favor of

6 Tarnutzer in the Tarnutzer Litigation, entered in the State Court Action on October 16,

7 2016, as thereafter amended by order entered April 10, 2017, as discussed in Section

8 II.E.2. of the Disclosure Statement.

9      **"Tarnutzer Lien"** means that the lien allegedly created by the recording of the

10 abstract of judgment by Tarnutzer related to the Tarnutzer Judgment in Orange, Los

11 Angeles, Riverside and San Bernardino counties.

12      **"Tarnutzer Litigation"** or **"State Court Action"** means that action commenced by

13 Domingo Villas on June 15, 2011, in the Orange County Superior Court, Central Justice

14 Center, entitled <u>Domingo Villas, Inc. v. Rick Tarnutzer, et. al</u>, Case No. 30-2011-

15 00484245, as discussed in Section II.E.2. of the Disclosure Statement.

16      **"Tarnutzer Loan"** means that $2.6 million loan to Domingo Villas by Tarnutzer,

17 secured by the DV Property and personally guaranteed by the Debtor, as discussed in

18 Section II.E.2. of the Disclosure Statement.

19      **"Tax Code"** means the Internal Revenue Code.

20      **"Undeliverable Distribution"** means a Distribution to any Holder of an Allowed

21 Claim that is returned to the Reorganized Debtor as undeliverable or otherwise unclaimed.

22      **"Vogele Firm"** means Thomas Vogele & Associates, APC.

23      **"Vonnie Lane Property"** means the real property located at 5641-5643 Vonnie

24 Lane, Cypress, California 90630, as more fully described in Section II.A.6 of the

25 Disclosure Statement.

26

27

28
     1120604.1                                                        DISCLOSURE STATEMENT

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

1    David Tudor Chamberlain, the debtor and debtor-in-possession herein (the

2    "Debtor"),[1] provides this Disclosure Statement Describing Chapter 11 Plan of

3    Reorganization (the "Disclosure Statement") to creditors, pursuant to 11 U.S.C. § 1125, in

4    connection with the solicitation of acceptances of his Chapter 11 Plan of Reorganization

5    (the "Plan") filed with the United States Bankruptcy Court for the Central District of

6    California, Santa Ana Division (the "Court") in the above-captioned chapter 11 bankruptcy

7    case (the "Case").

8

9    **I.    INTRODUCTION**

10    The Case was commenced by the filing of a voluntary chapter 11 petition under the

11    United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code" or the

12    "Code"), on April 9, 2017 (the "Petition Date").

13    Chapter 11 allows debtors, and, under some circumstances, creditors and other

14    parties in interest to propose a plan.  A plan may provide for a debtor to reorganize by

15    continuing to operate, to liquidate by selling assets of the estate, or a combination of both.

16    The Debtor is the proponent of the Plan, which was sent to you in the same envelope as

17    these documents.  THE DOCUMENT YOU ARE READING IS THE DISCLOSURE

18    STATEMENT FOR THE ENCLOSED PLAN.  **Your rights may be affected.  You should**

19    **read these papers carefully and discuss them with your attorney, if you have one.**

20    **(If you do not have an attorney, you may wish to consult one).**

21    The Plan is a reorganizing plan.  As described in detail below, all Allowed Claims

22    against the Debtor will be paid in full, including all Allowed Secured Claims, Allowed

23    Priority Claims and Allowed General Unsecured Claims.  In this regard, the Plan provides

24    for the following treatment of Allowed Claims:

25    _____

26    [1] Any capitalized terms not defined in the text of this Disclosure Statement are defined in the Table of
Definitions found at the end of the Disclosure Statement.

27

28    1120604.1                                  1                    DISCLOSURE STATEMENT

- Allowed Secured Claims of the Real Property Lenders are classified in Classes 1 through 15.  Certain Real Property Lenders (Classes 3, 6, 7, 8, 9, 10, 11,12, 13, 14 and 15) shall have their debt obligations modified with respect to repayment terms and interest rates as provided in the Plan, and are entitled to vote on the Plan.  Other Real Property Lenders (Classes 1, 2, 4 and 5) (as well as the Debtor's secured car lease with Alliant Credit Union (Class 17) and Secured Tax Claims (Class 18)) shall retain, unaltered, all of their legal, equitable and contractual rights, and, consequently, shall be deemed to vote in favor of the Plan.

- Allowed Priority Claims (Class 19) will either be paid in full on the Effective Date of the Plan, or will be paid over time in accordance with the provisions of the Bankruptcy Code.

- Allowed General Unsecured Claims (with the exception of any unsecured claims of Tarnutzer or Fern) (Class 20) will be paid in full on the Effective Date of the Plan.

- Any Allowed Claim of Tarnutzer based on a Final Order in the Tarnutzer Litigation will be paid in full in accordance with the terms of the Plan.

- Any Allowed Claim of Fern based on a Final Order in the Fern Litigation will be paid in full in accordance with the terms of the Plan.

- Any Allowed Claim of Tarnutzer based on a Final Order in the Tarnutzer Litigation, will be satisfied first from the Interpled DV Sale Proceeds (in the amount of approximately $1.8 million) and, thereafter, to the extent necessary to pay such Allowed Claim in full, from a Sale and/or Refinancing of some or all of the Real Property, as provided by the Plan.  Such payment to Tarnutzer pursuant to the

1  Plan will be made within one hundred and twenty (120) days following

2  the entry of a Final Order providing Tarnutzer with an Allowed Claim

3  against the Debtor.

4  • Any Allowed Claim of Fern based on a Final Order in the Fern

5  Litigation will be satisfied from a Sale and/or Refinancing of some or

6  all of the Real Property, as provided by the Plan.  Such payment to

7  Fern pursuant to the Plan will be made within one hundred and

8  twenty (120) days following the entry of a Final Order providing Fern

9  with an Allowed Claim against the Debtor; *provided, however*, that if

10  Fern obtains an Allowed Claim prior to resolution of the Tarnutzer

11  Litigation, Fern shall be granted a lien on the Real Property subject to

12  the Tarnutzer Lien, junior to the existing liens thereon, to secure such

13  Allowed Claim and shall be paid within one hundred and twenty (120)

14  days following the entry of a Final Order resolving the Tarnutzer

15  Litigation.

16  • Payments to creditors (other than to Tarnutzer and Fern) under the

17  Plan will be funded with the Real Property Income and the Debtor's

18  Income.

19  • Effective Date payments on account of General Unsecured Claims

20  (Class 20) and Professional Fee Claims will be satisfied from the

21  Debtor's Income and/or proceeds of a Sale and/or Refinancing of the

22  Real Property.

23  The Effective Date of the Plan will be the first Business Day that is at least fifteen

24  (15) after the entry of an order confirming the Plan (the "Confirmation Order"), provided

25  there has been no order staying the effectiveness of the Confirmation Order.

26

27

28

**A.    <u>The Purpose of This Document</u>**

The Disclosure Statement summarizes what is in the Plan and tells you certain information relating to the Plan and the process the Court follows in determining whether or not to confirm the Plan.

**<u>READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO KNOW ABOUT</u>:**

**1.    WHO CAN VOTE ON OR OBJECT TO THE PLAN;**

**2.    WHAT THE TREATMENT OF YOUR CLAIM IS UNDER THE PLAN (*i.e.*, what you will receive on account of your Claim if the Plan is confirmed), AND HOW THIS TREATMENT COMPARES TO WHAT YOUR CLAIM WOULD RECEIVE IN LIQUIDATION IN CHAPTER 7;**

**3.    THE HISTORY OF THE DEBTOR AND SIGNIFICANT EVENTS DURING THE BANKRUPTCY CASE;**

**4.    WHAT THE COURT WILL LOOK AT TO DECIDE WHETHER OR NOT TO CONFIRM THE PLAN;**

**5.    WHAT IS THE EFFECT OF CONFIRMATION; AND**

**6.    WHETHER THE PLAN IS FEASIBLE.**

This Disclosure Statement cannot tell you everything about your rights.  You should consider consulting your own lawyer to obtain more specific advice on how the Plan will affect you and what is the best course of action for you.  Lobel Weiland Golden Friedman LLP ("<u>LWGF</u>"), general insolvency counsel for the Debtor, <u>does not</u> represent you.

Be sure to read the Plan as well as the Disclosure Statement.  If there are any inconsistencies between the Plan and Disclosure Statement, the Plan provisions will govern.

The Code requires that a disclosure statement contain "adequate information" concerning the Plan.  By order entered on _____, 2017, the Court approved this document as an adequate Disclosure Statement, containing enough information to enable

4

1  parties affected by the Plan to make an informed judgment about the Plan.  Any party can

2  now solicit votes for or against the Plan.**2**

3    **B.    Deadlines for Voting and Objecting; Date of the Plan Confirmation**

4        **Hearing**

5        THE COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS

6  DISCLOSURE STATEMENT.  IN OTHER WORDS, THE TERMS OF THE PLAN ARE

7  NOT YET BINDING ON ANYONE.  HOWEVER, IF THE COURT LATER CONFIRMS

8  THE PLAN, THEN THE PLAN WILL BE BINDING ON THE DEBTOR AND ON ALL

9  CREDITORS IN THIS CASE.

10        **1.    Time and Place of the Confirmation Hearing**

11        The hearing where the Court will determine whether or not to confirm the Plan will

12  take place on _____, 2017, at _____, in Courtroom 5D of the United States

13  Bankruptcy Courthouse located at the Ronald Reagan Federal Building and Courthouse,

14  411 West Fourth Street, Santa Ana, California 92701-4593.

15        **2.    Deadline for Voting for or Against the Plan**

16        If you are entitled to vote, it is in your best interest to timely vote on the enclosed

17  ballot and return the ballot in the enclosed envelope to LWGF, Attn: Beth E. Gaschen,

18  Esq. and Lori A. Gauthier, 650 Town Center Drive, Suite 950, Costa Mesa, California

19  92626.

20        **Your ballot must be received no later than 5:00 p.m. (Pacific Time)**

21  **_____, 2017, or it will not be counted.**

22        **3.    Deadline for Objecting to the Confirmation of the Plan**

23        Objections to the confirmation of the Plan must be Filed with the Court and served

24  upon counsel for the Debtor so as to be received on or before _____, 2017.

25  _____

26        **2** The Disclosure Statement has not yet been approved.  A hearing on the approval of the Disclosure
27  Statement will take place on August 2, 2017 at 10:00 a.m.

28  1120604.1                                    5                        DISCLOSURE STATEMENT

**4.**   **Identity of Person to Contact for More Information Regarding the Plan**

Any interested party desiring further information about the Plan should contact Jeffrey I. Golden, Alan J. Friedman or Beth E. Gaschen of LWGF, by phone at (714) 966-1000 or by email at jgolden@lwgfllp.com, afriedman@lwgfllp.com or bgaschen@lwgfllp.com.

**C.**   **Disclaimer**

The financial data relied upon in formulating the Plan is based on the financial records of the Debtor, projections created by the Debtor or his financial professionals, or information provided by other parties in interest.  The professionals employed by the Debtor drafted the Plan and the Disclosure Statement based on this information and have no independent knowledge regarding the accuracy of the data.  The Court has not yet determined whether or not the Plan is confirmable and makes no recommendation as to whether or not you should support or oppose the Plan.

**II.**   **BACKGROUND**

The Debtor has been a real estate broker for 35 years and, together with his non-filing wife, Linda, and two other family members, operates Team Chamberlain Realty Executives, a real estate brokerage firm based in Los Alamitos, California.  The Debtor also owns fifteen pieces of real property in California, Nevada and New Hampshire (defined herein as the "Real Property").[3]  The Real Property is collectively valued at approximately $15.2 million and secured claims against the Real Property (and certain personal property related to the Real Property) collectively total approximately $6.4 million, not including a judgment lien against certain of the Real Property asserted by Rick

---

[3] The Real Property is owned by the Debtor and his non-filing wife, Linda Chamberlain, as community property.

1  Tarnutzer, as Trustee of the 1997 Troy Trust ("Tarnutzer"), purportedly securing a

2  judgment in the approximate amount of $2.5 million[4] which is currently being appealed by

3  the Debtor (defined herein, respectively, as the "Tarnutzer Lien," the "Tarnutzer

4  Judgment" and the "Appeal").  The Debtor also has personal property assets collectively

5  valued at approximately $2.4 million (not including encumbrances or applicable

6  exemptions thereon).  The Debtor also asserts that he is entitled to the amount of

7  approximately $1.8 million in funds interpled in the state court in connection with the

8  litigation with Tarnutzer (defined herein, respectively, as the "Interpled DV Sale Proceeds,"

9  and the "Tarnutzer Litigation" or "State Court Action").  The Debtor has various unsecured

10  claims totaling the amount of approximately $5.2 million, including a disputed claim

11  asserted by Fern, in the amount of approximately $4.1 million.[5]

12          Except for the Surfside Property (the Debtor's personal residence) and a portion of

13  the New Hampshire Property, the Real Property is subject to leases, pursuant to which

14  the tenants make monthly rental payments to the Debtor.  The rents from these income-

15  generating real estate assets (*i.e.,* the Real Property Income), as well as the Debtor's

16  income from his real estate business (*i.e.,* the Debtor's Income), will be utilized to fund the

17  Debtor's payments to creditors (other than Tarnutzer and Fern) under the Plan, which

18  provides for the payment of all Allowed Claims in full.

19          In addition, to the extent that Tarnutzer is ultimately successful in obtaining an

20  Allowed Claim against the Debtor by way of a Final Order in connection with the appeal

21  process in the Tarnutzer Litigation, any such Allowed Claim will be paid first from the

22  _____

23  [4] As set forth in the Proof of Claim filed by Tarnutzer on June 1, 2017 [Claim No. 7], Tarnutzer asserts
    that the Tarnutzer Judgment totaled, as of the Petition Date, the amount of $3,353,009.53, with the amount

24  of $2,547,300.81 being secured and the amount of $805,708.72 being unsecured.

25  [5] As set forth in the Proof of Claim filed by Fern on June 12, 2017 [Claim No. 12], Fern asserts an
    unsecured claim against the Debtor in the amount of $4,132,500 (plus damages according to proof,

26  attorneys' fees and costs) based on a proposed cross-complaint it wished to file in the Fern Litigation, that
    was stayed by the filing of the Debtor's Case.  On June 9, 2017, Fern filed a Complaint to Determine

27  Nondischargeability of Debts Pursuant to 11 U.S.C. §§ 523(a) and 524(a)(3) with respect to this claim.

28  1120604.1                              7                    DISCLOSURE STATEMENT

1  Interpled DV Sale Proceeds and, thereafter, to the extent necessary, through a Sale

2  and/or Refinancing of some or all of the Real Property.  In addition to the approximately

3  $1.8 million in Interpled DV Sale Proceeds, there is significant equity in the Real Property

4  – approximately $8.8 million in the aggregate – available to satisfy any Allowed Claim

5  determined by Final Order to be due and owing to Tarnutzer.

6         Similarly, to the extent that Fern is ultimately successful in obtaining an Allowed

7  Claim against the Debtor by way of a Final Order in connection with the Fern Litigation,

8  any such Allowed Claim will be paid through a Sale and/or Refinancing of some or all of

9  the Real Property.

10        Effective Date payments on account of Professional Fee Claims and Class 20

11  General Unsecured Claims will be satisfied from the Debtor's Income and/or proceeds of

12  a Sale and/or Refinancing of the Real Property.

13        **A.**     **The Debtor's Real Property Assets**

14               **1.**     **The Surfside Property**

15        The Debtor owns and resides at the real property located at 103 Surfside Avenue

16  A, Surfside, California 90743 (the "Surfside Property").  The Surfside Property consists of

17  a 2,508 sq. ft. single family residence built in 1976 and located on a 1,874 sq. ft. ocean

18  view lot.  The Surfside Property has been valued at $3,500,000.  The current expenses

19  related to the Surfside Property are set forth in Exhibit "1" hereto.

20        There are two deeds of trust recorded against the Surfside Property, as follows:

21  (1) a deed of trust recorded on April 15, 2008 as Instrument No. 2008000174973 in favor

22  Colorado Federal Savings Bank, which was subsequently assigned to Compass Bank

23  and, thereafter, to Roundpoint Mortgage, securing an obligation in the amount of

24  approximately $1,494,000 as of the Petition Date; and (2) a deed of trust recorded on

25  March 6, 2012 as Instrument No. 2012000126015 in favor of Wells Fargo Bank (which

26  deed of trust references and incorporates a fictitious deed of trust recorded on June 14,

27  2007 as Instrument No. 2007000527107), securing an obligation in the amount of

28

1 approximately $197,000 as of the Petition Date.[6]  Also recorded against the Surfside

2 Property (and the Debtor's other Real Property located in California) is the Tarnutzer Lien.

3     The equity in the Surfside Property (without taking into account the Tarnutzer Lien)

4 is approximately $1,809,000.

5          **2.     The LaSalle Street Property**

6     The Debtor owns real property located at 8832-8846 LaSalle Street, Cypress,

7 California 90630 (the "LaSalle Street Property").  The LaSalle Street Property consists of a

8 4,944 sq. ft. 9-unit apartment building built in 1969 and located on a 19,845 sq. ft. lot.  The

9 LaSalle Street Property has been valued at $2,000,000.  The current income and

10 expenses related to the LaSalle Street Property are set forth in Exhibit "1" hereto.

11     There are two deeds of trust recorded against the LaSalle Street Property, as

12 follows: (1) a deed of trust recorded on November 7, 2007 as Instrument No.

13 2007000673914, in favor of Washington Mutual Bank, which was subsequently assigned

14 to Chase Commercial Bank, securing an obligation in the amount of approximately

15 $578,000 as of the Petition Date; and (2) a deed of trust recorded on March 11, 2016 as

16 Instrument No. 2016000101545, in favor of Ann Leisy, securing an obligation in the

17 amount of approximately $162,000 as of the Petition Date.  Also recorded against the

18 LaSalle Street Property (and the Debtor's other Real Property located in California) is the

19 Tarnutzer Lien.

20     The equity in the LaSalle Street Property (without taking into account the Tarnutzer

21 Lien) is approximately $1,260,000.

22          **3.     The Comstock Avenue Property**

23     The Debtor owns real property located at 7632 Comstock Avenue, Whittier,

24 California 90602 (the "Comstock Avenue Property").  The Comstock Avenue Property

25 ────────────────

26     [6] Prior to the Petition Date, two additional deeds of trust were recorded against the Surfside Property, in
favor of Gregory Page and Eileen Cathro.  Such liens were subsequently released, and are not

27 encumbrances against the Surfside Property.

28

1  consists of a 4,600 sq. ft. 12-unit apartment building built in 1954 and located on a 7,000

2  sq. ft. lot.  The Comstock Avenue Property has been valued at $1,800,000.  The current

3  income and expenses related to the Comstock Avenue Property are set forth in Exhibit "1"

4  hereto.

5        The Comstock Avenue Property is subject to a deed of trust recorded on February

6  6, 2004 as Instrument No. 040274990, in favor of Washington Mutual Bank, which was

7  subsequently assigned to Chase Commercial Bank, securing an obligation in the amount

8  of approximately $380,000 as of the Petition Date.  Also recorded against the Comstock

9  Avenue Property (and the Debtor's other Real Property located in California) is the

10  Tarnutzer Lien.

11        The equity in the Comstock Property (without taking into account the Tarnutzer

12  Lien) is approximately $1,420,000.

13              **4.      The New Hampshire Property**

14        The Debtor owns real property located at 281-289 Merrimack & 274 Amory,

15  Manchester, New Hampshire (the "New Hampshire Property").  The New Hampshire

16  Property consists of 12-unit apartment building built in 1920.  The New Hampshire

17  Property has been valued at $1,000,000.  The current income and expenses related to the

18  New Hampshire Property are set forth in Exhibit "1" hereto.[7]

19        The New Hampshire Property is subject to a deed of trust recorded on November

20  18, 2004 as Instrument No. 4108398 in favor of Digital Federal Credit Union, securing an

21  obligation in the amount of approximately $378,000 as of the Petition Date.  The New

22  Hampshire Property is not subject to the Tarnutzer Lien.

23        The equity in the New Hampshire Property is approximately $622,000.

24

25
_____

26      [7] Only the real property located at 281-289 Merrimack is currently rented.  The real property located at
274 Amory is not rented.

27

28

### 5.    The Nevada Property

The Debtor owns real property located at 321-325 Cincinnati Avenue, Las Vegas, Nevada (the "Nevada Property").  The Nevada Property consists of a 20-unit apartment building built in phases between 1956 and 1957 on approximately 0.38 acres of land.  The Nevada Property has been valued at $860,000.  The current income and expenses related to the Nevada Property are set forth in Exhibit "1" hereto.

The Nevada Property is subject to a deed of trust recorded on February 11, 2013 as Instrument No. 201302110000845 in favor of U.S. Bank Trust Company, N.A., securing an obligation in the amount of approximately $209,000 as of the Petition Date.  The Nevada Property is not subject to the Tarnutzer Lien.

The equity in the Nevada Property is approximately $651,000.

### 6.    The Vonnie Lane Property

The Debtor owns real property located at 5641-5643 Vonnie Lane, Cypress, California 90630 (the "Vonnie Lane Property").  The Vonnie Lane Property consists of a 7,825 sq. ft. multi-unit complex built in 1947 and located on a 7,911 sq. ft. lot.  The Vonnie Lane Property has been valued at $700,000.  The current income and expenses related to the Vonnie Lane Property are set forth in Exhibit "1" hereto.

The Vonnie Lane Property is subject to a deed of trust recorded on March 29, 2006 as Instrument No. 2006000206171, in favor of BrooksAmerica Mortgage Corporation, which was subsequently assigned to Wells Fargo Bank, securing an obligation in the amount of approximately $444,000 as of the Petition Date.  Also recorded against the Vonnie Lane Property (and the Debtor's other Real Property located in California) is the Tarnutzer Lien.

The equity in the Vonnie Lane Property is approximately $252,000.

### 7.    The N. Olive Street Property

The Debtor owns real property located at 728 N. Olive Street, Anaheim, California 92805 (the "N. Olive Street Property").  The N. Olive Street Property consists of a 6,057

sq. ft. multi-unit complex built in 1922 and located on a 5,965 sq. ft. lot.  The N. Olive Street Property has been valued at $660,000.  The current income and expenses related to the N. Olive Street Property are set forth in Exhibit "1" hereto.

There are two deeds of trust recorded against the N. Olive Street Property, as follows: (1) a deed of trust recorded on April 21, 2006 as Instrument No. 2006000270694, in favor of BrooksAmerica Mortgage Corporation, which was subsequently assigned to Wells Fargo Bank, securing an obligation in the amount of approximately $187,000 as of the Petition Date; and (2) a deed of trust recorded on January 6, 2015 as Instrument No. 2015000004197, in favor of Pacific Premier Bank, securing an obligation in the amount of approximately $150,000 as of the Petition Date.  Also recorded against the N. Olive Street Property (and the Debtor's other Real Property located in California) is the Tarnutzer Lien.

The equity in the N. Olive Street Property (without taking into account the Tarnutzer Lien) is approximately $323,000.

### 8.    The Newman Street Property

The Debtor owns real property located at 5623 Newman Street, Cypress, California 90630 (the "Newman Street Property").  The Newman Street Property consists of a 7,045 sq. ft. multi-unit complex built in 1964 and located on an 8,096 sq. ft. lot.  The Newman Street Property has been valued at $1,250,000.  The current income and expenses related to the Newman Street Property are set forth in Exhibit "1" hereto.

The Newman Street Property is subject to a deed of trust recorded on December 20, 2013 as Instrument No. 2013000700324, in favor of Pacific Premier Bank, securing an obligation in the amount of approximately $600,000 as of the Petition Date.[8,9]   Also

---

[8] As discussed herein, Pacific Premier Bank is a lender to the Debtor in connection with five (5) Real Properties, the N. Olive Street Property, the Newman Street Property, the Bishop Street Property, the Del Amo Blvd. Property and the Denni Street Property.  As discussed above, Pacific Premier Bank asserts a secured claim, as of the Petition Date, in the amount of approximately $150,000 against the N. Olive Street Property.  Pacific Premier Bank also asserts a cross-collateralized secured claim, as of the Petition Date, in the aggregate amount of approximately $1.3 million against the Newman Street Property, the Bishop Street Property, the Del Amo Blvd. Property and the Denni Street Property (the "PPB Cross-Collateralized Secured Claim").  The aggregate value of the Newman Street Property (valued at $1,250,000), the Del Amo Blvd.

(Continued...)

1  recorded against the Newman Street Property (and the Debtor's other Real Property

2  located in California) is the Tarnutzer Lien.

3       The equity in the Newman Street Property (without taking into account the cross-

4  collateralization of the Pacific Premier Bank liens on the Newman Street Property, the Del

5  Amo Blvd. Property, the Denni Street Property and the Bishop Street Property, or the

6  Tarnutzer Lien), is approximately $650,000.

7                    **9.    The Del Amo Blvd. Property**

8       The Debtor owns real property located at 12350 Del Amo Blvd., Suite 169,

9  Lakewood, California 90713 (the "Del Amo Blvd. Property").  The Del Amo Blvd. Property

10  consists of a multi-unit complex built in 1971 and located on a 14.38 acre lot.  The Del

11  Amo Blvd. Property has been valued at $620,000.  The current income and expenses

12  related to the Del Amo Blvd. Property are set forth in Exhibit "1" hereto.

13       The Del Amo Blvd. Property is subject to a deed of trust recorded on December 20,

14  2013 as Instrument No. 20131789424, in favor of Pacific Premier Bank, securing an

15  obligation in the amount of approximately $250,000 as of the Petition Date.[10]  Also

16  recorded against the Del Amo Blvd. Property (and the Debtor's other Real Property

17  located in California) is the Tarnutzer Lien.

18  ───────────────────

(...Continued)

19  Property (valued at $620,000), the Denni Street Property (valued at $600,000) and the Bishop Street
Property (valued at $515,000), is approximately $2,985,000 which, after accounting for the PPB Cross-
20  Collateralized Secured Claim (in the aggregate amount of approximately $1.3 million), leaves approximately
$1,685,000 in aggregate equity in these four (4) Real Property.

21

22  [9] Pacific Premier Bank filed a UCC-1 filed with the California Secretary of State on December 4, 2014,
as Instrument No. 13-7389473570, against all inventory, equipment, accounts, chattel paper, instruments
23  (including but not limited to all promissory notes), letter-of-credit rights, letters of credit, documents, deposit
accounts, investment property, money, other rights to payment and performance, general intangibles
24  (including but not limited to all software and all payment intangibles), and all fixtures related to the Newman
Street Property, the Bishop Street Property, the Del Amo Blvd. Property and the Denni Street Property (the
25  "PPB UCC-1").

26  [10] *See* discussion in footnotes 6 and 7 above regarding Pacific Premium Bank's assertion of the PPB
Cross-Collateralized Secured Claim (in the aggregate amount of approximately $1.3 million) against the
27  Newman Street Property, the Bishop Street Property, the Del Amo Blvd. Property and the Denni Street
Property.

28

1120604.1                              13                              DISCLOSURE STATEMENT

1  The equity in the Del Amo Blvd. Property (without taking into account the cross-

2  collateralization of the Pacific Premier Bank liens on the Newman Street Property, the Del

3  Amo Blvd. Property, the Denni Street Property and the Bishop Street Property, or the

4  Tarnutzer Lien), is approximately $383,000.

5  ### 10.    The Denni Street Property

6  The Debtor owns real property located at 9062-9062.5 Denni Street, Cypress,

7  California 90630 (the "Denni Street Property").  The Denni Street Property consists of a

8  805 sq. ft. single family residence built in 1946 and located on a 10,781 sq. ft. lot.  The

9  Denni Street Property has been valued at $600,000.  The current income and expenses

10 related to the Denni Street Property are set forth in Exhibit "1" hereto.

11 The Denni Street Property is subject to a deed of trust recorded on December 20,

12 2013 as Instrument No. 2013000700323, in favor of Pacific Premier Bank, securing an

13 obligation in the amount of approximately $233,000 as of the Petition Date.[11]  Also

14 recorded against the Denni Street Property (and the Debtor's other Real Property located

15 in California) is the Tarnutzer Lien.

16 The equity in the Denni Street Property (without taking into account the cross-

17 collateralization of the Pacific Premier Bank liens on the Newman Street Property, the Del

18 Amo Blvd. Property, the Denni Street Property and the Bishop Street Property, or the

19 Tarnutzer Lien), is approximately $367,000.

20 ### 11.    The Bishop Street Property

21 The Debtor owns real property located at 5532 Bishop Street, Cypress, California

22 90630 (the "Bishop Street Property").  The Bishop Street Property consists of a 760 sq. ft.

23 single family residence built in 1946 and located on a 6,875 sq. ft. lot.  The Bishop Street

24

25 [11] *See* discussion in footnotes 6 and 7 above regarding Pacific Premium Bank's assertion of the PPB

26 Cross-Collateralized Secured Claim (in the aggregate amount of approximately $1.3 million) against the Newman Street Property, the Bishop Street Property, the Del Amo Blvd. Property and the Denni Street

27 Property.

28

1  Property has been valued at $515,000.  The current income and expenses related to the

2  Bishop Street Property are set forth in Exhibit "1" hereto.

3      The Bishop Street Property is subject to a deed of trust recorded on December 20,

4  2013 as Instrument No. 2013000700321, in favor of Pacific Premier Bank, securing an

5  obligation in the amount of approximately $201,000 as of the Petition Date.[12]  Also

6  recorded against the Bishop Street Property (and the Debtor's other Real Property located

7  in California) is the Tarnutzer Lien.

8      The equity in the Bishop Street Property (without taking into account the cross-

9  collateralization of the Pacific Premier Bank liens on the Newman Street Property, the Del

10  Amo Blvd. Property, the Denni Street Property and the Bishop Street Property, or the

11  Tarnutzer Lien), is approximately $314,000.

12  **12.    The San Alto Way Property**

13      The Debtor owns real property located at 6844 San Alto Way, Buena Park,

14  California 90620 (the "San Alto Way Property").  The San Alto Way Property consists of a

15  1,210 sq. ft. single family residence built in 1955 and located on a 6,000 sq. ft. lot.  The

16  San Alto Way Property has been valued at $500,000.  The current income and expenses

17  related to the San Alto Way Property are set forth in Exhibit "1" hereto.

18      The San Alto Way Property is subject to a deed of trust recorded on December 7,

19  2004 as Instrument No. 2004001088413, in favor of IndyMac Bank, F.S.B., which was

20  subsequently assigned to OCWEN, securing an obligation in the amount of approximately

21  $261,000 as of the Petition Date.  Also recorded against the San Alto Way Property (and

22  the Debtor's other Real Property located in California) is the Tarnutzer Lien.

23

24

---

25  [12] *See* discussion in footnotes 6 and 7 above regarding Pacific Premium Bank's assertion of the PPB
Cross-Collateralized Secured Claim (in the aggregate amount of approximately $1.3 million) against the
26  Newman Street Property, the Bishop Street Property, the Del Amo Blvd. Property and the Denni Street
Property.
27

28

1120604.1                                    15                    DISCLOSURE STATEMENT

1   The equity in the San Alto Way Property (without taking into account the Tarnutzer

2   Lien) is approximately $237,000.

### 13.    The Stratton Court Property

4   The Debtor owns real property located at 10418 Stratton Court, Cypress, California

5   90630 (the "Stratton Court Property").  The Stratton Court Property consists of a 1,306 sq.

6   ft. single family residence built in 1955 and located on a 1,075 sq. ft. lot.  The Stratton

7   Court Property has been valued at $436,000.  The current income and expenses related

8   to the Stratton Court Property are set forth in Exhibit "1" hereto.

9   The Stratton Court Property is subject to a deed of trust recorded on August 15,

10  2005 as Instrument No. 2005000636158, in favor of Express Capital Lending, which was

11  subsequently assigned to OCWEN, securing an obligation in the amount of approximately

12  $270,000 as of the Petition Date.  Also recorded against the Stratton Court Property (and

13  the Debtor's other Real Property located in California) is the Tarnutzer Lien.

14  The equity in the Stratton Court Property (without taking into account the Tarnutzer

15  Lien) is approximately $164,000.

### 14.    The 8479 Cedarview Court Property

17  The Debtor owns real property located at 8479 Cedarview Court, Cypress,

18  California 90630 (the "8479 Cedarview Court Property").  The 8479 Cedarview Court

19  Property consists of a 1,196 sq. ft. condominium built in 1980.  The 8479 Cedarview Court

20  Property has been valued at $400,000.  The current income and expenses related to the

21  8479 Cedarview Court Property are set forth in Exhibit "1" hereto.

22  The 8479 Cedarview Court Property is subject to a deed of trust recorded on

23  December 12, 2005 as Instrument No. 2005000986160, in favor of Guaranty Bank, which

24  was subsequently assigned to OCWEN, securing an obligation in the amount of

25  approximately $238,000 as of the Petition Date.  Also recorded against the 8479

26  Cedarview Court Property (and the Debtor's other Real Property located in California) is

27  the Tarnutzer Lien.

28

1    The equity in the 8479 Cedarview Court Property (without taking into account the

2    Tarnutzer Lien) is approximately $161,000.

3    **15.    The 8475 Cedarview Court Property**

4    The Debtor owns real property located at 8475 Cedarview Court, Cypress,

5    California 90630 (the "8475 Cedarview Court Property").  The 8475 Cedarview Court

6    Property consists of a 985 sq. ft. condominium built in 1980.  The 8475 Cedarview Court

7    Property has been valued at $375,000.  The current income and expenses related to the

8    8475 Cedarview Court Property are set forth in Exhibit "1" hereto.

9    The 8475 Cedarview Court Property is subject to a deed of trust recorded on

10    December 9, 2005 as Instrument No. 2005000985621, in favor of Guaranty Bank, which

11    was subsequently assigned to OCWEN, securing an obligation in the amount of

12    approximately $238,000 as of the Petition Date.  Also recorded against the 8475

13    Cedarview Court Property (and the Debtor's other Real Property located in California) is

14    the Tarnutzer Lien.

15    The equity in the 8475 Cedarview Court Property (without taking into account the

16    Tarnutzer Lien) is approximately $136,000.

17    **B.    The Debtor's Personal Property Assets**

18    In addition to the Real Property, and as set forth in the Schedules, as of the Petition

19    Date, the Debtor held personal property assets valued at approximately $2,423,000

20    (exclusive of any applicable exemptions and encumbrances).[13]

21

22
_____

23    [13] In addition to existing encumbrances on the Debtor's personal property assets (including, without
limitation, the security interest in the Debtor's vehicle held by Alliant Credit Union and the PPB UCC-1,
24    Tarnutzer may assert a judicial lien on certain of the Debtor's pre-petition, non-exempt personal property as
a result of the service of an order to appear for a judgment debtor exam in connection with the Tarnutzer
25    Litigation (defined herein as the "ORAP Lien").  The Debtor does not contemplate disposing of his personal
property assets under the Plan and such personal property assets will remain subject to any valid
26    encumbrances thereon, including any valid ORAP Lien.  Upon payment in full on account of any Allowed
Claim of Tarnutzer from the Debtor's Real Property as provided by the Plan, the ORAP Lien shall be
27    deemed expunged from the Debtor's personal property assets without further action by any party.

28

1    The Debtor's personal property assets include a 2007 Mercedes valued at $16,000

2  (less applicable exemption), a 2010 Chevrolet Tahoe valued at $16,000, a 2011 Chevrolet

3  Impala valued at $8,000, and a 2016 Tesla valued at approximately $73,000 (which

4  vehicle is encumbered by a security interest in favor of Alliant Credit Union in the amount

5  of approximately $86,000), various personal and household items with a value of

6  approximately $70,300 (exclusive of applicable exemptions), approximately $69,000 in

7  various bank accounts (exclusive of applicable exemptions and encumbrances), and stock

8  in a publicly-traded company, Polar Power, valued at approximately $91,000.  In addition,

9  the Debtor (along with this non-filing wife) holds interests in the following entities:

10  (1) 100% ownership of Domingo Villas, Inc. (defined herein as "Domingo Villas") with an

11  unknown value;[14] (2) 100% ownership of First Choice Escrow, Inc. with a value of

12  approximately $260,000; (3) 100% ownership of Coast Financial Group with a value of

13  $0.00; and (4) 1% ownership of OCTSC Partners I, LLC with a value of approximately

14  $40,000.  The Debtor also holds a judgment in the amount of approximately $276,000

15  against Paul Wakin, Monsen Tovoussi, Carmet LTD., Orange County Surgery Center, Inc.

16  and PT Partners, LLC (which judgment is currently on appeal), and a breach of contract

17  claim against Fern and First Realm valued in an unknown amount.

18    In addition to the foregoing, as discussed in further detail in Section II.E.2. hereof,

19  there is the amount of approximately $1.8 million in Interpled DV Sale Proceeds, which

20  represent undistributed proceeds from the sale of the assets of Domingo Villas (an entity

21  wholly owned by the Debtor).  The Debtor believes that the Interpled DV Sale Proceeds

22  should be released to Domingo Villas (as there has been a determination in the State

23  Court Action that Tarnutzer has no claim against that entity) and, as 100% owner of

24  Domingo Villas, the funds should be released to the Debtor.  In such event, the Debtor will

25  _____

26    [14] As discussed in further detail in Section II.E.2. hereof, Domingo Villas was the owner of the DV
Property, which was sold in 2012.  The remaining proceeds from the Sale of the DV Property are currently

27  being held in connection with the Tarnutzer Litigation as the Interpled DV Sale Proceeds.

28

1  utilize the $1.8 million as the initial source of funding for the repayment of any Allowed

2  Claim of Tarnutzer under the Plan.  Alternatively, even if Tarnutzer were determined to be

3  entitled to some or all of Interpled DV Sale Proceeds, any such funds would be applied to

4  the outstanding amount of any debt owed to Tarnutzer, reducing the balance owed to

5  Tarnutzer to be paid under the Plan.  In any event, the Interpled DV Sale Proceeds will be

6  utilized as a source of repayment on account of any Allowed Claim of Tarnutzer.

7           **C.      The Debtor's Income and Budget Motion**

8           On June 5, 2017, the Debtor filed with the Court amended Schedules I and J

9  ("Amended Schedules I and J") [Docket No. 98].  As indicated on Amended Schedules I

10  and J, the Debtor currently earns monthly gross wages and commissions (the "Debtor's

11  Commissions") in the amount of $36,694, monthly income from OCTSC Partners I, LLC

12  (the "OCTSC Income") in the amount of $613; and monthly net income from the Real

13  Property (the "Net Real Property Income") in the amount of $1,384, for total monthly

14  income in the amount of $38,691 (collectively, the Debtor's Commissions, the OCTSC

15  Income and the Net Real Property Income is referred to as the "Debtor's Income").

16           On June 6, 2017, the Debtor filed a Motion for approval of the Debtor's budget for

17  the use of the Debtor's Income and cash (the "Budget Motion") [Docket No, 103].  A

18  hearing on approval of the Budget Motion is scheduled for June 28, 2017.

19           **D.      The Events that Led to the Chapter 11 Filing**

20           As of the Petition Date, the Debtor was current on his monthly payment obligations

21  to the Real Property Lenders with respect to the Real Property and had substantial equity

22  in the Real Property over and above the liens of the Real Property Lenders –

23  approximately $8.8 million in the aggregate.  As described in further detail hereinbelow,

24  the filing of the Petition was precipitated by the entry of the Tarnutzer Judgment against

25  the Debtor, asserted to be in the amount of approximately $3.5 million as of the Petition

26  Date, and the subsequent judgment enforcement actions undertaken by Mr. Tarnutzer

27  that resulted in the Tarnutzer Lien and the ORAP Lien (as such terms are defined herein)

28

1  against certain of the Debtor's assets.  The Debtor intends to pursue his Appeal of the

2  Tarnutzer Judgment and believes that he will ultimately be successful in reversing the

3  Tarnutzer Judgment by way of the Appeal.  The Debtor, however, did not have sufficient

4  liquidity to post a bond in connection with the Appeal of the Tarnutzer Judgment, nor was

5  the Debtor able to borrow the funds necessary to post the bond.[15]

6       The Debtor's case was not filed to prejudice the rights of any party in connection

7  with the Tarnutzer Judgment or otherwise – and the Debtor intends to pay all Allowed

8  Claims in full.  Rather, through this Chapter 11 case, the Debtor intends to pursue his

9  Appeal of the Tarnutzer Judgment, resolve the Fern Litigation and restructure several of

10 the loans related to the Real Property.  To this end, the Plan provides for the restructuring

11 of certain debt of the Real Property Lenders (Classes 3, 6, 7, 8, 9, 10, 11,12, 13, 14 and

12 15) and providing for the payment, in full, of all Claims, including any Claim that is

13 ultimately allowed by Final Order in connection with the Tarnutzer Litigation and/or Fern

14 Litigation.

15      **E.   Significant Events During the Bankruptcy Case**

16           **1.   Bankruptcy Proceedings**

17                a.   The Order for Relief

18      The Debtor filed a petition for relief under chapter 11 of the Bankruptcy Code on

19 April 9, 2017.

20                b.   The Use of Cash Collateral

21      On April 26, 2017, the Debtor filed five motions seeking the use of cash collateral

22 generated by the Debtor's Real Property, and for approval of budgets to provide for the

23 payment of the expenses of the Debtor's Real Property as set forth therein (the "Cash

24

25      [15] Prior to commencing the Case, the Debtor attempted to borrow the funds necessary to post the bond
26 in connection with the Appeal.  In order to post the bond, the Debtor needed access to 150% of the amount
   of the Tarnutzer Judgment, nearly $4.5 million.  To try to raise the necessary funds, the Debtor contacted
27 several potential lending sources, but was unsuccessful in obtaining the necessary funds.

28

1  Collateral Motions") [Docket Nos. 25, 26, 27, 28 and 29].  On May 17, 2017, the Debtor

2  and Pacific Premier Bank entered into a Stipulation Authorizing the Debtor's Use of Cash

3  Collateral relating to the Newman Street Property, the Del Amo Blvd. Property, the Denni

4  Street Property, the Bishop Street Property and the N. Olive Street Property (the "PPB

5  Cash Collateral Stipulation") [Docket No. 63].  On May 30, 2017, an amended PPB Cash

6  Collateral Stipulation was filed with the Court [Docket No. 90] , and on June 6, 2017, the

7  Court entered its order approving the amended PPB Cash Collateral Stipulation [Docket

8  No. 100].

9      Hearings on approval of the Cash Collateral Motions were heard on May 24, 2017,

10  and, on May 26, 2017, the Court entered orders granting the Cash Collateral Motions

11  [Docket Nos. 79, 80, 81, 82 and 83].

12                    c.      The Debtor's Schedules, Statement of Financial Affairs and

13                            Operating Reports

14      The Debtor believes that the Estate is in compliance with the requirements under

15  11 U.S.C. §§ 521, 1006 and 1107, and the applicable Guidelines of the Office of the

16  United States Trustee (the "OUST").  On April 9, 2017, the Debtor filed certain of his

17  bankruptcy schedules (the "Schedules"), on May 2, 2017, the Debtor filed amended

18  Schedules and his statement of financial affairs ("SOFA") and, on May 5, 2017, the Debtor

19  filed additional amended Schedules and SOFA [Docket Nos. 98 and 99].  The Debtor has

20  prepared and submitted Monthly Operating Reports for the Estate through the filing of this

21  Disclosure Statement.  The Debtor is current on the quarterly fees owed to the OUST.

22                    d.      The Employment of Estate Professionals

23      By order entered on May 16, 2017, the Court authorized the employment of LWGF

24  as the Debtor's general insolvency counsel [Docket No. 58].  By order entered June 6,

25  2017, the Court authorized the employment of The Law Office of Gregory S. Page (the

26  "Page Firm") as the Debtor's special litigation counsel [Docket No. 102].  By order entered

27  on June 14, 2017, the Court authorized the employment of Force 10 Partners LLC ("Force

28

1120604.1                                21                    DISCLOSURE STATEMENT

10") as the Debtor's financial advisors [Docket No. 109].  The Debtor intends to file an application to employ Thomas Vogele & Associates, APC (the "Vogele Firm") as the Debtor's appellate counsel in connection with the Appeal..

e.      Claims Bar Date

By order entered May 17, 2017, the Court fixed June 26, 2017 as the last date for creditors to file Proofs of Claim and October 6, 2017 as the last date for governmental units to file Proofs of Claim (the "Bar Date").  The Debtor served all creditors and parties in interest with the Bar Date Notice on May 22, 2017.

f.      Exclusivity

The Bankruptcy Code provides debtors with an initial exclusive period of 120 days from the petition date to file a plan of reorganization, and an initial exclusive period of 180 days to solicit acceptances of its plan, subject to the discretion of the bankruptcy court to extend the exclusive periods.  During these exclusive periods no other person or entity is permitted to file a plan of reorganization.

Here, the Debtor's initial statutory exclusive periods to propose a plan and to obtain acceptances thereof are set to expire on August 7, 2017, and October 6, 2017, respectively.

**2.      The Appeal**

As discussed herein, in addition to seeking to restructure certain loan obligations, the Debtor's bankruptcy case was necessitated by the entry of the Tarnutzer Judgment against the Debtor in connection with the Tarnutzer Litigation, and the Debtor's need to pursue the Appeal of this unanticipated adverse ruling.

The background of the Tarnutzer Litigation is as follows.  Domingo Villas, an entity wholly-owned by the Debtor, was the owner of an 8-unit apartment building which was to be converted to condominiums (the "DV Property").  On May 3, 2007, Tarnutzer made a $2.6 million loan to Domingo Villas, which loan was secured by DV Property and personally guaranteed by the Debtor (the "Tarnutzer Loan").  The proceeds of the

1  Tarnutzer Loan were used to pay off Domingo Villa's existing loan secured by the DV

2  Property.

3      From May 2007 until July 2009, Domingo Villas made the payments called for in

4  connection with the Tarnutzer Loan in the total amount of approximately $480,000 (with

5  the Debtor making approximately $89,000 in payments as well, for a total of approximately

6  $569,000 being paid to Tarnutzer during this period).  Commencing in July 2009, the

7  Debtor only began making payments to Tarnutzer on account of the Tarnutzer Loan in the

8  amount of $100,000 per month (as called for by an extension agreement related to the

9  Tarnutzer Loan).  From July 2009 through January 2011, the Debtor paid a total of

10  $1,557,000 to Tarnutzer on account of the Tarnutzer Loan.

11      In mid-2010, Domingo Villas (and the Debtor as guarantor) advised Tarnutzer that

12  they were seeking to refinance the DV Property at a significantly lower interest rate (5%)

13  than that called for under the Tarnutzer Loan (which was at a 10% interest rate).  At that

14  time, Domingo Villas (and the Debtor as guarantor) had obtained preliminary loan

15  approval from Apartment Bank to refinance the DV Property and pay-off the Tarnutzer

16  Loan.  In connection with the contemplated refinancing, Domingo Villas and the Debtor

17  requested on numerous occasions that Tarnutzer provide a payoff statement, as

18  expressly required by California law.  Tarnutzer, however, refused to provide the required

19  payoff statement.  Domingo Villas and the Debtor, therefore, requested that the title

20  company handling the escrow for the contemplated refinancing prepare a proposed payoff

21  statement for Tarnutzer's review and signature, reflecting the outstanding balance of the

22  Tarnutzer Loan in the amount of $1,345,000.  Tarnutzer, however, refused to provide the

23  requisite documentation and, without the payoff statement, Apartment Bank was unwilling

24  and unable to refinance of the DV Property.  Under California law, a lender refusing to

25  provide a payoff statement is liable for the damages caused by a failure to provide such

26  information.

27

28

1120604.1                          23                      DISCLOSURE STATEMENT

1    On February 7, 2011, Tarnutzer contacted Domingo Villas and the Debtor via

2  email, claiming that the balance due under the Tarnutzer Loan (which loan was in the

3  initial principal amount of $2.6 million and had been substantially paid down) was

4  approximately $2.1 million – as opposed to the approximately $1.35 million reflected by

5  Domingo Villa's and the Debtor's books and records.  In reaching his figure, Tarnutzer

6  erroneously included interest at a rate of 13%, and included extension and other fees and

7  charges not supported by the loan documents.  Unable to reach agreement, and in light of

8  Tarnutzer's actions in thwarting the refinancing of the DV Property which would have paid-

9  off his loan, Domingo Villas and the Debtor ceased making payments to Tarnutzer on

10  account of the Tarnutzer Loan pending a resolution of the outstanding dispute.

11    In April 2011, Tarnutzer commenced efforts to collect on the Tarnutzer Loan,

12  including recording notices of default, commencing foreclosure proceedings and seeking

13  the appointment of a receiver.  In connection with these collection efforts, Tarnutzer then

14  claimed that he was owed over $3.5 million – a figure that exceeded the actual debt by

15  more than $2.1 million.  In calculating the amount of the debt, in addition to adding over

16  $500,000 in unsupported interest and charges, Tarnutzer erroneously failed to account for

17  any of the approximately $1.6 million in payments made by the Debtor on account of the

18  Tarnutzer Loan (*i.e.,* Tarnutzer claimed that only the payments made by Domingo Villas –

19  as opposed to payments by the Debtor as guarantor – counted against repayment of the

20  loan).  Applying such payments made by the Debtor (approximately $1.6 million), and

21  deducting the inappropriate charges (over $500,000), would work to reduce the debt

22  figure by over $2.1 million to the amount of approximately $1.35 million (*i.e.,*

23  approximately the amount that Domingo Villas and the Debtor had asserted was owed to

24  Tarnutzer from the outset).

25    Unable to reach a consensual resolution of the disputes, on June 15, 2011,

26  Domingo Villas commenced the State Court Action seeking to resolve these issues,

27  including as to the amount owed and for damages based on Tarnutzer's failure to provide

28

1120604.1                                    24                      DISCLOSURE STATEMENT

1  the payoff statement as required by law, thwarting the refinancing of the DV Property at

2  the lower rate.  Tarnutzer filed a cross-complaint in the State Court Action seeking

3  repayment of the Tarnutzer Loan and enforcement of the Debtor's personal guaranty,

4  continuing to overstate the loan balance by over $2.1 million.[16]

5        In August 2011, Tarnutzer recorded a notice of trustee's sale, again alleging a debt

6  of over $3.5 million.  The foreclosure of the DV Property was scheduled for September 2,

7  2011.  To halt the foreclosure sale, on September 1, 2011, Domingo Villas was forced to

8  commence a chapter 11 bankruptcy case in the United States Bankruptcy Court for the

9  Central District of California, Case No. 8:11-bk-22391-CB (the "DV Bankruptcy Case").  In

10  the DV Bankruptcy Case, relying on the overstated loan balance, Tarnutzer attempted to

11  obtain relief from the automatic stay and to credit bid at the sale of substantially all of the

12  assets of Domingo Villa.  Ultimately, the DV Property was sold to a third party, Novis, for

13  approximately $2.9 million, netting approximately $2.7 million in sale proceeds to the

14  Domingo Villas' estate (the "DV Sale Proceeds").  Tarnutzer's lien based on the Tarnutzer

15  Loan (the outstanding balance of which was still at issue) attached to the DV Sale

16  Proceeds.

17        Following the sale of the DV Property, Domingo Villas, the Debtor and Tarnutzer

18  agreed to resolve their disputes as to the outstanding amount due in connection with the

19  Tarnutzer Loan in the pending state court proceeding and, in 2012, the DV Sale Proceeds

20  were interpled in the State Court Action (the "Interpled DV Sale Proceeds").  After

21  accounting for court-authorized disbursements in the amount of $400,000 each to

22  Tarnutzer and the Debtor, there remain Interpled DV Sale Proceeds held in an interest-

23

24  _____

25  [16] The Debtor is informed and believes that Tarnutzer may have assigned his rights in this matter to
    another entity, Asset Management, during 2011 and may have lacked standing to assert any rights with
26  respect to the Tarnutzer Loan by virtue of said assignment.  Simply for ease of reference, the Debtor
    continues to refer herein to any such successor entity as Tarnutzer, but reserves all rights with respect to
27  any such assignment and assertion of rights related to the Tarnutzer Loan.

28

1  bearing account in the amount of approximately $1.82 million.  The DV Bankruptcy Case

2  was closed in June 2012.

3      A jury trial in the State Court Action was held in July 2015.[17]  Following trial, the jury

4  returned two verdicts.  First, that Tarnutzer had <u>no claim</u> against Domingo Villas based on

5  the Tarnutzer Loan.  Inexplicably, however, the jury also found that the Debtor, on account

6  of his personal guaranty of the Tarnutzer Loan, owed Tarnutzer the principal amount of

7  approximately $1.97 million (which determination did not include interest, late charges,

8  extension fees or consequential damages).  Following the jury verdicts, the Debtor sought

9  various relief that the superior court had indicated would be determined by the court

10  following the jury verdicts, including declaratory relief and for an accounting.  The superior

11  court denied such relief notwithstanding that such matters – including material information

12  of an accounting of the loan balance calculation and expert testimony with respect thereto

13  – had not been presented to the jury in reaching its determinations as to, among other

14  things, the amount of the debt owed to Tarnutzer.[18]  In addition, the superior court

15  indicated that it would not determine then who was entitled to the Interpled DV Sale

16  Proceeds, but that such matter would need to be considered in a second phase trial in

17  front of another superior court judge.  Ten months after the trial was conducted, the

18  superior court did appoint a forensic accountant as referee to conduct an accounting.  The

19  referee set forth five loan calculation scenarios from which the superior court could

20  

21  [17] The Debtor believes that there were a variety of reversible errors in connection with the trial, including improper instructions to the jury and a failure to allow the jury to consider relevant information regarding an accounting of the debt and related matters.  These matters are currently at issue in connection with the

22  Appeal.

23  [18] The Debtor believes that, had such information been properly provided to the jury, the jury would have made a finding as to the loan balance due (or, alternatively, had the superior court made such a

24  determination prior to the trial, the jury would have been provided with the court-determined loan balance in their deliberations).  Had the jury (or the superior court) agreed with the calculation by Domingo Villas and

25  the Debtor (and their expert), and had the jury been properly advised as to the efforts to repay the Tarnutzer Loan that were thwarted by Tarnutzer, the jury would have understood that Domingo Villas and the Debtor

26  were damaged by Tarnutzer's actions in miscalculating the loan balance and refusing repayment of the loan. It would have also resulted in a determination that imposition of interest, fees and costs in connection with

27  such inflated debt was improper.  These matters are at issue in connection with the Appeal.

28  

1120604.1                                26                    DISCLOSURE STATEMENT

1   choose depending on its interpretation of certain terms of the loan documents, but the

2   superior court refused to make the requisite determinations and never selected any of the

3   scenarios set by the referee in his July 2016 report.

4         On October 17, 2016, based on the jury verdicts, the superior court entered

5   judgment against the Debtor on account of his guaranty of the Tarnutzer Loan in the

6   principal amount of approximately $1.97 million.  In addition, the superior court added

7   nearly $1 million in prejudgment interest (notwithstanding that it was Tarnutzer's failure to

8   provide a payoff statement as required by California law that prevented the Debtor and

9   Domingo Villas from repaying the debt back in 2011), for a total award of approximately

10  $2.5 million (after accounting for a credit in the amount of $400,000 paid to Tarnutzer from

11  the Interpled DV Sale Proceeds).  Thereafter, in connection with post-trial motions, the

12  superior court was presented with expert testimony that even the court admitted

13  demonstrated errors in Tarnutzer's loan balance calculation (including a failure to properly

14  and timely credit payments) but, nonetheless, the superior court determined it was

15  powerless to disturb the jury's fill-in-the-blank verdicts.  Thereafter, on April 10, 2017, the

16  superior court entered an amended judgment which further included an award of

17  attorney's fees and costs of suit to Tarnutzer (together, the "Tarnutzer Judgment").  With

18  accruing interest, the Tarnutzer Judgment had grown to approximately $3.5 million as of

19  the Petition Date.

20        The Debtor believes that the Tarnutzer Judgment was entered against him without

21  justification and constitutes reversible error, in that, among other things, it erroneously

22  failed to consider an accounting as to the proper loan balance, failed to consider the

23  impact of Tarnutzer's refusal to allow the Tarnutzer Loan to be paid off, and improperly

24  included approximately $1.5 million in prejudgment interest and fees and costs to which

25  Tarnutzer was not entitled.  Following the superior court's denial of the Debtor's post-trial

26  motions for a judgment notwithstanding the verdict and for a new trial, the Debtor timely

27  appealed the Tarnutzer Judgment (the "Appeal").

28

1    The Debtor believes that the Tarnutzer Judgment against him based on his

2  personal guaranty of the Tarnutzer Loan will be reversed (or at the very least significantly

3  reduced) on Appeal.  In addition, based on the determination that Tarnutzer has no claim

4  against Domingo Villas, the Interpled DV Sale Proceeds should be released to the Debtor

5  (as the 100% owner of Domingo Villas) and utilized a source of funding for the payment of

6  any Allowed Claim that may be ultimately be allowed to Tarnutzer.

7              **3.    The Fern Litigation**

8    On December 22, 2015, the Debtor filed an action against Martin D. Fern and Linda

9  Taylor-Fern, individually and as Trustees of the Fern-Taylor Family Trust (collectively,

10  "Fern"), and First Realm, LLC ("First Realm"), in the Orange County Superior Court, Case

11  No. 30-2015-00826601-CU-BC-CJC, asserting causes of action for, among other things,

12  breach of contract, fraud and declaratory relief related to the ownership of certain real

13  properties (the "Fern State Court Action").  On February 6, 2016, Fern and First Realm

14  filed an answer in the Fern State Court Action, asserting affirmative defenses, including

15  fraudulent misrepresentation and defamation.  On June 12, 2017, Fern filed a Proof of

16  Claim in the Debtor's Case [Claim No. 12], asserting an unsecured claim against the

17  Debtor in the amount of $4,132,500 (plus damages according to proof, attorneys' fees and

18  costs) based on a proposed cross-complaint Fern asserts it intended to file in the Fern

19  State Court Action, the filing of which was stayed by the filing of the Debtor's Case.  On

20  June 9, 2017, Fern filed a Complaint to Determine Nondischargeability of Debts Pursuant

21  to 11 U.S.C. §§ 523(a) and 524(a)(3) with respect to Fern's claim against the Debtor (the

22  "Fern Non-Dischargeablility Action" and, together with the Fern State Court Action, the

23  "Fern Litigation").  For the reasons set forth in the complaint filed against Fern and First

24  Realm in the Fern State Court Action and otherwise, the Debtor disputes the claims

25  asserted by Fern in connection with the Fern Litigation.

26

27

28

1120604.1                                              28                    DISCLOSURE STATEMENT

### 4. Other Legal Proceedings

With the exception of the Appeal, the Fern Non-Dischargeablility Action and a pending worker's compensation case initiated by Ricardo Gutierrez, the Debtor does not have any litigation pending against him.  In addition to the Fern State Court Action, the Debtor is also a plaintiff in an action against Paul Wakin, Monsen Tovoussi, Carmet LTD., Orange County Surgery Center, Inc. and PT Partners, LLC in which the Debtor has obtained a favorable judgment in the amount of approximately $275,660 (which matter is currently on appeal by the defendants).

### 5. Actual and Projected Recovery from Avoidance Actions and Causes of Action

The Debtor has not undertaken a full analysis regarding whether meritorious claims for preferential or fraudulent transfers exist.  The Debtor is looking into whether the liens asserted against the Debtor's assets in connection with the Tarnutzer Judgment are subject to avoidance in the Case.  Claims for relief for all avoidance actions under 11 U.S.C. §§ 544 through 550, including, but not limited to, claims for the recovery of preferential and/or fraudulent transfers, are hereby reserved against any and all Persons and entities.  The omission of the identity of a recipient of a potentially avoidable and recoverable transfer of a particular payment is unintentional and shall not be deemed a waiver of the right of the Estate to recover any distribution(s), payment(s), or transfer(s) from any entity under any provision of the Bankruptcy Code.

Upon the Effective Date, no party shall have standing to bring or prosecute Avoidance Actions or other Causes of Action, except as specifically set forth below in Section III.F.4.

### III.  **SUMMARY OF THE PLAN**

The following is a summary of the material provisions of the Plan.

## A.   Overview of the Plan

The Plan provides for payment in full of all Allowed Claims against the Debtor. Allowed Secured Claims of the Real Property Lenders will be paid in full over time.  The Allowed Secured Claims of certain Real Property Lenders (Classes 3, 6, 7, 8, 9, 10, 11,12, 13, 14 and 15) shall have their debt obligations modified with respect to repayment terms and interest rates as provided in the Plan, and are entitled to vote on the Plan.  The Allowed Secured Claims of other Real Property Lenders (Classes 1, 2, 4 and 5), the Secured Claim of Alliant Credit Union (Class 17) and the Secured Tax Claims (Class 18) are unimpaired under the Plan.   Allowed Priority Claims (Class 19), if any, will either be paid in full on the Effective Date of the Plan, or will be paid over time in accordance with the provisions of the Bankruptcy Code.  Allowed General Unsecured Claims (with the exception of any unsecured claims of Tarnutzer or Fern) (Class 20) will be paid in full on the Effective Date of the Plan.  Payments to creditors (other than to Tarnutzer and Fern) under the Plan will be funded with the Real Property Income and the Debtor's Income.

Any Allowed Claim of Tarnutzer based on a Final Order in the Tarnutzer Litigation (Class 21) will be paid in full.  Any such Allowed Claim will be satisfied first from the Interpled DV Sale Proceeds and, thereafter, to the extent necessary to pay such Allowed Claim in full, from a Sale and/or Refinancing of some or all of the Real Property.  Such payment to Tarnutzer pursuant to the Plan will be made within 120 days following the entry of a Final Order providing Tarnutzer with an Allowed Claim against the Debtor.

Any Allowed Claim of Fern based on a Final Order in the Fern Litigation (Class 22) will be paid in full.  Any such Allowed Claim will be satisfied from a Sale and/or Refinancing of some or all of the Real Property.  Such payment to Fern pursuant to the Plan will be made within 120 days following the entry of a Final Order providing Fern with an Allowed Claim against the Debtor; *provided, however*, that if Fern obtains an Allowed Claim prior to resolution of the Tarnutzer Litigation, Fern shall be granted a lien on the Real Property subject to the Tarnutzer Lien, junior to the existing liens thereon, to secure

1   such Allowed Claim and shall be paid within 120 days following the entry of a Final Order

2   resolving the Tarnutzer Litigation.

3        Effective Date payments on account of Professional Fee Claims and Class 20

4   General Unsecured Claims will be satisfied from the Debtors' Income and/or the proceeds

5   of a Sale and/or Refinancing of the Real Property.

6        Unless otherwise expressly stated in the Plan, the treatment of Allowed Claims

7   under the Plan supersedes any agreements or rights the Holders of those Claims may

8   have in or against the Debtor or his assets and is in full satisfaction of the legal, equitable,

9   and contractual rights of the Holders of the Claim.

10       Unless the Plan provides otherwise, no Distributions will be made and no rights

11  retained on account of any Claim that has not become an Allowed Claim.

12       **B.    What Creditors Will Receive Under the Proposed Plan**

13       As required by the Bankruptcy Code, the Plan classifies Claims in various Classes

14  according to their right to priority.  The Plan states whether each Class of Claims is

15  impaired or unimpaired.  The Plan provides the treatment each Class will receive.  In no

16  event shall any creditor receive more than the creditor's Allowed Claim, plus interest, to

17  the extent provided herein.

18       **1.    Unclassified Claims**

19       Certain types of Claims are not placed into voting classes but are instead

20  unclassified.  They are not considered impaired and they do not vote on the Plan because

21  they are automatically entitled to certain treatment under the Bankruptcy Code.

22  Accordingly, the following Claims have not been placed into a Class:

23       a.    Administrative Expenses

24       Administrative Claims are Claims for costs or expenses of administering the

25  Debtor's Case which are allowed under § 507(a)(2) of the Bankruptcy Code.  The

26  Bankruptcy Code requires that all Allowed Administrative Claims be paid on the Effective

27  Date of the Plan, unless a particular claimant agrees to a different treatment.

28

1120604.1                              31                    DISCLOSURE STATEMENT

The following chart lists all of the Debtor's § 507(a)(2) unpaid Administrative Claims and their treatment under the Plan:

| Description | Estimated Amount Owed | Treatment |
|---|---|---|
| Clerk's Office Fees | $0 | Paid in full on or before the Effective Date. |
| OUST | $1,950 | Paid in full on or before the Effective Date. |
| Ordinary-Course Administrative Claims | $0 | Unless the Debtor objects to the Ordinary-Course Administrative Claim, the Claim will be allowed in accordance with the terms and conditions of the particular transaction giving rise to the Ordinary-Course Administrative Claim, and the Person Holding the Ordinary-Course Administrative Claim need not File any Request for Payment of its Claim. However, any Request for Payment, or Motion to allow a Claim as an Ordinary-Course Administrative Claim must be Filed with the Court and served on counsel for the Debtor or the Reorganized Debtor, as the case may be, and the OUST by no later than sixty (60) days after the Effective Date. |
| Non-Ordinary Course Administrative Claims | $0 | To the extent that any Non-Ordinary Course Administrative Claims are allowed, they will be paid in full by the Debtor on the later of the Effective Date or immediately after the Court enters a Final Order allowing the Non-Ordinary Course Administrative Claim. |
| Administrative Tax Claims | $0 | Unless the Debtor objects to an Administrative Tax Claim or otherwise disputes the Administrative Tax Claim in accordance with applicable law, the Claim will be Allowed in accordance with the terms and conditions of the particular transaction that gave rise to the Administrative Tax Claim, and the Person Holding the Administrative Tax Claim need not File any Request for Payment of its Claim. Any Allowed Administrative Tax Claim will be paid in the ordinary course of business, currently and timely as they are incurred and billed, unless the Debtor objects to or otherwise disputes such Administrative Tax Claim in accordance with applicable law. In an event of default, and to the extent such Administrative Tax Claim is also secured, the payment thereof will include all costs, fees, charges and interest, if applicable, as required under 11 U.S.C. §§ 506(b) and 511, and applicable non-bankruptcy law. |

| Description | Estimated Amount Owed | Treatment |
|---|---|---|
| LWGF | $300,000, estimated as of the Effective Date, which would be in addition to the fees and expenses, if any, paid to LWGF post-petition.[19] | Paid on the later of (i) the Effective Date or (ii) upon entry of an order approving the Professional Fee Claim, except to the extent that a Holder of such Claim agrees to other terms.  The Debtor intends to make such payment from the Debtor's Income and/or from the proceeds of a Sale and/or Refinancing of the Real Property. |
| The Page Firm | $10,000, estimated as of the Effective Date, which would be in addition to the fees and expenses, if any, paid to the Page Firm post-petition. | Paid on the later of (i) the Effective Date or (ii) upon entry of an order approving the Professional Fee Claim, except to the extent that a Holder of such Claim agrees to other terms.  The Debtor intends to make such payment from the Debtor's Income and/or from the proceeds of a Sale and/or Refinancing of the Real Property. |
| The Vogele Firm | $50,000, estimated as of the Effective Date, which would be in addition to the fees and expenses, if any, paid to the Vogele Firm post-petition. | Paid on the later of (i) the Effective Date or (ii) upon entry of an order approving the Professional Fee Claim, except to the extent that a Holder of such Claim agrees to other terms.  The Debtor intends to make such payment from the Debtor's Income and/or from the proceeds of a Sale and/or Refinancing of the Real Property. |
| Force 10 Partners LLC | $75,000, estimated as of the Effective Date, which would be in addition to the fees and expenses, if any, paid to Force Ten Partners LLC post-petition. | Paid on the later of (i) the Effective Date or (ii) upon entry of an order approving the Professional Fee Claim, except to the extent that a Holder of such Claim agrees to other terms.  The Debtor intends to make such payment from the Debtor's Income and/or from the proceeds of a Sale and/or Refinancing of the Real Property. |
| TOTAL | $436,950 | |

The following applies to Administrative Claims:

(1)    Professional Fee Claims

Any Professional seeking allowance of a Professional Fee Claim for services rendered prior to the Effective Date in connection with the Debtor's Case must (1) File their application for allowance of compensation and reimbursement of expenses on or before 45 days after the Effective Date or such other date as may be set by the Court, and (2) have the fees and expenses allowed by a Final Order.  Any party in interest may File

---

[19] The estimate of Professional Fee Claims is only an estimate and will change based upon the legal or financial services required during this Case and upon what the Court ultimately awards to Professionals. The Estate remains liable for all allowed professional fees and costs regardless of the estimates.

33

DISCLOSURE STATEMENT

1  an objection to such an application within the time provided by the Local Bankruptcy Rules

2  or within any other period that the Court sets.  Persons holding Professional Fee Claims

3  who do not timely File and serve their applications for payment will be forever barred from

4  asserting these Claims against the Reorganized Debtor or his property.

5      As indicated above, the Debtor may need to pay $436,950 worth of Administrative

6  Claims on the Effective Date of the Plan, unless the claimant has agreed to be paid later

7  or the Court has not yet ruled on the Claim.  Effective Date payments on account of

8  Professional Fee Claims (and Class 20 General Unsecured Claims) will be satisfied from

9  the Debtors' Income and/or the proceeds of a Sale and/or Refinancing of the Real

10  Property.

11      b.    Priority Tax Claims

12      Priority Tax Claims include certain unsecured income, employment and other taxes

13  described by Bankruptcy Code § 507(a)(8).  The Bankruptcy Code requires that each

14  Holder of such a § 507(a)(8) Priority Tax Claim receive the present value of such Claim in

15  regular installment payments in Cash, over a period not exceeding five (5) years from the

16  Petition Date.  The following chart lists all of the Debtor's known § 507(a)(8) Priority Tax

17  Claims and their treatment under the Plan:

| Description | Amount Owed | Treatment |
|---|---|---|
| Internal Revenue Service ("IRS") | $693 | To the extent that any amounts are determined to be owed to the IRS, the Debtor or the Reorganized Debtor, as the case may be, shall pay in full the allowed amount of its Claim no more than five (5) years from the Petition Date.  The Claim shall accrue interest from the Effective Date on the unpaid balance of the Allowed Priority Tax Claim at the rate required by 11 U.S.C. § 511 to provide "present value" of the Allowed Priority Tax Claim.  The Debtor or the Reorganized Debtor shall have the right to pay the balance of the Allowed Priority Tax Claim in full at any time on or after the Effective Date without premium or penalty of any kind.  Payments will be made quarterly, due on the first day of the quarter, starting on the first date after the Effective Date and ending on the last such date that is no more than five (5) years after the Petition Date. |
| California Franchise Tax Board ("CFTB") | $0 | To the extent that any amounts are determined to be owed to the CFTB, the Debtor or the Reorganized Debtor, as the |

| Description | Amount Owed | Treatment |
|---|---|---|
| | | case may be, shall pay in full the allowed amount of its Claim no more than five (5) years from the Petition Date.  The Claim shall accrue interest from the Effective Date on the unpaid balance of the Allowed Priority Tax Claim at the rate required by 11 U.S.C. § 511 to provide "present value" of the Allowed Priority Tax Claim.  The Debtor or the Reorganized Debtor shall have the right to pay the balance of the Allowed Priority Tax Claim in full at any time on or after the Effective Date without premium or penalty of any kind.  Payments will be made quarterly, due on the first day of the quarter, starting on the first date after the Effective Date and ending on the last such date that is no more than five (5) years after the Petition Date. |

## 2.   Classified Claims

### a.   Summary of Classes

| Summary of Classes | |
|---|---|
| **Class #** | **Claimant(s)** |
| 1 | Secured Claim of Roundpoint Mortgage (1st Trust Deed Surfside Property) |
| 2 | Secured Claim of Wells Fargo Bank (2nd Trust Deed Surfside Property) |
| 3 | Secured Claim of Chase Commercial Bank (1st Trust Deed LaSalle Street Property) |
| 4 | Secured Claim of Ann Leisy (2nd Trust Deed LaSalle Street Property) |
| 5 | Secured Claim of Chase Commercial Bank (1st Trust Deed Comstock Avenue Property) |
| 6 | Secured Claim of Digital Federal Credit Union (1st Trust Deed New Hampshire Property) |
| 7 | Secured Claim of U.S. Bank (1st Trust Deed Nevada Property) |
| 8 | Secured Claim of Wells Fargo Bank (1st Trust Deed Vonnie Lane Property) |
| 9 | Secured Claim of Wells Fargo Bank (1st Trust Deed N. Olive Street Property) |
| 10 | Secured Claim of Pacific Premier Bank (2nd Trust Deed N. Olive Street Property) |
| 11 | Secured Claim of Pacific Premier Bank (Cross-Collateralized 1st Trust Deeds Newman Street Property, Bishop Street Property, Del Amo Blvd. Property, Denni Street Property and PPB UCC-1) |
| 12 | Secured Claim of OCWEN (1st Trust Deed San Alto Way Property) |
| 13 | Secured Claim of OCWEN (1st Trust Deed Stratton Court Property) |
| 14 | Secured Claim of OCWEN (1st Trust Deed 8479 Cedarview Court Property) |
| 15 | Secured Claim of OCWEN (1st Trust Deed 8475 Cedarview Court Property) |
| 16 | Secured Claim of Tarnutzer (Tarnutzer Lien) |
| 17 | Secured Claim of Alliant  Credit Union (Tesla) |
| 18 | Secured Tax Claims |
| 19 | Priority Unsecured Claims |
| 20 | General Unsecured Claims (other than Tarnutzer and Fern) |
| 21 | Unsecured Claim of Tarnutzer |
| 22 | Unsecured Claim of Fern |

### b.   Secured Claims

Secured Claims are Claims secured by liens on property of the Estate.  The following chart lists all Classes of Secured Claim and their treatment under the Plan:

| Secured Claims | | | | |
|---|---|---|---|---|
| **Class #** | **Description** | **Insiders (Y/N)** | **Impaired (Y/N)** | **Treatment** |
| 1 | Secured Claim of Roundpoint Mortgage | N | N | Except to the extent that the holder of the Allowed Class 1 Claim agrees to different treatment, the legal, equitable and contractual |

| | | | Secured Claims | | |
|---|---|---|---|---|---|
| Class # | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment | |
| | • Collateral: Surfside Property<br><br>• Priority of Security Interest: First<br><br>• Total Claim Amount: $1,494,115[20]<br><br>• Collateral Value: approximately $3,500,000 | | | rights to which the holder of the Allowed Class 1 Claim is entitled shall remain unaltered under the Plan. | |
| 2 | Secured Claim of Wells Fargo Bank<br><br>• Collateral: Surfside Property<br><br>• Priority of Security Interest: Second<br><br>• Total Claim Amount: $196,765<br><br>Collateral Value: approximately $3,500,000 | N | N | Except to the extent that the holder of the Allowed Class 2 Claim agrees to different treatment, the legal, equitable and contractual rights to which the holder of the Allowed Class 2 Claim is entitled shall remain unaltered under the Plan. | |
| 3 | Secured Claim of Chase Commercial Bank<br><br>• Collateral: LaSalle Street Property<br><br>• Priority of Security Interest: First<br><br>• Total Claim Amount: $577,533<br><br>Collateral Value: approximately $2,000,000 | N | Y | Except to the extent that the holder of the Allowed Class 3 Claim agrees to different treatment, the Secured Claim of Chase Commercial Bank (LaSalle Street Property) shall be modified as follows:<br><br>Interest. Following the Effective Date, simple interest shall accrue on the Secured Claim at the rate of four and one-quarter percent (4.25%) per annum.<br>Payments. The monthly payment on account of the Secured Claim will be due on the first (1st) day of the first calendar month following the Effective Date and will be in an amount equal to (a) the interest accrued on the Secured Claim from the Effective Date through the end of the calendar month in | |

---

[20] The claim amounts set forth in this chart are based on the Debtor's records. Such amounts may vary from such amounts based on, among other things, the incurrence of interest and/or or payments made on account of such Secured Claims following the Petition Date.

| | | | Secured Claims | | |
|---|---|---|---|---|---|
| **Class #** | **Description** | **Insiders (Y/N)** | **Impaired (Y/N)** | | **Treatment** |
| | | | | | which the Effective Date occurs plus (b) principal calculated on the basis of a 30-year amortization schedule.  Thereafter, until maturity, a monthly payment will be due on the first (1st) day of each successive month in an amount equal to (a) the interest accrued on the unpaid principal balance of the Secured Claim during the previous month plus (b) an installment of principal calculated on the basis of a 30-year amortization schedule. Maturity Date.  The Secured Claim will be due and payable seven (7) years following the Effective Date. Other Terms Unchanged.  Except to the extent provided above, the legal, equitable and contractual rights to which the holder of the Allowed Class 4 Claim was otherwise entitled shall remain unaltered under the Plan. |
| 4 | Secured Claim of Ann Leisy  • Collateral: LaSalle Street Property  • Priority of Security Interest: Second  • Total Claim Amount: $162,342  Collateral Value: approximately $2,000,000 | Y | N | | Except to the extent that the holder of the Allowed Class 4 Claim agrees to different treatment, the legal, equitable and contractual rights to which the holder of the Allowed Class 4 Claim is entitled shall remain unaltered under the Plan. |
| 5 | Secured Claim of Chase Commercial Bank  • Collateral: Comstock Avenue Property  • Priority of Security Interest: First  • Total Claim Amount: $380,355  Collateral Value: approximately $1,800,000 | N | N | | Except to the extent that the holder of the Allowed Class 5 Claim agrees to different treatment, the legal, equitable and contractual rights to which the holder of the Allowed Class 5 Claim is entitled shall remain unaltered under the Plan. |
| 6 | Secured Claim of Digital Federal Credit | N | Y | | Except to the extent that the holder of the Allowed Class 6 Claim agrees to different |

| | | | | Secured Claims |
|---|---|---|---|---|
| Class # | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | Union<br><br>• Collateral: New Hampshire Property<br><br>• Priority of Security Interest: First<br><br>• Total Claim Amount: $380,355<br><br>Collateral Value: approximately $1,000,000 | | | treatment, the Secured Claim of Digital Federal Credit Union (New Hampshire Property) shall be modified as follows:<br><br>Interest. Following the Effective Date, simple interest shall accrue on the Secured Claim at the rate of four and one-quarter percent (4.25%) per annum.<br>Payments. The monthly payment on account of the Secured Claim will be due on the first (1st) day of the first calendar month following the Effective Date and will be in an amount equal to (a) the interest accrued on the Secured Claim from the Effective Date through the end of the calendar month in which the Effective Date occurs plus (b) principal calculated on the basis of a 30-year amortization schedule. Thereafter, until maturity, a monthly payment will be due on the first (1st) day of each successive month in an amount equal to (a) the interest accrued on the unpaid principal balance of the Secured Claim during the previous month plus (b) an installment of principal calculated on the basis of a 30-year amortization schedule.<br>Maturity Date. The Secured Claim will be due and payable seven (7) years following the Effective Date.<br>Other Terms Unchanged. Except to the extent provided above, the legal, equitable and contractual rights to which the holder of the Allowed Class 4 Claim was otherwise entitled shall remain unaltered under the Plan. |
| 7 | Secured Claim of U.S. Bank<br><br>• Collateral: Nevada Property<br><br>• Priority of Security Interest: First<br><br>• Total Claim Amount: $209,343<br><br>Collateral Value: approximately $860,000 | N | Y | Except to the extent that the holder of the Allowed Class 7 Claim agrees to different treatment, the Secured Claim of U.S. Bank (Nevada Property) shall be modified as follows:<br><br>Interest. Following the Effective Date, simple interest shall accrue on the Secured Claim at the rate of four and one-quarter percent (4.25%) per annum.<br>Payments. The monthly payment on account of the Secured Claim will be due on the first (1st) day of the first calendar month following the Effective Date and will be in an amount equal to (a) the interest accrued on the Secured Claim from the Effective Date through the end of the calendar month in which the Effective Date occurs plus (b) principal calculated on the basis of a 30-year |

| Secured Claims | | | | |
|---|---|---|---|---|
| **Class #** | **Description** | **Insiders (Y/N)** | **Impaired (Y/N)** | **Treatment** |
| | | | | amortization schedule. Thereafter, until maturity, a monthly payment will be due on the first (1st) day of each successive month in an amount equal to (a) the interest accrued on the unpaid principal balance of the Secured Claim during the previous month plus (b) an installment of principal calculated on the basis of a 30-year amortization schedule. <u>Maturity Date</u>. The Secured Claim will be due and payable seven (7) years following the Effective Date. <u>Other Terms Unchanged</u>. Except to the extent provided above, the legal, equitable and contractual rights to which the holder of the Allowed Class 7 Claim was otherwise entitled shall remain unaltered under the Plan. |
| 8 | Secured Claim of Wells Fargo Bank<br><br>• Collateral: Vonnie Lane Property<br><br>• Priority of Security Interest: First<br><br>• Total Claim Amount: $444,048<br><br>Collateral Value: approximately $700,000 | N | Y | Except to the extent that the holder of the Allowed Class 8 Claim agrees to different treatment, the Secured Claim of Wells Fargo Bank (Vonnie Lane Property) shall be modified as follows:<br><br><u>Interest</u>. Following the Effective Date, simple interest shall accrue on the Secured Claim at the rate of four and one-quarter percent (4.25%) per annum.<br><u>Payments</u>. The monthly payment on account of the Secured Claim will be due on the first (1st) day of the first calendar month following the Effective Date and will be in an amount equal to (a) the interest accrued on the Secured Claim from the Effective Date through the end of the calendar month in which the Effective Date occurs plus (b) principal calculated on the basis of a 30-year amortization schedule. Thereafter, until maturity, a monthly payment will be due on the first (1st) day of each successive month in an amount equal to (a) the interest accrued on the unpaid principal balance of the Secured Claim during the previous month plus (b) an installment of principal calculated on the basis of a 30-year amortization schedule. <u>Maturity Date</u>. The Secured Claim will be due and payable seven (7) years following the Effective Date. <u>Other Terms Unchanged</u>. Except to the extent provided above, the legal, equitable and contractual rights to which the holder of the Allowed Class 8 Claim was otherwise entitled shall remain unaltered under the Plan. |

| Secured Claims | | | | |
|---|---|---|---|---|
| **Class #** | **Description** | **Insiders (Y/N)** | **Impaired (Y/N)** | **Treatment** |
| | | | | |
| 9 | Secured Claim of Wells Fargo Bank<br><br>• Collateral: N. Olive Street Property<br><br>• Priority of Security Interest: First<br><br>• Total Claim Amount: $187,283<br><br>Collateral Value: approximately $660,000 | N | Y | Except to the extent that the holder of the Allowed Class 9 Claim agrees to different treatment, the Secured Claim of Wells Fargo Bank (N. Olive Street Property) shall be modified as follows:<br><br>Interest. Following the Effective Date, simple interest shall accrue on the Secured Claim at the rate of four and one-quarter percent (4.25%) per annum.<br>Payments. The monthly payment on account of the Secured Claim will be due on the first (1st) day of the first calendar month following the Effective Date and will be in an amount equal to (a) the interest accrued on the Secured Claim from the Effective Date through the end of the calendar month in which the Effective Date occurs plus (b) principal calculated on the basis of a 30-year amortization schedule. Thereafter, until maturity, a monthly payment will be due on the first (1st) day of each successive month in an amount equal to (a) the interest accrued on the unpaid principal balance of the Secured Claim during the previous month plus (b) an installment of principal calculated on the basis of a 30-year amortization schedule.<br>Maturity Date. The Secured Claim will be due and payable seven (7) years following the Effective Date.<br>Other Terms Unchanged. Except to the extent provided above, the legal, equitable and contractual rights to which the holder of the Allowed Class 9 Claim was otherwise entitled shall remain unaltered under the Plan. |
| 10 | Secured Claim of Pacific Premier Bank<br><br>• Collateral: N. Olive Street Property<br><br>• Priority of Security Interest: Second<br><br>• Total Claim Amount: $150,321<br><br>Collateral Value: approximately $660,000 | N | Y | Except to the extent that the holder of the Allowed Class 10 Claim agrees to different treatment, the Secured Claim of Pacific Premier Bank (N. Olive Street Property) shall be modified as follows:<br><br>Interest. Following the Effective Date, simple interest shall accrue on the Secured Claim at the rate of five and one-quarter percent (5.25%) per annum.<br>Maturity Date. The Secured Claim will be due and payable on January 1, 2024.<br>Other Terms Unchanged. Except to the extent provided above, the legal, equitable and contractual rights to which the holder of the Allowed Class 10 Claim was otherwise entitled shall remain unaltered under the Plan. |

| Secured Claims | | | | |
|---|---|---|---|---|
| **Class #** | **Description** | **Insiders (Y/N)** | **Impaired (Y/N)** | **Treatment** |
| | | | | |
| 11 | Cross-Collateralized Secured Claim of Pacific Premier Bank<br><br>• Collateral: Newman Street Property, Bishop Street Property, Del Amo Blvd. Property, Denni Street Property and PPB UCC-1<br><br>• Priority of Security Interest: First<br><br>• Total Claim Amount: $1,142,254<br><br>Collateral Value: approximately $2,985,000 | N | Y | Except to the extent that the holder of the Allowed Class 11 Claim agrees to different treatment, the Cross-Collateralized Secured Claim of Pacific Premier Bank (Newman Street Property, Bishop Street Property, Del Amo Blvd. Property, Denni Street Property and PPB UCC-1) shall be modified as follows:<br><br>Interest.  Following the Effective Date, simple interest shall accrue on the Secured Claim at the rate of four and one-quarter percent (4.25%) per annum.<br>Other Terms Unchanged.  Except to the extent provided above, the legal, equitable and contractual rights to which the holder of the Allowed Class 11 Claim was otherwise entitled shall remain unaltered under the Plan. |
| 12 | Secured Claim of OCWEN<br><br>• Collateral: San Alto Way Property<br><br>• Priority of Security Interest: First<br><br>• Total Claim Amount: $260,867<br><br>Collateral Value: approximately $500,000 | N | Y | Except to the extent that the holder of the Allowed Class 12 Claim agrees to different treatment, the Secured Claim of OCWEN (Stratton Court Property) shall be modified as follows:<br><br>Interest.  Following the Effective Date, simple interest shall accrue on the Secured Claim at the rate of four and one-quarter percent (4.25%) per annum.<br>Other Terms Unchanged.  Except to the extent provided above, the legal, equitable and contractual rights to which the holder of the Allowed Class 12 Claim was otherwise entitled shall remain unaltered under the Plan. |
| 13 | Secured Claim of OCWEN<br><br>• Collateral: Stratton Court Property<br><br>• Priority of Security Interest: First<br><br>• Total Claim Amount: $270,160<br><br>Collateral Value: | N | Y | Except to the extent that the holder of the Allowed Class 13 Claim agrees to different treatment, the Secured Claim of OCWEN (Stratton Court Property) shall be modified as follows:<br><br>Interest.  Following the Effective Date, simple interest shall accrue on the Secured Claim at the rate of four and one-quarter percent (4.25%) per annum.<br>Other Terms Unchanged.  Except to the extent provided above, the legal, equitable and contractual rights to which the holder of |

| | | Secured Claims | | |
|---|---|---|---|---|
| **Class #** | **Description** | **Insiders (Y/N)** | **Impaired (Y/N)** | **Treatment** |
| | approximately $436,000 | | | the Allowed Class 13 Claim was otherwise entitled shall remain unaltered under the Plan. |
| 14 | Secured Claim of OCWEN<br><br>• Collateral: 8479 Cedarview Court Property<br><br>• Priority of Security Interest: First<br><br>• Total Claim Amount: $237,521<br><br>Collateral Value: approximately $400,000 | N | Y | Except to the extent that the holder of the Allowed Class 14 Claim agrees to different treatment, the Secured Claim of OCWEN (8479 Cedarview Court Property) shall be modified as follows:<br><br>Interest.  Following the Effective Date, simple interest shall accrue on the Secured Claim at the rate of four and one-quarter percent (4.25%) per annum.<br>Other Terms Unchanged.  Except to the extent provided above, the legal, equitable and contractual rights to which the holder of the Allowed Class 14 Claim was otherwise entitled shall remain unaltered under the Plan. |
| 15 | Secured Claim of OCWEN<br><br>• Collateral: 8475 Cedarview Court Property<br><br>• Priority of Security Interest: First<br><br>• Total Claim Amount: $237,521<br><br>Collateral Value: approximately $375,000 | N | Y | Except to the extent that the holder of the Allowed Class 15 Claim agrees to different treatment, the Secured Claim of OCWEN (8475 Cedarview Court Property) shall be modified as follows:<br><br>Interest.  Following the Effective Date, simple interest shall accrue on the Secured Claim at the rate of four and one-quarter percent (4.25%) per annum.<br>Other Terms Unchanged.  Except to the extent provided above, the legal, equitable and contractual rights to which the holder of the Allowed Class 15 Claim was otherwise entitled shall remain unaltered under the Plan. |
| 16 | Secured Claim of Tarnutzer<br><br>• Collateral: Judgment Lien on certain Real Property and Personal Property<br><br>• Priority of Security Interest: junior to liens of Real Property Lenders and pre-existing liens on personal property<br><br>• Total Claim Amount: $2,547,301 | N | Y | To the extent that the creditor in this Class is determined to have an Allowed Secured Claim, such Allowed Secured Claim will be paid in full within 120 days from the entry of a Final Order in the Tarnutzer Litigation allowing the Claim.  Any such Allowed Claim will be satisfied first from the Interpled DV Sale Proceeds and, thereafter, to the extent necessary, from the proceeds of a Sale and/or Refinancing of some or all of the Real Property. |

| Secured Claims | | | | |
|---|---|---|---|---|
| **Class #** | **Description** | **Insiders (Y/N)** | **Impaired (Y/N)** | **Treatment** |
| | • Collateral Value (Real Property): Approximately $7.6 million (Claimant does not have a lien against the New Hampshire Property or the Nevada Property). Under the Plan, the value from which the Class 16 Claim may be paid is approximately $1.8 million in Interpled DV Sale Proceeds and approximately $8.8 million in total equity in Real Property (which figure includes the value of the New Hampshire Property and the Nevada Property) | | | |
| 17 | Secured Claim of Alliant Credit Union<br><br>• Collateral: Lien on Tesla<br><br>• Priority of Security Interest: First<br><br>• Total Claim Amount: $86,648<br><br>Collateral Value: approximately $73,000 | N | N | Except to the extent that the holder of the Allowed Class 17 Claim agrees to different treatment, the legal, equitable and contractual rights to which the holder of the Allowed Class 17 Claim is entitled shall remain unaltered under the Plan. |
| 18 | Secured Tax Claims<br><br>• Los Angeles: $12,761<br>• Orange County: $51,854 | N | N | Except to the extent that the holder of the Allowed Class 18 Claim agrees to different treatment, the legal, equitable and contractual rights to which the holder of the Allowed Class 18 Claim is entitled shall remain unaltered under the Plan. |

If a secured creditor disputes the value of its collateral as stated above, that secured creditor must timely File an objection to confirmation of the Plan, or the value

1  stated by the Debtor may be determined to be the value of the collateral.  The objection

2  must be accompanied by competent evidence of valuation.  If the value of the collateral is

3  disputed, the Court may schedule a separate hearing to determine value.

4                          c.      Class of Priority Claims

5          Certain Priority Claims that are referred to in Bankruptcy Code §§ 507(a)(3), (4),

6  (5), (6), and (7) are required to be placed in Classes in a chapter 11 plan.  The Bankruptcy

7  Code requires that each Holder of a Priority Claim receive Cash on the Effective Date

8  equal to the allowed amount of such Claim.  However, a Class of unsecured Priority Claim

9  Holders may vote to accept deferred Cash payments of a value, as of the Effective Date,

10  equal to the allowed amount of such Claim.

11        The following chart lists all Classes containing the Debtor's Bankruptcy Code

12  §§ 507(a)(3), (4), (5), (6), and (7) Priority Claims and their treatment under the Plan:

| Priority Claims | | | | |
|---|---|---|---|---|
| **Class #** | **Description** | **Insiders (Y/N)** | **Impaired (Y/N)** | **Treatment** |
| 19 | Priority Claims<br><br>Estimated total amount of claims: $693 | N | N | Each Allowed Priority Claim in Class 19 will be paid in full on the Effective Date. |

d.      Class of General Unsecured Claims

General Unsecured Claims are unsecured Claims not entitled to priority under

Bankruptcy Code § 507(a).  The following chart identifies the Plan's treatment of General

Unsecured Claims:

| General Unsecured Claims | | | | |
|---|---|---|---|---|
| **Class #** | **Description** | **Insiders (Y/N)** | **Impaired (Y/N)** | **Treatment** |
| 20 | General Unsecured Claims (other than Tarnutzer and Fern)<br>Estimated total amount of claims: $271,000 | Y | N | Each Allowed General Unsecured Claim in Class 20 (with the exception of Tarnutzer and Fern) will be paid on the later of (i) the Effective Date or (ii) upon entry of an order allowing the Claim, except to the extent that a Holder of such Claim agrees to other terms. |

| General Unsecured Claims | | | | |
|---|---|---|---|---|
| Class # | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| 21 | General Unsecured Claim of Tarnutzer<br>Estimated total amount of claim: $805,709 (disputed) | Y | Y | To the extent that the Tarnutzer is determined to have an Allowed General Unsecured Claim, such Allowed General Unsecured Claim will be paid in full within 120 days from the entry of a Final Order in the Tarnutzer Litigation allowing the Claim.  Any such Allowed Claim will be satisfied first from the Interpled DV Sale Proceeds and, thereafter, to the extent necessary, from the proceeds of a Sale and/or Refinancing of some or all of the Real Property. |
| 22 | General Unsecured Claim of Fern<br>Estimated total amount of claim: $4,132,500 (disputed) | Y | Y | To the extent that Fern is determined to have an Allowed General Unsecured Claim, such Allowed Claim will be satisfied from the proceeds of a Sale and/or Refinancing of some or all of the Real Property.  Such Allowed General Unsecured Claim will be paid in full within 120 days from the entry of a Final Order in the Fern Litigation allowing the Claim; *provided, however*, that if Fern obtains an Allowed Claim prior to resolution of the Tarnutzer Litigation, Fern shall be granted a lien on the Real Property subject to the Tarnutzer Lien, junior to the existing liens thereon, to secure such Allowed Claim and shall be paid within one hundred and twenty (120) days following the entry of a Final Order resolving the Tarnutzer Litigation. |

### C.    Means of Effectuating the Plan

This section is intended to explain how the Debtor intends to effectuate the Plan, and how the Debtor intends to fund the obligations to Holders of Allowed Claims as provided in the Plan.  This section provides information regarding the funding sources for Plan obligations and other material issues bearing upon performance of the Plan.

### 1.    Funding the Plan

Distributions to creditors (other than to Tarnutzer and Fern) under the Plan will be funded with the Real Property Income and the Debtor's Income.  *See* Exhibit "1" (Projections) attached hereto.

1   Any Allowed Claim of Tarnutzer based on a Final Order in the Tarnutzer Litigation
2   will be satisfied first from the Interpled DV Sale Proceeds and, thereafter, to the extent
3   necessary to pay such Allowed Claim in full, from a Sale and/or Refinancing of some or all
4   of the Real Property.

5   Any Allowed Claim of Fern based on a Final Order in the Fern Litigation will be
6   satisfied from a Sale and/or Refinancing of some or all of the Real Property.

7   Effective Date payments on account of Professional Fee Claims and Class 20
8   General Unsecured Claims will be satisfied from the Debtor's Income and/or proceeds of
9   a Sale and/or Refinancing of the Real Property.

10                        a.      The Interpled DV Sale Proceeds

11  The Debtor may seek the release of the Interpled DV Sale Proceeds to utilize such
12  funds as an initial source of repayment on account of any Allowed Claim of Tarnutzer.  If
13  the release of the Interpled DV Sale Proceeds to the Debtor is effectuated prior to a
14  Distribution on account of any Allowed Claim of Tarnutzer, the Debtor shall maintain such
15  Interpled DV Sales Proceeds in a segregated, interest-bearing account, earmarked for
16  payment on account of any Allowed Claim of Tarnutzer pursuant to the Plan.  Such
17  payment to Tarnutzer from the Interpled DV Sale Proceeds held by the Debtor shall be
18  made within fifteen (15) days of a determination by Final Order that Tarnutzer holds an
19  Allowed Claim against the Debtor and shall be credited against the amount owed to
20  Tarnutzer by the Debtor.  The remaining balance owed to Tarnutzer shall be satisfied by
21  way of the proceeds from a Sale and/or Refinance of some or all of the Real Property.
22  Alternatively, should the Interpled DV Sale Proceeds not be released to the Debtor prior to
23  a determination by Final Order that Tarnutzer holds an Allowed Claim against the Debtor,
24  the Debtor shall release his claim to the Interpled DV Sale Proceeds (up to the amount of
25  the Allowed Claim) and such amount of the Interpled DV Sale Proceeds shall be credited
26  against the amount owed to Tarnutzer on account of an Allowed Claim.  Any remaining
27  balance owed to Tarnutzer after crediting the amount of the Interpled DV Sale Proceeds

28

1  against the Allowed Claim shall be satisfied by way of the proceeds from a Sale and/or

2  Refinance of some or all of the Real Property.

3      Should the amount of the Interpled DV Proceeds exceed the Allowed Claim of

4  Tarnutzer, after deducting the amount necessary to satisfy the Allowed Claim of Tarnutzer

5  in full, any excess amount of Interpled DV Sale Proceeds not utilized to satisfy the

6  Allowed Claim of Tarnutzer in full shall be released to and/or retained by, as applicable,

7  the Reorganized Debtor.  To the extent the Interpled DV Sale Proceeds are still held by

8  the superior court in connection with the Tarnutzer Litigation at such time (*i.e.,* such funds

9  were not previously released to the Debtor), the Confirmation Order shall serve as an

10  order to the superior court authorizing and directing the release to the Reorganized Debtor

11  of any Interpled DV Sale Proceeds not needed to pay Tarnutzer in full on account of his

12  Allowed Claim against the Debtor, without any further action by any party.

13            b.    The Sale and/or Refinance of Some or All of the Real Property

14                  to Pay Allowed Claim of Tarnutzer

15      To the extent that the Interpled DV Sale Proceeds are insufficient to pay in full any

16  Allowed Claim of Tarnutzer, the Reorganized Debtor shall have a period of one hundred

17  and twenty (120) days from entry of a Final Order providing Tarnutzer with an Allowed

18  Claim against the Debtor (which 120-day deadline may be extended only by written

19  agreement with Tarnutzer or by Court order upon "cause" shown), to pay the remaining

20  balance due to Tarnutzer on account of his Allowed Claim.  The source of such payment

21  will be from a Sale and/or Refinancing of some or all of the Real Property, at the

22  Reorganized Debtor's sole discretion.  In the event that the Debtor does not obtain the

23  consent of Tarnutzer or a Court order extending the 120-day deadline, the Liquidating

24  Agent shall be appointed to carry out the Sale and/or Refinancing to pay the Allowed

25  Claim of Tarnutzer in place of the Reorganized Debtor.  Prior to the Confirmation Hearing,

26  the Debtor shall submit to the Court the identity of the Liquidating Agent and an

27  agreement with the Liquidating Agent setting forth the terms of such appointment.

28

1120604.1                          48                  DISCLOSURE STATEMENT

1    In connection with any Sale or Refinancing of the Real Property, provided that the

2    net proceeds of such Sale or Refinancing (after payment of transaction costs and senior

3    liens against the applicable Real Property, and after reserving for any tax obligations in

4    connection therewith) are earmarked to pay Tarnutzer on account of his Allowed Claim,

5    the Tarnutzer Lien shall be deemed released from the applicable Real Property subject to

6    such Sale or Refinancing, without any further action by any party.  Any entity facilitating

7    such a Sale or Refinancing (including, without limitation, any purchaser, lender, title or

8    escrow company) shall be entitled to rely solely on the Confirmation Order as evidence of

9    such release of the Tarnutzer Lien in connection with such Sale or Refinancing.  In

10    addition, upon payment in full on account of any Allowed Claim of Tarnutzer, the ORAP

11    Lien shall be deemed released from the Debtor's personal property, without any further

12    action by any party.

13        c.    The Sale and/or Refinance of Some or All of the Real Property

14                to Pay Allowed Claim of Fern

15    The source of such payment to Fern on account of any Allowed Claim will be from

16    a Sale and/or Refinancing of some or all of the Real Property, at the Reorganized

17    Debtor's sole discretion.  The Reorganized Debtor shall have a period of one hundred and

18    twenty (120) days from entry of a Final Order providing Fern with an Allowed Claim

19    against the Debtor (which 120-day deadline may be extended only by written agreement

20    with Fern or by Court order upon "cause" shown), to pay Fern on account of any Allowed

21    Claim; *provided, however*, that if Fern obtains an Allowed Claim prior to resolution of the

22    Tarnutzer Litigation, Fern shall be granted a lien on the Real Property subject to the

23    Tarnutzer Lien, junior to the existing liens thereon, to secure such Allowed Claim and shall

24    be paid within one hundred and twenty (120) days following the entry of a Final Order

25    resolving the Tarnutzer Litigation.  In the event that the Debtor does not obtain the

26    consent of Fern or a Court order extending the applicable 120-day deadline, the

27    Liquidating Agent shall be appointed to carry out the Sale and/or Refinancing to pay the

28

1 Allowed Claim of Fern in place of the Reorganized Debtor.  Prior to the Confirmation

2 Hearing, the Debtor shall submit to the Court the identity of the Liquidating Agent and an

3 agreement with the Liquidating Agent setting forth the terms of such appointment.

4      In connection with any Sale or Refinancing of the Real Property, provided that the

5 net proceeds of such Sale or Refinancing (after payment of transaction costs and senior

6 liens against the applicable Real Property, and after reserving for any tax obligations in

7 connection therewith) are earmarked to pay Fern on account of his Allowed Claim, any

8 lien granted to Fern shall be deemed released from the applicable Real Property subject

9 to such Sale or Refinancing, without any further action by any party.  Any entity facilitating

10 such a Sale or Refinancing (including, without limitation, any purchaser, lender, title or

11 escrow company) shall be entitled to rely solely on the Confirmation Order as evidence of

12 such release of the lien held by Fern in connection with such Sale or Refinancing.

13       **2.**     **Disbursing Agent**

14      The Reorganized Debtor shall act as the disbursing agent for the purpose of

15 making the Distributions provided for under the Plan.

16       **3.**     **The Reorganized Debtor**

17      As the Debtor is an individual, he will remain in charge of his financial affairs post-

18 confirmation as the Reorganized Debtor.

19      **D.**     <u>**Risk Factors**</u>

20      Performance of the obligations under the Plan are subject to various factors and

21 contingencies, some of which are described in this section.  The following discussion

22 summarizes some of the material risks associated with the Plan, but is not intended to be

23 exhaustive.  Moreover, it should be read in connection with the other disclosures

24 contained in this Disclosure Statement and the Plan.  Each creditor, in conjunction with its

25 advisors, should supplement the following discussion by analyzing and evaluating the

26 Plan and Disclosure Statement as a whole.  THE RISKS ASSOCIATED WITH THE PLAN

27

28

1 MUST BE CAREFULLY CONSIDERED IN DETERMINING WHETHER TO ACCEPT THE

2 PLAN.

3      The Debtor's ability to make the Effective Date Payments and to fund payments to

4 certain creditors depends on the continued generation of rental income from the Real

5 Property and the Debtor's ability to generate post-petition earnings.  With respect to any

6 Allowed Claim of Tarnutzer obtained in connection with the Tarnutzer Litigation, such

7 payment in full depends on the Debtor's ability to utilize the Interpled DV Sale Proceeds

8 and to monetize the equity in the Real Property.  Similarly, the Debtor's ability to pay any

9 Allowed Claim of Fern obtained in connection with the Fern Litigation depends on the

10 Debtor's ability to monetize the equity in the Real Property.  In addition, it is likely that the

11 Debtor may need to monetize the equity in the Real Property to satisfy the Professional

12 Fee Claims and Effective Date payments to Class 20 General Unsecured Claims.  There

13 is always a risk that the Debtor's Real Property assets could decline in value.  However,

14 the value would have to decline by millions of dollars before the Debtor would not to be

15 able to fund the Plan payments and such a significant change in the market is not likely to

16 occur.  In addition, Tarnutzer will continue to hold the Tarnutzer Lien and ORAP Lien

17 against certain of the Debtor's Real Property and personal property assets to secure

18 repayment of any Allowed Claim (subject to release of the Tarnutzer Lien and ORAP Lien

19 in connection with a Sale and/or Refinancing that would pay Tarnutzer as discussed in

20 Section III.C.1 hereof).  Moreover, even assuming that the Debtor was for some reason

21 not entitled to directly receive the $1.8 million in Interpled DV Sale Proceeds as the 100%

22 owner of Domingo Villas, and such funds were determined to be properly paid directly to

23 Tarnutzer, the application of such funds would reduce the amount of any Allowed Claim of

24 Tarnutzer by approximately $1.8 million and, therefore, would significantly reduce the

25 amount that would need to be paid to Tarnutzer under the Plan from a Sale and/Refinance

26 of the Real Property.  In addition, to the extent that the Fern Litigation is resolved prior to

27 resolution of the Tarnutzer Litigation, and results in Fern holding an Allowed Claim against

28

1120604.1                    51                    DISCLOSURE STATEMENT

1   the Debtor, Fern will be granted a lien on the Real Property junior to the existing liens of

2   the Real Property Lenders and Tarnutzer to secured payment of such Allowed Claim.

3       **E.**      **Provisions Governing Distributions**

4           **1.      Dates of Distributions**

5           Effective Date Payments shall be deemed timely made if made as soon as

6   practicable after the Effective Date, but, in any event, within fifteen (15) days of the

7   Effective Date.  Any Distribution required to be made when a Disputed Claim becomes an

8   Allowed Claim shall be deemed timely made if made as soon as practicable thereafter,

9   but, in any event, within fifteen (15) days thereafter.

10          **2.      Manner of Distribution**

11          At the option and in the sole discretion of the Reorganized Debtor, monetary

12  Distributions may be made by (i) wire transfers from, or (ii) a check drawn on a domestic

13  bank approved by the OUST.

14          **3.      Delivery of Distributions in General**

15          Distributions to Holders of Allowed Claims shall be made by the Reorganized

16  Debtor (a) at the addresses set forth on the Proof of Claim filed by such Holders, (b) at the

17  addresses reflected in the Schedules if no Proof of Claim has been filed and the

18  Reorganized Debtor has not received a written notice of a change of address, or (c) in the

19  case of a Holder of a Claim that is governed by an agreement and is administered by an

20  agent or servicer, at the address (i) set forth on any Proof of Claim filed by the agent or

21  servicer, (ii) in the Schedules for the agent or servicer if no Proof of Claim has been filed,

22  or (iii) contained in the official records of such agent or servicer.  Holders of Claims may

23  change the address to which Distributions will be sent by filing a written change of

24  address with the Court and serving a copy of the change of address on the Reorganized

25  Debtor.

26          If a Distribution to any Holder of an Allowed Claim is returned to the Reorganized

27  Debtor as undeliverable or otherwise unclaimed ("Undeliverable Distribution"), the

28

1120604.1                                    52                    DISCLOSURE STATEMENT

Reorganized Debtor shall make no further Distributions to such Holder unless and until the Reorganized Debtor is notified in writing of such Holder's then-current address, at which time all Undeliverable Distributions shall be made to such Holder without interest. All Undeliverable Distributions shall be returned to the Reorganized Debtor until such Undeliverable Distributions are claimed.  The Reorganized Debtor shall, in the case of Cash, hold Undeliverable Distributions in a segregated interest-bearing account for Undeliverable Distributions until such Undeliverable Distributions become deliverable, is claimed or is forfeited.  Nothing contained in the Plan shall require the Debtor, or anyone else, to attempt to locate the intended recipient of an Undeliverable Distribution.

Any Holder of an Allowed Claim that does not present itself within six (6) months of the Distribution Date upon which the Undeliverable Distribution was made shall be deemed to have forfeited its right or Claim to or interest in the Undeliverable Distribution and shall be forever barred and enjoined from asserting any Claim for the Undeliverable Distribution against the Debtor and his Estate, the Reorganized Debtor, and their respective agents, attorneys, representatives, employees or independent contractors, and/or any of their property.  In such cases, the Undeliverable Distribution and accrued interest thereon shall become property of the Reorganized Debtor free and clear of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary and shall be distributed in accordance with the terms of the Plan.

### 4.    Rounding Payments

The Reorganized Debtor shall not be required to make Distributions or payments of fractions of dollars.  Whenever any payment of a fraction of a dollar under this Plan would otherwise be called for, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down.

**5.      Interest on Claims**

Unless otherwise specifically provided for in the Plan, post-petition interest shall not accrue or be paid on any Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim.

**6.      Compliance with Tax Requirements**

In connection with the Plan, and all Distributions under this Plan, the Reorganized Debtor shall, to the extent applicable, comply with all tax withholding, payment and reporting requirements imposed by federal, state, or local taxing authorities.  The Reorganized Debtor shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding, payment, and reporting requirements.  All amounts properly withheld from Distributions to a Holder of a Claim as required by applicable law and paid over to the applicable taxing authority for the account of such Holder shall be treated as part of the Distributions to such Holder.  All persons Holding Claims shall be required to provide any information necessary to effect information reporting and withholding of such taxes.  If such information has not been received by the Reorganized Debtor, then the Reorganized Debtor may, at his option, withhold the amount required and distribute the balance to such Holder or decline to make the Distribution until the information is received.

Notwithstanding any other provision of the Plan, (a) each Holder of an Allowed Claim that is to receive a Distribution pursuant to this Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding, and other tax obligations, on account of such Distribution, and (b) no Distribution shall be made to or on behalf of such Holder pursuant to the Plan unless and until such Holder has made arrangements satisfactory to the Reorganized Debtor for the payment and satisfaction of such withholding tax obligations or such tax obligation that would be imposed upon the Debtor in connection with such Distribution.  Any property to be distributed pursuant to the Plan shall, pending

1   implementation of such arrangements, be treated as an Undeliverable Distribution

2   pursuant to Section III.E.3 above.

3             **7.    De Minimis Distributions**

4        The Reorganized Debtor shall not have any obligations to make a Distribution on

5   account of an Allowed Claim if the amount to be distributed to the specific Holder of the

6   Allowed Claim on a Distribution Date is for an amount of $5.00 or less, and may, at the

7   Reorganized Debtor's option, either add the Distribution to the next Distribution if the

8   collective amount would be greater than $5.00 or treat the Distribution as an

9   Undeliverable Distribution.

10            **8.    Setoffs**

11        Except as otherwise stated in the Plan, the Debtor may, pursuant to 11 U.S.C.

12   § 553 or applicable non-bankruptcy law, but shall not be required to, set off against any

13   Allowed Claim and the Distribution to be made pursuant to the Plan on account of such

14   Allowed Claim any account stated, Claim, right, or Cause of Action which the Debtor or

15   the Estate possesses against the Holder of such Allowed Claim; provided, however, that

16   neither the failure to effect such a setoff nor the allowance of any Claim shall constitute a

17   waiver or release by the Debtor of any such account, Claim, right, and Cause of Action

18   that the Debtor or the Estate may possess against the Holder of such Allowed Claim.

19            **9.    Limitation on Liability**

20        The Reorganized Debtor, and any of his respective agents or Professionals, shall

21   not be liable for (i) any acts or omissions, except for willful misconduct, in connection with

22   implementing the Distribution provision of the Plan and the making or withholding of

23   Distributions under the Plan, or (ii) any change in the value of Distributions made under

24   the Plan resulting from any delays in making such Distributions in accordance with the

25   terms of the Plan (including, but not limited to, any delays caused by the resolution of

26   Disputed Claims).

27

28

**F.    Other Provisions of the Plan**

**1.    Claim Objections and Disputed Claims**

THE BAR DATE FOR FILING A PROOF OF CLAIM IN THIS CASE BY CLAIMANTS WHOSE CLAIMS WERE NOT SCHEDULED OR WERE SCHEDULED AS UNKNOWN, DISPUTED, CONTINGENT OR UNLIQUIDATED IS JUNE 26, 2017 (AS TO CREDITORS OTHER THAN GOVERNMENTAL UNITS) AND OCTOBER 6, 2017 (AS TO GOVERNMENTAL UNITS).

a.    Standing and Claim Objection Deadline

The Reorganized Debtor or any other party in interest shall have up until 180 days after the Effective Date to file objections to Claims.  The Reorganized Debtor or any other party in interest may obtain an extension of this date by filing a motion in the Court, based upon a showing of "cause."

b.    No Distribution Pending Allowance

Notwithstanding any other provision of the Plan, no payments or Distributions shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by Final Order, and the Disputed Claim, or some portion thereof, has become an Allowed Claim; provided, however, that if the only dispute regarding a Disputed Claim is to the amount of the Disputed Claim, the Holder of a Disputed Claim shall be entitled to a Distribution on account of that portion of the Disputed Claim which the Debtor does not dispute at the time and in the manner that the Debtor makes Distributions to the Holders of Allowed Claims pursuant to the provisions of the Plan.

A Disputed Claim is a Claim that has not been allowed or disallowed and to which either: (i) a Proof of Claim has been Filed or deemed Filed and the Debtor or another party in interest has Filed an objection; (ii) no Proof of Claim has been Filed and the Claim was not scheduled or the Debtor has scheduled such claim as disputed, contingent, unliquidated or unknown.

1    The Debtor will have the power and authority to settle and compromise a Disputed

2  Claim with Court approval and compliance with Bankruptcy Rule 9019 unless the amount

3  allowed by the compromise does not exceed $5,000, in which case no Court approval is

4  necessary.

5                              c.        Reserves for Disputed Claims

6    In the event that Disputed Claims are pending at the time of a Distribution under

7  the Plan, the Debtor shall establish and maintain a reserve for such Disputed Claims.

8  With respect to the Disputed Claims of Tarnutzer and Fern, no reserve(s) shall be

9  established; rather, such Disputed Claims shall be resolved by way of the appellate

10  process in connection with the Tarnutzer Litigation and in connection with the Fern

11  Litigation, respectively.  To the extent Tarnutzer is determined by Final Order to hold an

12  Allowed Claim, such Allowed Claim shall be satisfied in full, first, from the Interpled DV

13  Sales Proceeds and then, to the extent necessary, from the proceeds from a Sale and/or

14  Refinance of some or all of the Debtor's Real Property, as provided by the Plan.  To the

15  extent Fern is determined by Final Order to hold an Allowed Claim, such Allowed Claim

16  shall be satisfied in full from the proceeds from a Sale and/or Refinance of some or all of

17  the Debtor's Real Property, as provided by the Plan.

18                      **2.    Executory Contracts and Unexpired Leases**

19                              a.        Assumption and Assignment

20    Any executory contracts and/or unexpired leases to be assumed pursuant to the

21  provisions of sections 365 and 1123 of the Code shall be the subject of a motion filed by

22  the Debtor prior to the Effective Date of the Plan.  Any executory contracts and unexpired

23  leases assumed by the Debtor shall vest in the Reorganized Debtor as of the Effective

24  Date.

25                              b.        Rejections

26    Any executory contracts and/or unexpired leases to be rejected pursuant to the

27  provisions of sections 365 and 1123 of the Code may be the subject of a motion filed by

28

the Debtor prior to the Effective Date of the Plan.  A Proof of Claim arising from the rejection of an executory contract or unexpired lease pursuant to such motion must be filed no later than 30 days after entry of the Order authorizing the rejection.  The Debtor is conclusively deemed to have rejected all executory contracts and unexpired leases not previously assumed or rejected as of the Effective Date.  A Proof of Claim arising from the presumed rejection of an executory contract or unexpired lease must be filed no later than 30 days after entry of the Confirmation Order.  Claims arising from the rejection of an executory contract or unexpired lease under this section are General Unsecured Claims in Class 20, except to the extent the Court orders otherwise.  Any such rejection damage Claims that are not timely Filed and served will be forever barred and unenforceable against the Debtor, the Estate, the Reorganized Debtor, and their respective property. Persons holding these Claims who fail to timely file Claims will be barred from receiving any Distributions under the Plan on account of their requested rejection damage Claims.

### 3.    Changes in Rates Subject to Regulatory Commission Approval

The Debtor is an individual not subject to governmental regulatory commission approval of any rates.

### 4.    Preservation of Causes of Action and Avoidance Actions

The Debtor reserves for the Estate and the Reorganized Debtor all rights to commence and pursue, as appropriate, any and all Causes of Action and Avoidance Actions, whether arising prior to or after the Petition Date, in any court or other tribunal, including without limitation, in an adversary proceeding Filed in the Court, except for as otherwise provided in the Plan.  On the Effective Date, the Reorganized Debtor will be vested with authority to enforce, file, litigate, prosecute, settle and collect with respect to Causes of Action and Avoidance Actions, although he will not be required to do so and the determination of whether to do so will be made solely by the Reorganized Debtor in his absolute discretion.

1    Unless a Cause of Action or Avoidance Action against any Person is expressly

2  waived, relinquished, released, compromised or settled as provided or identified in the

3  Plan, any Confirmation Order or prior order of the Court, the Debtor expressly reserves

4  any Causes of Action and Avoidance Action for later adjudication.  Therefore, no

5  preclusion doctrine, including, without limitation, the doctrine of *res judicata*, collateral

6  estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise) or

7  laches shall apply to such Causes of Action or Avoidance Actions upon or after

8  Confirmation or consummation of the Plan.  All Avoidance Actions and other Causes of

9  Action are preserved under the Plan for the benefit of the Estate, except as otherwise

10  provided for in the Plan.  Any recoveries from Avoidance Actions and/or other Causes of

11  Action will be paid to the Reorganized Debtor.

12    ANY CREDITORS THAT BELIEVE THEY RECEIVED A TRANSFER OR SETOFF

13  THAT IS AVOIDABLE UNDER THE CODE OR THAT HOLDS A CLAIM AGAINST THE

14  ESTATE THAT COULD BE SUBJECT TO AN OBJECTION BASED UPON FAILURE TO

15  RETURN AN AVOIDABLE TRANSFER OR SETOFF, ARE DIRECTED TO REVIEW

16  THEIR RECORDS AND/OR THE DEBTOR'S SCHEDULES FOR FURTHER

17  INFORMATION, HOWEVER, ALL RIGHTS OF THE DEBTOR AND THE ESTATE ARE

18  RESERVED WITH RESPECT TO ANY AND ALL TRANSFERS OR SETOFF WHICH

19  MAY BE AVOIDABLE UNDER THE BANKRUPTCY CODE.

20    All professional fees incurred in pursuing the Avoidance Actions or other Causes of

21  Action shall be paid by the Reorganized Debtor without the necessity of a Court order.

22  However, the Bankruptcy Court will reserve exclusive jurisdiction to decide any and all

23  disputes regarding the payment of the fees and costs related to post-confirmation

24  professional fees, upon request of a party-in-interest and after notice and a hearing.

25

26

27

28

## 5.    Retention of Jurisdiction

The Court will retain exclusive jurisdiction during the Plan payout period to resolve disputes and conflicts arising from the administration of the Plan, upon request of a party-in-interest and after notice and a hearing, including, without limitation:

1.    The adjudication of the validity, scope, classification, allowance, and disallowance of any Claim;

2.    The estimation of any Claim;

3.    The allowance or disallowance of Professional Fee Claims, compensation, or other Administrative Claims;

4.    To hear and determine Claims concerning taxes pursuant to Bankruptcy Code §§ 346, 505, 525, and 1146;

5.    To hear and determine any action or proceeding brought under Bankruptcy Code §§ 108, 510, 543, 544, 545, 547, 548, 549, 550, 551, and 553;

6.    To hear and determine all actions and proceedings which relate to pre-confirmation matters;

7.    To hear and determine any issue relating to the assumption or rejection of executory contracts and unexpired leases;

8.    To hear and determine any modification to the Plan in accordance with the Bankruptcy Rules and the Bankruptcy Code;

9.    To enforce and interpret the terms of the Plan;

10.    To correct any defects, cure any omissions, or reconcile any inconsistency in the Plan or the Confirmation Order as may be necessary to carry out the purpose and intent of the Plan;

11.    The entry of any order, including injunctions, necessary to enforce title, rights and powers of the Debtor or Reorganized Debtor, and to impose such limitations, restrictions, terms and conditions on such title, rights and powers

1  as the Court may deem necessary including, without limitation, any right of

2  the Debtor or Reorganized Debtor to recover and liquidate assets;

3  12.  To determine the validity, extent and priority of all liens and security interests

4  against property of the Estate or the Reorganized Debtor;

5  13.  To hear and resolve any disputes in connection with any Sale and/or

6  Refinancing of the Real Property, including any extension of the 120-day

7  deadline and the appointment of the Liquidating Agent;

8  14.  To hear and resolve any disputes regarding employment applications and

9  professional fees;

10  15.  To hear and determine such matters and make such orders as are

11  consistent with the Plan as may be necessary to carry out the provisions

12  thereof and to adjudicate any disputes arising under or relating to any order

13  entered by the Court in this Case;

14  16.  The entry of an order concluding and terminating this Case; and

15  17.  To resolve any disputes as to whether there has been a default under the

16  Plan.

17  **6.    Tax Consequences of the Plan**

18  CREDITORS CONCERNED WITH HOW THE PLAN MAY AFFECT THEIR TAX

19  LIABILITY SHOULD CONSULT WITH THEIR OWN ACCOUNTANTS, ATTORNEYS,

20  AND/OR ADVISORS.  The following disclosure of possible tax consequences is intended

21  solely for the purpose of alerting readers about possible tax issues the Plan may present

22  to the Debtor and the Reorganized Debtor.  The Debtor and his professionals CANNOT

23  and DO NOT represent that the tax consequences contained below are the only tax

24  consequences of the Plan because the Tax Code embodies many complicated rules

25  which make it difficult to state completely and accurately all of the tax implications of any

26  action.

27

28

1       Due to the unsettled and complex nature of some of the tax issues, as well as the

2  possibility that developments subsequent to the date hereof could affect the tax

3  consequences of the Plan, the following discussion should not be regarded as definitive or

4  as covering all possible tax consequences.  Additionally, this summary does not discuss

5  all aspects of federal income taxation that may be relevant to a particular creditor in light

6  of its individual circumstances or to certain creditors subject to special treatment under the

7  federal income tax law (for example, life insurance companies, tax-exempt organizations,

8  foreign corporations and individuals who are not citizens or residents of the United

9  States).

10       As stated above, creditors concerned with how the Plan will affect their own tax

11  liability should consult with their own accountants, attorneys, and/or advisors.  The Debtor

12  is still in the process of determining the tax consequences of the Plan, but does not

13  believe that there will be a material taxable event upon any Sale of the Real Property.

14  However, the Debtor does not expect adverse consequences materially affecting the

15  distributions to the Holders of Allowed Claims under the Plan.

16                  **7.**    **Exemption from Transfer Taxes**

17       Pursuant to Bankruptcy Code § 1146(a), any transfers from the Debtor to the

18  Reorganized Debtor or to any other Person pursuant to the Plan in the United States shall

19  not be subject to any stamp, real estate transfer, personal property, recording or other

20  similar tax, and the Confirmation Order shall direct the appropriate state or local

21  governmental official or agents to forgo the collection of any such tax or governmental

22  assessment and to accept for filing and recordation any of the foregoing instruments or

23  other documents without payment of any such tax or governmental assessment.

24

25  **IV.**    **CONFIRMATION REQUIREMENTS AND PROCEDURES**

26       PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OF THE PLAN

27  SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON

28

1   CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX.  The following

2   discussion is intended solely for the purpose of alerting readers about basic confirmation

3   issues, which they may wish to consider, as well as certain deadlines for Filing Claims.

4   The Debtor CANNOT and DOES NOT represent that the discussion contained below is a

5   complete summary of the law on this topic.

6       Many requirements must be met before the Court can confirm a Plan.  Some of the

7   requirements include that the Plan must be proposed in good faith, acceptance of the

8   Plan, whether the Plan pays creditors at least as much as creditors would receive in a

9   chapter 7 liquidation, and whether the Plan is feasible.  These requirements are <u>not</u> the

10  only requirements for confirmation.

11      **A.    <u>Who May Vote or Object</u>**

12          **1.    Who May Object to Confirmation of the Plan**

13      Any party in interest may object to the confirmation of the Plan, but as explained

14  below, not everyone is entitled to vote to accept or reject the Plan.

15          **2.    Who May Vote to Accept/Reject the Plan**

16      A creditor has a right to vote for or against the Plan if that creditor has a Claim that:

17  (a) either is an Allowed Claim or is allowed for voting purposes; (b) is classified in an

18  impaired Class; and (c) is entitled to receive or retain some property on account of its

19  Claim.[21]

20              a.    <u>What is an Allowed Claim</u>

21      As noted above, a creditor must first have an Allowed Claim to have the right to

22  vote.  Generally, any Proof of Claim will be Allowed, unless a party in interest Files an

23  objection to that Claim.  When an objection to a Claim is Filed, the Holder of the Claim

24  cannot vote unless and until the Court, after notice and hearing, either overrules the

25  _____

26      [21] If the Plan provides that a Class will receive or retain no property on account of its Claim, that Class is
    deemed to reject the Plan under Bankruptcy Code § 1126(g) and therefore is not entitled to vote.

27

28  1120604.1                              63                   DISCLOSURE STATEMENT

1  objection or allows the Claim for voting purposes.  Any Person who seeks temporary

2  allowance of its Claim for the purpose of voting on the Plan must promptly take the steps

3  necessary to File an appropriate motion requesting the same and arrange an appropriate

4  hearing with the Court.

5      THE BAR DATE FOR FILING A PROOF OF CLAIM IN THIS CASE BY

6  CLAIMANTS WHOSE CLAIMS WERE NOT SCHEDULED OR WERE SCHEDULED AS

7  UNKNOWN, DISPUTED, CONTINGENT, OR UNLIQUIDATED IS JUNE 26, 2017 (AS TO

8  CREDITORS OTHER THAN GOVERNMENTAL UNITS) AND OCTOBER 6, 2017 (AS TO

9  GOVERNMENTAL UNITS).  A creditor may have an Allowed Claim even if a Proof of

10  Claim was not timely filed.  A Claim is deemed Allowed if (1) it is scheduled on the

11  Debtor's Schedules and such Claim is not scheduled as disputed, contingent, or

12  unliquidated, and (2) no party in interest has objected to the Claim.

13                          b.      What is an Impaired Claim

14      As noted above, the Holder of an Allowed Claim only has the right to vote if it is in a

15  Class that is impaired under the Plan.  A Class is impaired if the Plan alters the legal,

16  equitable, or contractual rights of the members of that Class.  For example, a Class

17  comprised of General Unsecured Claims is impaired if the Plan fails to pay the members

18  of that Class 100% of what they are owed or otherwise impairs the legal rights of the

19  Holders of the Claims.

20      In this case, the Debtor believes that Classes 3, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15,

21  16, 21 and 22 are impaired and Holders of Claims in each of these Classes are therefore

22  entitled to vote to accept or reject the Plan, unless otherwise specified below.  The Debtor

23  believes that Classes 1, 2, 4, 5, 17, 18, 19 and 20 are unimpaired under the Plan.  Any

24  party in interest who disputes the Debtor's characterization of its Claim as being in an

25  impaired or unimpaired Class may File an objection to the Plan contending that the Debtor

26  incorrectly characterized the Claim or Class.

27

28

### 3.    Who is Not Entitled to Vote

The following four types of Claims are not entitled to vote: (1) Claims that have been disallowed; (2) Claims in unimpaired Classes; (3) Claims entitled to priority pursuant to Bankruptcy Code §§ 507(a)(2), (a)(3), and (a)(8); and (4) Claims in Classes that do not receive or retain any value under the Plan.  Claims in unimpaired Classes are not entitled to vote because such Classes are deemed to have accepted the Plan.  Claims entitled to priority pursuant to Bankruptcy Code §§ 507(a)(2), (a)(3), and (a)(8) are not entitled to vote because such Claims are not placed into Classes and they are required to receive certain treatment specified by the Bankruptcy Code.  Claims in Classes that do not receive or retain any value under the Plan do not vote because such Classes are deemed to have rejected the Plan.  In this Case, Classes 1, 2, 4, 5, 17, 18, 19 and 20 are not entitled to vote on the Plan, but are deemed to have accepted the Plan.  EVEN IF YOUR CLAIM IS OF THE TYPE DESCRIBED ABOVE, YOU MAY STILL HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THE PLAN.

### 4.    Who Can Vote in More Than One Class

A creditor whose Claim has been Allowed in part as a Secured Claim and in part as a General Unsecured Claim is entitled to accept or reject the Plan in both capacities by casting one ballot for the secured portion of the Claim and another ballot for the unsecured portion of the Claim.

### 5.    Votes Necessary to Confirm the Plan

If impaired Classes exist, the Court cannot confirm the Plan unless (1) at least one impaired Class has accepted the Plan without counting the votes of any insiders within that Class, and (2) all impaired Classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cramdown" on non-accepting Classes, as discussed later in Section IV.A.7 and IV.A.8 below.

### 6.    Votes Necessary for a Class to Accept the Plan

A Class of Claims is considered to have accepted the Plan when more than one-half (1/2) in number, and at least two-thirds (2/3) in dollar amount, of the Claims which actually voted, voted in favor of the Plan.

### 7.    Treatment of Nonaccepting Classes

If at least one impaired Class votes to accept the Plan, and other impaired Classes vote to reject the Plan, the Court may nonetheless confirm the Plan if the nonaccepting Classes are treated in the manner required by the Bankruptcy Code.  The process by which nonaccepting Classes are forced to be bound by the terms of a Plan is commonly referred to as "cramdown."  The Bankruptcy Code allows the Plan to be "crammed down" on nonaccepting Classes of Claims if it meets all consensual requirements except the voting requirements of § 1129(a)(8) and if the Plan does not "discriminate unfairly" and is "fair and equitable" toward each impaired Class that has not voted to accept the Plan as referred to in § 1129(b) and applicable case law.

### 8.    Request for Confirmation Despite Nonacceptance by Impaired Class

The Debtor will ask the Court to confirm the Plan by "cramdown" on all impaired Classes if any of these Classes do not vote to accept the Plan.

### B.    Liquidation Analysis

Another confirmation requirement is the so-called "Best Interests Test" embodied in Bankruptcy Code § 1129(a)(7), which requires a liquidation analysis.  Under the Best Interests Test, if a claimant is in an impaired Class and that claimant does not vote to accept the Plan, then that claimant must receive or retain under the Plan property of a value not less than the amount that such Holder would receive or retain if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code.

In a chapter 7 case, the debtor's assets are usually sold by a chapter 7 trustee. Secured creditors are paid first from the sales proceeds of properties on which the

1  secured creditor has a lien.  Administrative Claims are paid next.  Next, unsecured

2  creditors are paid from any remaining sale proceeds, according to their rights to priority.

3  Unsecured creditors with the same priority share in proportion to the amount of their

4  Allowed Claims in relationship to the amount of total allowed unsecured claims.

5  For the Court to be able to confirm the Plan, the Court must find that all creditors

6  who do not accept the Plan will receive at least as much under the Plan as holders would

7  receive under a chapter 7 liquidation.  The Debtor maintains that this requirement is met

8  here because the Plan provides for 100% payment to creditors, as set forth in Exhibit "2"

9  (Schedule of Net Asset Value) attached hereto.  Therefore, creditors will receive at least

10  as much as they would receive in a hypothetical chapter 7 liquidation.

11  Below is demonstration, in tabular format, that all creditors are projected to receive

12  at least as much under the Plan as such creditor would receive under a chapter 7

13  liquidation.

| CLAIMS & CLASSES | PAYOUT PERCENTAGE UNDER THE PLAN | PAYOUT PERCENTAGE IN CHAPTER 7 LIQUIDATION |
|---|---|---|
| Administrative Claims | 100% | 100% |
| Priority Tax Claims | 100% | 100% |
| Classes 1 through 15 - Secured Claims of Real Property Lenders | 100% | 100% |
| Class 16 - Secured Claim of Tarnutzer | 100% | 100% |
| Class 17 - Secured Claim of Alliant Credit Union (Tesla) | 100% | 100% |
| Class 18 – Secured Tax Claims | 100% | 100% |
| Class 19 – Priority Unsecured Claims | 100% | 100% |
| Class 20 – General Unsecured Claims (other than Tarnutzer and Fern) | 100% | 100% |
| Class 21 – Unsecured Claim of Tarnutzer | 100% | 100% |
| Class 22 – Unsecured Claim of Fern | 100% | 100% |

## C.    Feasibility

Another requirement for confirmation involves the feasibility of the Plan, which

means that confirmation of the Plan is not likely to be followed by the liquidation, or the

1  need for further financial reorganization of the Debtor or any successor to the Debtor

2  under the Plan, unless such liquidation or reorganization is proposed in the Plan.

3       There are at least two important aspects of a feasibility analysis.  The first aspect

4  considers whether the Debtor will have enough Cash on hand on the Effective Date of the

5  Plan to pay all the Claims and expenses which are entitled to be paid on such date.  The

6  Debtor maintains that this aspect of feasibility is satisfied.  As set forth in Exhibit "1"

7  attached hereto, Effective Date Payments to Administrative Claimants and General

8  Unsecured Claimants, are estimated to be approximately $700,000.  These Claimants will

9  be paid from Cash on hand in the Estate, the Debtor's Income and/or from the proceeds

10  of a Sale and/or Refinancing of the Real Property.

11       The second aspect considers whether the Reorganized Debtor will have enough

12  Cash over the life of the Plan to make the required Plan payments.  The Debtor has

13  satisfied this aspect as well.  The remaining payments to be made are to the holders of

14  Secured Claims of the Real Property Lenders, which will (with the exception of the

15  Surfside Property) continue to be satisfied from the Real Property Income, as set forth in

16  Exhibit "1" attached hereto.  The payments to the Real Property Lenders on the Surfside

17  Property, and to Alliant Credit Union, will continue to be satisfied from the Debtor's

18  Income, as set forth in Exhibit "1" attached hereto.

19       With respect to any Allowed Claim of Tarnutzer, the Debtor will fund the payment

20  on account of any such Allowed Claim first from the Interpled DV Sale Proceeds and,

21  thereafter, to the extent necessary to pay such Allowed Claim in full, from the Sale and/or

22  Refinance of some or all of the Real Property.  With respect to any Allowed Claim of Fern,

23  the Debtor will fund the payment on account of any such Allowed Claim from the Sale

24  and/or Refinance of some or all of the Real Property.  As set forth in Exhibit "2" attached

25  hereto, the Interpled DV Sale Proceeds are in the amount of approximately $1.8 million,

26  and there is approximately $8.8 million in equity in the Real Property over and above the

27  Claims of the Real Property Lenders, providing the Debtor will sufficient funding sources

28

1120604.1                                           68                           DISCLOSURE STATEMENT

1  to make the payments called for under the Plan on account of all Claims.   In this regard,

2  the Debtor does not believe that there will be a material taxable event in connection with

3  any Sale of the Real Property.  In connection with confirmation of the Plan, the Debtor's

4  financial advisors will provide evidence of the likelihood of the Debtor's ability to sell

5  and/or refinance the Real Property in sufficient amounts, and within the specified

6  timeframe, to satisfy any Allowed Claim of Tarnutzer and/or Fern (and the Effective Date

7  payments to Class 20 General Unsecured Claimants and on account of Professional

8  Fees) and thereby demonstrate the feasibility aspect of the Plan.  Moreover, should the

9  120 day deadlines following allowance of the Tarnutzer Claim and/or Fern Claim for

10  undertaking the Sale and/or Refinance pass without extension by agreement or Court

11  order, the Liquidating Agent will be appointed to undertake such Sale and/or Refinancing.

12      In sum, the Debtor believes that he will have sufficient Cash on hand on the

13  Effective Date to fund all Effective Date Payments and will be able to make the other

14  required payments under the Plan through income generated by the Real Property and

15  the Debtor's business income, and to the extent necessary, through monetizing the equity

16  in the Real Property and utilization of the Interpled DV Sale Proceeds.

17      YOU ARE ADVISED TO CONSULT WITH YOUR ACCOUNTANT OR FINANCIAL

18  ADVISOR IF YOU HAVE ANY QUESTIONS PERTAINING TO ANY OF THE DEBTOR'S

19  FINANCIAL STATEMENTS.

20

21  **V.**    **EFFECT OF CONFIRMATION**

22      **A.**    **Discharge**

23      The rights under the Plan and the treatment of Claims under the Plan will be in

24  exchange for, and in complete satisfaction, discharge, and release of, all Claims of any

25  nature whatsoever (including, without limitation, any interest accrued on Claims from and

26  after the Petition Date) against the Debtor, the Reorganized Debtor, or their property.

27

28

Except as otherwise provided in the Plan or the Confirmation Order, and to the extent provided in further Court order pursuant to Bankruptcy Code § 1141(d)(5):

1. To the fullest extent permitted by Bankruptcy Code § 1141, the Debtor, the Debtor's Estate, the Reorganized Debtor, and their property will be deemed discharged and released from any and all Claims, including, without limitation, all demands, liabilities, Claims, that arose before the Confirmation Date or that are based upon or otherwise relate to acts, events, omissions, transactions or other activities of any kind that occurred before the Confirmation Date, and all debts of the kind specified in Bankruptcy Code §§ 502(g), 502(h), or 502(l) regardless of whether: (1) a Proof of Claim based on such a debt is Filed or deemed Filed; (2) a Claim based on such a debt is allowable under Bankruptcy Code § 502; or (3) the Person Holding the Claim based on such a debt has accepted the Plan;

2. All Persons will be precluded from asserting against the Debtor, the Estate, the Reorganized Debtor, or their property any other or further Claims based on, arising from, or in connection with any act, event, omission, transaction, or other activity of any kind that occurred before the Confirmation Date;

3. Any debt of the Debtor, whether secured or unsecured, which was in default as of or at any time prior to the Confirmation Date, will no longer be deemed in default.  Moreover, to the extent that the Debtor complies with the terms and conditions of the Plan, these obligations will be deemed in good standing; and

4. Subject to the limitations and conditions imposed under Bankruptcy Code § 1125(e), Persons who - in good faith and in compliance with applicable Bankruptcy Code provisions - solicit Plan acceptances or rejections will not be liable on account of their solicitation for violation of any applicable law,

1120604.1

70

DISCLOSURE STATEMENT

1   rule, or regulation governing the solicitation of Plan acceptances or

2   rejections.

3   **B.    Exculpation and Releases**

4   Effective upon the entry of the Confirmation Order, neither the Debtor, the

5   Reorganized Debtor, the Professionals, nor any of their respective members, officers,

6   directors, shareholders, employees, or agents, shall have or incur any liability to any

7   Persons, including any creditor of the Debtor for any act taken or omission made in

8   connection with or related to the negotiation, formulation, or preparation of the Plan and

9   the Disclosure Statement, the approval of the Disclosure Statement, the confirmation of

10  the Plan, the consummation of the Plan, or the administration of the Plan, the Case, or the

11  property to be distributed under the Plan, to the fullest extent permitted by applicable

12  statutes and case law, except that the Reorganized Debtor will be liable for performance

13  and obligations assumed by his or imposed upon him under or by the Plan.

14  **C.    Vesting of the Assets**

15  On the Effective Date, all property of the Estate will vest in the Reorganized Debtor

16  pursuant to § 1141(b), free and clear of all claims and interests except as provided in the

17  Plan.

18  **D.    Plan Creates New Obligations**

19  Except as otherwise stated in the Plan, the payments promised in the Plan

20  constitute new contractual obligations that replace those obligations to creditors that

21  existed prior to the Effective Date.

22  **E.    Creditor Action Restrained**

23  Creditors may not take any action to enforce either preconfirmation obligations or

24  obligations due under the Plan, so long as the Debtor is not in material default under the

25  Plan.  If the Debtor is in material default under the Plan, affected creditors may: (i) take

26  any action permitted under nonbankruptcy law to enforce the terms of the Plan; or (ii)

27  move to dismiss this case or to convert this case to a chapter 7 bankruptcy case.

28

1120604.1

DISCLOSURE STATEMENT

### F.   Material Default Defined

If the Debtor fails to make any payment required under the Plan, or to perform any other obligation required under the Plan for more than 14 days after the time specified in the Plan, the affected creditor may serve upon the Debtor and the Debtor's attorney a written notice of default.  The Debtor is in material default under the Plan if the Debtor fails within 21 days of the service of such notice of default, plus 3 additional days if served by mail, either: (i) to cure the default or (ii) to obtain from the Court an extension of time to cure the default or a determination that no default occurred.

### G.   Modification of the Plan

The Debtor may modify the Plan at any time before confirmation subject to Bankruptcy Code § 1127(a).  If the Plan is modified, however, the Court may require a new disclosure statement or re-voting on the Plan depending upon the nature of the modifications and their effect on parties in interest.  The Reorganized Debtor may also seek to modify the Plan at any time after confirmation subject to Bankruptcy Code § 1127(b), if: (a) the Plan has not been substantially consummated; and (b) the Court, after notice and a hearing, authorizes the proposed modification.

### H.   Post-Confirmation Status Report

Within 120 days of the entry of the Confirmation Order, the Reorganized Debtor shall file a status report with the Court explaining what progress has been made towards consummation of the confirmed Plan.  The status report shall be served on the OUST and the parties who have requested special notice.  Further status reports shall be filed every 120 days and served on the same entities.

### I.   Quarterly Fees

Quarterly fees accruing under 28 U.S.C. § 1930(a)(6) prior to confirmation shall be paid to the OUST on or before the Effective Date.  Quarterly fees accruing under 28 U.S.C. § 1930(a)(6) after confirmation shall be paid to the OUST by the Reorganized

1120604.1

72

DISCLOSURE STATEMENT

Debtor until a final decree, or the entry of an order dismissing the case or converting the case to chapter 7, at the rate in effect at the time such fees are due.

### J.    Post-Confirmation Conversion/Dismissal

After the Plan is confirmed, the Court, upon a motion by a creditor or party in interest and after notice and a hearing, may convert this case to one under chapter 7 of the Bankruptcy Code or dismiss this case under Bankruptcy Code § 1112(b) upon a showing of cause therefore, including, without limitation, if there is a material default by the Reorganized Debtor with respect to the confirmed Plan.  If the Court orders the case converted to chapter 7 after the Plan is confirmed, then all property that had been property of the Estate and that has not been distributed under the Plan will revest in the chapter 7 estate.  The automatic stay provisions of § 362(a) of the Bankruptcy Code will be reimposed upon the revested property only to the extent that relief from stay was not previously authorized by the Court during the case.

The Confirmation Order may also be revoked under very limited circumstances. Pursuant to § 1144 of the Bankruptcy Code, the Court may revoke the Confirmation Order if it was procured by fraud and if a party in interest brings an adversary proceeding to revoke the confirmation within 180 days after the entry of the Confirmation Order.

### K.    Final Decree

Pursuant to Bankruptcy Rule 3022, a Final Decree may be not be entered until a bankruptcy case is fully administered.  The Court may, however, allow a Final Decree to be entered at an earlier date if requested, or for cause shown.

1    Dated:  June 21, 2017

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,
LOBEL WEILAND GOLDEN FRIEDMAN LLP


By:   */s/ Alan J. Friedman*
      JEFFREY I. GOLDEN
      ALAN J. FRIEDMAN
      BETH E. GASCHEN
      Attorneys for David Tudor Chamberlain,
      Debtor and Debtor-in-Possession

1120604.1

74

DISCLOSURE STATEMENT

EXHIBIT "1"

| PLAN PROJECTIONS | Oct-17 | Nov-17 | Dec-17 | Jan-18 | Feb-18 | Mar-18 | Apr-18 | May-18 | Jun-18 | Jul-18 | Aug-18 | Sep-18 | Oct-18 | Nov-18 | Dec-18 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Sources of Cash* | | | | | | | | | | | | | | | |
| Gross Income from RE brokerage and related activities | $ 47,870 | $ 25,524 | $ 36,134 | $ 14,967 | $ 22,781 | $ 13,504 | $ 28,408 | $ 22,077 | $ 77,924 | $ 29,491 | $ 75,146 | $ 50,174 | $ 47,870 | $ 25,524 | $ 36,134 |
| Gross Rental Income | 70,997 | 70,997 | 70,997 | 70,997 | 70,997 | 70,997 | 70,997 | 70,997 | 70,997 | 70,997 | 70,997 | 70,997 | 70,997 | 70,997 | 70,997 |
| Other Income: OCTSC | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 |
| Other Income: FCT | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Income** | **119,467** | **97,121** | **107,732** | **86,564** | **94,378** | **85,101** | **100,006** | **93,674** | **149,521** | **101,088** | **146,744** | **121,771** | **119,467** | **97,121** | **107,732** |
| | | | | | | | | | | | | | | | |
| *Uses of Cash* | | | | | | | | | | | | | | | |
| Brokerage expenses (50% of Gross Income) | 23,935 | 12,762 | 18,067 | 7,483 | 11,390 | 6,752 | 14,204 | 11,039 | 38,962 | 14,745 | 37,573 | 25,087 | 23,935 | 12,762 | 18,067 |
| Rental Expenses | 4,857 | 4,857 | 4,857 | 4,857 | 4,857 | 4,857 | 4,857 | 4,857 | 4,857 | 4,857 | 4,857 | 4,857 | 4,857 | 4,857 | 4,857 |
| | | | | | | | | | | | | | | | |
| *Primary Residence* | | | | | | | | | | | | | | | |
| Insurance | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 |
| Maintenance | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| Utilities | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 |
| | | | | | | | | | | | | | | | |
| *Other* | | | | | | | | | | | | | | | |
| Income Tax @ 15% effective rate | 17,920 | 14,568 | 16,160 | 12,985 | 14,157 | 12,765 | 15,001 | 14,051 | 22,428 | 15,163 | 22,012 | 18,266 | 17,920 | 14,568 | 16,160 |
| Groceries | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 |
| Housekeeping | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 |
| Clothing | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 |
| Personal Care | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 |
| Out-of-pocket medical | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 |
| Transportation | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 |
| Entertainment | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 |
| Charity | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 |
| Life Insurance | 205 | 205 | 205 | 205 | 205 | 205 | 205 | 205 | 205 | 205 | 205 | 205 | 205 | 205 | 205 |
| Health Insurance | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| Family obligations | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 |
| | | | | | | | | | | | | | | | |
| **Total Uses of Cash** | **54,568** | **40,043** | **46,940** | **33,181** | **38,260** | **32,230** | **41,918** | **37,802** | **74,103** | **42,621** | **72,298** | **56,065** | **54,568** | **40,043** | **46,940** |
| | | | | | | | | | | | | | | | |
| **Net cash flow before New Borrowings and Plan Payments ("Operating")(1)** | **64,899** | **57,078** | **60,792** | **53,383** | **56,118** | **52,871** | **58,088** | **55,872** | **75,418** | **58,467** | **74,446** | **65,706** | **64,899** | **57,078** | **60,792** |
| | | | | | | | | | | | | | | | |
| **Proceeds from Net New Borrowings** | **750,000** | | | | | | | | | | | | | | |

(1) This represent's 100% of the income and expense from the
Debtor and spouse's investment properties and 50% of real estate
commission and related income and expenses.

| PLAN PROJECTIONS | Q4-17 | Q1-18 | Q2-18 | Q3-18 | Q4-18 | Q1-19 | Q2-19 | Q3-19 | Q4-19 | Q1-20 | Q2-20 | Q3-20 | Q4-20 | Q1-21 | Q2-21 | Q3-21 | Q4-21 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Sources of Cash* | | | | | | | | | | | | | | | | | |
| Gross Income from RE brokerage and related activities | $109,528 | $51,252 | $128,409 | $154,811 | $109,528 | $51,252 | $128,409 | $154,811 | $109,528 | $51,252 | $128,409 | $154,811 | $109,528 | $51,252 | $128,409 | $154,811 | $109,528 |
| Gross Rental Income | 212,992 | 212,992 | 212,992 | 212,992 | 212,992 | 212,992 | 212,992 | 212,992 | 212,992 | 212,992 | 212,992 | 212,992 | 212,992 | 212,992 | 212,992 | 212,992 | 212,992 |
| Other Income: OCTSC | 1,800 | 1,800 | 1,800 | 1,800 | 1,800 | 1,800 | 1,800 | 1,800 | 1,800 | 1,800 | 1,800 | 1,800 | 1,800 | 1,800 | 1,800 | 1,800 | 1,800 |
| Other Income: FCT | - | | | | | | | | | | | | | | | | |
| **Total Income** | 324,320 | 266,044 | 343,201 | 369,603 | 324,320 | 266,044 | 343,201 | 369,603 | 324,320 | 266,044 | 343,201 | 369,603 | 324,320 | 266,044 | 343,201 | 369,603 | 324,320 |
| *Uses of Cash* | | | | | | | | | | | | | | | | | |
| Brokerage expenses (50% of Gross Income) | 54,764 | 25,626 | 64,205 | 77,405 | 54,764 | 25,626 | 64,205 | 77,405 | 54,764 | 25,626 | 64,205 | 77,405 | 54,764 | 25,626 | 64,205 | 77,405 | 54,764 |
| Rental Expenses | 14,572 | 14,572 | 14,572 | 14,572 | 14,572 | 14,572 | 14,572 | 14,572 | 14,572 | 14,572 | 14,572 | 14,572 | 14,572 | 14,572 | 14,572 | 14,572 | 14,572 |
| *Primary Residence* | | | | | | | | | | | | | | | | | |
| Insurance | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 |
| Maintenance | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 |
| Utilities | 1,350 | 1,350 | 1,350 | 1,350 | 1,350 | 1,350 | 1,350 | 1,350 | 1,350 | 1,350 | 1,350 | 1,350 | 1,350 | 1,350 | 1,350 | 1,350 | 1,350 |
| *Other* | | | | | | | | | | | | | | | | | |
| Income Tax @ 15% effective rate | 48,648 | 39,907 | 51,480 | 55,440 | 48,648 | 39,907 | 51,480 | 55,440 | 48,648 | 39,907 | 51,480 | 55,440 | 48,648 | 39,907 | 51,480 | 55,440 | 48,648 |
| Groceries | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 |
| Housekeeping | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 |
| Clothing | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 |
| Personal Care | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 |
| Out-of-pocket medical | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 |
| Transportation | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 |
| Entertainment | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 |
| Charity | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 |
| Life Insurance | 616 | 616 | 616 | 616 | 616 | 616 | 616 | 616 | 616 | 616 | 616 | 616 | 616 | 616 | 616 | 616 | 616 |
| Health Insurance | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 |
| Family obligations | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 |
| **Total Uses of Cash** | 141,550 | 103,671 | 153,823 | 170,984 | 141,550 | 103,671 | 153,823 | 170,984 | 141,550 | 103,671 | 153,823 | 170,984 | 141,550 | 103,671 | 153,823 | 170,984 | 141,550 |
| **Net cash flow before New Borrowings and Plan Payments ("Operating")(1)** | 182,769 | 162,373 | 189,378 | 198,618 | 182,769 | 162,373 | 189,378 | 198,618 | 182,769 | 162,373 | 189,378 | 198,618 | 182,769 | 162,373 | 189,378 | 198,618 | 182,769 |
| **Proceeds from Net New Borrowings** | 750,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

(1) This represent's 100% of the income and expense from the
Debtor and spouse's investment properties and 50% of real estate
commission and related income and expenses.

**PLAN PROJECTIONS**

*Sources of Cash*

| | | | | | |
|---|---|---|---|---|---|
| Gross Income from RE brokerage and related activities | $ 109,528 | $ 444,000 | $ 444,000 | $ 444,000 | $ 444,000 |
| Gross Rental Income | 212,992 | 851,967 | 851,967 | 851,967 | 851,967 |
| Other Income: OCTSC | 1,800 | 7,200 | 7,200 | 7,200 | 7,200 |
| Other Income: FCT | - | - | - | - | - |
| **Total Income** | 324,320 | 1,303,167 | 1,303,167 | 1,303,167 | 1,303,167 |

*Uses of Cash*

| | | | | | |
|---|---|---|---|---|---|
| Brokerage expenses (50% of Gross Income) | 54,764 | 222,000 | 222,000 | 222,000 | 222,000 |
| Rental Expenses | 14,572 | 14,572 | 14,572 | 14,572 | 14,572 |
| *Primary Residence* | | | | | |
| Insurance | 450 | 1,800 | 1,800 | 1,800 | 1,800 |
| Maintenance | 300 | 1,200 | 1,200 | 1,200 | 1,200 |
| Utilities | 1,350 | 5,400 | 5,400 | 5,400 | 5,400 |
| *Other* | | | | | |
| Income Tax @ 15% effective rate | 48,648 | 195,475 | 195,475 | 195,475 | 195,475 |
| Groceries | 1,500 | 6,000 | 6,000 | 6,000 | 6,000 |
| Housekeeping | 1,500 | 6,000 | 6,000 | 6,000 | 6,000 |
| Clothing | 1,500 | 6,000 | 6,000 | 6,000 | 6,000 |
| Personal Care | 750 | 3,000 | 3,000 | 3,000 | 3,000 |
| Out-of-pocket medical | 1,500 | 6,000 | 6,000 | 6,000 | 6,000 |
| Transportation | 1,500 | 6,000 | 6,000 | 6,000 | 6,000 |
| Entertainment | 4,500 | 18,000 | 18,000 | 18,000 | 18,000 |
| Charity | 600 | 2,400 | 2,400 | 2,400 | 2,400 |
| Life Insurance | 616 | 2,465 | 2,465 | 2,465 | 2,465 |
| Health Insurance | 3,000 | 12,000 | 12,000 | 12,000 | 12,000 |
| Family obligations | 4,500 | 18,000 | 18,000 | 18,000 | 18,000 |
| | - | - | - | - | - |
| **Total Uses of Cash** | 141,550 | 570,028 | 570,028 | 570,028 | 570,028 |
| | - | - | - | - | - |
| **Net cash flow before New Borrowings and Plan Payments ("Operating")(1)** | 182,769 | 733,139 | 733,139 | 733,139 | 733,139 |
| | - | - | - | - | - |
| **Proceeds from Net New Borrowings** | **750,000** | **0** | **0** | **0** | **0** |

(1) This represent's 100% of the income and expense from the
Debtor and spouse's investment properties and 50% of real estate
commission and related income and expenses.

**PLAN PROJECTIONS**

**Plan Payments**

| Class | Current Claim | PF Rate | PF P&I | Tax/Insurance | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Secured** | | | | | | | | | | | | | | | | | | | |
| **1** | | | | | | | | | | | | | | | | | | | |
| Secured Claim of Secured Claim of Roundpoint Mortgage (1st Trust Deed Surfside Property) | 1,494,115 | 3.50% | 4,358 | 1,105 | | | | | | | | | | | | | | | |
| **1 Total** | **1,494,115** | **3.50%** | **4,358** | **1,105** | 5,463 | 5,463 | 5,463 | 5,463 | 5,463 | 5,463 | 5,463 | 5,463 | 5,463 | 5,463 | 5,463 | 5,463 | 5,463 | 5,463 | 5,463 |
| **2** | | | | | | | | | | | | | | | | | | | |
| Secured Claim of Wells Fargo Bank (2nd Trust Deed Surfside Property) | 196,765 | 6.03% | 1,032 | - | | | | | | | | | | | | | | | |
| **2 Total** | **196,765** | **6.03%** | **1,032** | **-** | 1,032 | 1,032 | 1,032 | 1,032 | 1,032 | 1,032 | 1,032 | 1,032 | 1,032 | 1,032 | 1,032 | 1,032 | 1,032 | 1,032 | 1,032 |
| **3** | | | | | | | | | | | | | | | | | | | |
| Secured Claim of Chase Commercial Bank (1st Trust Deed LaSalle Street Property) | 577,533 | 4.25% | 2,841 | 774 | | | | | | | | | | | | | | | |
| **3 Total** | **577,533** | **4.25%** | **2,841** | **774** | 3,616 | 3,616 | 3,616 | 3,616 | 3,616 | 3,616 | 3,616 | 3,616 | 3,616 | 3,616 | 3,616 | 3,616 | 3,616 | 3,616 | 3,616 |
| **4** | | | | | | | | | | | | | | | | | | | |
| Secured Claim of Ann Leisy (2nd trust deed of LaSalle Street Property) | 162,342 | 4.25% | 799 | | | | | | | | | | | | | | | | |
| **4 Total** | **162,342** | **4.25%** | **799** | | 799 | 799 | 799 | 799 | 799 | 799 | 799 | 799 | 799 | 799 | 799 | 799 | 799 | 799 | 799 |
| **5** | | | | | | | | | | | | | | | | | | | |
| Secured Claim of Chase Commercial Bank (1st Trust Deed Comstock Avenue Property) | 380,355 | 3.31% | 2,450 | 1,081 | | | | | | | | | | | | | | | |
| **5 Total** | **380,355** | **3.31%** | **2,450** | **1,081** | 3,531 | 3,531 | 3,531 | 3,531 | 3,531 | 3,531 | 3,531 | 3,531 | 3,531 | 3,531 | 3,531 | 3,531 | 3,531 | 3,531 | 3,531 |
| **6** | | | | | | | | | | | | | | | | | | | |
| Secured Claim of Digital Federal Credit Union (1st Trust Deed NH Property) | 378,485 | 4.25% | 1,862 | 1,544 | | | | | | | | | | | | | | | |
| **6 Total** | **378,485** | **4.25%** | **1,862** | **1,544** | 3,406 | 3,406 | 3,406 | 3,406 | 3,406 | 3,406 | 3,406 | 3,406 | 3,406 | 3,406 | 3,406 | 3,406 | 3,406 | 3,406 | 3,406 |
| **7** | | | | | | | | | | | | | | | | | | | |
| Secured Claim of U.S. Bank (1st Trust Deed Nevada Property) | 209,343 | 4.25% | 1,030 | 584 | | | | | | | | | | | | | | | |
| **7 Total** | **209,343** | **4.25%** | **1,030** | **584** | 1,614 | 1,614 | 1,614 | 1,614 | 1,614 | 1,614 | 1,614 | 1,614 | 1,614 | 1,614 | 1,614 | 1,614 | 1,614 | 1,614 | 1,614 |
| **8** | | | | | | | | | | | | | | | | | | | |
| Secured Claim of Wells Fargo Bank (1st Trust Deed Vonnie Lane Property) | 444,048 | 4.25% | 2,184 | 365 | | | | | | | | | | | | | | | |
| **8 Total** | **444,048** | **4.25%** | **2,184** | **365** | 2,550 | 2,550 | 2,550 | 2,550 | 2,550 | 2,550 | 2,550 | 2,550 | 2,550 | 2,550 | 2,550 | 2,550 | 2,550 | 2,550 | 2,550 |
| **9** | | | | | | | | | | | | | | | | | | | |
| Secured Claim of Wells Fargo Bank (1st Trust Deed N. Olive Street Property) | 187,283 | 4.25% | 921 | 397 | | | | | | | | | | | | | | | |
| **9 Total** | **187,283** | **4.25%** | **921** | **397** | 1,319 | 1,319 | 1,319 | 1,319 | 1,319 | 1,319 | 1,319 | 1,319 | 1,319 | 1,319 | 1,319 | 1,319 | 1,319 | 1,319 | 1,319 |
| **10** | | | | | | | | | | | | | | | | | | | |
| Secured Claim of Pacific Premier Bank (2nd Trust Deed N. Olive Street Property) | 150,321 | 5.25% | 658 | - | | | | | | | | | | | | | | | |
| **10 Total** | **150,321** | **5.25%** | **658** | **-** | 658 | 658 | 658 | 658 | 658 | 658 | 658 | 658 | 658 | 658 | 658 | 658 | 658 | 658 | 658 |
| **11** | | | | | | | | | | | | | | | | | | | |
| Secured Claim of Pacific Premier Bank (1st Trust Deed on Newman, Del Amo, Denni, Bishop) | 1,142,254 | 4.25% | 5,976 | 1,574 | | | | | | | | | | | | | | | |
| **11 Total** | **1,142,254** | **4.25%** | **5,976** | **1,574** | 7,550 | 7,550 | 7,550 | 7,550 | 7,550 | 7,550 | 7,550 | 7,550 | 7,550 | 7,550 | 7,550 | 7,550 | 7,550 | 7,550 | 7,550 |
| **12** | | | | | | | | | | | | | | | | | | | |
| Secured Claim of OCWEN (1st Trust Deed San Alto Way Property) | 260,867 | 4.25% | 1,769 | 217 | | | | | | | | | | | | | | | |
| **12 Total** | **260,867** | **4.25%** | **1,769** | **217** | 1,985 | 1,985 | 1,985 | 1,985 | 1,985 | 1,985 | 1,985 | 1,985 | 1,985 | 1,985 | 1,985 | 1,985 | 1,985 | 1,985 | 1,985 |
| **13** | | | | | | | | | | | | | | | | | | | |
| Secured Claim of OCWEN (1st Trust Deed Stratton Court Property) | 270,160 | 4.25% | 1,780 | 176 | | | | | | | | | | | | | | | |
| **13 Total** | **270,160** | **4.25%** | **1,780** | **176** | 1,956 | 1,956 | 1,956 | 1,956 | 1,956 | 1,956 | 1,956 | 1,956 | 1,956 | 1,956 | 1,956 | 1,956 | 1,956 | 1,956 | 1,956 |
| **14** | | | | | | | | | | | | | | | | | | | |
| Secured Claim of OCWEN (1st Trust Deed 8479 Cedarview Court Property) | 237,521 | 4.25% | 1,546 | 164 | | | | | | | | | | | | | | | |
| **14 Total** | **237,521** | **4.25%** | **1,546** | **164** | 1,710 | 1,710 | 1,710 | 1,710 | 1,710 | 1,710 | 1,710 | 1,710 | 1,710 | 1,710 | 1,710 | 1,710 | 1,710 | 1,710 | 1,710 |
| **15** | | | | | | | | | | | | | | | | | | | |
| Secured Claim of OCWEN (1st Trust Deed 8475 Cedarview Court Property) | 237,521 | 4.25% | 1,546 | 147 | | | | | | | | | | | | | | | |
| **15 Total** | **237,521** | **4.25%** | **1,546** | **147** | 1,693 | 1,693 | 1,693 | 1,693 | 1,693 | 1,693 | 1,693 | 1,693 | 1,693 | 1,693 | 1,693 | 1,693 | 1,693 | 1,693 | 1,693 |

| PLAN PROJECTIONS | | | | | | | | | | | | | | | | | Q2-21 | Q3-21 | Q4-21 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

**Plan Payments**

| Class | Current Claim | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Secured** | | | | | | | | | | | | | | | | | | |
| **1** | | | | | | | | | | | | | | | | | | |
| Secured Claim of Secured Claim of Roundpoint Mortgage (1st Trust Deed Surfside Property) | 1,494,115 | | | | | | | | | | | | | | | | | |
| **1 Total** | **1,494,115** | 16,389 | 16,389 | 16,389 | 16,389 | 16,389 | 16,389 | 16,389 | 16,389 | 16,389 | 16,389 | 16,389 | 16,389 | 16,389 | 16,389 | 16,389 | 16,389 | 16,389 |
| **2** | | | | | | | | | | | | | | | | | | |
| Secured Claim of Wells Fargo Bank (2nd Trust Deed Surfside Property) | 196,765 | | | | | | | | | | | | | | | | | |
| **2 Total** | **196,765** | 3,096 | 3,096 | 3,096 | 3,096 | 3,096 | 3,096 | 3,096 | 3,096 | 3,096 | 3,096 | 3,096 | 3,096 | 3,096 | 3,096 | 3,096 | 3,096 | 3,096 |
| **3** | | | | | | | | | | | | | | | | | | |
| Secured Claim of Chase Commercial Bank (1st Trust Deed LaSalle Street Property) | 577,533 | | | | | | | | | | | | | | | | | |
| **3 Total** | **577,533** | 10,847 | 10,847 | 10,847 | 10,847 | 10,847 | 10,847 | 10,847 | 10,847 | 10,847 | 10,847 | 10,847 | 10,847 | 10,847 | 10,847 | 10,847 | 10,847 | 10,847 |
| **4** | | | | | | | | | | | | | | | | | | |
| Secured Claim of Ann Leisy (2nd trust deed of LaSalle Street Property) | 162,342 | | | | | | | | | | | | | | | | | |
| **4 Total** | **162,342** | 2,396 | 2,396 | 2,396 | 2,396 | 2,396 | 2,396 | 2,396 | 2,396 | 2,396 | 2,396 | 2,396 | 2,396 | 2,396 | 2,396 | 2,396 | 2,396 | 2,396 |
| **5** | | | | | | | | | | | | | | | | | | |
| Secured Claim of Chase Commercial Bank (1st Trust Deed Comstock Avenue Property) | 380,355 | | | | | | | | | | | | | | | | | |
| **5 Total** | **380,355** | 10,594 | 10,594 | 10,594 | 10,594 | 10,594 | 10,594 | 10,594 | 10,594 | 10,594 | 10,594 | 10,594 | 10,594 | 10,594 | 10,594 | 10,594 | 10,594 | 10,594 |
| **6** | | | | | | | | | | | | | | | | | | |
| Secured Claim of Digital Federal Credit Union (1st Trust Deed NH Property) | 378,485 | | | | | | | | | | | | | | | | | |
| **6 Total** | **378,485** | 10,218 | 10,218 | 10,218 | 10,218 | 10,218 | 10,218 | 10,218 | 10,218 | 10,218 | 10,218 | 10,218 | 10,218 | 10,218 | 10,218 | 10,218 | 10,218 | 10,218 |
| **7** | | | | | | | | | | | | | | | | | | |
| Secured Claim of U.S. Bank (1st Trust Deed Nevada Property) | 209,343 | | | | | | | | | | | | | | | | | |
| **7 Total** | **209,343** | 4,842 | 4,842 | 4,842 | 4,842 | 4,842 | 4,842 | 4,842 | 4,842 | 4,842 | 4,842 | 4,842 | 4,842 | 4,842 | 4,842 | 4,842 | 4,842 | 4,842 |
| **8** | | | | | | | | | | | | | | | | | | |
| Secured Claim of Wells Fargo Bank (1st Trust Deed Vonnie Lane Property) | 444,048 | | | | | | | | | | | | | | | | | |
| **8 Total** | **444,048** | 7,650 | 7,650 | 7,650 | 7,650 | 7,650 | 7,650 | 7,650 | 7,650 | 7,650 | 7,650 | 7,650 | 7,650 | 7,650 | 7,650 | 7,650 | 7,650 | 7,650 |
| **9** | | | | | | | | | | | | | | | | | | |
| Secured Claim of Wells Fargo Bank (1st Trust Deed N. Olive Street Property) | 187,283 | | | | | | | | | | | | | | | | | |
| **9 Total** | **187,283** | 3,956 | 3,956 | 3,956 | 3,956 | 3,956 | 3,956 | 3,956 | 3,956 | 3,956 | 3,956 | 3,956 | 3,956 | 3,956 | 3,956 | 3,956 | 3,956 | 3,956 |
| **10** | | | | | | | | | | | | | | | | | | |
| Secured Claim of Pacific Premier Bank (2nd Trust Deed N. Olive Street Property) | 150,321 | | | | | | | | | | | | | | | | | |
| **10 Total** | **150,321** | 1,973 | 1,973 | 1,973 | 1,973 | 1,973 | 1,973 | 1,973 | 1,973 | 1,973 | 1,973 | 1,973 | 1,973 | 1,973 | 1,973 | 1,973 | 1,973 | 1,973 |
| **11** | | | | | | | | | | | | | | | | | | |
| Secured Claim of Pacific Premier Bank (1st Trust Deed on Newman, Del Amo, Denni, Bishop) | 1,142,254 | | | | | | | | | | | | | | | | | |
| **11 Total** | **1,142,254** | 22,650 | 22,650 | 22,650 | 22,650 | 22,650 | 22,650 | 22,650 | 22,650 | 22,650 | 22,650 | 22,650 | 22,650 | 22,650 | 22,650 | 22,650 | 22,650 | 22,650 |
| **12** | | | | | | | | | | | | | | | | | | |
| Secured Claim of OCWEN (1st Trust Deed San Alto Way Property) | 260,867 | | | | | | | | | | | | | | | | | |
| **12 Total** | **260,867** | 5,955 | 5,955 | 5,955 | 5,955 | 5,955 | 5,955 | 5,955 | 5,955 | 5,955 | 5,955 | 5,955 | 5,955 | 5,955 | 5,955 | 5,955 | 5,955 | 5,955 |
| **13** | | | | | | | | | | | | | | | | | | |
| Secured Claim of OCWEN (1st Trust Deed Stratton Court Property) | 270,160 | | | | | | | | | | | | | | | | | |
| **13 Total** | **270,160** | 5,868 | 5,868 | 5,868 | 5,868 | 5,868 | 5,868 | 5,868 | 5,868 | 5,868 | 5,868 | 5,868 | 5,868 | 5,868 | 5,868 | 5,868 | 5,868 | 5,868 |
| **14** | | | | | | | | | | | | | | | | | | |
| Secured Claim of OCWEN (1st Trust Deed 8479 Cedarview Court Property) | 237,521 | | | | | | | | | | | | | | | | | |
| **14 Total** | **237,521** | 5,129 | 5,129 | 5,129 | 5,129 | 5,129 | 5,129 | 5,129 | 5,129 | 5,129 | 5,129 | 5,129 | 5,129 | 5,129 | 5,129 | 5,129 | 5,129 | 5,129 |
| **15** | | | | | | | | | | | | | | | | | | |
| Secured Claim of OCWEN (1st Trust Deed 8475 Cedarview Court Property) | 237,521 | | | | | | | | | | | | | | | | | |
| **15 Total** | **237,521** | 5,079 | 5,079 | 5,079 | 5,079 | 5,079 | 5,079 | 5,079 | 5,079 | 5,079 | 5,079 | 5,079 | 5,079 | 5,079 | 5,079 | 5,079 | 5,079 | 5,079 |

**PLAN PROJECTIONS**

**Plan Payments**

| Class | Current Claim | | | | | |
|---|---|---|---|---|---|---|
| **Secured** | | | | | | |
| **1** | | | | | | |
| Secured Claim of Secured Claim of Roundpoint Mortgage (1st Trust Deed Surfside Property) | 1,494,115 | | | | | |
| **1 Total** | **1,494,115** | 16,389 | 65,555 | 65,555 | 65,555 | 65,555 |
| **2** | | | | | | |
| Secured Claim of Wells Fargo Bank (2nd Trust Deed Surfside Property) | 196,765 | | | | | |
| **2 Total** | **196,765** | 3,096 | 12,383 | 12,383 | 12,383 | 12,383 |
| **3** | | | | | | |
| Secured Claim of Chase Commercial Bank (1st Trust Deed LaSalle Street Property) | 577,533 | | | | | |
| **3 Total** | **577,533** | 10,847 | 43,387 | 43,387 | 43,387 | 43,387 |
| **4** | | | | | | |
| Secured Claim of Ann Leisy (2nd trust deed of LaSalle Street Property) | 162,342 | | | | | |
| **4 Total** | **162,342** | 2,396 | 9,584 | 9,584 | 9,584 | 9,584 |
| **5** | | | | | | |
| Secured Claim of Chase Commercial Bank (1st Trust Deed Comstock Avenue Property) | 380,355 | | | | | |
| **5 Total** | **380,355** | 10,594 | 42,375 | 42,375 | 42,375 | 42,375 |
| **6** | | | | | | |
| Secured Claim of Digital Federal Credit Union (1st Trust Deed NH Property) | 378,485 | | | | | |
| **6 Total** | **378,485** | 10,218 | 40,872 | 40,872 | 40,872 | 40,872 |
| **7** | | | | | | |
| Secured Claim of U.S. Bank (1st Trust Deed Nevada Property) | 209,343 | | | | | |
| **7 Total** | **209,343** | 4,842 | 19,369 | 19,369 | 19,369 | 19,369 |
| **8** | | | | | | |
| Secured Claim of Wells Fargo Bank (1st Trust Deed Vonnie Lane Property) | 444,048 | | | | | |
| **8 Total** | **444,048** | 7,650 | 30,598 | 30,598 | 30,598 | 30,598 |
| **9** | | | | | | |
| Secured Claim of Wells Fargo Bank (1st Trust Deed N. Olive Street Property) | 187,283 | | | | | |
| **9 Total** | **187,283** | 3,956 | 15,823 | 15,823 | 15,823 | 15,823 |
| **10** | | | | | | |
| Secured Claim of Pacific Premier Bank (2nd Trust Deed N. Olive Street Property) | 150,321 | | | | | |
| **10 Total** | **150,321** | 1,973 | 7,892 | 7,892 | 7,892 | 7,892 |
| **11** | | | | | | |
| Secured Claim of Pacific Premier Bank (1st Trust Deed on Newman, Del Amo, Denni, Bishop) | 1,142,254 | | | | | |
| **11 Total** | **1,142,254** | 22,650 | 90,599 | 90,599 | 90,599 | 90,599 |
| **12** | | | | | | |
| Secured Claim of OCWEN (1st Trust Deed San Alto Way Property) | 260,867 | | | | | |
| **12 Total** | **260,867** | 5,955 | 23,822 | 23,822 | 23,822 | 23,822 |
| **13** | | | | | | |
| Secured Claim of OCWEN (1st Trust Deed Stratton Court Property) | 270,160 | | | | | |
| **13 Total** | **270,160** | 5,868 | 23,472 | 23,472 | 23,472 | 23,472 |
| **14** | | | | | | |
| Secured Claim of OCWEN (1st Trust Deed 8479 Cedarview Court Property) | 237,521 | | | | | |
| **14 Total** | **237,521** | 5,129 | 20,518 | 20,518 | 20,518 | 20,518 |
| **15** | | | | | | |
| Secured Claim of OCWEN (1st Trust Deed 8475 Cedarview Court Property) | 237,521 | | | | | |
| **15 Total** | **237,521** | 5,079 | 20,315 | 20,315 | 20,315 | 20,315 |

| PLAN PROJECTIONS | Amount | Rate | | | Jun-17 | Jul-17 | Aug-17 | Sep-17 | Oct-17 | Nov-17 | Dec-17 | Jan-18 | Feb-18 | Mar-18 | Apr-18 | May-18 | Jun-18 | Jul-18 | Aug-18 | Sep-18 | Oct-18 | Nov-18 | Dec-18 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **16** | | | | | | | | | | | | | | | | | | | | | | | |
| Rick Tarnutzer | 2,547,301 | | | | | | | | | | | | | | | | | | | | | | |
| **16 Total** | **2,547,301** | | | | | | | | | | | | | | | | | | | | | | |
| **17** | | | | | | | | | | | | | | | | | | | | | | | |
| 2016 Tesla X | 86,648 | | 1,349 | | | | | | | | | | | | | | | | | | | | |
| **17 Total** | **86,648** | | **1,349** | | | | | | 1,349 | 1,349 | 1,349 | 1,349 | 1,349 | 1,349 | 1,349 | 1,349 | 1,349 | 1,349 | 1,349 | 1,349 | 1,349 | 1,349 | 1,349 |
| **18** | | | | | | | | | | | | | | | | | | | | | | | |
| LA County Tax | 12,761 | | | | | | | | | | | | | | | | | | | | | | |
| OC County Tax | 51,854 | | | | | | | | | | | | | | | | | | | | | | |
| **18 Total** | **64,614** | | | | | | | | | | | | | | | | | | | | | | |
| **Exit Financing** | | | | | | | | | | | | | | | | | | | | | | | |
| New Loan Proceeds | 750,000 | 7.50% | 4,688 | | | | | | | | | | | | | | | | | | | | |
| **Exit Financing Total** | **750,000** | **7.50%** | **4,688** | | | | | | 4,688 | 4,688 | 4,688 | 4,688 | 4,688 | 4,688 | 4,688 | 4,688 | 4,688 | 4,688 | 4,688 | 4,688 | 4,688 | 4,688 | 4,688 |
| **Secured Total** | **9,777,475** | **4.48%** | **36,787** | **8,130** | | | | | 44,917 | 44,917 | 44,917 | 44,917 | 44,917 | 44,917 | 44,917 | 44,917 | 44,917 | 44,917 | 44,917 | 44,917 | 44,917 | 44,917 | 44,917 |
| **Admin** | | | | | | | | | | | | | | | | | | | | | | | |
| **507(a)(2)** | | | | | | | | | | | | | | | | | | | | | | | |
| Clerk's Office Fees | - | | | | | | | | 1 | | | | | | | | | | | | | | |
| Force 10 | 75,000 | | | | | | | | 75,000 | | | | | | | | | | | | | | |
| Gregory Page | 10,000 | | | | | | | | 10,000 | | | | | | | | | | | | | | |
| LWGF | 300,000 | | | | | | | | 300,000 | | | | | | | | | | | | | | |
| OUST | 1,950 | | | | | | | | 1,950 | | | 1,950 | | | - | | | - | | | - | | |
| The Vogle Firm | 50,000 | | | | | | | | 50,000 | | | | | | | | | | | | | | |
| **507(a)(2) Total** | **436,950** | | | | | | | | | | | | | | | | | | | | | | |
| **Admin Total** | **436,950** | | | | | | | | 436,951 | - | - | 1,950 | - | - | - | - | - | - | - | - | - | - | - |
| **GUC** | | | | | | | | | | | | | | | | | | | | | | | |
| **20** | | | | | | | | | | | | | | | | | | | | | | | |
| Barclays Bank, DE | 15,328 | | | | | | | | 15,328 | | | | | | | | | | | | | | |
| Citibank (Costco Adv.) | 717 | | | | | | | | 717 | | | | | | | | | | | | | | |
| Citibank Visa - 2800 | 17,228 | | | | | | | | 17,228 | | | | | | | | | | | | | | |
| Eileen Cathro | 100,000 | | | | | | | | 100,000 | | | | | | | | | | | | | | |
| Gregory Page | 97,368 | | | | | | | | 97,368 | | | | | | | | | | | | | | |
| Joseph Coyne | 41,000 | | | | | | | | 41,000 | | | | | | | | | | | | | | |
| **20 Total** | **271,641** | | | | | | | | | | | | | | | | | | | | | | |
| **21** | | | | | | | | | | | | | | | | | | | | | | | |
| Rick Tarnutzer | 805,709 | | | | | | | | | | | | | | | | | | | | | | |
| **21 Total** | **805,709** | | | | | | | | | | | | | | | | | | | | | | |
| **22** | | | | | | | | | | | | | | | | | | | | | | | |
| Fern, et al. | 4,132,500 | | | | | | | | | | | | | | | | | | | | | | |
| **22 Total** | **4,132,500** | | | | | | | | | | | | | | | | | | | | | | |
| **GUC Total** | **5,209,850** | | | | | | | | 271,641 | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Grand Total** | **15,424,275** | **4.48%** | **36,787** | **8,130** | | | | | 753,509 | 44,917 | 44,917 | 46,867 | 44,917 | 44,917 | 44,917 | 44,917 | 44,917 | 44,917 | 44,917 | 44,917 | 44,917 | 44,917 | 44,917 |
| | | | | | | | | | | | | | | | | | | | | | | | |
| Cash at beginning of period(1) | | | | | | | | | $ - | $ 61,391 | $ 73,552 | $ 89,427 | $ 95,944 | $107,145 | $115,100 | $128,271 | $139,226 | $169,728 | $183,277 | $212,807 | $233,596 | $253,579 | $265,740 |
| Net cash flow from Operating activities | | | | | | | | | 64,899 | 57,078 | 60,792 | 53,383 | 56,118 | 52,871 | 58,088 | 55,872 | 75,418 | 58,467 | 74,446 | 65,706 | 64,899 | 57,078 | 60,792 |
| Net cash flow from new borrowings | | | | | | | | | 750,000 | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Net cash flow used by Plan Payments | | | | | | | | | (753,509) | (44,917) | (44,917) | (46,867) | (44,917) | (44,917) | (44,917) | (44,917) | (44,917) | (44,917) | (44,917) | (44,917) | (44,917) | (44,917) |
| **Cash at end of period** | | | | | | | | | **$ 61,391** | **$ 73,552** | **$ 89,427** | **$ 95,944** | **$107,145** | **$115,100** | **$128,271** | **$139,226** | **$169,728** | **$183,277** | **$212,807** | **$233,596** | **$253,579** | **$265,740** | **$281,615** |

| PLAN PROJECTIONS | Total | | | | | | | | | | | | | | | | Q2-21 | Q3-21 | Q4-21 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **16** | | | | | | | | | | | | | | | | | | | |
| Rick Tarnutzer | 2,547,301 | | | | | | | | | | | | | | | | | | |
| **16 Total** | **2,547,301** | | | | | | | | | | | | | | | | | | |
| **17** | | | | | | | | | | | | | | | | | | | |
| 2016 Tesla X | 86,648 | | | | | | | | | | | | | | | | | | |
| **17 Total** | **86,648** | 4,047 | 4,047 | 4,047 | 4,047 | 4,047 | 4,047 | 4,047 | 4,047 | 4,047 | 4,047 | 4,047 | 4,047 | 4,047 | 4,047 | 4,047 | 4,047 | 4,047 |
| **18** | | | | | | | | | | | | | | | | | | | |
| LA County Tax | 12,761 | | | | | | | | | | | | | | | | | | |
| OC County Tax | 51,854 | | | | | | | | | | | | | | | | | | |
| **18 Total** | **64,614** | | | | | | | | | | | | | | | | | | |
| **Exit Financing** | | | | | | | | | | | | | | | | | | | |
| New Loan Proceeds | 750,000 | | | | | | | | | | | | | | | | | | |
| **Exit Financing Total** | **750,000** | 14,063 | 14,063 | 14,063 | 14,063 | 14,063 | 14,063 | 14,063 | 14,063 | 14,063 | 14,063 | 14,063 | 14,063 | 14,063 | 14,063 | 14,063 | 14,063 | 14,063 |
| **Secured Total** | **9,777,475** | 134,750 | 134,750 | 134,750 | 134,750 | 134,750 | 134,750 | 134,750 | 134,750 | 134,750 | 134,750 | 134,750 | 134,750 | 134,750 | 134,750 | 134,750 | 134,750 | 134,750 |
| **Admin** | | | | | | | | | | | | | | | | | | | |
| **507(a)(2)** | | | | | | | | | | | | | | | | | | | |
| Clerk's Office Fees | - | 1 | - | | | | | | | | | | | | | | | | |
| Force 10 | 75,000 | 75,000 | - | | | | | | | | | | | | | | | | |
| Gregory Page | 10,000 | 10,000 | - | | | | | | | | | | | | | | | | |
| LWGF | 300,000 | 300,000 | - | | | | | | | | | | | | | | | | |
| OUST | 1,950 | 1,950 | 1,950 | | | | | | | | | | | | | | | | |
| The Vogle Firm | 50,000 | 50,000 | - | | | | | | | | | | | | | | | | |
| **507(a)(2) Total** | **436,950** | - | | | | | | | | | | | | | | | | | |
| **Admin Total** | **436,950** | 436,951 | 1,950 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **GUC** | | | | | | | | | | | | | | | | | | | |
| **20** | | | | | | | | | | | | | | | | | | | |
| Barclays Bank, DE | 15,328 | 15,328 | - | | | | | | | | | | | | | | | | |
| Citibank (Costco Adv.) | 717 | 717 | - | | | | | | | | | | | | | | | | |
| Citibank Visa - 2800 | 17,228 | 17,228 | - | | | | | | | | | | | | | | | | |
| Eileen Cathro | 100,000 | 100,000 | - | | | | | | | | | | | | | | | | |
| Gregory Page | 97,368 | 97,368 | - | | | | | | | | | | | | | | | | |
| Joseph Coyne | 41,000 | 41,000 | - | | | | | | | | | | | | | | | | |
| **20 Total** | **271,641** | | | | | | | | | | | | | | | | | | |
| **21** | | | | | | | | | | | | | | | | | | | |
| Rick Tarnutzer | 805,709 | - | | | | | | | | | | | | | | | | | |
| **21 Total** | **805,709** | - | | | | | | | | | | | | | | | | | |
| **22** | | | | | | | | | | | | | | | | | | | |
| Fern, et al. | 4,132,500 | - | | | | | | | | | | | | | | | | | |
| **22 Total** | **4,132,500** | - | | | | | | | | | | | | | | | | | |
| **GUC Total** | **5,209,850** | 271,641 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Grand Total** | **15,424,275** | 843,342 | 136,700 | 134,750 | 134,750 | 134,750 | 134,750 | 134,750 | 134,750 | 134,750 | 134,750 | 134,750 | 134,750 | 134,750 | 134,750 | 134,750 | 134,750 | 134,750 |
| | | | | | | | | | | | | | | | | | | | |
| Cash at beginning of period(1) | | $ - | $89,427 | $115,100 | $169,728 | $233,596 | $281,615 | $309,238 | $363,866 | $427,734 | $475,753 | $503,376 | $558,004 | $621,872 | $669,891 | $697,514 | $752,142 | $816,010 |
| Net cash flow from Operating activities | | 182,769 | 162,373 | 189,378 | 198,618 | 182,769 | 162,373 | 189,378 | 198,618 | 182,769 | 162,373 | 189,378 | 198,618 | 182,769 | 162,373 | 189,378 | 198,618 | 182,769 |
| Net cash flow from new borrowings | | 750,000 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Net cash flow used by Plan Payments | | (843,342) | (136,700) | (134,750) | (134,750) | (134,750) | (134,750) | (134,750) | (134,750) | (134,750) | (134,750) | (134,750) | (134,750) | (134,750) | (134,750) | (134,750) | (134,750) | (134,750) |
| **Cash at end of period** | | $89,427 | $115,100 | $169,728 | $233,596 | $281,615 | $309,238 | $363,866 | $427,734 | $475,753 | $503,376 | $558,004 | $621,872 | $669,891 | $697,514 | $752,142 | $816,010 | $864,029 |

| PLAN PROJECTIONS | | | | | | |
|---|---|---|---|---|---|---|
| 16 | | | | | | |
| Rick Tarnutzer | 2,547,301 | | | | | |
| **16 Total** | **2,547,301** | | | | | |
| 17 | | | | | | |
| 2016 Tesla X | 86,648 | | | | | |
| **17 Total** | **86,648** | 4,047 | 4,047 | 4,047 | 4,047 | 4,047 |
| 18 | | | | | | |
| LA County Tax | 12,761 | | | | | |
| OC County Tax | 51,854 | | | | | |
| **18 Total** | **64,614** | | | | | |
| **Exit Financing** | | | | | | |
| New Loan Proceeds | 750,000 | | | | | |
| **Exit Financing Total** | **750,000** | 14,063 | 14,063 | 14,063 | 14,063 | 14,063 |
| **Secured Total** | **9,777,475** | **134,750** | **539,000** | **539,000** | **539,000** | **539,000** |
| **Admin** | | | | | | |
| 507(a)(2) | | | | | | |
| Clerk's Office Fees | - | 1 | - | - | - | - |
| Force 10 | 75,000 | 75,000 | - | - | - | - |
| Gregory Page | 10,000 | 10,000 | - | - | - | - |
| LWGF | 300,000 | 300,000 | - | - | - | - |
| OUST | 1,950 | 1,950 | 1,950 | - | - | - |
| The Vogle Firm | 50,000 | 50,000 | - | - | - | - |
| **507(a)(2) Total** | **436,950** | - | - | - | - | - |
| **Admin Total** | **436,950** | **436,951** | **1,950** | **-** | **-** | **-** |
| **GUC** | | | | | | |
| 20 | | - | - | - | - | - |
| Barclays Bank, DE | 15,328 | 15,328 | - | - | - | - |
| Citibank (Costco Adv.) | 717 | 717 | - | - | - | - |
| Citibank Visa - 2800 | 17,228 | 17,228 | - | - | - | - |
| Eileen Cathro | 100,000 | 100,000 | - | - | - | - |
| Gregory Page | 97,368 | 97,368 | - | - | - | - |
| Joseph Coyne | 41,000 | 41,000 | - | - | - | - |
| **20 Total** | **271,641** | - | - | - | - | - |
| 21 | | - | - | - | - | - |
| Rick Tarnutzer | 805,709 | - | - | - | - | - |
| **21 Total** | **805,709** | - | - | - | - | - |
| 22 | | - | - | - | - | - |
| Fern, et al. | 4,132,500 | - | - | - | - | - |
| **22 Total** | **4,132,500** | - | - | - | - | - |
| **GUC Total** | **5,209,850** | **271,641** | **-** | **-** | **-** | **-** |
| **Grand Total** | **15,424,275** | **843,342** | **540,950** | **539,000** | **539,000** | **539,000** |

| | | | | | | |
|---|---|---|---|---|---|---|
| **Cash at beginning of period(1)** | $ | - | $ 89,427 | $ 281,615 | $ 475,753 | $ 669,891 |
| Net cash flow from Operating activities | | 182,769 | 733,139 | 733,139 | 733,139 | 733,139 |
| **Net cash flow from new borrowings** | | 750,000 | - | - | | |
| Net cash flow used by Plan Payments | | (843,342) | (540,950) | (539,000) | (539,000) | (539,000) |
| **Cash at end of period** | $ | 89,427 | $ 281,615 | $ 475,753 | $ 669,891 | $ 864,029 |

EXHIBIT "2"

**NET ASSET VALUE**

| | FMV | Claims | NAV | Note |
|---|---|---|---|---|
| **Secured** | | | | |
| **Real Property** | | | | (1) |
| Surfside | $ 3,500,000 | $ 1,705,674 | $ 1,809,121 | |
| Comstock | 1,800,000 | 380,355 | 1,419,645 | |
| LaSalle | 2,000,000 | 746,519 | 1,260,125 | |
| Newman | 1,250,000 | 485,584 | 771,669 | |
| Cincinnatti | 860,000 | 209,343 | 650,657 | |
| Merrimack | 1,000,000 | 378,485 | 621,515 | |
| Del Amo | 620,000 | 250,013 | 382,748 | |
| Denni | 600,000 | 233,378 | 370,401 | |
| Olive | 660,000 | 341,451 | 322,396 | |
| Bishop | 515,000 | 200,762 | 317,928 | |
| Vonnie | 700,000 | 447,520 | 255,952 | |
| San Alto | 500,000 | 263,239 | 239,133 | |
| Stratton | 436,000 | 272,345 | 165,840 | |
| Cedarview - 8479 | 400,000 | 239,528 | 162,479 | |
| Cedarview -8475 | 375,000 | 239,330 | 137,479 | |
| New Loan Proceeds | | 750,000 | (750,000) | (2) |
| Rick Tarnutzer | | 2,547,301 | (2,547,301) | |
| **Real Property Total** | **15,216,000** | **9,690,827** | **5,589,787** | |
| **Other  Assets** | | | | |
| 2016 Tesla X | 73,000 | 86,648 | (13,648) | |
| **Other  Assets Total** | **73,000** | **86,648** | **(13,648)** | |
| **Secured Total** | **15,289,000** | **9,777,475** | **5,576,139** | |
| **Asset** | | | | |
| **Other  Assets** | | | | (3) |
| DV Interpled Funds | 1,800,000 | | 1,800,000 | |
| Judgement - Wakim, et al. | 275,660 | | 275,660 | |
| First Choice Escrow | 150,000 | - | 150,000 | |
| Polar Power (Stock) | 47,100 | | 47,100 | |
| Jewelry | 50,300 | 6,000 | 44,300 | |
| Orange Coast Title | 40,000 | - | 40,000 | |
| Other Automobiles | 40,500 | 3,050 | 37,450 | |
| **Other  Assets Total** | **2,403,560** | **9,050** | **2,394,510** | |
| **Asset Total** | **2,403,560** | **9,050** | **2,394,510** | |
| **Grand Total** | **17,692,560** | **9,786,525** | **7,970,649** | |

| Creditors | Claims |
|---|---|
| **Admin** | |
| LWGF | $    300,000 |
| Force 10 | 75,000 |
| The Vogle Firm | 50,000 |
| Gregory Page | 10,000 |
| OUST | 1,950 |
| Clerk's Office Fees | - |
| **Admin Total** | **436,950** |
| **PUC** | |
| IRS | 693 |
| **PUC Total** | **693** |
| **GUC** | |
| Fern, et al. | 4,132,500 |
| Rick Tarnutzer | 805,709 |
| Eileen Cathro | 100,000 |
| Gregory Page | 97,368 |
| Joseph Coyne | 41,000 |
| Citibank Visa - 2800 | 17,228 |
| Barclays Bank, DE | 15,328 |
| Citibank (Costco Adv.) - 8972 | 717 |
| **GUC Total** | **5,209,850** |
| **Grand Total** | **$ 5,647,493** |

| Net Asset Value (NAV) | $ 2,323,156 |
|---|---|

(1) Claims figures include the claims of the Real Property Lenders and secured tax
   claims.

(2) Proceeds from new secured loan used to  meet effective date payments.

(3) Amounts listed in Claims column are claimed exemptions.
   If exemption equals the FMV, then not listed.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

650 Town Center Drive, Suite 950, Costa Mesa, CA 92626

A true and correct copy of the foregoing document entitled (*specify*): **DISCLOSURE STATEMENT DESCRIBING CHAPTER 11 PLAN OF REORGANIZATION** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document.  On June 21, 2017, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒    Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) June 21, 2017, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☒    Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) June 21, 2017, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

SERVED VIA PERSONAL DELIVERY/ATTORNEY SERVICE
The Honorable Catherine E. Bauer
United States Bankruptcy Court
Central District of California
Ronald Reagan Federal Building and Courthouse
411 West Fourth Street, Suite 5165/Courtesy Bin
Santa Ana, CA 92701-4593

☐    Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 6/21/2017 | Lori Gauthier | /s/ Lori Gauthier |
|-----------|---------------|-------------------|
| *Date* | *Printed Name* | *Signature* |

**SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:

- **Julian K Bach**    Julian@Jbachlaw.com, julianbach@sbcglobal.net
- **Frank Cadigan**    frank.cadigan@usdoj.gov
- **Sean C Ferry**    sferry@ecf.courtdrive.com, bkyecf@rasflaw.com
- **Alan J Friedman**    afriedman@lwgfllp.com,
  nlockwood@lwgfllp.com;jokeefe@lwgfllp.com;banavim@lwgfllp.com;lgauthier@lwgfllp.com
- **Beth Gaschen**    bgaschen@wgllp.com,
  kadele@wgllp.com;lfisk@wgllp.com;lgauthier@lwgfllp.com;nlockwood@lwgfllp.com
- **David Gill**    dag@dgdk.com, DanningGill@gmail.com;dgill@ecf.inforuptcy.com
- **Jeffrey I Golden**    jgolden@wgllp.com, kadele@wgllp.com;lfisk@wgllp.com
- **Eric P Israel**    eisrael@dgdk.com, danninggill@gmail.com;eisrael@ecf.inforuptcy.com
- **Byron B Mauss**    efilings@amlegalgroup.com
- **Thomas J Polis**    tom@polis-law.com, paralegal@polis-law.com
- **United States Trustee (SA)**    ustpregion16.sa.ecf@usdoj.gov


**SERVED VIA FIRST-CLASS MAIL**

David Tudor Chamberlain
103 Surfside Avenue A
Surfside, CA 90743

Office of the United States Trustee
411 W. Fourth Street
Suite 7160
Santa Ana, CA 927601-4593

U.S. Securities & Exchange Commission
Attn: BK Counsel
444 South Flower St., Ste. 900
Los Angeles, CA 90071-9591

PARTIES REQUESTING NOTICE:

Deutsche Bank Nat'l. Trust Co.
c/o Robertson, Anschutz & Schneid
Bankruptcy Dept.
6409 Congress Ave., Suite 100
Boca Raton, FL 33487