1 | **LOBEL WEILAND GOLDEN FRIEDMAN LLP**
Jeffrey I. Golden, State Bar No. 133040
2 | jgolden@lwgfllp.com
Alan J. Friedman, State Bar No. 132580
3 | afriedman@lwgfllp.com
Beth E. Gaschen, State Bar No. 245894
4 | bgaschen@lwgfllp.com
650 Town Center Drive, Suite 950
5 | Costa Mesa, California 92626
Telephone:   (714) 966-1000
6 | Facsimile:   (714) 966-1002

7 | Attorneys for Debtor and Debtor-in-Possession
David Tudor Chamberlain
8 |

9 | **UNITED STATES BANKRUPTCY COURT**

10 | **CENTRAL DISTRICT OF CALIFORNIA**

11 | **SANTA ANA DIVISION**

12 | In re

13 | DAVID TUDOR CHAMBERLAIN,

14 |        Debtor and
Debtor-in-Possession.

Case No. 8:17-bk-11370-CB

Chapter 11

**SECOND AMENDED DISCLOSURE STATEMENT DESCRIBING SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION**

<u>**Cont. Disclosure Statement Hearing**</u>:
**DATE:    September 20, 2017**
**TIME:    10:00 a.m.**
**CTRM:   5D**

<u>**Plan Confirmation Hearing**</u>:
**DATE:   To Be Set**
**TIME:**
**CTRM:**

*(Sidebar, vertical text):* Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

1131251.1

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION.................................................................................................1

    A.   The Purpose of This Document.................................................4

    B.   Deadlines for Voting and Objecting; Date of the Plan
        Confirmation Hearing ...........................................................5

        1.   Time and Place of the Confirmation Hearing .....................5

        2.   Deadline for Voting for or Against the Plan .......................5

        3.   Deadline for Objecting to the Confirmation of the Plan ....5

        4.   Identity of Person to Contact for More Information
           Regarding the Plan ...........................................................6

    C.   Disclaimer..............................................................................6

II.  BACKGROUND ...........................................................................................6

    A.   The Debtor's Real Property Assets ..........................................8

        1.   The Surfside Property.......................................................8

        2.   The LaSalle Street Property .............................................9

        3.   The Comstock Avenue Property ......................................10

        4.   The New Hampshire Property .........................................10

        5.   The Nevada Property.......................................................11

        6.   The Vonnie Lane Property ...............................................11

        7.   The N. Olive Street Property............................................12

        8.   The Newman Street Property ..........................................12

        9.   The Del Amo Blvd. Property ............................................13

        10.  The Denni Street Property ..............................................14

        11.  The Bishop Street Property .............................................15

        12.  The San Alto Way Property .............................................15

        13.  The Stratton Court Property.............................................16

        14.  The 8479 Cedarview Court Property ...............................16

        15.  The 8475 Cedarview Court Property ...............................17

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

## <u>TABLE OF CONTENTS (cont.)</u>

<u>Page</u>

B.    The Debtor's Personal Property Assets.....................................................18

C.    The Debtor's Income and Budget Motion ................................................19

D.    The Events that Led to the Chapter 11 Filing ...........................................20

E.    Significant Events During the Bankruptcy Case .......................................21

    1.    Bankruptcy Proceedings............................................................21

        a.    The Order for Relief ...............................................21

        b.    The Use of Cash Collateral ....................................21

        c.    The Debtor's Schedules, Statement of Financial
            Affairs and Operating Reports.................................22

        d.    The Employment of Estate Professionals ................22

        e.    Claims Bar Date......................................................22

        f.    Exclusivity ...............................................................22

    2.    The Appeal .................................................................................23

    3.    The Fern Litigation.....................................................................29

    4.    Other Legal Proceedings ...........................................................29

    5.    Actual and Projected Recovery from Avoidance Actions
        and Causes of Action.................................................................30

III.    SUMMARY OF THE PLAN ................................................................................30

A.    Overview of the Plan ................................................................................30

B.    What Creditors Will Receive Under the Proposed Plan............................32

    1.    Unclassified Claims ...................................................................32

        a.    Administrative Expenses.......................................32

        b.    Priority Tax Claims................................................35

    2.    Classified Claims .......................................................................36

        a.    Summary of Classes............................................36

        b.    Secured Claims....................................................37

        c.    Class of Priority Claims .......................................47

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1131251.1

ii

## TABLE OF CONTENTS (cont.)

**Page**

|   |   | d. | Class of General Unsecured Claims ....................................47 |
| C. |   | Means of Effectuating the Plan................................................48 |
|   | 1. |   | Funding the Plan................................................................49 |
|   |   | a. | The Interpled DV Sale Proceeds..........................................49 |
|   |   | b. | The Sale and/or Refinance of Some or All of the Real Property to Pay Allowed Claim of Tarnutzer ...............51 |
|   |   | c. | The Sale and/or Refinance of Some or All of the Real Property to Pay Allowed Claim of Fern ........................52 |
|   | 2. |   | Disbursing Agent .................................................................53 |
|   | 3. |   | The Reorganized Debtor ......................................................53 |
| D. |   | Risk Factors ...........................................................................53 |
| E. |   | Provisions Governing Distributions...........................................55 |
|   | 1. |   | Dates of Distributions..........................................................55 |
|   | 2. |   | Manner of Distribution.........................................................55 |
|   | 3. |   | Delivery of Distributions in General.......................................55 |
|   | 4. |   | Rounding Payments .............................................................56 |
|   | 5. |   | Interest on Claims................................................................57 |
|   | 6. |   | Compliance with Tax Requirements ......................................57 |
|   | 7. |   | De Minimis Distributions .....................................................58 |
|   | 8. |   | Setoffs .................................................................................58 |
|   | 9. |   | Limitation on Liability ..........................................................58 |
| F. |   | Other Provisions of the Plan....................................................59 |
|   | 1. |   | Claim Objections and Disputed Claims.................................59 |
|   |   | a. | Standing and Claim Objection Deadline ..............................59 |
|   |   | b. | No Distribution Pending Allowance .....................................59 |
|   |   | c. | Reserves for Disputed Claims..............................................60 |
|   | 2. |   | Executory Contracts and Unexpired Leases....................................60 |

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

SECOND AMENDED
DISCLOSURE STATEMENT

## TABLE OF CONTENTS (cont.)

**Page**

   a. Assumption and Assignment.................................................60

   b. Rejections ........................................................................63

  3. Changes in Rates Subject to Regulatory Commission Approval ...............................................................................64

  4. Preservation of Causes of Action and Avoidance Actions....................................................................................64

  5. Retention of Jurisdiction ...........................................................65

  6. Tax Consequences of the Plan...............................................67

  7. Exemption from Transfer Taxes...............................................68

IV. CONFIRMATION REQUIREMENTS AND PROCEDURES ....................................68

 A. Who May Vote or Object ....................................................................69

  1. Who May Object to Confirmation of the Plan...............................69

  2. Who May Vote to Accept/Reject the Plan ...................................69

   a. What is an Allowed Claim ..................................................69

   b. What is an Impaired Claim ................................................70

  3. Who is Not Entitled to Vote.....................................................70

  4. Who Can Vote in More Than One Class.........................................71

  5. Votes Necessary to Confirm the Plan ........................................71

  6. Votes Necessary for a Class to Accept the Plan ...........................71

  7. Treatment of Nonaccepting Classes.................................................72

  8. Request for Confirmation Despite Nonacceptance by Impaired Class.......................................................................72

 B. Liquidation Analysis..........................................................................72

 C. Feasibility ........................................................................................73

V. EFFECT OF CONFIRMATION...............................................................75

 A. Discharge ........................................................................................75

 B. Exculpation and Releases ..................................................................76

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS (cont.)

**Page**

C.    Vesting of the Assets .................................................................................. 77

D.    Plan Creates New Obligations .................................................................. 77

E.    Creditor Action Restrained ........................................................................ 77

F.    Material Default Defined ............................................................................ 77

G.    Modification of the Plan ............................................................................. 78

H.    Post-Confirmation Status Report .............................................................. 78

I.    Quarterly Fees ........................................................................................... 78

J.    Post-Confirmation Conversion/Dismissal ................................................. 78

K.    Final Decree .............................................................................................. 79

**Lobel Weiland Golden Friedman LLP**
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

# TABLE OF AUTHORITIES

**Page(s)**

## STATUTES

11 U.S.C § 524(a)(3)................................................................................................29

11 U.S.C. § 101 ........................................................................................................1

11 U.S.C. § 108 ......................................................................................................66

11 U.S.C. § 346 ......................................................................................................66

11 U.S.C. § 362(a) .................................................................................................79

11 U.S.C. § 502 ......................................................................................................76

11 U.S.C. § 502(g) .................................................................................................76

11 U.S.C. § 502(h) .................................................................................................76

11 U.S.C. § 502(l) ..................................................................................................76

11 U.S.C. § 505 ......................................................................................................66

11 U.S.C. § 506(b) .................................................................................................33

11 U.S.C. § 507(a) .................................................................................................47

11 U.S.C. § 507(a)(2) .......................................................................................32, 71

11 U.S.C. § 507(a)(3) .......................................................................................47, 71

11 U.S.C. § 507(a)(4) .............................................................................................47

11 U.S.C. § 507(a)(5) .............................................................................................47

11 U.S.C. § 507(a)(6) .............................................................................................47

11 U.S.C. § 507(a)(7) .............................................................................................47

11 U.S.C. § 507(a)(8) .......................................................................................35, 71

11 U.S.C. § 510 ......................................................................................................66

11 U.S.C. § 511 ...............................................................................................33, 35

11 U.S.C. § 521 ......................................................................................................22

11 U.S.C. §§ 523(a) ...............................................................................................29

11 U.S.C. § 525 ......................................................................................................66

11 U.S.C. § 543 ......................................................................................................66

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

vi

## TABLE OF AUTHORITIES (cont.)

**Page(s)**

11 U.S.C. § 544 ..................................................................................................... 30, 66

11 U.S.C. § 545 ............................................................................................................ 66

11 U.S.C. § 547 ............................................................................................................ 66

11 U.S.C. § 548 ............................................................................................................ 66

11 U.S.C. § 549 ............................................................................................................ 66

11 U.S.C. § 550 ..................................................................................................... 30, 66

11 U.S.C. § 551 ............................................................................................................ 66

11 U.S.C. § 553 ..................................................................................................... 58, 66

11 U.S.C. § 1006 .......................................................................................................... 22

11 U.S.C. § 1107 .......................................................................................................... 22

11 U.S.C. § 1112(b) ...................................................................................................... 78

11 U.S.C. § 1125 ............................................................................................................. 1

11 U.S.C. § 1125(e) ...................................................................................................... 76

11 U.S.C. § 1126(g) ...................................................................................................... 69

11 U.S.C. § 1127(a) ...................................................................................................... 78

11 U.S.C. § 1127(b) ...................................................................................................... 78

11 U.S.C. § 1129(a)(7) .................................................................................................. 72

11 U.S.C. § 1129(a)(8) .................................................................................................. 72

11 U.S.C. § 1129(b) ...................................................................................................... 72

11 U.S.C. § 1141 .......................................................................................................... 75

11 U.S.C. § 1141(b) ...................................................................................................... 77

11 U.S.C. § 1144 .......................................................................................................... 79

11 U.S.C. § 1146 .......................................................................................................... 66

11 U.S.C. § 1146(a) ...................................................................................................... 68

28 U.S.C. § 1930(a)(6) .................................................................................................. 78

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

SECOND AMENDED
DISCLOSURE STATEMENT

## TABLE OF AUTHORITIES (cont.)

**Page(s)**

## RULES

Federal Rule of Bankruptcy Procedure 9019 ................................................................... 60

Federal Rule of Bankruptcy Procedure 3022 ................................................................... 79

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

SECOND AMENDED
DISCLOSURE STATEMENT

1    David Tudor Chamberlain, the debtor and debtor-in-possession herein (the

2  "Debtor"),[1] provides this Second Amended Disclosure Statement Describing Second

3  Amended Chapter 11 Plan of Reorganization (the "Disclosure Statement") to creditors,

4  pursuant to 11 U.S.C. § 1125, in connection with the solicitation of acceptances of his

5  Second Amended Chapter 11 Plan of Reorganization (the "Plan") filed with the United

6  States Bankruptcy Court for the Central District of California, Santa Ana Division (the

7  "Court") in the above-captioned chapter 11 bankruptcy case (the "Case").

8

9  I.    **INTRODUCTION**

10    The Case was commenced by the filing of a voluntary chapter 11 petition under the

11  United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code" or the

12  "Code"), on April 9, 2017 (the "Petition Date").

13    Chapter 11 allows debtors, and, under some circumstances, creditors and other

14  parties in interest to propose a plan.  A plan may provide for a debtor to reorganize by

15  continuing to operate, to liquidate by selling assets of the estate, or a combination of both.

16  The Debtor is the proponent of the Plan, which was sent to you in the same envelope as

17  these documents.  THE DOCUMENT YOU ARE READING IS THE DISCLOSURE

18  STATEMENT FOR THE ENCLOSED PLAN.  **Your rights may be affected.  You should**

19  **read these papers carefully and discuss them with your attorney, if you have one.**

20  **(If you do not have an attorney, you may wish to consult one).**

21    The Plan is a reorganizing plan.  As described in detail below, all Allowed Claims

22  against the Debtor will be paid in full, including all Allowed Secured Claims, Allowed

23  Priority Claims and Allowed General Unsecured Claims.  In this regard, the Plan provides

24  for the following treatment of Allowed Claims:

25  _____

26    [1] Any capitalized terms not defined in the text of this Disclosure Statement are defined in the Table of
27  Definitions found at the end of the Disclosure Statement.

28

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

1131251.1

1

SECOND AMENDED
DISCLOSURE STATEMENT

- Allowed Secured Claims of the Real Property Lenders are classified in Classes 1 through 15.  Certain Real Property Lenders (Classes 3, 6, 7, 8, 9, 10, 12, 13, 14 and 15) shall have their debt obligations modified with respect to repayment terms and interest rates as provided in the Plan, and are entitled to vote on the Plan.  Other Real Property Lenders (Classes 1, 2, 4, 5 and 11) (as well as the Debtor's secured car lease with Alliant Credit Union (Class 17) and Secured Tax Claims (Class 18) shall retain, unaltered, all of their legal, equitable and contractual rights, and, consequently, shall be deemed to vote in favor of the Plan.

- Allowed Priority Claims (Class 19) will either be paid in full on the Effective Date of the Plan, or will be paid over time in accordance with the provisions of the Bankruptcy Code.

- Allowed General Unsecured Claims (with the exception of any unsecured claim of Fern) (Class 20) will be paid in full on the Effective Date of the Plan.

- Any Allowed Claim of Tarnutzer based on a Final Order in the Tarnutzer Litigation will be paid in full in accordance with the terms of the Plan.

- Any Allowed Claim of Fern based on a Final Order in the Fern Litigation will be paid in full in accordance with the terms of the Plan.

- Any Allowed Claim of Tarnutzer based on a Final Order in the Tarnutzer Litigation, will be satisfied first from the Interpled DV Sale Proceeds (in the amount of approximately $1.8 million) and, thereafter, to the extent necessary to pay such Allowed Claim in full, from a Sale and/or Refinancing of some or all of the Real Property, as provided by the Plan.  Such payment to Tarnutzer pursuant to the

2

SECOND AMENDED
DISCLOSURE STATEMENT

Plan will be made within one hundred and twenty (120) days following the entry of a Final Order providing Tarnutzer with an Allowed Claim against the Debtor.

- Any Allowed Claim of Fern based on a Final Order in the Fern Litigation will be satisfied from a Sale and/or Refinancing of some or all of the Real Property, as provided by the Plan.  Such payment to Fern pursuant to the Plan will be made within one hundred and twenty (120) days following the entry of a Final Order providing Fern with an Allowed Claim against the Debtor; *provided, however*, that if Fern obtains an Allowed Claim prior to resolution of the Tarnutzer Litigation, Fern shall be granted a lien on the Real Property subject to the Tarnutzer Lien, junior to the existing liens thereon, to secure such Allowed Claim and shall be paid within one hundred and twenty (120) days following the entry of a Final Order resolving the Tarnutzer Litigation.

- Payments to creditors (other than to Tarnutzer and Fern) under the Plan will be funded with the Real Property Income and the Debtor's Income.

- Effective Date payments on account of General Unsecured Claims (Class 20) and Professional Fee Claims will be satisfied from the Debtor's Income and/or proceeds of a Sale and/or Refinancing of the Real Property.

The Effective Date of the Plan will be the first Business Day that is at least fifteen (15) days after the entry of an order confirming the Plan (the "Confirmation Order"), provided there has been no order staying the effectiveness of the Confirmation Order.

3

**A.    The Purpose of This Document**

The Disclosure Statement summarizes what is in the Plan and tells you certain information relating to the Plan and the process the Court follows in determining whether or not to confirm the Plan.

**READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO KNOW ABOUT:**

**1.    WHO CAN VOTE ON OR OBJECT TO THE PLAN;**

**2.    WHAT THE TREATMENT OF YOUR CLAIM IS UNDER THE PLAN (*i.e.*, what you will receive on account of your Claim if the Plan is confirmed), AND HOW THIS TREATMENT COMPARES TO WHAT YOUR CLAIM WOULD RECEIVE IN LIQUIDATION IN CHAPTER 7;**

**3.    THE HISTORY OF THE DEBTOR AND SIGNIFICANT EVENTS DURING THE BANKRUPTCY CASE;**

**4.    WHAT THE COURT WILL LOOK AT TO DECIDE WHETHER OR NOT TO CONFIRM THE PLAN;**

**5.    WHAT IS THE EFFECT OF CONFIRMATION; AND**

**6.    WHETHER THE PLAN IS FEASIBLE.**

This Disclosure Statement cannot tell you everything about your rights.  You should consider consulting your own lawyer to obtain more specific advice on how the Plan will affect you and what is the best course of action for you.  Lobel Weiland Golden Friedman LLP ("LWGF"), general insolvency counsel for the Debtor, does not represent you.

Be sure to read the Plan as well as the Disclosure Statement.  If there are any inconsistencies between the Plan and Disclosure Statement, the Plan provisions will govern.

The Code requires that a disclosure statement contain "adequate information" concerning the Plan.  By order entered on _____, 2017, the Court approved this document as an adequate Disclosure Statement, containing enough information to enable

1  parties affected by the Plan to make an informed judgment about the Plan.  Any party can

2  now solicit votes for or against the Plan.**²**

3       **B.**    **Deadlines for Voting and Objecting; Date of the Plan Confirmation**

4              **Hearing**

5       THE COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS

6  DISCLOSURE STATEMENT.  IN OTHER WORDS, THE TERMS OF THE PLAN ARE

7  NOT YET BINDING ON ANYONE.  HOWEVER, IF THE COURT LATER CONFIRMS

8  THE PLAN, THEN THE PLAN WILL BE BINDING ON THE DEBTOR AND ON ALL

9  CREDITORS IN THIS CASE.

10         **1.**    **Time and Place of the Confirmation Hearing**

11       The hearing where the Court will determine whether or not to confirm the Plan will

12  take place on _____, 2017, at _____, in Courtroom 5D of the United States

13  Bankruptcy Courthouse located at the Ronald Reagan Federal Building and Courthouse,

14  411 West Fourth Street, Santa Ana, California 92701-4593.

15         **2.**    **Deadline for Voting for or Against the Plan**

16       If you are entitled to vote, it is in your best interest to timely vote on the enclosed

17  ballot and return the ballot in the enclosed envelope to LWGF, Attn: Beth E. Gaschen,

18  Esq. and Lori A. Gauthier, 650 Town Center Drive, Suite 950, Costa Mesa, California

19  92626.

20       **Your ballot must be received no later than 5:00 p.m. (Pacific Time)**

21  **_____, 2017, or it will not be counted.**

22         **3.**    **Deadline for Objecting to the Confirmation of the Plan**

23       Objections to the confirmation of the Plan must be Filed with the Court and served

24  upon counsel for the Debtor so as to be received on or before _____, 2017.

25  _____

26      **²** The Disclosure Statement has not yet been approved.  A continued hearing on the approval of the
Disclosure Statement will take place on September 20, 2017 at 10:00 a.m.

27

28

1131251.1

5

**4.** **Identity of Person to Contact for More Information Regarding the Plan**

Any interested party desiring further information about the Plan should contact Jeffrey I. Golden, Alan J. Friedman or Beth E. Gaschen of LWGF, by phone at (714) 966-1000 or by email at jgolden@lwgfllp.com, afriedman@lwgfllp.com or bgaschen@lwgfllp.com.

**C.** **Disclaimer**

The financial data relied upon in formulating the Plan is based on the financial records of the Debtor, projections created by the Debtor or his financial professionals, or information provided by other parties in interest.  The professionals employed by the Debtor drafted the Plan and the Disclosure Statement based on this information and have no independent knowledge regarding the accuracy of the data.  The Court has not yet determined whether or not the Plan is confirmable and makes no recommendation as to whether or not you should support or oppose the Plan.

## II.    BACKGROUND

The Debtor has been a real estate broker for 35 years and, together with his non-filing wife, Linda, and two other family members, operates Team Chamberlain Realty Executives, a real estate brokerage firm based in Los Alamitos, California.  The Debtor also owns fifteen pieces of real property in California, Nevada and New Hampshire (defined herein as the "Real Property").[3]  The Real Property is collectively valued at approximately $15.2 million and secured claims against the Real Property (and certain personal property related to the Real Property) collectively total approximately $6.4 million, not including a judgment lien against certain of the Real Property asserted by Rick

---

[3] The Real Property is owned by the Debtor and his non-filing wife, Linda Chamberlain, as community property.

1131251.1

6

SECOND AMENDED
DISCLOSURE STATEMENT

1  Tarnutzer, as Trustee of the 1997 Troy Trust ("Tarnutzer"), purportedly securing a

2  judgment in the approximate amount of $3.35 million[4] which is currently being appealed

3  by the Debtor (defined herein, respectively, as the "Tarnutzer Lien," the "Tarnutzer

4  Judgment" and the "Appeal").  The Debtor also has personal property assets collectively

5  valued at approximately $2.4 million (not including encumbrances or applicable

6  exemptions thereon).  The Debtor also asserts that he is entitled to the amount of

7  approximately $1.8 million in funds interpled in the state court in connection with the

8  litigation with Tarnutzer by way of his 100% ownership interest in Domingo Villas (defined

9  herein, respectively, as the "Interpled DV Sale Proceeds," and the "Tarnutzer Litigation" or

10 "State Court Action").  The Debtor has various unsecured claims totaling the amount of

11 approximately $5.2 million, including a disputed claim asserted by Fern, in the amount of

12 approximately $4.1 million.[5]

13        Except for the Surfside Property (the Debtor's personal residence) and a portion of

14 the New Hampshire Property, the Real Property is subject to leases, pursuant to which

15 the tenants make monthly rental payments to the Debtor.  The rents from these income-

16 generating real estate assets (*i.e.,* the Real Property Income), as well as the Debtor's

17 income from his real estate business (*i.e.,* the Debtor's Income), will be utilized to fund the

18 Debtor's payments to creditors (other than Tarnutzer and Fern) under the Plan, which

19 provides for the payment of all Allowed Claims in full.

20        In addition, to the extent that Tarnutzer is ultimately successful in obtaining an

21 Allowed Claim against the Debtor by way of a Final Order in connection with the appeal

22

23        [4] As set forth in the amended Proof of Claim filed by Tarnutzer on July 12, 2017 [Claim No. 7], Tarnutzer

24 asserts that the Tarnutzer Judgment is fully secured and totaled, as of the Petition Date, the amount of
$3,353,009.53,.

25        [5] As set forth in the Proof of Claim filed by Fern on June 12, 2017 [Claim No. 12], Fern asserts an
unsecured claim against the Debtor in the amount of $4,132,500 (plus damages according to proof,

26 attorneys' fees and costs) based on a proposed cross-complaint it wished to file in the Fern Litigation, that
was stayed by the filing of the Debtor's Case.  On June 9, 2017, Fern filed a Complaint to Determine

27 Nondischargeability of Debts Pursuant to 11 U.S.C. §§ 523(a) and 524(a)(3) with respect to this claim.

28

1131251.1                                    7                    SECOND AMENDED
                                                                  DISCLOSURE STATEMENT

1  process in the Tarnutzer Litigation, any such Allowed Claim will be paid first from the

2  Interpled DV Sale Proceeds and, thereafter, to the extent necessary, through a Sale

3  and/or Refinancing of some or all of the Real Property.  In addition to the approximately

4  $1.8 million in Interpled DV Sale Proceeds, there is significant equity in the Real Property

5  – approximately $8.8 million in the aggregate – available to satisfy any Allowed Claim

6  determined by Final Order to be due and owing to Tarnutzer.

7         Similarly, to the extent that Fern is ultimately successful in obtaining an Allowed

8  Claim against the Debtor by way of a Final Order in connection with the Fern Litigation,

9  any such Allowed Claim will be paid through a Sale and/or Refinancing of some or all of

10 the Real Property.

11        Effective Date payments on account of Professional Fee Claims and Class 20

12 General Unsecured Claims will be satisfied from the Debtor's Income and/or proceeds of

13 a Sale and/or Refinancing of the Real Property.

14        **A.    The Debtor's Real Property Assets**

15             **1.    The Surfside Property**

16        The Debtor owns and resides at the real property located at 103 Surfside Avenue

17 A, Surfside, California 90743 (the "Surfside Property").  The Surfside Property consists of

18 a 2,508 sq. ft. single family residence built in 1976 and located on a 1,874 sq. ft. ocean

19 view lot.  The Surfside Property has been valued at $3,500,000.  The current expenses

20 related to the Surfside Property are set forth in Exhibit "1" hereto.

21        There are two deeds of trust recorded against the Surfside Property, as follows:

22 (1) a deed of trust recorded on April 15, 2008 as Instrument No. 2008000174973 in favor

23 Colorado Federal Savings Bank, which was subsequently assigned to Compass Bank

24 and, thereafter, to Roundpoint Mortgage, securing an obligation in the amount of

25 approximately $1,494,000 as of the Petition Date; and (2) a deed of trust recorded on

26 March 6, 2012 as Instrument No. 2012000126015 in favor of Wells Fargo Bank (which

27 deed of trust references and incorporates a fictitious deed of trust recorded on June 14,

28

1131251.1

SECOND AMENDED
DISCLOSURE STATEMENT

1  2007 as Instrument No. 2007000527107), securing an obligation in the amount of

2  approximately $197,000 as of the Petition Date.[6]  Also recorded against the Surfside

3  Property (and the Debtor's other Real Property located in California) is the Tarnutzer Lien.

4       The equity in the Surfside Property (without taking into account the Tarnutzer Lien)

5  is approximately $1,809,000.

6            **2.    The LaSalle Street Property**

7       The Debtor owns real property located at 8832-8846 LaSalle Street, Cypress,

8  California 90630 (the "LaSalle Street Property").  The LaSalle Street Property consists of a

9  4,944 sq. ft. 9-unit apartment building built in 1969 and located on a 19,845 sq. ft. lot.  The

10 LaSalle Street Property has been valued at $2,000,000.  The current income and

11 expenses related to the LaSalle Street Property are set forth in Exhibit "1" hereto.

12      There are two deeds of trust recorded against the LaSalle Street Property, as

13 follows: (1) a deed of trust recorded on November 7, 2007 as Instrument No.

14 2007000673914, in favor of Washington Mutual Bank, which was subsequently assigned

15 to Chase Commercial Bank, securing an obligation in the amount of approximately

16 $578,000 as of the Petition Date; and (2) a deed of trust recorded on March 11, 2016 as

17 Instrument No. 2016000101545, in favor of Ann Leisy, securing an obligation in the

18 amount of approximately $162,000 as of the Petition Date.  Also recorded against the

19 LaSalle Street Property (and the Debtor's other Real Property located in California) is the

20 Tarnutzer Lien.

21      The equity in the LaSalle Street Property (without taking into account the Tarnutzer

22 Lien) is approximately $1,260,000.

23

24

25

26 [6] Prior to the Petition Date, two additional deeds of trust were recorded against the Surfside Property, in
   favor of Gregory Page and Eileen Cathro.  Such liens were subsequently released, and are not
27 encumbrances against the Surfside Property.

28
1131251.1                                      9                        SECOND AMENDED
                                                                       DISCLOSURE STATEMENT

### 3.    The Comstock Avenue Property

The Debtor owns real property located at 7632 Comstock Avenue, Whittier, California 90602 (the "Comstock Avenue Property").  The Comstock Avenue Property consists of a 4,600 sq. ft. 12-unit apartment building built in 1954 and located on a 7,000 sq. ft. lot.  The Comstock Avenue Property has been valued at $1,800,000.  The current income and expenses related to the Comstock Avenue Property are set forth in Exhibit "1" hereto.

The Comstock Avenue Property is subject to a deed of trust recorded on February 6, 2004 as Instrument No. 040274990, in favor of Washington Mutual Bank, which was subsequently assigned to Chase Commercial Bank, securing an obligation in the amount of approximately $380,000 as of the Petition Date.  Also recorded against the Comstock Avenue Property (and the Debtor's other Real Property located in California) is the Tarnutzer Lien.

The equity in the Comstock Property (without taking into account the Tarnutzer Lien) is approximately $1,420,000.

### 4.    The New Hampshire Property

The Debtor owns real property located at 281-289 Merrimack & 274 Amory, Manchester, New Hampshire (the "New Hampshire Property").  The New Hampshire Property consists of 12-unit apartment building built in 1920.  The New Hampshire Property has been valued at $1,000,000.  The current income and expenses related to the New Hampshire Property are set forth in Exhibit "1" hereto.[7]

The New Hampshire Property is subject to a deed of trust recorded on November 18, 2004 as Instrument No. 4108398 in favor of Digital Federal Credit Union, securing an

---

[7] Only the real property located at 281-289 Merrimack is currently rented.  The real property located at 274 Amory is not rented.

1  obligation in the amount of approximately $378,000 as of the Petition Date.  The New

2  Hampshire Property is not subject to the Tarnutzer Lien.

3       The equity in the New Hampshire Property is approximately $622,000.

4       On May 26, 2017, a fire occurred at 274 Amory, Manchester, New Hampshire.  The

5  Debtor is expected to receive $136,777.80 in insurance proceeds based upon the

6  coverage in place at the time of the fire.  The Debtor is in the process of preparing and

7  filing a motion for authority to enter into the agreement with his insurance provider and for

8  use of the insurance proceeds as set forth in Class 6 below.

9        **5.    The Nevada Property**

10       The Debtor owns real property located at 321-325 Cincinnati Avenue, Las Vegas,

11  Nevada (the "Nevada Property").  The Nevada Property consists of a 20-unit apartment

12  building built in phases between 1956 and 1957 on approximately 0.38 acres of land.  The

13  Nevada Property has been valued at $860,000.  The current income and expenses

14  related to the Nevada Property are set forth in Exhibit "1" hereto.

15       The Nevada Property is subject to a deed of trust recorded on February 11, 2013

16  as Instrument No. 201302110000845 in favor of U.S. Bank Trust Company, N.A., securing

17  an obligation in the amount of approximately $209,000 as of the Petition Date.  The

18  Nevada Property is not subject to the Tarnutzer Lien.

19       The equity in the Nevada Property is approximately $651,000.

20        **6.    The Vonnie Lane Property**

21       The Debtor owns real property located at 5641-5643 Vonnie Lane, Cypress,

22  California 90630 (the "Vonnie Lane Property").  The Vonnie Lane Property consists of a

23  7,825 sq. ft. multi-unit complex built in 1947 and located on a 7,911 sq. ft. lot.  The Vonnie

24  Lane Property has been valued at $700,000.  The current income and expenses related to

25  the Vonnie Lane Property are set forth in Exhibit "1" hereto.

26       The Vonnie Lane Property is subject to a deed of trust recorded on March 29, 2006

27  as Instrument No. 2006000206171, in favor of BrooksAmerica Mortgage Corporation,

28

1131251.1           11           SECOND AMENDED
DISCLOSURE STATEMENT

1  which was subsequently assigned to Wells Fargo Bank, securing an obligation in the

2  amount of approximately $444,000 as of the Petition Date.  Also recorded against the

3  Vonnie Lane Property (and the Debtor's other Real Property located in California) is the

4  Tarnutzer Lien.

5       The equity in the Vonnie Lane Property is approximately $252,000.

6       **7.    The N. Olive Street Property**

7       The Debtor owns real property located at 728 N. Olive Street, Anaheim, California

8  92805 (the "N. Olive Street Property").  The N. Olive Street Property consists of a 6,057

9  sq. ft. multi-unit complex built in 1922 and located on a 5,965 sq. ft. lot.  The N. Olive

10 Street Property has been valued at $660,000.  The current income and expenses related

11 to the N. Olive Street Property are set forth in Exhibit "1" hereto.

12      There are two deeds of trust recorded against the N. Olive Street Property, as

13 follows: (1) a deed of trust recorded on April 21, 2006 as Instrument No. 2006000270694,

14 in favor of BrooksAmerica Mortgage Corporation, which was subsequently assigned to

15 Wells Fargo Bank, securing an obligation in the amount of approximately $187,000 as of

16 the Petition Date; and (2) a deed of trust recorded on January 6, 2015 as Instrument No.

17 2015000004197, in favor of Pacific Premier Bank, securing an obligation in the amount of

18 approximately $150,000 as of the Petition Date.  Also recorded against the N. Olive Street

19 Property (and the Debtor's other Real Property located in California) is the Tarnutzer Lien.

20      The equity in the N. Olive Street Property (without taking into account the Tarnutzer

21 Lien) is approximately $323,000.

22      **8.    The Newman Street Property**

23      The Debtor owns real property located at 5623 Newman Street, Cypress, California

24 90630 (the "Newman Street Property").  The Newman Street Property consists of a 7,045

25 sq. ft. multi-unit complex built in 1964 and located on an 8,096 sq. ft. lot.  The Newman

26 Street Property has been valued at $1,250,000.  The current income and expenses

27 related to the Newman Street Property are set forth in Exhibit "1" hereto.

28

1131251.1

SECOND AMENDED
DISCLOSURE STATEMENT

1  The Newman Street Property is subject to a deed of trust recorded on December

2  20, 2013 as Instrument No. 2013000700324, in favor of Pacific Premier Bank, securing an

3  obligation in the amount of approximately $600,000 as of the Petition Date.[8,9]   Also

4  recorded against the Newman Street Property (and the Debtor's other Real Property

5  located in California) is the Tarnutzer Lien.

6  The equity in the Newman Street Property (without taking into account the cross-

7  collateralization of the Pacific Premier Bank liens on the Newman Street Property, the Del

8  Amo Blvd. Property, the Denni Street Property and the Bishop Street Property, or the

9  Tarnutzer Lien), is approximately $650,000.

10  **9.    The Del Amo Blvd. Property**

11  The Debtor owns real property located at 12350 Del Amo Blvd., Suite 169,

12  Lakewood, California 90713 (the "Del Amo Blvd. Property").  The Del Amo Blvd. Property

13  consists of a multi-unit complex built in 1971 and located on a 14.38 acre lot.  The Del

14  Amo Blvd. Property has been valued at $620,000.  The current income and expenses

15  related to the Del Amo Blvd. Property are set forth in Exhibit "1" hereto.

16

17 _____

18  [8] As discussed herein, Pacific Premier Bank is a lender to the Debtor in connection with five (5) Real Properties, the N. Olive Street Property, the Newman Street Property, the Bishop Street Property, the Del Amo Blvd. Property and the Denni Street Property.  As discussed above, Pacific Premier Bank asserts a

19  secured claim, as of the Petition Date, in the amount of approximately $150,000 against the N. Olive Street Property.  Pacific Premier Bank also asserts a cross-collateralized secured claim, as of the Petition Date, in

20  the aggregate amount of approximately $1.3 million against the Newman Street Property, the Bishop Street Property, the Del Amo Blvd. Property and the Denni Street Property (the "PPB Cross-Collateralized Secured

21  Claim").  The aggregate value of the Newman Street Property (valued at $1,250,000), the Del Amo Blvd. Property (valued at $620,000), the Denni Street Property (valued at $600,000) and the Bishop Street

22  Property (valued at $515,000), is approximately $2,985,000 which, after accounting for the PPB Cross-Collateralized Secured Claim (in the aggregate amount of approximately $1.3 million), leaves approximately

23  $1,685,000 in aggregate equity in these four (4) Real Property.

24  [9] Pacific Premier Bank filed a UCC-1 filed with the California Secretary of State on December 4, 2014, as Instrument No. 13-7389473570, against all inventory, equipment, accounts, chattel paper, instruments

25  (including but not limited to all promissory notes), letter-of-credit rights, letters of credit, documents, deposit accounts, investment property, money, other rights to payment and performance, general intangibles

26  (including but not limited to all software and all payment intangibles), and all fixtures related to the Newman Street Property, the Bishop Street Property, the Del Amo Blvd. Property and the Denni Street Property (the

27  "PPB UCC-1").

28

13      SECOND AMENDED
DISCLOSURE STATEMENT

1  The Del Amo Blvd. Property is subject to a deed of trust recorded on December 20,

2  2013 as Instrument No. 20131789424, in favor of Pacific Premier Bank, securing an

3  obligation in the amount of approximately $250,000 as of the Petition Date.[10]  Also

4  recorded against the Del Amo Blvd. Property (and the Debtor's other Real Property

5  located in California) is the Tarnutzer Lien.

6  The equity in the Del Amo Blvd. Property (without taking into account the cross-

7  collateralization of the Pacific Premier Bank liens on the Newman Street Property, the Del

8  Amo Blvd. Property, the Denni Street Property and the Bishop Street Property, or the

9  Tarnutzer Lien), is approximately $383,000.

10  **10.    The Denni Street Property**

11  The Debtor owns real property located at 9062-9062.5 Denni Street, Cypress,

12  California 90630 (the "Denni Street Property").  The Denni Street Property consists of a

13  805 sq. ft. single family residence built in 1946 and located on a 10,781 sq. ft. lot.  The

14  Denni Street Property has been valued at $600,000.  The current income and expenses

15  related to the Denni Street Property are set forth in Exhibit "1" hereto.

16  The Denni Street Property is subject to a deed of trust recorded on December 20,

17  2013 as Instrument No. 2013000700323, in favor of Pacific Premier Bank, securing an

18  obligation in the amount of approximately $233,000 as of the Petition Date.[11]  Also

19  recorded against the Denni Street Property (and the Debtor's other Real Property located

20  in California) is the Tarnutzer Lien.

21

22  _____

23  [10] *See* discussion in footnotes 6 and 7 above regarding Pacific Premium Bank's assertion of the PPB

24  Cross-Collateralized Secured Claim (in the aggregate amount of approximately $1.3 million) against the
Newman Street Property, the Bishop Street Property, the Del Amo Blvd. Property and the Denni Street
Property.

25  [11] *See* discussion in footnotes 6 and 7 above regarding Pacific Premium Bank's assertion of the PPB

26  Cross-Collateralized Secured Claim (in the aggregate amount of approximately $1.3 million) against the
Newman Street Property, the Bishop Street Property, the Del Amo Blvd. Property and the Denni Street

27  Property.

28

1131251.1

14

SECOND AMENDED
DISCLOSURE STATEMENT

1  The equity in the Denni Street Property (without taking into account the cross-

2  collateralization of the Pacific Premier Bank liens on the Newman Street Property, the Del

3  Amo Blvd. Property, the Denni Street Property and the Bishop Street Property, or the

4  Tarnutzer Lien), is approximately $367,000.

5  ### 11.    The Bishop Street Property

6  The Debtor owns real property located at 5532 Bishop Street, Cypress, California

7  90630 (the "Bishop Street Property").  The Bishop Street Property consists of a 760 sq. ft.

8  single family residence built in 1946 and located on a 6,875 sq. ft. lot.  The Bishop Street

9  Property has been valued at $515,000.  The current income and expenses related to the

10  Bishop Street Property are set forth in Exhibit "1" hereto.

11  The Bishop Street Property is subject to a deed of trust recorded on December 20,

12  2013 as Instrument No. 2013000700321, in favor of Pacific Premier Bank, securing an

13  obligation in the amount of approximately $201,000 as of the Petition Date.[12]  Also

14  recorded against the Bishop Street Property (and the Debtor's other Real Property located

15  in California) is the Tarnutzer Lien.

16  The equity in the Bishop Street Property (without taking into account the cross-

17  collateralization of the Pacific Premier Bank liens on the Newman Street Property, the Del

18  Amo Blvd. Property, the Denni Street Property and the Bishop Street Property, or the

19  Tarnutzer Lien), is approximately $314,000.

20  ### 12.    The San Alto Way Property

21  The Debtor owns real property located at 6844 San Alto Way, Buena Park,

22  California 90620 (the "San Alto Way Property").  The San Alto Way Property consists of a

23  1,210 sq. ft. single family residence built in 1955 and located on a 6,000 sq. ft. lot.  The

24

25  [12] *See* discussion in footnotes 6 and 7 above regarding Pacific Premium Bank's assertion of the PPB
Cross-Collateralized Secured Claim (in the aggregate amount of approximately $1.3 million) against the

26  Newman Street Property, the Bishop Street Property, the Del Amo Blvd. Property and the Denni Street

27  Property.

28

1  San Alto Way Property has been valued at $500,000.  The current income and expenses

2  related to the San Alto Way Property are set forth in Exhibit "1" hereto.

3      The San Alto Way Property is subject to a deed of trust recorded on December 7,

4  2004 as Instrument No. 2004001088413, in favor of IndyMac Bank, F.S.B., which was

5  subsequently assigned to OCWEN, securing an obligation in the amount of approximately

6  $261,000 as of the Petition Date.  Also recorded against the San Alto Way Property (and

7  the Debtor's other Real Property located in California) is the Tarnutzer Lien.

8      The equity in the San Alto Way Property (without taking into account the Tarnutzer

9  Lien) is approximately $237,000.

10                **13.    The Stratton Court Property**

11      The Debtor owns real property located at 10418 Stratton Court, Cypress, California

12  90630 (the "Stratton Court Property").  The Stratton Court Property consists of a 1,306 sq.

13  ft. single family residence built in 1955 and located on a 1,075 sq. ft. lot.  The Stratton

14  Court Property has been valued at $436,000.  The current income and expenses related

15  to the Stratton Court Property are set forth in Exhibit "1" hereto.

16      The Stratton Court Property is subject to a deed of trust recorded on August 15,

17  2005 as Instrument No. 2005000636158, in favor of Express Capital Lending, which was

18  subsequently assigned to OCWEN, securing an obligation in the amount of approximately

19  $270,000 as of the Petition Date.  Also recorded against the Stratton Court Property (and

20  the Debtor's other Real Property located in California) is the Tarnutzer Lien.

21      The equity in the Stratton Court Property (without taking into account the Tarnutzer

22  Lien) is approximately $164,000.

23              **14.    The 8479 Cedarview Court Property**

24      The Debtor owns real property located at 8479 Cedarview Court, Cypress,

25  California 90630 (the "8479 Cedarview Court Property").  The 8479 Cedarview Court

26  Property consists of a 1,196 sq. ft. condominium built in 1980.  The 8479 Cedarview Court

27

28

1131251.1

16

1  Property has been valued at $400,000.  The current income and expenses related to the

2  8479 Cedarview Court Property are set forth in Exhibit "1" hereto.

3      The 8479 Cedarview Court Property is subject to a deed of trust recorded on

4  December 12, 2005 as Instrument No. 2005000986160, in favor of Guaranty Bank, which

5  was subsequently assigned to OCWEN, securing an obligation in the amount of

6  approximately $238,000 as of the Petition Date.  Also recorded against the 8479

7  Cedarview Court Property (and the Debtor's other Real Property located in California) is

8  the Tarnutzer Lien.

9      The equity in the 8479 Cedarview Court Property (without taking into account the

10  Tarnutzer Lien) is approximately $161,000.

11          **15.    The 8475 Cedarview Court Property**

12      The Debtor owns real property located at 8475 Cedarview Court, Cypress,

13  California 90630 (the "8475 Cedarview Court Property").  The 8475 Cedarview Court

14  Property consists of a 985 sq. ft. condominium built in 1980.  The 8475 Cedarview Court

15  Property has been valued at $375,000.  The current income and expenses related to the

16  8475 Cedarview Court Property are set forth in Exhibit "1" hereto.

17      The 8475 Cedarview Court Property is subject to a deed of trust recorded on

18  December 9, 2005 as Instrument No. 2005000985621, in favor of Guaranty Bank, which

19  was subsequently assigned to OCWEN, securing an obligation in the amount of

20  approximately $238,000 as of the Petition Date.  Also recorded against the 8475

21  Cedarview Court Property (and the Debtor's other Real Property located in California) is

22  the Tarnutzer Lien.

23      The equity in the 8475 Cedarview Court Property (without taking into account the

24  Tarnutzer Lien) is approximately $136,000.

25

26

27

28

1131251.1

17

1

**B.      The Debtor's Personal Property Assets**

2      In addition to the Real Property, and as set forth in the Schedules, as of the Petition

3  Date, the Debtor held personal property assets valued at approximately $2,423,000

4  (exclusive of any applicable exemptions and encumbrances).[13]

5      The Debtor's personal property assets include a 2007 Mercedes valued at $16,000

6  (less applicable exemption), a 2010 Chevrolet Tahoe valued at $16,000, a 2011 Chevrolet

7  Impala valued at $8,000, and a 2016 Tesla valued at approximately $73,000 (which

8  vehicle is encumbered by a security interest in favor of Alliant Credit Union in the amount

9  of approximately $86,000), various personal and household items with a value of

10  approximately $70,300 (exclusive of applicable exemptions), approximately $69,000 in

11  various bank accounts (exclusive of applicable exemptions and encumbrances), and stock

12  in a publicly-traded company, Polar Power, valued at approximately $91,000.  In addition,

13  the Debtor (along with this non-filing wife) holds interests in the following entities:

14  (1) 100% ownership of Domingo Villas, Inc. (defined herein as "Domingo Villas") with an

15  unknown value;[14] (2) 100% ownership of First Choice Escrow, Inc. with a value of

16  approximately $260,000; (3) 100% ownership of Coast Financial Group with a value of

17  $0.00; and (4) 1% ownership of OCTSC Partners I, LLC with a value of approximately

18  $40,000.  The Debtor also holds a judgment in the amount of approximately $276,000

19  against Paul Wakin, Monsen Tovoussi, Carmet LTD., Orange County Surgery Center, Inc.

20  _____

21      [13] In addition to existing encumbrances on the Debtor's personal property assets (including, without
limitation, the security interest in the Debtor's vehicle held by Alliant Credit Union and the PPB UCC-1,
22  Tarnutzer may assert a judicial lien on certain of the Debtor's pre-petition, non-exempt personal property as
a result of the service of an order to appear for a judgment debtor exam in connection with the Tarnutzer
23  Litigation (defined herein as the "ORAP Lien").  The Debtor does not contemplate disposing of his personal
property assets under the Plan and such personal property assets will remain subject to any valid
24  encumbrances thereon, including any valid ORAP Lien.  Upon payment in full on account of any Allowed
Claim of Tarnutzer from the Debtor's Real Property as provided by the Plan, the ORAP Lien shall be
25  deemed expunged from the Debtor's personal property assets without further action by any party.

26      [14] As discussed in further detail in Section II.E.2. hereof, Domingo Villas was the owner of the DV
Property, which was sold in 2012.  The remaining proceeds from the Sale of the DV Property are currently
27  being held in connection with the Tarnutzer Litigation as the Interpled DV Sale Proceeds.

28

1131251.1

18

1  and PT Partners, LLC (which judgment is currently on appeal), and a breach of contract

2  claim against Fern and First Realm valued in an unknown amount.

3  　　　　In addition to the foregoing, as discussed in further detail in Section II.E.2. hereof,

4  there is the amount of approximately $1.8 million in Interpled DV Sale Proceeds, which

5  represent undistributed proceeds from the sale of the assets of Domingo Villas (an entity

6  wholly owned by the Debtor).  The Interpled DV Sale Proceeds will not be released unless

7  and until the state court resolves the issues regarding the parties' entitlement to the

8  Interpled DV Sale Proceeds.  The Debtor will not seek the release of the Interpled DV

9  Sale Proceeds though the Plan or by way of order of the Bankruptcy Court.  In this regard,

10  and for purposes of clarification regarding the Debtor's contemplated use of such Funds, if

11  the state court determines that Tarnutzer is entitled to the Interpled DV Sale Proceeds,

12  such amounts will be used as a credit against Tarnutzer's Allowed Claim, if any.  If the

13  state court determines that Tarnutzer is not entitled to the Interpled DV Sale Proceeds (for

14  example, because the Tarnutzer Judgment was only entered against the Debtor based on

15  his personal guaranty of Tarnutzer's loan to Domingo Villa and there was no judgment in

16  favor of Tarnutzer against Domingo Villas itself), and the Interpled Funds are determined

17  to be Domingo Villa's property free of any claim of Tarnutzer, such Interpled DV Sale

18  Proceeds would flow to the Debtor as the 100% owner of Domingo Villas.  In this event,

19  the Debtor would use the monies to pay any Allowed Claim, including any Allowed Claim

20  of Tarnutzer.

21  　　　　**C.**　　**The Debtor's Income and Budget Motion**

22  　　　　On June 5, 2017, the Debtor filed with the Court amended Schedules I and J

23  ("Amended Schedules I and J") [Docket No. 98].  As indicated on Amended Schedules I

24  and J, the Debtor currently earns monthly gross wages and commissions (the "Debtor's

25  Commissions") in the amount of $36,694, monthly income from OCTSC Partners I, LLC

26  (the "OCTSC Income") in the amount of $613; and monthly net income from the Real

27  Property (the "Net Real Property Income") in the amount of $1,384, for total monthly

28

1131251.1

19

1  income in the amount of $38,691 (collectively, the Debtor's Commissions, the OCTSC

2  Income and the Net Real Property Income is referred to as the "Debtor's Income").

3      On June 6, 2017, the Debtor filed a Motion for approval of the Debtor's budget for

4  the use of the Debtor's Income and cash (the "Budget Motion") [Docket No, 103].  On

5  June 29, 2017, the Court entered an order approving the Budget Motion [Docket No. 121].

6          **D.      The Events that Led to the Chapter 11 Filing**

7      As of the Petition Date, the Debtor was current on his monthly payment obligations

8  to the Real Property Lenders with respect to the Real Property and had substantial equity

9  in the Real Property over and above the liens of the Real Property Lenders –

10  approximately $8.8 million in the aggregate.  As described in further detail hereinbelow,

11  the filing of the Petition was precipitated by the entry of the Tarnutzer Judgment against

12  the Debtor, asserted to be in the amount of approximately $3.5 million as of the Petition

13  Date, and the subsequent judgment enforcement actions undertaken by Mr. Tarnutzer

14  that resulted in the Tarnutzer Lien and the ORAP Lien (as such terms are defined herein)

15  against certain of the Debtor's assets.  The Debtor intends to pursue his Appeal of the

16  Tarnutzer Judgment and believes that he will ultimately be successful in reversing the

17  Tarnutzer Judgment by way of the Appeal.  The Debtor, however, did not have sufficient

18  liquidity to post a bond in connection with the Appeal of the Tarnutzer Judgment, nor was

19  the Debtor able to borrow the funds necessary to post the bond.[15]

20      The Debtor's case was not filed to prejudice the rights of any party in connection

21  with the Tarnutzer Judgment or otherwise – and the Debtor intends to pay all Allowed

22  Claims in full.  Rather, through this Chapter 11 case, the Debtor intends to pursue his

23  Appeal of the Tarnutzer Judgment, resolve the Fern Litigation and restructure several of

24

25      [15] Prior to commencing the Case, the Debtor attempted to borrow the funds necessary to post the bond
26  in connection with the Appeal.  In order to post the bond, the Debtor needed access to 150% of the amount
   of the Tarnutzer Judgment, nearly $4.5 million.  To try to raise the necessary funds, the Debtor contacted
27  several potential lending sources, but was unsuccessful in obtaining the necessary funds.

28

1131251.1

SECOND AMENDED
DISCLOSURE STATEMENT

1  the loans related to the Real Property.  To this end, the Plan provides for the restructuring

2  of certain debt of the Real Property Lenders (Classes 3, 6, 7, 8, 9, 10, 12, 13, 14 and 15)

3  and providing for the payment, in full, of all Claims, including any Claim that is ultimately

4  allowed by Final Order in connection with the Tarnutzer Litigation and/or Fern Litigation.

5       **E.    Significant Events During the Bankruptcy Case**

6            **1.    Bankruptcy Proceedings**

7                 a.    The Order for Relief

8       The Debtor filed a petition for relief under chapter 11 of the Bankruptcy Code on

9  April 9, 2017.

10                b.    The Use of Cash Collateral

11      On April 26, 2017, the Debtor filed five motions seeking the use of cash collateral

12 generated by the Debtor's Real Property, and for approval of budgets to provide for the

13 payment of the expenses of the Debtor's Real Property as set forth therein (the "Cash

14 Collateral Motions") [Docket Nos. 25, 26, 27, 28 and 29].  On May 17, 2017, the Debtor

15 and Pacific Premier Bank entered into a Stipulation Authorizing the Debtor's Use of Cash

16 Collateral relating to the Newman Street Property, the Del Amo Blvd. Property, the Denni

17 Street Property, the Bishop Street Property and the N. Olive Street Property (the "PPB

18 Cash Collateral Stipulation") [Docket No. 63].  On May 30, 2017, an amended PPB Cash

19 Collateral Stipulation was filed with the Court [Docket No. 90], and on June 6, 2017, the

20 Court entered its order approving the amended PPB Cash Collateral Stipulation [Docket

21 No. 100].

22      Hearings on approval of the Cash Collateral Motions were heard on May 24, 2017,

23 and, on May 26, 2017, the Court entered orders granting the Cash Collateral Motions

24 [Docket Nos. 79, 80, 81, 82 and 83].

25

26

27

28

1131251.1

SECOND AMENDED
DISCLOSURE STATEMENT

c.    The Debtor's Schedules, Statement of Financial Affairs and
Operating Reports

The Debtor believes that the Estate is in compliance with the requirements under 11 U.S.C. §§ 521, 1006 and 1107, and the applicable Guidelines of the Office of the United States Trustee (the "OUST").  On April 9, 2017, the Debtor filed certain of his bankruptcy schedules (the "Schedules"), on May 2, 2017, the Debtor filed amended Schedules and his statement of financial affairs ("SOFA") and, on May 5, 2017, the Debtor filed additional amended Schedules and SOFA [Docket Nos. 98 and 99].  The Debtor has prepared and submitted Monthly Operating Reports for the Estate through the filing of this Disclosure Statement.  The Debtor is current on the quarterly fees owed to the OUST.

d.    The Employment of Estate Professionals

By order entered on May 16, 2017, the Court authorized the employment of LWGF as the Debtor's general insolvency counsel [Docket No. 58].  By order entered June 6, 2017, the Court authorized the employment of The Law Office of Gregory S. Page (the "Page Firm") as the Debtor's special litigation counsel [Docket No. 102].  By order entered on June 14, 2017, the Court authorized the employment of Force 10 Partners LLC ("Force 10") as the Debtor's financial advisors [Docket No. 109].  On July 13, 2017, the Debtor filed an application to employ Thomas Vogele & Associates, APC (the "Vogele Firm") as the Debtor's appellate counsel in connection with the Appeal [Docket No. 131].

e.    Claims Bar Date

By order entered May 17, 2017, the Court fixed June 26, 2017 as the last date for creditors to file Proofs of Claim and October 6, 2017 as the last date for governmental units to file Proofs of Claim (the "Bar Date").  The Debtor served all creditors and parties in interest with the Bar Date Notice on May 22, 2017.

f.    Exclusivity

The Bankruptcy Code provides debtors with an initial exclusive period of 120 days from the petition date to file a plan of reorganization, and an initial exclusive period of 180

1  days to solicit acceptances of its plan, subject to the discretion of the bankruptcy court to

2  extend the exclusive periods.  During these exclusive periods no other person or entity is

3  permitted to file a plan of reorganization.

4       Here, the Debtor's initial statutory exclusive periods to propose a plan and to obtain

5  acceptances thereof are set to expire on August 7, 2017, and October 6, 2017,

6  respectively.

7              **2.    The Appeal**

8       As discussed herein, in addition to seeking to restructure certain loan obligations,

9  the Debtor's bankruptcy case was necessitated by the entry of the Tarnutzer Judgment

10  against the Debtor in connection with the Tarnutzer Litigation, and the Debtor's need to

11  pursue the Appeal of this unanticipated adverse ruling.

12       The background of the Tarnutzer Litigation is as follows.  Domingo Villas, an entity

13  wholly-owned by the Debtor, was the owner of an 8-unit apartment building which was to

14  be converted to condominiums (the "<u>DV Property</u>").  On May 3, 2007, Tarnutzer made a

15  $2.6 million loan to Domingo Villas, which loan was secured by DV Property and

16  personally guaranteed by the Debtor (the "<u>Tarnutzer Loan</u>").  The proceeds of the

17  Tarnutzer Loan were used to pay off Domingo Villa's existing loan secured by the DV

18  Property.

19       From May 2007 until July 2009, Domingo Villas made the payments called for in

20  connection with the Tarnutzer Loan in the total amount of approximately $480,000 (with

21  the Debtor making approximately $89,000 in payments as well, for a total of approximately

22  $569,000 being paid to Tarnutzer during this period).  Commencing in July 2009, the

23  Debtor only began making payments to Tarnutzer on account of the Tarnutzer Loan in the

24  amount of $100,000 per month (as called for by an extension agreement related to the

25  Tarnutzer Loan).  From July 2009 through January 2011, the Debtor paid a total of

26  $1,557,000 to Tarnutzer on account of the Tarnutzer Loan.

27

28

1    In mid-2010, Domingo Villas (and the Debtor as guarantor) advised Tarnutzer that

2 they were seeking to refinance the DV Property at a significantly lower interest rate (5%)

3 than that called for under the Tarnutzer Loan (which was at a 10% interest rate).  At that

4 time, Domingo Villas (and the Debtor as guarantor) had obtained preliminary loan

5 approval from Apartment Bank to refinance the DV Property and pay-off the Tarnutzer

6 Loan.  In connection with the contemplated refinancing, Domingo Villas and the Debtor

7 requested on numerous occasions that Tarnutzer provide a payoff statement, as

8 expressly required by California law.  Tarnutzer, however, refused to provide the required

9 payoff statement.  Domingo Villas and the Debtor, therefore, requested that the title

10 company handling the escrow for the contemplated refinancing prepare a proposed payoff

11 statement for Tarnutzer's review and signature, reflecting the outstanding balance of the

12 Tarnutzer Loan in the amount of $1,345,000.  Tarnutzer, however, refused to provide the

13 requisite documentation and, without the payoff statement, Apartment Bank was unwilling

14 and unable to refinance of the DV Property.  Under California law, a lender refusing to

15 provide a payoff statement is liable for the damages caused by a failure to provide such

16 information.

17    On February 7, 2011, Tarnutzer contacted Domingo Villas and the Debtor via

18 email, claiming that the balance due under the Tarnutzer Loan (which loan was in the

19 initial principal amount of $2.6 million and had been substantially paid down) was

20 approximately $2.1 million – as opposed to the approximately $1.35 million reflected by

21 Domingo Villa's and the Debtor's books and records.  In reaching his figure, Tarnutzer

22 erroneously included interest at a rate of 13%, and included extension and other fees and

23 charges not supported by the loan documents.  Unable to reach agreement, and in light of

24 Tarnutzer's actions in thwarting the refinancing of the DV Property which would have paid-

25 off his loan, Domingo Villas and the Debtor ceased making payments to Tarnutzer on

26 account of the Tarnutzer Loan pending a resolution of the outstanding dispute.

27

28

1131251.1

24

SECOND AMENDED
DISCLOSURE STATEMENT

1    In April 2011, Tarnutzer commenced efforts to collect on the Tarnutzer Loan,

2  including recording notices of default, commencing foreclosure proceedings and seeking

3  the appointment of a receiver.  In connection with these collection efforts, Tarnutzer then

4  claimed that he was owed over $3.5 million – a figure that exceeded the actual debt by

5  more than $2.1 million.  In calculating the amount of the debt, in addition to adding over

6  $500,000 in unsupported interest and charges, Tarnutzer erroneously failed to account for

7  any of the approximately $1.6 million in payments made by the Debtor on account of the

8  Tarnutzer Loan (*i.e.,* Tarnutzer claimed that only the payments made by Domingo Villas –

9  as opposed to payments by the Debtor as guarantor – counted against repayment of the

10 loan).  Applying such payments made by the Debtor (approximately $1.6 million), and

11 deducting the inappropriate charges (over $500,000), would work to reduce the debt

12 figure by over $2.1 million to the amount of approximately $1.35 million (*i.e.,*

13 approximately the amount that Domingo Villas and the Debtor had asserted was owed to

14 Tarnutzer from the outset).

15    Unable to reach a consensual resolution of the disputes, on June 15, 2011,

16 Domingo Villas commenced the State Court Action seeking to resolve these issues,

17 including as to the amount owed and for damages based on Tarnutzer's failure to provide

18 the payoff statement as required by law, thwarting the refinancing of the DV Property at

19 the lower rate.  Tarnutzer filed a cross-complaint in the State Court Action seeking

20 repayment of the Tarnutzer Loan and enforcement of the Debtor's personal guaranty,

21 continuing to overstate the loan balance by over $2.1 million.[16]

22    In August 2011, Tarnutzer recorded a notice of trustee's sale, again alleging a debt

23 of over $3.5 million.  The foreclosure of the DV Property was scheduled for September 2,

24 ─────────────────────

25 [16] The Debtor is informed and believes that Tarnutzer may have assigned his rights in this matter to
   another entity, Asset Management, during 2011 and may have lacked standing to assert any rights with
26 respect to the Tarnutzer Loan by virtue of said assignment.  Simply for ease of reference, the Debtor
   continues to refer herein to any such successor entity as Tarnutzer, but reserves all rights with respect to
27 any such assignment and assertion of rights related to the Tarnutzer Loan.

28

1    2011.  To halt the foreclosure sale, on September 1, 2011, Domingo Villas was forced to

2    commence a chapter 11 bankruptcy case in the United States Bankruptcy Court for the

3    Central District of California, Case No. 8:11-bk-22391-CB (the "DV Bankruptcy Case").  In

4    the DV Bankruptcy Case, relying on the overstated loan balance, Tarnutzer attempted to

5    obtain relief from the automatic stay and to credit bid at the sale of substantially all of the

6    assets of Domingo Villa.  Ultimately, the DV Property was sold to a third party, Novis, for

7    approximately $2.9 million, netting approximately $2.7 million in sale proceeds to the

8    Domingo Villas' estate (the "DV Sale Proceeds").  Tarnutzer's lien based on the Tarnutzer

9    Loan (the outstanding balance of which was still at issue) attached to the DV Sale

10   Proceeds.

11          Following the sale of the DV Property, Domingo Villas, the Debtor and Tarnutzer

12   agreed to resolve their disputes as to the outstanding amount due in connection with the

13   Tarnutzer Loan in the pending state court proceeding and, in 2012, the DV Sale Proceeds

14   were interpled in the State Court Action (the "Interpled DV Sale Proceeds").  After

15   accounting for court-authorized disbursements in the amount of $400,000 each to

16   Tarnutzer and the Debtor, there remain Interpled DV Sale Proceeds held in an interest-

17   bearing account in the amount of approximately $1.82 million.  The DV Bankruptcy Case

18   was closed in June 2012.

19          A jury trial in the State Court Action was held in July 2015.[17]  Following trial, the jury

20   returned two verdicts.  First, that Tarnutzer had no claim against Domingo Villas based on

21   the Tarnutzer Loan.  Inexplicably, however, the jury also found that the Debtor, on account

22   of his personal guaranty of the Tarnutzer Loan, owed Tarnutzer the principal amount of

23   approximately $1.97 million (which determination did not include interest, late charges,

24

25          [17] The Debtor believes that there were a variety of reversible errors in connection with the trial, including
26   improper instructions to the jury and a failure to allow the jury to consider relevant information regarding an
     accounting of the debt and related matters.  These matters are currently at issue in connection with the
27   Appeal.

28
     1131251.1                                        26                        SECOND AMENDED
                                                                              DISCLOSURE STATEMENT

1   extension fees or consequential damages).  Following the jury verdicts, the Debtor sought

2   various relief that the superior court had indicated would be determined by the court

3   following the jury verdicts, including declaratory relief and for an accounting.  The superior

4   court denied such relief notwithstanding that such matters – including material information

5   of an accounting of the loan balance calculation and expert testimony with respect thereto

6   – had not been presented to the jury in reaching its determinations as to, among other

7   things, the amount of the debt owed to Tarnutzer.[18]  In addition, the superior court

8   indicated that it would not determine then who was entitled to the Interpled DV Sale

9   Proceeds, but that such matter would need to be considered in a second phase trial in

10  front of another superior court judge.  Ten months after the trial was conducted, the

11  superior court did appoint a forensic accountant as referee to conduct an accounting.  The

12  referee set forth five loan calculation scenarios from which the superior court could

13  choose depending on its interpretation of certain terms of the loan documents, but the

14  superior court refused to make the requisite determinations and never selected any of the

15  scenarios set by the referee in his July 2016 report.

16      On October 17, 2016, based on the jury verdicts, the superior court entered

17  judgment against the Debtor on account of his guaranty of the Tarnutzer Loan in the

18  principal amount of approximately $1.97 million.  In addition, the superior court added

19  nearly $1 million in prejudgment interest (notwithstanding that it was Tarnutzer's failure to

20  provide a payoff statement as required by California law that prevented the Debtor and

21  Domingo Villas from repaying the debt back in 2011), for a total award of approximately

22

_____

23  [18] The Debtor believes that, had such information been properly provided to the jury, the jury would have
    made a finding as to the loan balance due (or, alternatively, had the superior court made such a
24  determination prior to the trial, the jury would have been provided with the court-determined loan balance in
    their deliberations).  Had the jury (or the superior court) agreed with the calculation by Domingo Villas and
25  the Debtor (and their expert), and had the jury been properly advised as to the efforts to repay the Tarnutzer
    Loan that were thwarted by Tarnutzer, the jury would have understood that Domingo Villas and the Debtor
26  were damaged by Tarnutzer's actions in miscalculating the loan balance and refusing repayment of the loan.
    It would have also resulted in a determination that imposition of interest, fees and costs in connection with
27  such inflated debt was improper.  These matters are at issue in connection with the Appeal.

28

1131251.1

27

1   $2.5 million (after accounting for a credit in the amount of $400,000 paid to Tarnutzer from

2   the Interpled DV Sale Proceeds).  Thereafter, in connection with post-trial motions, the

3   superior court was presented with expert testimony that even the court admitted

4   demonstrated errors in Tarnutzer's loan balance calculation (including a failure to properly

5   and timely credit payments) but, nonetheless, the superior court determined it was

6   powerless to disturb the jury's fill-in-the-blank verdicts.  Thereafter, on April 10, 2017, the

7   superior court entered an amended judgment which further included an award of

8   attorney's fees and costs of suit to Tarnutzer (together, the "Tarnutzer Judgment").  With

9   accruing interest, the Tarnutzer Judgment had grown to approximately $3.5 million as of

10  the Petition Date.

11      The Debtor believes that the Tarnutzer Judgment was entered against him without

12  justification and constitutes reversible error, in that, among other things, it erroneously

13  failed to consider an accounting as to the proper loan balance, failed to consider the

14  impact of Tarnutzer's refusal to allow the Tarnutzer Loan to be paid off, and improperly

15  included approximately $1.5 million in prejudgment interest and fees and costs to which

16  Tarnutzer was not entitled.  Following the superior court's denial of the Debtor's post-trial

17  motions for a judgment notwithstanding the verdict and for a new trial, the Debtor timely

18  appealed the Tarnutzer Judgment (the "Appeal").

19      The Debtor believes that the Tarnutzer Judgment against him based on his

20  personal guaranty of the Tarnutzer Loan will be reversed (or at the very least significantly

21  reduced) on Appeal.  Tarnutzer disagrees with the Debtor's position in this regard and

22  believes that the Tarnutzer Judgment will be upheld on Appeal.

23      On August 23, 2017, the Court heard and granted two motions for relief from the

24  automatic stay filed by Tarnutzer to allow the Appeal to proceed and for retroactive

25  annulment of the stay to allow for the entry of the amended judgment on April 10, 2017.

26

27

28

1131251.1

28

### 3. The Fern Litigation

On December 22, 2015, the Debtor filed an action against Martin D. Fern and Linda Taylor-Fern, individually and as Trustees of the Fern-Taylor Family Trust (collectively, "Fern"), and First Realm, LLC ("First Realm"), in the Orange County Superior Court, Case No. 30-2015-00826601-CU-BC-CJC, asserting causes of action for, among other things, breach of contract, fraud and declaratory relief related to the ownership of certain real properties (the "Fern State Court Action").  On February 6, 2016, Fern and First Realm filed an answer in the Fern State Court Action, asserting affirmative defenses, including fraudulent misrepresentation and defamation.  On June 12, 2017, Fern filed a Proof of Claim in the Debtor's Case [Claim No. 12], asserting an unsecured claim against the Debtor in the amount of $4,132,500 (plus damages according to proof, attorneys' fees and costs) based on a proposed cross-complaint Fern asserts it intended to file in the Fern State Court Action, the filing of which was stayed by the filing of the Debtor's Case.  On June 9, 2017, Fern filed a Complaint to Determine Nondischargeability of Debts Pursuant to 11 U.S.C. §§ 523(a) and 524(a)(3) with respect to Fern's claim against the Debtor (the "Fern Non-Dischargeability Action" and, together with the Fern State Court Action, the "Fern Litigation").  For the reasons set forth in the complaint filed against Fern and First Realm in the Fern State Court Action and otherwise, the Debtor disputes the claims asserted by Fern in connection with the Fern Litigation.

### 4. Other Legal Proceedings

With the exception of the Appeal, the Fern Non-Dischargeability Action and a pending worker's compensation case initiated by Ricardo Gutierrez, the Debtor does not have any litigation pending against him.  In addition to the Fern State Court Action, the Debtor is also a plaintiff in an action against Paul Wakin, Monsen Tovoussi, Carmet LTD., Orange County Surgery Center, Inc. and PT Partners, LLC in which the Debtor has obtained a favorable judgment in the amount of approximately $275,660 (which matter is currently on appeal by the defendants).

1131251.1

SECOND AMENDED
DISCLOSURE STATEMENT

**5.    Actual and Projected Recovery from Avoidance Actions and Causes of Action**

The Debtor has not undertaken a full analysis regarding whether meritorious claims for preferential or fraudulent transfers exist.  The Debtor is looking into whether the liens asserted against the Debtor's assets in connection with the Tarnutzer Judgment are subject to avoidance in the Case.  Claims for relief for all avoidance actions under 11 U.S.C. §§ 544 through 550, including, but not limited to, claims for the recovery of preferential and/or fraudulent transfers, are hereby reserved against any and all Persons and entities.  The omission of the identity of a recipient of a potentially avoidable and recoverable transfer of a particular payment is unintentional and shall not be deemed a waiver of the right of the Estate to recover any distribution(s), payment(s), or transfer(s) from any entity under any provision of the Bankruptcy Code.

Upon the Effective Date, no party shall have standing to bring or prosecute Avoidance Actions or other Causes of Action, except as specifically set forth below in Section III.F.4.

**III.    SUMMARY OF THE PLAN**

The following is a summary of the material provisions of the Plan.

**A.    Overview of the Plan**

The Plan provides for payment in full of all Allowed Claims against the Debtor. Allowed Secured Claims of the Real Property Lenders will be paid in full over time.  The Allowed Secured Claims of certain Real Property Lenders (Classes 3, 6, 7, 8, 9, 10, 12, 13, 14 and 15) shall have their debt obligations modified with respect to repayment terms and interest rates as provided in the Plan, and are entitled to vote on the Plan.  The Allowed Secured Claims of other Real Property Lenders (Classes 1, 2, 4, 5 and 11), the Secured Claim of Alliant Credit Union (Class 17) and the Secured Tax Claims (Class 18) are unimpaired under the Plan.  Allowed Priority Claims (Class 19), if any, will either be

1   paid in full on the Effective Date of the Plan, or will be paid over time in accordance with

2   the provisions of the Bankruptcy Code.  Allowed General Unsecured Claims (with the

3   exception of any unsecured claim of Fern) (Class 20) will be paid in full on the Effective

4   Date of the Plan.  Payments to creditors (other than to Tarnutzer and Fern) under the Plan

5   will be funded with the Real Property Income and the Debtor's Income.

6       Any Allowed Claim of Tarnutzer based on a Final Order in the Tarnutzer Litigation

7   (Class 16) will be paid in full.  Any such Allowed Claim will be satisfied first from the

8   Interpled DV Sale Proceeds and, thereafter, to the extent necessary to pay such Allowed

9   Claim in full, from a Sale and/or Refinancing of some or all of the Real Property.  Such

10  payment to Tarnutzer pursuant to the Plan will be made within 120 days following the

11  entry of a Final Order providing Tarnutzer with an Allowed Claim against the Debtor.

12      Any Allowed Claim of Fern based on a Final Order in the Fern Litigation (Class 22)

13  will be paid in full.  Any such Allowed Claim will be satisfied from a Sale and/or

14  Refinancing of some or all of the Real Property.  Such payment to Fern pursuant to the

15  Plan will be made within 120 days following the entry of a Final Order providing Fern with

16  an Allowed Claim against the Debtor; *provided, however*, that if Fern obtains an Allowed

17  Claim prior to resolution of the Tarnutzer Litigation, Fern shall be granted a lien on the

18  Real Property subject to the Tarnutzer Lien, junior to the existing liens thereon, to secure

19  such Allowed Claim and shall be paid within 120 days following the entry of a Final Order

20  resolving the Tarnutzer Litigation.

21      Effective Date payments on account of Professional Fee Claims and Class 20

22  General Unsecured Claims will be satisfied from the Debtors' Income and/or the proceeds

23  of a Sale and/or Refinancing of the Real Property.

24      Unless otherwise expressly stated in the Plan, the treatment of Allowed Claims

25  under the Plan supersedes any agreements or rights the Holders of those Claims may

26  have in or against the Debtor or his assets and is in full satisfaction of the legal, equitable,

27  and contractual rights of the Holders of the Claim.

28

1131251.1

31

1    Unless the Plan provides otherwise, no Distributions will be made and no rights

2  retained on account of any Claim that has not become an Allowed Claim.

3    **B.    What Creditors Will Receive Under the Proposed Plan**

4    As required by the Bankruptcy Code, the Plan classifies Claims in various Classes

5  according to their right to priority.  The Plan states whether each Class of Claims is

6  impaired or unimpaired.  The Plan provides the treatment each Class will receive.  In no

7  event shall any creditor receive more than the creditor's Allowed Claim, plus interest, to

8  the extent provided herein.

9    **1.    Unclassified Claims**

10   Certain types of Claims are not placed into voting classes but are instead

11  unclassified.  They are not considered impaired and they do not vote on the Plan because

12  they are automatically entitled to certain treatment under the Bankruptcy Code.

13  Accordingly, the following Claims have not been placed into a Class:

14   a.    Administrative Expenses

15   Administrative Claims are Claims for costs or expenses of administering the

16  Debtor's Case which are allowed under § 507(a)(2) of the Bankruptcy Code.  The

17  Bankruptcy Code requires that all Allowed Administrative Claims be paid on the Effective

18  Date of the Plan, unless a particular claimant agrees to a different treatment.

19   The following chart lists all of the Debtor's § 507(a)(2) unpaid Administrative Claims

20  and their treatment under the Plan:

| Description | Estimated Amount Owed | Treatment |
|---|---|---|
| Clerk's Office Fees | $0 | Paid in full on or before the Effective Date. |
| OUST | $1,950 | Paid in full on or before the Effective Date. |

| Description | Estimated Amount Owed | Treatment |
|---|---|---|
| Ordinary-Course Administrative Claims | $0 | Unless the Debtor objects to the Ordinary-Course Administrative Claim, the Claim will be allowed in accordance with the terms and conditions of the particular transaction giving rise to the Ordinary-Course Administrative Claim, and the Person Holding the Ordinary-Course Administrative Claim need not File any Request for Payment of its Claim. However, any Request for Payment, or Motion to allow a Claim as an Ordinary-Course Administrative Claim must be Filed with the Court and served on counsel for the Debtor or the Reorganized Debtor, as the case may be, and the OUST by no later than sixty (60) days after the Effective Date. |
| Non-Ordinary Course Administrative Claims | $0 | To the extent that any Non-Ordinary Course Administrative Claims are allowed, they will be paid in full by the Debtor on the later of the Effective Date or immediately after the Court enters a Final Order allowing the Non-Ordinary Course Administrative Claim. |
| Administrative Tax Claims | $0 | Unless the Debtor objects to an Administrative Tax Claim or otherwise disputes the Administrative Tax Claim in accordance with applicable law, the Claim will be Allowed in accordance with the terms and conditions of the particular transaction that gave rise to the Administrative Tax Claim, and the Person Holding the Administrative Tax Claim need not File any Request for Payment of its Claim. Any Allowed Administrative Tax Claim will be paid in the ordinary course of business, currently and timely as they are incurred and billed, unless the Debtor objects to or otherwise disputes such Administrative Tax Claim in accordance with applicable law.  In an event of default, and to the extent such Administrative Tax Claim is also secured, the payment thereof will include all costs, fees, charges and interest, if applicable, as required under 11 U.S.C. §§ 506(b) and 511, and applicable non-bankruptcy law. |
| LWGF | $500,000, estimated as of the Effective Date.[19] | Paid on the later of (i) the Effective Date or (ii) upon entry of an order approving the Professional Fee Claim, except to the extent that a Holder of such Claim agrees to other terms.  The Debtor intends to make such payment from the Debtor's Income and/or from the proceeds of a Sale and/or Refinancing of the Real Property. |

---

[19] The estimate of Professional Fee Claims is only an estimate and will change based upon the legal or financial services required during this Case and upon what the Court ultimately awards to Professionals. The Estate remains liable for all allowed professional fees and costs regardless of the estimates.

| Description | Estimated Amount Owed | Treatment |
|---|---|---|
| The Page Firm | $30,000, estimated as of the Effective Date, which would be in addition to the fees and expenses, if any, paid to the Page Firm post-petition. | Paid on the later of (i) the Effective Date or (ii) upon entry of an order approving the Professional Fee Claim, except to the extent that a Holder of such Claim agrees to other terms. The Debtor intends to make such payment from the Debtor's Income and/or from the proceeds of a Sale and/or Refinancing of the Real Property. |
| The Vogele Firm | $50,000, estimated as of the Effective Date, which would be in addition to the fees and expenses, if any, paid to the Vogele Firm post-petition. | Paid on the later of (i) the Effective Date or (ii) upon entry of an order approving the Professional Fee Claim, except to the extent that a Holder of such Claim agrees to other terms. The Debtor intends to make such payment from the Debtor's Income and/or from the proceeds of a Sale and/or Refinancing of the Real Property. |
| Force 10 Partners LLC | $60,000, estimated as of the Effective Date, which would be in addition to the fees and expenses, if any, paid to Force Ten Partners LLC post-petition. | Paid on the later of (i) the Effective Date or (ii) upon entry of an order approving the Professional Fee Claim, except to the extent that a Holder of such Claim agrees to other terms. The Debtor intends to make such payment from the Debtor's Income and/or from the proceeds of a Sale and/or Refinancing of the Real Property. |
| TOTAL | $641,950 | |

The following applies to Administrative Claims:

(1)    Professional Fee Claims

Any Professional seeking allowance of a Professional Fee Claim for services rendered prior to the Effective Date in connection with the Debtor's Case must (1) File their application for allowance of compensation and reimbursement of expenses on or before 45 days after the Effective Date or such other date as may be set by the Court, and (2) have the fees and expenses allowed by a Final Order. Any party in interest may File an objection to such an application within the time provided by the Local Bankruptcy Rules or within any other period that the Court sets. Persons holding Professional Fee Claims who do not timely File and serve their applications for payment will be forever barred from asserting these Claims against the Reorganized Debtor or his property.

As indicated above, the Debtor may need to pay $641,950 worth of Administrative Claims on the Effective Date of the Plan, unless the claimant has agreed to be paid later or the Court has not yet ruled on the Claim. Effective Date payments on account of

1   Professional Fee Claims (and Class 20 General Unsecured Claims) will be satisfied from

2   the Debtors' Income and/or the proceeds of a Sale and/or Refinancing of the Real

3   Property.

4                    b.    Priority Tax Claims

5          Priority Tax Claims include certain unsecured income, employment and other taxes

6   described by Bankruptcy Code § 507(a)(8).  The Bankruptcy Code requires that each

7   Holder of such a § 507(a)(8) Priority Tax Claim receive the present value of such Claim in

8   regular installment payments in Cash, over a period not exceeding five (5) years from the

9   Petition Date.  The following chart lists all of the Debtor's known § 507(a)(8) Priority Tax

10  Claims and their treatment under the Plan:

| Description | Amount Owed | Treatment |
|---|---|---|
| Internal Revenue Service ("IRS") | $693 | To the extent that any amounts are determined to be owed to the IRS, the Debtor or the Reorganized Debtor, as the case may be, shall pay in full the allowed amount of its Claim no more than five (5) years from the Petition Date.  The Claim shall accrue interest from the Effective Date on the unpaid balance of the Allowed Priority Tax Claim at the rate required by 11 U.S.C. § 511 to provide "present value" of the Allowed Priority Tax Claim.  The Debtor or the Reorganized Debtor shall have the right to pay the balance of the Allowed Priority Tax Claim in full at any time on or after the Effective Date without premium or penalty of any kind.  Payments will be made quarterly, due on the first day of the quarter, starting on the first date after the Effective Date and ending on the last such date that is no more than five (5) years after the Petition Date. |
| California Franchise Tax Board ("CFTB") | $0 | To the extent that any amounts are determined to be owed to the CFTB, the Debtor or the Reorganized Debtor, as the case may be, shall pay in full the allowed amount of its Claim no more than five (5) years from the Petition Date.  The Claim shall accrue interest from the Effective Date on the unpaid balance of the Allowed Priority Tax Claim at the rate required by 11 U.S.C. § 511 to provide "present value" of the Allowed Priority Tax Claim.  The Debtor or the Reorganized Debtor shall have the right to pay the balance of the Allowed Priority Tax Claim in full at any time on or after the Effective Date without premium or penalty of any kind.  Payments will be made quarterly, due on the first day of the quarter, starting on the first date after the Effective Date and ending on the last such date that is no more |

| Description | Amount Owed | Treatment |
|---|---|---|
| | | than five (5) years after the Petition Date. |

### 2.    Classified Claims

a.    <u>Summary of Classes</u>

| Summary of Classes | |
|---|---|
| **Class #** | **Claimant(s)** |
| 1 | Secured Claim of Roundpoint Mortgage (1st Trust Deed Surfside Property) |
| 2 | Secured Claim of Wells Fargo Bank (2nd Trust Deed Surfside Property) |
| 3 | Secured Claim of Chase Commercial Bank (1st Trust Deed LaSalle Street Property) |
| 4 | Secured Claim of Ann Leisy (2nd Trust Deed LaSalle Street Property) |
| 5 | Secured Claim of Chase Commercial Bank (1st Trust Deed Comstock Avenue Property) |
| 6 | Secured Claim of Digital Federal Credit Union (1st Trust Deed New Hampshire Property) |
| 7 | Secured Claim of U.S. Bank (1st Trust Deed Nevada Property) |
| 8 | Secured Claim of Wells Fargo Bank (1st Trust Deed Vonnie Lane Property) |
| 9 | Secured Claim of Wells Fargo Bank (1st Trust Deed N. Olive Street Property) |
| 10 | Secured Claim of Pacific Premier Bank (2nd Trust Deed N. Olive Street Property) |
| 11 | Secured Claim of Pacific Premier Bank (Cross-Collateralized 1st Trust Deeds Newman Street Property, Bishop Street Property, Del Amo Blvd. Property, Denni Street Property and PPB UCC-1) |
| 12 | Secured Claim of OCWEN (1st Trust Deed San Alto Way Property) |
| 13 | Secured Claim of OCWEN (1st Trust Deed Stratton Court Property) |
| 14 | Secured Claim of OCWEN (1st Trust Deed 8479 Cedarview Court Property) |
| 15 | Secured Claim of OCWEN (1st Trust Deed 8475 Cedarview Court Property) |
| 16 | Secured Claim of Tarnutzer (Tarnutzer Lien) |
| 17 | Secured Claim of Alliant  Credit Union (Tesla) |
| 18 | Secured Tax Claims |
| 19 | Priority Unsecured Claims |
| 20 | General Unsecured Claims (other than Fern) |
| 21 | [Intentionally Omitted] |
| 22 | Unsecured Claim of Fern |

b.    Secured Claims

Secured Claims are Claims secured by liens on property of the Estate.  The following chart lists all Classes of Secured Claim and their treatment under the Plan:

| Secured Claims | | | | |
|---|---|---|---|---|
| Class # | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| 1 | Secured Claim of Roundpoint Mortgage<br><br>• Collateral: Surfside Property<br><br>• Priority of Security Interest: First<br><br>• Total Claim Amount: $1,494,115[20]<br><br>• Collateral Value: approximately $3,500,000 | N | N | Except to the extent that the holder of the Allowed Class 1 Claim agrees to different treatment, the legal, equitable and contractual rights to which the holder of the Allowed Class 1 Claim is entitled shall remain unaltered under the Plan. |
| 2 | Secured Claim of Wells Fargo Bank<br><br>• Collateral: Surfside Property<br><br>• Priority of Security Interest: Second<br><br>• Total Claim Amount: $196,765<br><br>Collateral Value: approximately $3,500,000 | N | N | Except to the extent that the holder of the Allowed Class 2 Claim agrees to different treatment, the legal, equitable and contractual rights to which the holder of the Allowed Class 2 Claim is entitled shall remain unaltered under the Plan. |
| 3 | Secured Claim of Chase Commercial Bank<br><br>• Collateral: LaSalle Street Property<br><br>• Priority of Security | N | Y | Except to the extent that the holder of the Allowed Class 3 Claim agrees to different treatment, the Secured Claim of Chase Commercial Bank (LaSalle Street Property) shall be modified as follows:<br><br>Interest.  Following the Effective Date, simple interest shall accrue on the Secured Claim at |

---

[20] The claim amounts set forth in this chart are based on the Debtor's records.  Such amounts may vary from such amounts based on, among other things, the incurrence of interest and/or or payments made on account of such Secured Claims following the Petition Date.

| | | | | Secured Claims |
| Class # | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
|---|---|---|---|---|
| | Interest: First<br><br>• Total Claim Amount: $577,533<br><br>Collateral Value: approximately $2,000,000 | | | the rate of four and one-quarter percent (4.25%) per annum.<br>Payments.  The monthly payment on account of the Secured Claim will be due on the first (1st) day of the first calendar month following the Effective Date and will be in an amount equal to (a) the interest accrued on the Secured Claim from the Effective Date through the end of the calendar month in which the Effective Date occurs plus (b) principal calculated on the basis of a 30-year amortization schedule.  Thereafter, until maturity, a monthly payment will be due on the first (1st) day of each successive month in an amount equal to (a) the interest accrued on the unpaid principal balance of the Secured Claim during the previous month plus (b) an installment of principal calculated on the basis of a 30-year amortization schedule.<br>Maturity Date.  The Secured Claim will be due and payable seven (7) years following the Effective Date.<br>Other Terms Unchanged.  Except to the extent provided above, the legal, equitable and contractual rights to which the holder of the Allowed Class 3 Claim was otherwise entitled shall remain unaltered under the Plan. |
| 4 | Secured Claim of Ann Leisy<br><br>• Collateral: LaSalle Street Property<br><br>• Priority of Security Interest: Second<br><br>• Total Claim Amount: $162,342<br><br>Collateral Value: approximately $2,000,000 | Y | N | Except to the extent that the holder of the Allowed Class 4 Claim agrees to different treatment, the legal, equitable and contractual rights to which the holder of the Allowed Class 4 Claim is entitled shall remain unaltered under the Plan. |
| 5 | Secured Claim of Chase Commercial Bank<br><br>• Collateral: Comstock Avenue Property<br><br>• Priority of Security Interest: First | N | N | Except to the extent that the holder of the Allowed Class 5 Claim agrees to different treatment, the legal, equitable and contractual rights to which the holder of the Allowed Class 5 Claim is entitled shall remain unaltered under the Plan. |

| Secured Claims | | | | |
|---|---|---|---|---|
| Class # | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | • Total Claim Amount: $380,355  Collateral Value: approximately $1,800,000 | | | |
| 6 | Secured Claim of Digital Federal Credit Union  • Collateral: New Hampshire Property  • Priority of Security Interest: First  • Total Claim Amount: $378,485  Collateral Value: approximately $1,000,000 | N | Y | Except to the extent that the holder of the Allowed Class 6 Claim agrees to different treatment, the Secured Claim of Digital Federal Credit Union (New Hampshire Property) shall be modified as follows:  Payments.  The monthly payment on account of the Secured Claim will be due on the first (1st) day of the first calendar month following the Effective Date and will be in an amount equal to (a) the interest accrued on the Secured Claim from the Effective Date through the end of the calendar month in which the Effective Date occurs plus (b) principal calculated on the basis of a 7-year amortization schedule.  Thereafter, until maturity, a monthly payment will be due on the first (1st) day of each successive month in an amount equal to (a) the interest accrued on the unpaid principal balance of the Secured Claim during the previous month plus (b) an installment of principal calculated on the basis of a 7-year amortization schedule.  Maturity Date.  The Secured Claim will be due and payable seven (7) years following the Effective Date.  Co-Obligors.  Digital Federal Credit Union will not pursue the non-filing co-obligors so long as the Debtor is current on plan payments.  The 274 Armory Property.  Digital Federal Credit Union will take custody of certain insurance proceeds and place the insurance proceeds in a suspense or escrow account until the Debtor is authorized by the Bankruptcy Court to sell the property "as is".  After approval, Digital Federal Credit Union will apply the insurance proceeds to the balance of the loan. As long as Digital Federal Credit Union is in custody of the insurance proceeds, it will not oppose an "as is" sale of the property and will release its lien on the property as part of the sale.  If the Debtor is not able to sell the property and desires instead to use the insurance proceeds to rebuild the property, Digital Federal Credit |

| | | | | Secured Claims |
|---|---|---|---|---|
| Class # | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | Union will cooperate with the Debtor and release the insurance proceeds incrementally on a percentage of completion basis.  Upon the Debtor retaining a contractor and completing a plan and budget to rebuild the property, Digital Federal Credit Union will, at each milestone in the building process, release the funds necessary to pay for the contractor(s), subcontractor(s), and any materials, up to the amount of the insurance proceeds.<br>Other Terms Unchanged.  Except to the extent provided above, the legal, equitable and contractual rights to which the holder of the Allowed Class 6 Claim was otherwise entitled shall remain unaltered under the Plan. |
| 7 | Secured Claim of U.S. Bank<br><br>• Collateral: Nevada Property<br><br>• Priority of Security Interest: First<br><br>• Total Claim Amount: $209,343<br><br>Collateral Value: approximately $860,000 | N | Y | Except to the extent that the holder of the Allowed Class 7 Claim agrees to different treatment, the Secured Claim of U.S. Bank (Nevada Property) shall be modified as follows:<br><br>Interest.  Following the Effective Date, simple interest shall accrue on the Secured Claim at the rate of four percent (4.0%) per annum.<br>Payments.  The monthly payment on account of the Secured Claim will be due on the first (1st) day of the first calendar month following the Effective Date and will be in an amount equal to (a) the interest accrued on the Secured Claim from the Effective Date through the end of the calendar month in which the Effective Date occurs plus (b) principal calculated on the basis of a 10-year amortization schedule.  Thereafter, until maturity, a monthly payment will be due on the first (1st) day of each successive month in an amount equal to (a) the interest accrued on the unpaid principal balance of the Secured Claim during the previous month plus (b) an installment of principal calculated on the basis of a 10-year amortization schedule.<br>Maturity Date.  The Secured Claim will be due and payable five (5) years following the Effective Date.<br>Other Terms Unchanged.  Except to the extent provided above, the legal, equitable and contractual rights to which the holder of the Allowed Class 7 Claim was otherwise entitled shall remain unaltered under the Plan. |

40

| Secured Claims | | | | |
|---|---|---|---|---|
| Class # | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| 8 | Secured Claim of Wells Fargo Bank<br><br>• Collateral: Vonnie Lane Property<br><br>• Priority of Security Interest: First<br><br>• Total Claim Amount: $444,048<br><br>Collateral Value: approximately $700,000 | N | Y | Except to the extent that the holder of the Allowed Class 8 Claim agrees to different treatment, the Secured Claim of Wells Fargo Bank (Vonnie Lane Property) shall be modified as follows:<br><br>Interest.  Following the Effective Date, simple interest shall accrue on the Secured Claim at the rate of four and one-quarter percent (4.25%) per annum.<br>Payments.  The monthly payment on account of the Secured Claim will be due on the first (1st) day of the first calendar month following the Effective Date and will be in an amount equal to (a) the interest accrued on the Secured Claim from the Effective Date through the end of the calendar month in which the Effective Date occurs plus (b) principal calculated on the basis of a 30-year amortization schedule.  Thereafter, until maturity, a monthly payment will be due on the first (1st) day of each successive month in an amount equal to (a) the interest accrued on the unpaid principal balance of the Secured Claim during the previous month plus (b) an installment of principal calculated on the basis of a 30-year amortization schedule.<br>Maturity Date.  The Secured Claim will be due and payable seven (7) years following the Effective Date.<br>Other Terms Unchanged.  Except to the extent provided above, the legal, equitable and contractual rights to which the holder of the Allowed Class 8 Claim was otherwise entitled shall remain unaltered under the Plan. |
| 9 | Secured Claim of Wells Fargo Bank<br><br>• Collateral: N. Olive Street Property<br><br>• Priority of Security Interest: First<br><br>• Total Claim Amount: $187,283<br><br>Collateral Value: approximately $660,000 | N | Y | Except to the extent that the holder of the Allowed Class 9 Claim agrees to different treatment, the Secured Claim of Wells Fargo Bank (N. Olive Street Property) shall be modified as follows:<br><br>Interest.  Following the Effective Date, simple interest shall accrue on the Secured Claim at the rate of four and one-quarter percent (4.25%) per annum.<br>Payments.  The monthly payment on account of the Secured Claim will be due on the first (1st) day of the first calendar month following the Effective Date and will be in an amount equal to (a) the interest accrued on the Secured Claim from the Effective Date through the end of the calendar month in |

| Secured Claims | | | | |
|---|---|---|---|---|
| Class # | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | which the Effective Date occurs plus (b) principal calculated on the basis of a 30-year amortization schedule.  Thereafter, until maturity, a monthly payment will be due on the first (1st) day of each successive month in an amount equal to (a) the interest accrued on the unpaid principal balance of the Secured Claim during the previous month plus (b) an installment of principal calculated on the basis of a 30-year amortization schedule. <br> Maturity Date.  The Secured Claim will be due and payable seven (7) years following the Effective Date. <br> Other Terms Unchanged.  Except to the extent provided above, the legal, equitable and contractual rights to which the holder of the Allowed Class 9 Claim was otherwise entitled shall remain unaltered under the Plan. |
| 10 | Secured Claim of Pacific Premier Bank <br><br> • Collateral: N. Olive Street Property <br><br> • Priority of Security Interest: Second <br><br> • Total Claim Amount: $150,321 <br><br> Collateral Value: approximately $660,000 | N | Y | Except to the extent that the holder of the Allowed Class 10 Claim agrees to different treatment, the Secured Claim of Pacific Premier Bank (N. Olive Street Property) shall be modified as follows: <br><br> Maturity Date.  The Secured Claim will be due and payable five (5) years following the Effective Date. <br> Other Terms Unchanged.  Except to the extent provided above, the legal, equitable and contractual rights to which the holder of the Allowed Class 10 Claim was otherwise entitled shall remain unaltered under the Plan. |
| 11 | Cross-Collateralized Secured Claim of Pacific Premier Bank <br><br> • Collateral: Newman Street Property, Bishop Street Property, Del Amo Blvd. Property, Denni Street Property and PPB UCC-1 <br><br> • Priority of Security Interest: First <br><br> • Total Claim Amount: $1,142,254 <br><br> Collateral Value: | N | N | Except to the extent that the holder of the Allowed Class 11 Claim agrees to different treatment, the legal, equitable and contractual rights to which the holder of the Allowed Class 11 Claim is entitled shall remain unaltered under the Plan. |

| Secured Claims | | | | |
|---|---|---|---|---|
| Class # | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | approximately $2,985,000 | | | |
| 12 | Secured Claim of OCWEN<br><br>• Collateral: San Alto Way Property<br><br>• Priority of Security Interest: First<br><br>• Total Claim Amount: $260,867<br><br>Collateral Value: approximately $500,000 | N | Y | Except to the extent that the holder of the Allowed Class 12 Claim agrees to different treatment, the Secured Claim of OCWEN (Stratton Court Property) shall be modified as follows:<br><br>Interest.  Following the Effective Date, simple interest shall accrue on the Secured Claim at the rate of five and one-half percent (5.5%) per annum.<br>Payments.  The monthly payment on account of the Secured Claim will be due on the first (1st) day of the first calendar month following the Effective Date and will be in an amount equal to (a) the interest accrued on the Secured Claim from the Effective Date through the end of the calendar month in which the Effective Date occurs plus (b) principal calculated on the basis of a 30-year amortization schedule.  Thereafter, until maturity, a monthly payment will be due on the first (1st) day of each successive month in an amount equal to (a) the interest accrued on the unpaid principal balance of the Secured Claim during the previous month plus (b) an installment of principal calculated on the basis of a 30-year amortization schedule.<br>Maturity Date.  The Secured Claim will be due and payable thirty (30) years following the Effective Date.<br>Other Terms Unchanged.  Except to the extent provided above, the legal, equitable and contractual rights to which the holder of the Allowed Class 12 Claim was otherwise entitled shall remain unaltered under the Plan. |
| 13 | Secured Claim of OCWEN<br><br>• Collateral: Stratton Court Property<br><br>• Priority of Security Interest: First<br><br>• Total Claim Amount: $270,160<br><br>Collateral Value: approximately | N | Y | Except to the extent that the holder of the Allowed Class 13 Claim agrees to different treatment, the Secured Claim of OCWEN (Stratton Court Property) shall be modified as follows:<br><br>Interest.  Following the Effective Date, simple interest shall accrue on the Secured Claim at the rate of five and one-half percent (5.5%) per annum.<br>Payments.  The monthly payment on account of the Secured Claim will be due on the first (1st) day of the first calendar month following the Effective Date and will be in an amount |

43

SECOND AMENDED
DISCLOSURE STATEMENT

| | | | | Secured Claims |
|---|---|---|---|---|
| Class # | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | $436,000 | | | equal to (a) the interest accrued on the Secured Claim from the Effective Date through the end of the calendar month in which the Effective Date occurs plus (b) principal calculated on the basis of a 30-year amortization schedule. Thereafter, until maturity, a monthly payment will be due on the first (1st) day of each successive month in an amount equal to (a) the interest accrued on the unpaid principal balance of the Secured Claim during the previous month plus (b) an installment of principal calculated on the basis of a 30-year amortization schedule. <br>Maturity Date. The Secured Claim will be due and payable thirty (30) years following the Effective Date. <br>Other Terms Unchanged. Except to the extent provided above, the legal, equitable and contractual rights to which the holder of the Allowed Class 13 Claim was otherwise entitled shall remain unaltered under the Plan. |
| 14 | Secured Claim of OCWEN <br><br>• Collateral: 8479 Cedarview Court Property <br><br>• Priority of Security Interest: First <br><br>• Total Claim Amount: $237,521 <br><br>Collateral Value: approximately $400,000 | N | Y | Except to the extent that the holder of the Allowed Class 14 Claim agrees to different treatment, the Secured Claim of OCWEN (8479 Cedarview Court Property) shall be modified as follows: <br><br>Interest. Following the Effective Date, simple interest shall accrue on the Secured Claim at the rate of five and one-half percent (5.5%) per annum. <br>Payments. The monthly payment on account of the Secured Claim will be due on the first (1st) day of the first calendar month following the Effective Date and will be in an amount equal to (a) the interest accrued on the Secured Claim from the Effective Date through the end of the calendar month in which the Effective Date occurs plus (b) principal calculated on the basis of a 30-year amortization schedule. Thereafter, until maturity, a monthly payment will be due on the first (1st) day of each successive month in an amount equal to (a) the interest accrued on the unpaid principal balance of the Secured Claim during the previous month plus (b) an installment of principal calculated on the basis of a 30-year amortization schedule. <br>Maturity Date. The Secured Claim will be due and payable thirty (30) years following the Effective Date. <br>Other Terms Unchanged. Except to the |

| Class # | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
|---|---|---|---|---|
| | | | | extent provided above, the legal, equitable and contractual rights to which the holder of the Allowed Class 14 Claim was otherwise entitled shall remain unaltered under the Plan. |
| 15 | Secured Claim of OCWEN<br><br>• Collateral: 8475 Cedarview Court Property<br><br>• Priority of Security Interest: First<br><br>• Total Claim Amount: $237,521<br><br>Collateral Value: approximately $375,000 | N | Y | Except to the extent that the holder of the Allowed Class 15 Claim agrees to different treatment, the Secured Claim of OCWEN (8475 Cedarview Court Property) shall be modified as follows:<br><br>Interest. Following the Effective Date, simple interest shall accrue on the Secured Claim at the rate of five and one-half percent (5.5%) per annum.<br>Payments. The monthly payment on account of the Secured Claim will be due on the first (1st) day of the first calendar month following the Effective Date and will be in an amount equal to (a) the interest accrued on the Secured Claim from the Effective Date through the end of the calendar month in which the Effective Date occurs plus (b) principal calculated on the basis of a 30-year amortization schedule. Thereafter, until maturity, a monthly payment will be due on the first (1st) day of each successive month in an amount equal to (a) the interest accrued on the unpaid principal balance of the Secured Claim during the previous month plus (b) an installment of principal calculated on the basis of a 30-year amortization schedule.<br>Maturity Date. The Secured Claim will be due and payable thirty (30) years following the Effective Date.<br>Other Terms Unchanged. Except to the extent provided above, the legal, equitable and contractual rights to which the holder of the Allowed Class 15 Claim was otherwise entitled shall remain unaltered under the Plan. |
| 16 | Secured Claim of Tarnutzer<br><br>• Collateral: Judgment Lien on certain Real Property and Personal Property<br><br>• Priority of Security Interest: junior to liens of Real | N | Y | To the extent that the creditor in this Class is determined to have an Allowed Secured Claim, such Allowed Secured Claim will be paid in full within 120 days from the entry of a Final Order in the Tarnutzer Litigation allowing the Claim. Any such Allowed Claim will be satisfied first from the Interpled DV Sale Proceeds and, thereafter, to the extent necessary, from the proceeds of a Sale and/or Refinancing of some or all of the Real Property. As of the Petition Date, the |

| Secured Claims | | | | |
|---|---|---|---|---|
| **Class #** | **Description** | **Insiders (Y/N)** | **Impaired (Y/N)** | **Treatment** |
| | Property Lenders and pre-existing liens on personal property<br><br>• Total Claim Amount: $2,547,301 ($3,353,009.53 as of the Petition Date, including post-judgment accrual of interest)<br><br>• Collateral Value (Real Property): Approximately $7.6 million (Claimant does not have a lien against the New Hampshire Property or the Nevada Property). Under the Plan, the value from which the Class 16 Claim may be paid is approximately $1.8 million in Interpled DV Sale Proceeds and approximately $8.8 million in total equity in Real Property (which figure includes the value of the New Hampshire Property and the Nevada Property) | | | Tarnutzer Judgment was in the amount of $3,353,009.53.  Any Allowed Secured Claim of Tarnutzer shall include post-judgment interest as provided under applicable law. |
| 17 | Secured Claim of Alliant Credit Union<br><br>• Collateral: Lien on Tesla<br><br>• Priority of Security Interest: First<br><br>• Total Claim Amount: $86,648<br><br>Collateral Value: approximately $73,000 | N | N | Except to the extent that the holder of the Allowed Class 17 Claim agrees to different treatment, the legal, equitable and contractual rights to which the holder of the Allowed Class 17 Claim is entitled shall remain unaltered under the Plan. |
| 18 | Secured Tax Claims<br><br>• Los Angeles: | N | N | Except to the extent that the holder of the Allowed Class 18 Claim agrees to different treatment, the legal, equitable and contractual |

| Secured Claims | | | | |
|---|---|---|---|---|
| **Class #** | **Description** | **Insiders (Y/N)** | **Impaired (Y/N)** | **Treatment** |
| | $12,761 <br>• Orange County: $51,854 | | | rights to which the holder of the Allowed Class 18 Claim is entitled shall remain unaltered under the Plan. |

If a secured creditor disputes the value of its collateral as stated above, that secured creditor must timely File an objection to confirmation of the Plan, or the value stated by the Debtor may be determined to be the value of the collateral.  The objection must be accompanied by competent evidence of valuation.  If the value of the collateral is disputed, the Court may schedule a separate hearing to determine value.

c.    Class of Priority Claims

Certain Priority Claims that are referred to in Bankruptcy Code §§ 507(a)(3), (4), (5), (6), and (7) are required to be placed in Classes in a chapter 11 plan.  The Bankruptcy Code requires that each Holder of a Priority Claim receive Cash on the Effective Date equal to the allowed amount of such Claim.  However, a Class of unsecured Priority Claim Holders may vote to accept deferred Cash payments of a value, as of the Effective Date, equal to the allowed amount of such Claim.

The following chart lists all Classes containing the Debtor's Bankruptcy Code §§ 507(a)(3), (4), (5), (6), and (7) Priority Claims and their treatment under the Plan:

| Priority Claims | | | | |
|---|---|---|---|---|
| **Class #** | **Description** | **Insiders (Y/N)** | **Impaired (Y/N)** | **Treatment** |
| 19 | Priority Claims <br><br>Estimated total amount of claims: $693 | N | N | Each Allowed Priority Claim in Class 19 will be paid in full on the Effective Date. |

d.    Class of General Unsecured Claims

General Unsecured Claims are unsecured Claims not entitled to priority under Bankruptcy Code § 507(a).  The following chart identifies the Plan's treatment of General Unsecured Claims:

| General Unsecured Claims | | | | |
|---|---|---|---|---|
| Class # | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| 20 | General Unsecured Claims (other than Fern)<br><br>Estimated total amount of claims: $271,000 | Y | N | Each Allowed General Unsecured Claim in Class 20 (with the exception of Fern) will be paid on the later of (i) the Effective Date or (ii) upon allowance of an Allowed Claim, except to the extent that a Holder of such Claim agrees to other terms. |
| 21 | [Intentionally Omitted] | | | |
| 22 | General Unsecured Claim of Fern<br><br>Estimated total amount of claim: $4,132,500 (disputed) | Y | Y | To the extent that Fern is determined to have an Allowed General Unsecured Claim, such Allowed Claim will be satisfied from the proceeds of a Sale and/or Refinancing of some or all of the Real Property.  Such Allowed General Unsecured Claim will be paid in full within 120 days from the entry of a Final Order in the Fern Litigation allowing the Claim; *provided, however*, that if Fern obtains an Allowed Claim prior to resolution of the Tarnutzer Litigation, Fern shall be granted a lien on the Real Property subject to the Tarnutzer Lien, junior to the existing liens thereon, to secure such Allowed Claim and shall be paid within one hundred and twenty (120) days following the entry of a Final Order resolving the Tarnutzer Litigation. |

## C.    Means of Effectuating the Plan

This section is intended to explain how the Debtor intends to effectuate the Plan, and how the Debtor intends to fund the obligations to Holders of Allowed Claims as provided in the Plan.  This section provides information regarding the funding sources for Plan obligations and other material issues bearing upon performance of the Plan.

**1.    Funding the Plan**

Distributions to creditors (other than to Tarnutzer and Fern) under the Plan will be funded with the Real Property Income and the Debtor's Income.  _See_ Exhibit "1" (Projections) attached hereto.

Any Allowed Claim of Tarnutzer based on a Final Order in the Tarnutzer Litigation will be satisfied first from the Interpled DV Sale Proceeds and, thereafter, to the extent necessary to pay such Allowed Claim in full, from a Sale and/or Refinancing of some or all of the Real Property.[21]

Any Allowed Claim of Fern based on a Final Order in the Fern Litigation will be satisfied from a Sale and/or Refinancing of some or all of the Real Property.

Within thirty (30) days of a Final Order granting an Allowed Claim to Tarnutzer and/or Fern, the Debtor shall provide a written status report to Tarnutzer and Fern setting forth information regarding the manner in which the Debtor intends to satisfy such Allowed Claim in accordance with the terms of the Plan.

Effective Date payments on account of Professional Fee Claims and Class 20 General Unsecured Claims will be satisfied from the Debtor's Income and/or proceeds of a Sale and/or Refinancing of the Real Property.

a.    The Interpled DV Sale Proceeds

The Interpled DV Sale Proceeds will not be released unless and until the state court resolves the issues regarding the parties' entitlement to the Interpled DV Sale Proceeds.  The Debtor will not seek the release of the Interpled DV Sale Proceeds though the Plan or by way of order of the Bankruptcy Court.  In this regard, and for purposes of clarification regarding the Debtor's contemplated use of such Funds, if the state court determines that Tarnutzer is entitled to the Interpled DV Sale Proceeds, such amounts will

---

[21] To the extent that Tarnutzer does not have an Allowed Claim and the Interpled DV Sale Proceeds are determined to be Domingo Villa's property free of any claim of Tarnutzer, the Interpled DV Sale Proceeds will be used to pay any and all other Allowed Claims.

1  be used as a credit against Tarnutzer's Allowed Claim, if any.  If the state court

2  determines that Tarnutzer is not entitled to the Interpled DV Sale Proceeds (for example,

3  because the Tarnutzer Judgment was only entered against the Debtor based on his

4  personal guaranty of Tarnutzer's loan to Domingo Villa and there was no judgment in

5  favor of Tarnutzer against Domingo Villas itself), and the Interpled Funds are determined

6  to be Domingo Villa's property free of any claim of Tarnutzer, such Interpled DV Sale

7  Proceeds would flow to the Debtor as the 100% owner of Domingo Villas.  In this event,

8  the Debtor would use the monies to pay any Allowed Claim, including any Allowed Claim

9  of Tarnutzer.

10         If any release of the Interpled DV Sale Proceeds to the Debtor is effectuated prior

11  to a Distribution on account of any Allowed Claim of Tarnutzer, the Debtor shall maintain

12  such Interpled DV Sales Proceeds in a segregated, interest-bearing account, earmarked

13  for payment on account of any Allowed Claim of Tarnutzer pursuant to the Plan.  Such

14  payment to Tarnutzer from the Interpled DV Sale Proceeds held by the Debtor shall be

15  made within fifteen (15) days of a determination by Final Order that Tarnutzer holds an

16  Allowed Claim against the Debtor and shall be credited against the amount owed to

17  Tarnutzer by the Debtor.  The remaining balance owed to Tarnutzer shall be satisfied by

18  way of the proceeds from a Sale and/or Refinance of some or all of the Real Property.

19  Alternatively, should the Interpled DV Sale Proceeds not be released to the Debtor prior to

20  a determination by Final Order that Tarnutzer holds an Allowed Claim against the Debtor,

21  the Debtor shall release his claim to the Interpled DV Sale Proceeds (up to the amount of

22  the Allowed Claim) and such amount of the Interpled DV Sale Proceeds shall be credited

23  against the amount owed to Tarnutzer on account of an Allowed Claim.  Any remaining

24  balance owed to Tarnutzer after crediting the amount of the Interpled DV Sale Proceeds

25  against the Allowed Claim shall be satisfied by way of the proceeds from a Sale and/or

26  Refinance of some or all of the Real Property.

27

28

1131251.1

SECOND AMENDED
DISCLOSURE STATEMENT

1    Should the amount of the Interpled DV Proceeds exceed the Allowed Claim of

2  Tarnutzer, after deducting the amount necessary to satisfy the Allowed Claim of Tarnutzer

3  in full, any excess amount of Interpled DV Sale Proceeds not utilized to satisfy the

4  Allowed Claim of Tarnutzer in full shall be released to and/or retained by, as applicable,

5  the Reorganized Debtor.  To the extent the Interpled DV Sale Proceeds are still held by

6  the superior court in connection with the Tarnutzer Litigation at such time (*i.e.,* such funds

7  were not previously released to the Debtor), the Confirmation Order shall serve as an

8  order to the superior court authorizing and directing the release to the Reorganized Debtor

9  of any Interpled DV Sale Proceeds not needed to pay Tarnutzer in full on account of his

10  Allowed Claim against the Debtor, without any further action by any party.

11              b.      The Sale and/or Refinance of Some or All of the Real Property

12                      to Pay Allowed Claim of Tarnutzer

13    To the extent that the Interpled DV Sale Proceeds are insufficient to pay in full any

14  Allowed Claim of Tarnutzer, the Reorganized Debtor shall have a period of one hundred

15  and twenty (120) days from entry of a Final Order providing Tarnutzer with an Allowed

16  Claim against the Debtor (which 120-day deadline may be extended only by written

17  agreement with Tarnutzer or by Court order upon "cause" shown), to pay the remaining

18  balance due to Tarnutzer on account of his Allowed Claim.  The source of such payment

19  will be from a Sale and/or Refinancing of some or all of the Real Property, at the

20  Reorganized Debtor's sole discretion.  In the event that the Debtor does not obtain the

21  consent of Tarnutzer or a Court order extending the 120-day deadline, the Liquidating

22  Agent shall be appointed to carry out the Sale and/or Refinancing to pay the Allowed

23  Claim of Tarnutzer in place of the Reorganized Debtor.  Prior to the Confirmation Hearing,

24  the Debtor shall submit to the Court the identity of the Liquidating Agent and an

25  agreement with the Liquidating Agent setting forth the terms of such appointment.

26    In connection with any Sale or Refinancing of the Real Property, provided that the

27  net proceeds of such Sale or Refinancing (after payment of transaction costs and senior

28

1131251.1
SECOND AMENDED
DISCLOSURE STATEMENT

1  liens against the applicable Real Property, and after reserving for any tax obligations in

2  connection therewith) are earmarked to pay Tarnutzer on account of his Allowed Claim,

3  the Tarnutzer Lien shall be deemed released from the applicable Real Property subject to

4  such Sale or Refinancing, without any further action by any party.  Any entity facilitating

5  such a Sale or Refinancing (including, without limitation, any purchaser, lender, title or

6  escrow company) shall be entitled to rely solely on the Confirmation Order as evidence of

7  such release of the Tarnutzer Lien in connection with such Sale or Refinancing.  In

8  addition, upon payment in full on account of any Allowed Claim of Tarnutzer, the ORAP

9  Lien shall be deemed released from the Debtor's personal property, without any further

10  action by any party.

11            c.      The Sale and/or Refinance of Some or All of the Real Property

12                    to Pay Allowed Claim of Fern

13            The source of such payment to Fern on account of any Allowed Claim will be from

14  a Sale and/or Refinancing of some or all of the Real Property, at the Reorganized

15  Debtor's sole discretion.  The Reorganized Debtor shall have a period of one hundred and

16  twenty (120) days from entry of a Final Order providing Fern with an Allowed Claim

17  against the Debtor (which 120-day deadline may be extended only by written agreement

18  with Fern or by Court order upon "cause" shown), to pay Fern on account of any Allowed

19  Claim; *provided, however*, that if Fern obtains an Allowed Claim prior to resolution of the

20  Tarnutzer Litigation, Fern shall be granted a lien on the Real Property subject to the

21  Tarnutzer Lien, junior to the existing liens thereon, to secure such Allowed Claim and shall

22  be paid within one hundred and twenty (120) days following the entry of a Final Order

23  resolving the Tarnutzer Litigation.  In the event that the Debtor does not obtain the

24  consent of Fern or a Court order extending the applicable 120-day deadline, the

25  Liquidating Agent shall be appointed to carry out the Sale and/or Refinancing to pay the

26  Allowed Claim of Fern in place of the Reorganized Debtor.  Prior to the Confirmation

27

28

1131251.1

52

1   Hearing, the Debtor shall submit to the Court the identity of the Liquidating Agent and an

2   agreement with the Liquidating Agent setting forth the terms of such appointment.

3        In connection with any Sale or Refinancing of the Real Property, provided that the

4   net proceeds of such Sale or Refinancing (after payment of transaction costs and senior

5   liens against the applicable Real Property, and after reserving for any tax obligations in

6   connection therewith) are earmarked to pay Fern on account of his Allowed Claim, any

7   lien granted to Fern shall be deemed released from the applicable Real Property subject

8   to such Sale or Refinancing, without any further action by any party.  Any entity facilitating

9   such a Sale or Refinancing (including, without limitation, any purchaser, lender, title or

10  escrow company) shall be entitled to rely solely on the Confirmation Order as evidence of

11  such release of the lien held by Fern in connection with such Sale or Refinancing.

12              **2.    Disbursing Agent**

13       The Reorganized Debtor shall act as the disbursing agent for the purpose of

14  making the Distributions provided for under the Plan.

15              **3.    The Reorganized Debtor**

16       As the Debtor is an individual, he will remain in charge of his financial affairs post-

17  confirmation as the Reorganized Debtor.

18       **D.    Risk Factors**

19       Performance of the obligations under the Plan are subject to various factors and

20  contingencies, some of which are described in this section.  The following discussion

21  summarizes some of the material risks associated with the Plan, but is not intended to be

22  exhaustive.  Moreover, it should be read in connection with the other disclosures

23  contained in this Disclosure Statement and the Plan.  Each creditor, in conjunction with its

24  advisors, should supplement the following discussion by analyzing and evaluating the

25  Plan and Disclosure Statement as a whole.  THE RISKS ASSOCIATED WITH THE PLAN

26  MUST BE CAREFULLY CONSIDERED IN DETERMINING WHETHER TO ACCEPT THE

27  PLAN.

28

1131251.1                                53

1    The Debtor's ability to make the Effective Date Payments and to fund payments to

2  certain creditors depends on the continued generation of rental income from the Real

3  Property and the Debtor's ability to generate post-petition earnings.  With respect to any

4  Allowed Claim of Tarnutzer obtained in connection with the Tarnutzer Litigation, such

5  payment in full depends on the Debtor's ability to utilize the Interpled DV Sale Proceeds

6  and to monetize the equity in the Real Property.  Similarly, the Debtor's ability to pay any

7  Allowed Claim of Fern obtained in connection with the Fern Litigation depends on the

8  Debtor's ability to monetize the equity in the Real Property.  In addition, it is likely that the

9  Debtor may need to monetize the equity in the Real Property to satisfy the Professional

10  Fee Claims and Effective Date payments to Class 20 General Unsecured Claims.  There

11  is always a risk that the Debtor's Real Property assets could decline in value.  However,

12  the value would have to decline by millions of dollars before the Debtor would not to be

13  able to fund the Plan payments and such a significant change in the market is not likely to

14  occur.  In addition, the Debtor will provide information regarding the potential tax

15  implications of the Plan in connection with the hearing on the confirmation of the Plan to

16  demonstrate the feasibility thereof, and does not believe that there will be a material

17  taxable event upon any Sale of the Real Property that would materially affect the

18  contemplated distributions to the Holders of Allowed Claims under the Plan.  Further,

19  Tarnutzer will continue to hold the Tarnutzer Lien and ORAP Lien against certain of the

20  Debtor's Real Property and personal property assets to secure repayment of any Allowed

21  Claim (subject to release of the Tarnutzer Lien and ORAP Lien in connection with a Sale

22  and/or Refinancing that would pay Tarnutzer as discussed in Section III.C.1 hereof).

23  Moreover, even assuming that the Debtor was not entitled to directly receive the $1.8

24  million in Interpled DV Sale Proceeds as the 100% owner of Domingo Villas, and such

25  funds were determined to be properly paid directly to Tarnutzer, the application of such

26  funds would reduce the amount of any Allowed Claim of Tarnutzer by approximately $1.8

27  million and, therefore, would significantly reduce the amount that would need to be paid to

28

1  Tarnutzer under the Plan from a Sale and/Refinance of the Real Property.  In addition, to

2  the extent that the Fern Litigation is resolved prior to resolution of the Tarnutzer Litigation,

3  and results in Fern holding an Allowed Claim against the Debtor, Fern will be granted a

4  lien on the Real Property junior to the existing liens of the Real Property Lenders and

5  Tarnutzer to secure payment of such Allowed Claim.

6        **E.**    **Provisions Governing Distributions**

7            **1.**    **Dates of Distributions**

8        Effective Date Payments shall be deemed timely made if made as soon as

9  practicable after the Effective Date, but, in any event, within fifteen (15) days of the

10  Effective Date.  Any Distribution required to be made when a Disputed Claim becomes an

11  Allowed Claim shall be deemed timely made if made as soon as practicable thereafter,

12  but, in any event, within fifteen (15) days thereafter.

13            **2.**    **Manner of Distribution**

14        At the option and in the sole discretion of the Reorganized Debtor, monetary

15  Distributions may be made by (i) wire transfers from, or (ii) a check drawn on a domestic

16  bank approved by the OUST.

17            **3.**    **Delivery of Distributions in General**

18        Distributions to Holders of Allowed Claims shall be made by the Reorganized

19  Debtor (a) at the addresses set forth on the Proof of Claim filed by such Holders, (b) at the

20  addresses reflected in the Schedules if no Proof of Claim has been filed and the

21  Reorganized Debtor has not received a written notice of a change of address, or (c) in the

22  case of a Holder of a Claim that is governed by an agreement and is administered by an

23  agent or servicer, at the address (i) set forth on any Proof of Claim filed by the agent or

24  servicer, (ii) in the Schedules for the agent or servicer if no Proof of Claim has been filed,

25  or (iii) contained in the official records of such agent or servicer.  Holders of Claims may

26  change the address to which Distributions will be sent by filing a written change of

27

28

1  address with the Court and serving a copy of the change of address on the Reorganized

2  Debtor.

3      If a Distribution to any Holder of an Allowed Claim is returned to the Reorganized

4  Debtor as undeliverable or otherwise unclaimed ("Undeliverable Distribution"), the

5  Reorganized Debtor shall make no further Distributions to such Holder unless and until

6  the Reorganized Debtor is notified in writing of such Holder's then-current address, at

7  which time all Undeliverable Distributions shall be made to such Holder without interest.

8  All Undeliverable Distributions shall be returned to the Reorganized Debtor until such

9  Undeliverable Distributions are claimed.  The Reorganized Debtor shall, in the case of

10  Cash, hold Undeliverable Distributions in a segregated interest-bearing account for

11  Undeliverable Distributions until such Undeliverable Distributions become deliverable, is

12  claimed or is forfeited.  Nothing contained in the Plan shall require the Debtor, or anyone

13  else, to attempt to locate the intended recipient of an Undeliverable Distribution.

14      Any Holder of an Allowed Claim that does not present itself within six (6) months of

15  the Distribution Date upon which the Undeliverable Distribution was made shall be

16  deemed to have forfeited its right or Claim to or interest in the Undeliverable Distribution

17  and shall be forever barred and enjoined from asserting any Claim for the Undeliverable

18  Distribution against the Debtor and his Estate, the Reorganized Debtor, and their

19  respective agents, attorneys, representatives, employees or independent contractors,

20  and/or any of their property.  In such cases, the Undeliverable Distribution and accrued

21  interest thereon shall become property of the Reorganized Debtor free and clear of any

22  restrictions thereon and notwithstanding any federal or state escheat laws to the contrary

23  and shall be distributed in accordance with the terms of the Plan.

24      **4.    Rounding Payments**

25      The Reorganized Debtor shall not be required to make Distributions or payments of

26  fractions of dollars.  Whenever any payment of a fraction of a dollar under this Plan would

27

28

1131251.1

SECOND AMENDED
DISCLOSURE STATEMENT

1  otherwise be called for, the actual payment shall reflect a rounding of such fraction to the

2  nearest whole dollar (up or down), with half dollars being rounded down.

3             **5.    Interest on Claims**

4         Unless otherwise specifically provided for in the Plan, or provided by applicable

5  law, post-petition interest shall not accrue or be paid on any Claims, and no Holder of a

6  Claim shall be entitled to interest accruing on or after the Petition Date on any Claim.

7             **6.    Compliance with Tax Requirements**

8         In connection with the Plan, and all Distributions under this Plan, the Reorganized

9  Debtor shall, to the extent applicable, comply with all tax withholding, payment and

10 reporting requirements imposed by federal, state, or local taxing authorities.  The

11 Reorganized Debtor shall be authorized to take any and all actions that may be necessary

12 or appropriate to comply with such withholding, payment, and reporting requirements.  All

13 amounts properly withheld from Distributions to a Holder of a Claim as required by

14 applicable law and paid over to the applicable taxing authority for the account of such

15 Holder shall be treated as part of the Distributions to such Holder.  All persons Holding

16 Claims shall be required to provide any information necessary to effect information

17 reporting and withholding of such taxes.  If such information has not been received by the

18 Reorganized Debtor, then the Reorganized Debtor may, at his option, withhold the

19 amount required and distribute the balance to such Holder or decline to make the

20 Distribution until the information is received.

21        Notwithstanding any other provision of the Plan, (a) each Holder of an Allowed

22 Claim that is to receive a Distribution pursuant to this Plan shall have sole and exclusive

23 responsibility for the satisfaction and payment of any tax obligations imposed by any

24 governmental unit, including income, withholding, and other tax obligations, on account of

25 such Distribution, and (b) no Distribution shall be made to or on behalf of such Holder

26 pursuant to the Plan unless and until such Holder has made arrangements satisfactory to

27 the Reorganized Debtor for the payment and satisfaction of such withholding tax

28

1 obligations or such tax obligation that would be imposed upon the Debtor in connection

2 with such Distribution.  Any property to be distributed pursuant to the Plan shall, pending

3 implementation of such arrangements, be treated as an Undeliverable Distribution

4 pursuant to Section III.E.3 above.

5                    **7.    De Minimis Distributions**

6              The Reorganized Debtor shall not have any obligations to make a Distribution on

7 account of an Allowed Claim if the amount to be distributed to the specific Holder of the

8 Allowed Claim on a Distribution Date is for an amount of $5.00 or less, and may, at the

9 Reorganized Debtor's option, either add the Distribution to the next Distribution if the

10 collective amount would be greater than $5.00 or treat the Distribution as an

11 Undeliverable Distribution.

12                    **8.    Setoffs**

13             Except as otherwise stated in the Plan, the Debtor may, pursuant to 11 U.S.C.

14 § 553 or applicable non-bankruptcy law, but shall not be required to, set off against any

15 Allowed Claim and the Distribution to be made pursuant to the Plan on account of such

16 Allowed Claim any account stated, Claim, right, or Cause of Action which the Debtor or

17 the Estate possesses against the Holder of such Allowed Claim; provided, however, that

18 neither the failure to effect such a setoff nor the allowance of any Claim shall constitute a

19 waiver or release by the Debtor of any such account, Claim, right, and Cause of Action

20 that the Debtor or the Estate may possess against the Holder of such Allowed Claim.

21                    **9.    Limitation on Liability**

22             The Reorganized Debtor, and any of his respective agents or Professionals, shall

23 not be liable for (i) any acts or omissions, except for willful misconduct, in connection with

24 implementing the Distribution provision of the Plan and the making or withholding of

25 Distributions under the Plan, or (ii) any change in the value of Distributions made under

26 the Plan resulting from any delays in making such Distributions in accordance with the

27

28

terms of the Plan (including, but not limited to, any delays caused by the resolution of Disputed Claims).

**F.    Other Provisions of the Plan**

**1.    Claim Objections and Disputed Claims**

THE BAR DATE FOR FILING A PROOF OF CLAIM IN THIS CASE BY CLAIMANTS WHOSE CLAIMS WERE NOT SCHEDULED OR WERE SCHEDULED AS UNKNOWN, DISPUTED, CONTINGENT OR UNLIQUIDATED IS JUNE 26, 2017 (AS TO CREDITORS OTHER THAN GOVERNMENTAL UNITS) AND OCTOBER 6, 2017 (AS TO GOVERNMENTAL UNITS).

a.    Standing and Claim Objection Deadline

The Reorganized Debtor or any other party in interest shall have up until 180 days after the Effective Date to file objections to Claims.  The Reorganized Debtor or any other party in interest may obtain an extension of this date by filing a motion in the Court, based upon a showing of "cause."

b.    No Distribution Pending Allowance

Notwithstanding any other provision of the Plan, no payments or Distributions shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by Final Order, and the Disputed Claim, or some portion thereof, has become an Allowed Claim; provided, however, that if the only dispute regarding a Disputed Claim is to the amount of the Disputed Claim, the Holder of a Disputed Claim shall be entitled to a Distribution on account of that portion of the Disputed Claim which the Debtor does not dispute at the time and in the manner that the Debtor makes Distributions to the Holders of Allowed Claims pursuant to the provisions of the Plan.

A Disputed Claim is a Claim that has not been allowed or disallowed and to which either: (i) a Proof of Claim has been Filed or deemed Filed and the Debtor or another party in interest has Filed an objection; (ii) no Proof of Claim has been Filed and the Claim

1  was not scheduled or the Debtor has scheduled such claim as disputed, contingent,

2  unliquidated or unknown.

3      The Debtor will have the power and authority to settle and compromise a Disputed

4  Claim with Court approval and compliance with Bankruptcy Rule 9019 unless the amount

5  allowed by the compromise does not exceed $5,000, in which case no Court approval is

6  necessary.

7                      c.      Reserves for Disputed Claims

8      In the event that Disputed Claims are pending at the time of a Distribution under

9  the Plan, the Debtor shall establish and maintain a reserve for such Disputed Claims.

10 With respect to the Disputed Claims of Tarnutzer and Fern, no reserve(s) shall be

11 established; rather, such Disputed Claims shall be resolved by way of the appellate

12 process in connection with the Tarnutzer Litigation and in connection with the Fern

13 Litigation, respectively.  To the extent Tarnutzer is determined by Final Order to hold an

14 Allowed Claim, such Allowed Claim shall be satisfied in full, first, from the Interpled DV

15 Sales Proceeds and then, to the extent necessary, from the proceeds from a Sale and/or

16 Refinance of some or all of the Debtor's Real Property, as provided by the Plan.  To the

17 extent Fern is determined by Final Order to hold an Allowed Claim, such Allowed Claim

18 shall be satisfied in full from the proceeds from a Sale and/or Refinance of some or all of

19 the Debtor's Real Property, as provided by the Plan.

20              **2.    Executory Contracts and Unexpired Leases**

21                      a.      Assumption and Assignment

22      On the Effective Date, the executory contracts and unexpired leases identified on

23 the Schedule of Assumed and Assigned Agreements attached or filed, or to be attached

24 or filed as Exhibit "1" to the Plan shall be deemed assumed.  The Debtor intends to file the

25 Schedule of Assumed and Assigned Agreements with the Court no later than twenty-eight

26 (28) days prior to the Confirmation Hearing.  The Schedule of Assumed and Assigned

27 Agreements also identifies or will identify any amounts that must be paid to cure defaults

28

1131251.1

60

under the executory contracts and unexpired leases to be assumed and assigned under the Plan (the "Cure Amount").  If filed earlier, the Debtor reserves the right to amend the Schedule of Assumed Agreements up to twenty-eight (28) days prior to the Confirmation Hearing to: (a) add any executory contract or unexpired lease and provide for its assumption and assignment; or (b) modify the Cure Amount for any particular executory contract or unexpired lease.  The Debtor further reserves the right to amend the Schedule of Assumed Agreements to delete any executory contract or unexpired lease and provide for its rejection at any time prior to the Confirmation Hearing.  The Debtor will provide notice of any amendment to the Schedule of Assumed and Assigned Agreements to any party or parties to the executory contracts or unexpired leases affected by the amendment.  Absent a timely objection as provided below, the Confirmation Order will constitute a Court order approving the assumption and assignment, on the Effective Date, of the executory contracts and unexpired leases then identified on the Schedule of Assumed and Assigned Agreements, and shall constitute a final determination of the Cure Amount and that the Debtor has shown adequate assurance of future performance. Furthermore, any Cure Amount ordered by the Court, through entry of the Confirmation Order, and paid shall be deemed to satisfy any and all defaults arising from, out of or related to the executory contract or unexpired lease, including any tort claims that were or could be asserted by the non-debtor party to the contract or lease on or prior to the entry of the Confirmation Order, and all actual or pecuniary losses that have resulted from such defaults.

　　　　If you are a party to an executory contract or unexpired lease to be assumed and assigned and you object to the assumption and assignment of your lease or contract and/or you dispute the Cure Amount related to your lease or contract, then you must File and serve upon counsel for the Debtor (Lobel Weiland Golden Friedman LLP, attn: Beth E. Gaschen, 650 Town Center Drive, Suite 950, Costa Mesa, California 92626) a written objection by fourteen (14) days prior to the Confirmation Hearing.  An objection to the

1  Cure Amount must also set forth the amount you contend to be the correct Cure Amount

2  and contain evidence to support such amount.  Failure to timely File an objection as

3  provided herein shall be deemed consent to the proposed assumption and assignment

4  and to the Cure Amount and a waiver of any and all rights to challenge such assumption

5  and assignment and the Cure Amount.

6      With respect to each executory contract and unexpired lease identified on the

7  Schedule of Assumed and Assigned Agreements, if no dispute arises regarding the Cure

8  Amount, adequate assurances, or some other matter related to the assumption of the

9  executory contract or unexpired lease, then the Cure Amount set forth in the Schedule of

10 Assumed and Assigned Agreements shall be paid to the applicable non-debtor party in

11 Cash on the Effective Date or as soon as reasonably practicable thereafter.  If a dispute

12 arises regarding (a) whether the Debtor has provided adequate assurance of future

13 performance of an executory contract or unexpired lease to be assumed, or (b) any other

14 matter pertaining to a proposed assumption and assignment, the Cure Amount will be

15 paid on the later of (1) the Effective Date or as soon as practicable thereafter, or (2) within

16 thirty (30) days after entry of a Final Order resolving the dispute and approving the

17 assumption and assignment; provided, however, if a dispute arises regarding any of the

18 foregoing, the Debtor reserves the right to completely forego assumption and assignment

19 of and, instead, reject the subject executory contract or unexpired lease.

20     If a party to an executory contract or unexpired lease identified on the Schedule of

21 Assumed and Assigned Agreements Files an objection disputing the Cure Amount, then

22 the Debtor may amend the Schedule of Assumed and Assigned Agreements at any time

23 prior to the Confirmation Hearing to delete the subject executory contract or unexpired

24 lease and provide for its rejection.  Executory contracts or unexpired leases not so deleted

25 shall be conditionally assumed, subject to the Debtor's right to file a Motion to determine

26 the appropriate Cure Amount up to the first (1st) Business Day that is at least sixty (60)

27 days following the Effective Date.  The Debtor will serve any such Motion on the party to

28

1    the executory contract or unexpired lease affected by the Motion (or its attorney, if any).  If

2    the Debtor does not file a Motion to determine the appropriate Cure Amount, then the

3    executory contract or unexpired lease shall be assumed and assigned, as of the Effective

4    Date, and the Cure Amount shall be the alternative Cure Amount asserted by the non-

5    debtor party to the subject executory contract or unexpired lease in its objection to the

6    Plan.  The Cure Amount shall be paid as soon as reasonably practicable following the

7    expiration of the 60-day deadline.

8        If the Debtor files a Motion to determine the appropriate Cure Amount, then the

9    Reorganized Debtor shall have the right to amend the Schedule of Assumed and

10   Assigned Agreements to completely forego assumption and assignment of and, instead,

11   reject the subject executory contract or unexpired lease up to the first (1st) Business Day

12   that is at least fifteen (15) days after the entry of an order fixing the Cure Amount.  The

13   Debtor will provide notice of any amendment to the Schedule of Assumed and Assigned

14   Agreements to the party to the executory contract or unexpired lease affected by the

15   amendment.  If the Debtor has filed such a Motion and does not timely amend the

16   Schedule of Assumed and Assigned Agreements within fifteen (15) days after entry of an

17   order fixing the Cure Amount, then the executory contract or unexpired lease shall be

18   assumed and assigned, as of the Effective Date, and the Cure Amount shall be fixed as

19   the Cure Amount ordered by the Court.  The Cure Amount shall be paid as soon as

20   reasonably practicable following the expiration of the 15-day deadline.  Any executory

21   contracts and unexpired leases assumed by the Debtor shall vest in the Reorganized

22   Debtor as of the Effective Date.

23                    b.    Rejections

24       Any executory contracts and/or unexpired leases to be rejected pursuant to the

25   provisions of sections 365 and 1123 of the Code may be the subject of a motion filed by

26   the Debtor prior to the Effective Date of the Plan.  A Proof of Claim arising from the

27   rejection of an executory contract or unexpired lease pursuant to such motion must be

28

1131251.1

63

1  filed no later than 30 days after entry of the Order authorizing the rejection.  The Debtor is

2  conclusively deemed to have rejected all executory contracts and unexpired leases not

3  previously assumed or rejected as of the Effective Date.  A Proof of Claim arising from the

4  deemed rejection of an executory contract or unexpired lease must be filed no later than

5  30 days after entry of the Confirmation Order.  Claims arising from the rejection of an

6  executory contract or unexpired lease under this section are General Unsecured Claims in

7  Class 20, except to the extent the Court orders otherwise.  Any such rejection damage

8  Claims that are not timely Filed and served will be forever barred and unenforceable

9  against the Debtor, the Estate, the Reorganized Debtor, and their respective property.

10  Persons holding these Claims who fail to timely file Claims will be barred from receiving

11  any Distributions under the Plan on account of their requested rejection damage Claims.

12        **3.      Changes in Rates Subject to Regulatory Commission Approval**

13        The Debtor is an individual not subject to governmental regulatory commission

14  approval of any rates.

15        **4.      Preservation of Causes of Action and Avoidance Actions**

16        The Debtor reserves for the Estate and the Reorganized Debtor all rights to

17  commence and pursue, as appropriate, any and all Causes of Action and Avoidance

18  Actions, whether arising prior to or after the Petition Date, in any court or other tribunal,

19  including without limitation, in an adversary proceeding Filed in the Court and the litigation

20  described above, except for as otherwise provided in the Plan.  On the Effective Date, the

21  Reorganized Debtor will be vested with authority to enforce, file, litigate, prosecute, settle

22  and collect with respect to Causes of Action and Avoidance Actions, although he will not

23  be required to do so and the determination of whether to do so will be made solely by the

24  Reorganized Debtor in his absolute discretion.

25        Unless a Cause of Action or Avoidance Action against any Person is expressly

26  waived, relinquished, released, compromised or settled as provided or identified in the

27  Plan, any Confirmation Order or prior order of the Court, the Debtor expressly reserves

28

1131251.1                                     64                        SECOND AMENDED
                                                                        DISCLOSURE STATEMENT

1   any Causes of Action and Avoidance Action for later adjudication.  Therefore, no

2   preclusion doctrine, including, without limitation, the doctrine of *res judicata*, collateral

3   estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise) or

4   laches shall apply to such Causes of Action or Avoidance Actions upon or after

5   Confirmation or consummation of the Plan.  All Avoidance Actions and other Causes of

6   Action are preserved under the Plan for the benefit of the Estate, except as otherwise

7   provided for in the Plan.  Any recoveries from Avoidance Actions and/or other Causes of

8   Action will be paid to the Reorganized Debtor.

9       ANY CREDITORS THAT BELIEVE THEY RECEIVED A TRANSFER OR SETOFF

10  THAT IS AVOIDABLE UNDER THE CODE OR THAT HOLD A CLAIM AGAINST THE

11  ESTATE THAT COULD BE SUBJECT TO AN OBJECTION BASED UPON FAILURE TO

12  RETURN AN AVOIDABLE TRANSFER OR SETOFF, ARE DIRECTED TO REVIEW

13  THEIR RECORDS AND/OR THE DEBTOR'S SCHEDULES FOR FURTHER

14  INFORMATION, HOWEVER, ALL RIGHTS OF THE DEBTOR AND THE ESTATE ARE

15  RESERVED WITH RESPECT TO ANY AND ALL TRANSFERS OR SETOFF WHICH

16  MAY BE AVOIDABLE UNDER THE BANKRUPTCY CODE.

17      All professional fees incurred in pursuing the Avoidance Actions or other Causes of

18  Action shall be paid by the Reorganized Debtor without the necessity of a Court order.

19  However, the Bankruptcy Court will reserve exclusive jurisdiction to decide any and all

20  disputes regarding the payment of the fees and costs related to post-confirmation

21  professional fees, upon request of a party-in-interest and after notice and a hearing.

22              **5.    Retention of Jurisdiction**

23      The Court will retain exclusive jurisdiction during the Plan payout period to resolve

24  disputes and conflicts arising from the administration of the Plan, upon request of a party-

25  in-interest and after notice and a hearing, including, without limitation:

26      1.    The adjudication of the validity, scope, classification, allowance, and

27              disallowance of any Claim;

28

1131251.1

SECOND AMENDED
DISCLOSURE STATEMENT

2.      The estimation of any Claim;

3.      The allowance or disallowance of Professional Fee Claims, compensation, or other Administrative Claims;

4.      To hear and determine Claims concerning taxes pursuant to Bankruptcy Code §§ 346, 505, 525, and 1146;

5.      To hear and determine any action or proceeding brought under Bankruptcy Code §§ 108, 510, 543, 544, 545, 547, 548, 549, 550, 551, and 553;

6.      To hear and determine all actions and proceedings which relate to pre-confirmation matters;

7.      To hear and determine any issue relating to the assumption or rejection of executory contracts and unexpired leases;

8.      To hear and determine any modification to the Plan in accordance with the Bankruptcy Rules and the Bankruptcy Code;

9.      To enforce and interpret the terms of the Plan;

10.     To correct any defects, cure any omissions, or reconcile any inconsistency in the Plan or the Confirmation Order as may be necessary to carry out the purpose and intent of the Plan;

11.     The entry of any order, including injunctions, necessary to enforce title, rights and powers of the Debtor or Reorganized Debtor, and to impose such limitations, restrictions, terms and conditions on such title, rights and powers as the Court may deem necessary including, without limitation, any right of the Debtor or Reorganized Debtor to recover and liquidate assets;

12.     To determine the validity, extent and priority of all liens and security interests against property of the Estate or the Reorganized Debtor;

13.     To hear and resolve any disputes in connection with any Sale and/or Refinancing of the Real Property, including any extension of the 120-day deadline and the appointment of the Liquidating Agent;

1131251.1

66

SECOND AMENDED
DISCLOSURE STATEMENT

14.    To hear and resolve any disputes regarding employment applications and professional fees;

15.    To hear and determine such matters and make such orders as are consistent with the Plan as may be necessary to carry out the provisions thereof and to adjudicate any disputes arising under or relating to any order entered by the Court in this Case;

16.    The entry of an order concluding and terminating this Case; and

17.    To resolve any disputes as to whether there has been a default under the Plan.

### 6.    Tax Consequences of the Plan

CREDITORS CONCERNED WITH HOW THE PLAN MAY AFFECT THEIR TAX LIABILITY SHOULD CONSULT WITH THEIR OWN ACCOUNTANTS, ATTORNEYS, AND/OR ADVISORS.  The following disclosure of possible tax consequences is intended solely for the purpose of alerting readers about possible tax issues the Plan may present to the Debtor and the Reorganized Debtor.  The Debtor and his professionals CANNOT and DO NOT represent that the tax consequences contained below are the only tax consequences of the Plan because the Tax Code embodies many complicated rules which make it difficult to state completely and accurately all of the tax implications of any action.

Due to the unsettled and complex nature of some of the tax issues, as well as the possibility that developments subsequent to the date hereof could affect the tax consequences of the Plan, the following discussion should not be regarded as definitive or as covering all possible tax consequences.  Additionally, this summary does not discuss all aspects of federal income taxation that may be relevant to a particular creditor in light of its individual circumstances or to certain creditors subject to special treatment under the federal income tax law (for example, life insurance companies, tax-exempt organizations,

1  foreign corporations and individuals who are not citizens or residents of the United

2  States).

3       As stated above, creditors concerned with how the Plan will affect their own tax

4  liability should consult with their own accountants, attorneys, and/or advisors.  The Debtor

5  is still in the process of determining the tax consequences of the Plan, but does not

6  believe that there will be a material taxable event upon any Sale of the Real Property.

7  However, the Debtor does not expect adverse consequences materially affecting the

8  distributions to the Holders of Allowed Claims under the Plan.

9       In connection with the hearing on confirmation of the Plan, and in order to

10 demonstrate the feasibility thereof, the Debtor will provide information regarding the

11 potential tax implications of the Plan.

12             **7.    Exemption from Transfer Taxes**

13      Pursuant to Bankruptcy Code § 1146(a), any transfers from the Debtor to the

14 Reorganized Debtor or to any other Person pursuant to the Plan in the United States shall

15 not be subject to any stamp, real estate transfer, personal property, recording or other

16 similar tax, and the Confirmation Order shall direct the appropriate state or local

17 governmental official or agents to forgo the collection of any such tax or governmental

18 assessment and to accept for filing and recordation any of the foregoing instruments or

19 other documents without payment of any such tax or governmental assessment.

20

21 **IV.    CONFIRMATION REQUIREMENTS AND PROCEDURES**

22      PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OF THE PLAN

23 SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON

24 CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX.  The following

25 discussion is intended solely for the purpose of alerting readers about basic confirmation

26 issues, which they may wish to consider, as well as certain deadlines for Filing Claims.

27

28

1131251.1

68

1  The Debtor CANNOT and DOES NOT represent that the discussion contained below is a

2  complete summary of the law on this topic.

3       Many requirements must be met before the Court can confirm a Plan.  Some of the

4  requirements include that the Plan must be proposed in good faith, acceptance of the

5  Plan, whether the Plan pays creditors at least as much as creditors would receive in a

6  chapter 7 liquidation, and whether the Plan is feasible.  These requirements are <u>not</u> the

7  only requirements for confirmation.

8       **A.**    **<u>Who May Vote or Object</u>**

9       **1.**    **Who May Object to Confirmation of the Plan**

10       Any party in interest may object to the confirmation of the Plan, but as explained

11  below, not everyone is entitled to vote to accept or reject the Plan.

12       **2.**    **Who May Vote to Accept/Reject the Plan**

13       A creditor has a right to vote for or against the Plan if that creditor has a Claim that:

14  (a) either is an Allowed Claim or is allowed for voting purposes; (b) is classified in an

15  impaired Class; and (c) is entitled to receive or retain some property on account of its

16  Claim.[22]

17       a.    <u>What is an Allowed Claim</u>

18       As noted above, a creditor must first have an Allowed Claim to have the right to

19  vote.  Generally, any Proof of Claim will be Allowed, unless a party in interest Files an

20  objection to that Claim.  When an objection to a Claim is Filed, the Holder of the Claim

21  cannot vote unless and until the Court, after notice and hearing, either overrules the

22  objection or allows the Claim for voting purposes.  Any Person who seeks temporary

23  allowance of its Claim for the purpose of voting on the Plan must promptly take the steps

24

25

---

26  [22] If the Plan provides that a Class will receive or retain no property on account of its Claim, that Class is

27  deemed to reject the Plan under Bankruptcy Code § 1126(g) and therefore is not entitled to vote.

28  1131251.1

SECOND AMENDED
DISCLOSURE STATEMENT

1  necessary to File an appropriate motion requesting the same and arrange an appropriate

2  hearing with the Court.

3        THE BAR DATE FOR FILING A PROOF OF CLAIM IN THIS CASE BY

4  CLAIMANTS WHOSE CLAIMS WERE NOT SCHEDULED OR WERE SCHEDULED AS

5  UNKNOWN, DISPUTED, CONTINGENT, OR UNLIQUIDATED IS JUNE 26, 2017 (AS TO

6  CREDITORS OTHER THAN GOVERNMENTAL UNITS) AND OCTOBER 6, 2017 (AS TO

7  GOVERNMENTAL UNITS).  A creditor may have an Allowed Claim even if a Proof of

8  Claim was not timely filed.  A Claim is deemed Allowed if (1) it is scheduled on the

9  Debtor's Schedules and such Claim is not scheduled as disputed, contingent, or

10  unliquidated, and (2) no party in interest has objected to the Claim.

11              b.      What is an Impaired Claim

12        As noted above, the Holder of an Allowed Claim only has the right to vote if it is in a

13  Class that is impaired under the Plan.  A Class is impaired if the Plan alters the legal,

14  equitable, or contractual rights of the members of that Class.  For example, a Class

15  comprised of General Unsecured Claims is impaired if the Plan fails to pay the members

16  of that Class 100% of what they are owed or otherwise impairs the legal rights of the

17  Holders of the Claims.

18        In this case, the Debtor believes that Classes 3, 6, 7, 8, 9, 10, 12, 13, 14, 15, 16

19  and 22 are impaired and Holders of Claims in each of these Classes are therefore entitled

20  to vote to accept or reject the Plan, unless otherwise specified below.  The Debtor

21  believes that Classes 1, 2, 4, 5, 11, 17, 18, 19 and 20 are unimpaired under the Plan.  Any

22  party in interest who disputes the Debtor's characterization of its Claim as being in an

23  impaired or unimpaired Class may File an objection to the Plan contending that the Debtor

24  incorrectly characterized the Claim or Class.

25          **3.      Who is Not Entitled to Vote**

26        The following four types of Claims are not entitled to vote: (1) Claims that have

27  been disallowed; (2) Claims in unimpaired Classes; (3) Claims entitled to priority pursuant

28

1131251.1                                      70                    SECOND AMENDED
                                                                     DISCLOSURE STATEMENT

to Bankruptcy Code §§ 507(a)(2), (a)(3), and (a)(8); and (4) Claims in Classes that do not receive or retain any value under the Plan.  Claims in unimpaired Classes are not entitled to vote because such Classes are deemed to have accepted the Plan.  Claims entitled to priority pursuant to Bankruptcy Code §§ 507(a)(2), (a)(3), and (a)(8) are not entitled to vote because such Claims are not placed into Classes and they are required to receive certain treatment specified by the Bankruptcy Code.  Claims in Classes that do not receive or retain any value under the Plan do not vote because such Classes are deemed to have rejected the Plan.  In this Case, Classes 1, 2, 4, 5, 11, 17, 18, 19 and 20 are not entitled to vote on the Plan, but are deemed to have accepted the Plan.  EVEN IF YOUR CLAIM IS OF THE TYPE DESCRIBED ABOVE, YOU MAY STILL HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THE PLAN.

### 4.    Who Can Vote in More Than One Class

A creditor whose Claim has been Allowed in part as a Secured Claim and in part as a General Unsecured Claim is entitled to accept or reject the Plan in both capacities by casting one ballot for the secured portion of the Claim and another ballot for the unsecured portion of the Claim.

### 5.    Votes Necessary to Confirm the Plan

If impaired Classes exist, the Court cannot confirm the Plan unless (1) at least one impaired Class has accepted the Plan without counting the votes of any insiders within that Class, and (2) all impaired Classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cramdown" on non-accepting Classes, as discussed later in Section IV.A.7 and IV.A.8 below.

### 6.    Votes Necessary for a Class to Accept the Plan

A Class of Claims is considered to have accepted the Plan when more than one-half (1/2) in number, and at least two-thirds (2/3) in dollar amount, of the Claims which actually voted, voted in favor of the Plan.

**7.     Treatment of Nonaccepting Classes**

If at least one impaired Class votes to accept the Plan, and other impaired Classes vote to reject the Plan, the Court may nonetheless confirm the Plan if the nonaccepting Classes are treated in the manner required by the Bankruptcy Code.  The process by which nonaccepting Classes are forced to be bound by the terms of a Plan is commonly referred to as "cramdown."  The Bankruptcy Code allows the Plan to be "crammed down" on nonaccepting Classes of Claims if it meets all consensual requirements except the voting requirements of § 1129(a)(8) and if the Plan does not "discriminate unfairly" and is "fair and equitable" toward each impaired Class that has not voted to accept the Plan as referred to in § 1129(b) and applicable case law.

**8.     Request for Confirmation Despite Nonacceptance by Impaired Class**

The Debtor will ask the Court to confirm the Plan by "cramdown" on all impaired Classes if any of these Classes do not vote to accept the Plan.

**B.     Liquidation Analysis**

Another confirmation requirement is the so-called "Best Interests Test" embodied in Bankruptcy Code § 1129(a)(7), which requires a liquidation analysis.  Under the Best Interests Test, if a claimant is in an impaired Class and that claimant does not vote to accept the Plan, then that claimant must receive or retain under the Plan property of a value not less than the amount that such Holder would receive or retain if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code.

In a chapter 7 case, the debtor's assets are usually sold by a chapter 7 trustee. Secured creditors are paid first from the sales proceeds of properties on which the secured creditor has a lien.  Administrative Claims are paid next.  Next, unsecured creditors are paid from any remaining sale proceeds, according to their rights to priority. Unsecured creditors with the same priority share in proportion to the amount of their Allowed Claims in relationship to the amount of total allowed unsecured claims.

For the Court to be able to confirm the Plan, the Court must find that all creditors who do not accept the Plan will receive at least as much under the Plan as holders would receive under a chapter 7 liquidation.  The Debtor maintains that this requirement is met here because the Plan provides for 100% payment to creditors, as set forth in Exhibit "2" (Schedule of Net Asset Value) attached hereto.  Therefore, creditors will receive at least as much as they would receive in a hypothetical chapter 7 liquidation.

Below is demonstration, in tabular format, that all creditors are projected to receive at least as much under the Plan as such creditor would receive under a chapter 7 liquidation.

| CLAIMS & CLASSES | PAYOUT PERCENTAGE UNDER THE PLAN | PAYOUT PERCENTAGE IN CHAPTER 7 LIQUIDATION |
|---|---|---|
| Administrative Claims | 100% | 100% |
| Priority Tax Claims | 100% | 100% |
| Classes 1 through 15 - Secured Claims of Real Property Lenders | 100% | 100% |
| Class 16 - Secured Claim of Tarnutzer | 100% | 100% |
| Class 17 - Secured Claim of Alliant Credit Union (Tesla) | 100% | 100% |
| Class 18 – Secured Tax Claims | 100% | 100% |
| Class 19 – Priority Unsecured Claims | 100% | 100% |
| Class 20 – General Unsecured Claims (other than Fern) | 100% | 100% |
| Class 21 – Intentionally Omitted | N/A | N/A |
| Class 22 – Unsecured Claim of Fern | 100% | 100% |

## C.    Feasibility

Another requirement for confirmation involves the feasibility of the Plan, which means that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the Debtor or any successor to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan.

There are at least two important aspects of a feasibility analysis.  The first aspect considers whether the Debtor will have enough Cash on hand on the Effective Date of the Plan to pay all the Claims and expenses which are entitled to be paid on such date.  The

1  Debtor maintains that this aspect of feasibility is satisfied.  As set forth in Exhibit "1"

2  attached hereto, Effective Date Payments to Administrative Claimants and General

3  Unsecured Claimants, are estimated to be approximately $900,000.  These Claimants will

4  be paid from Cash on hand in the Estate, the Debtor's Income and/or from the proceeds

5  of a Sale and/or Refinancing of the Real Property.

6        The second aspect considers whether the Reorganized Debtor will have enough

7  Cash over the life of the Plan to make the required Plan payments.  The Debtor has

8  satisfied this aspect as well.  The remaining payments to be made are to the holders of

9  Secured Claims of the Real Property Lenders, which will (with the exception of the

10  Surfside Property) continue to be satisfied from the Real Property Income, as set forth in

11  Exhibit "1" attached hereto.  The payments to the Real Property Lenders on the Surfside

12  Property, and to Alliant Credit Union, will continue to be satisfied from the Debtor's

13  Income, as set forth in Exhibit "1" attached hereto.

14        With respect to any Allowed Claim of Tarnutzer, the Debtor will fund the payment

15  on account of any such Allowed Claim first from the Interpled DV Sale Proceeds and,

16  thereafter, to the extent necessary to pay such Allowed Claim in full, from the Sale and/or

17  Refinance of some or all of the Real Property.  With respect to any Allowed Claim of Fern,

18  the Debtor will fund the payment on account of any such Allowed Claim from the Sale

19  and/or Refinance of some or all of the Real Property.  As set forth in Exhibit "2" attached

20  hereto, the Interpled DV Sale Proceeds are in the amount of approximately $1.8 million,

21  and there is approximately $8.8 million in equity in the Real Property over and above the

22  Claims of the Real Property Lenders, providing the Debtor with sufficient funding sources

23  to make the payments called for under the Plan on account of all Claims.   In this regard,

24  the Debtor does not believe that there will be a material taxable event in connection with

25  any Sale of the Real Property.  In connection with confirmation of the Plan, the Debtor's

26  financial advisors will provide evidence of the likelihood of the Debtor's ability to sell

27  and/or refinance the Real Property in sufficient amounts, and within the specified

28

1131251.1                        74                    SECOND AMENDED
                                                       DISCLOSURE STATEMENT

timeframe, to satisfy any Allowed Claim of Tarnutzer and/or Fern (and the Effective Date payments to Class 20 General Unsecured Claimants and on account of Professional Fees) and thereby demonstrate the feasibility aspect of the Plan.  Moreover, should the 120 day deadlines following allowance of the Tarnutzer Claim and/or Fern Claim for undertaking the Sale and/or Refinance pass without extension by agreement or Court order, the Liquidating Agent will be appointed to undertake such Sale and/or Refinancing.

In sum, the Debtor believes that he will have sufficient Cash on hand on the Effective Date to fund all Effective Date Payments and will be able to make the other required payments under the Plan through income generated by the Real Property and the Debtor's business income, and to the extent necessary, through monetizing the equity in the Real Property and utilization of the Interpled DV Sale Proceeds.

YOU ARE ADVISED TO CONSULT WITH YOUR ACCOUNTANT OR FINANCIAL ADVISOR IF YOU HAVE ANY QUESTIONS PERTAINING TO ANY OF THE DEBTOR'S FINANCIAL STATEMENTS.

## V.    EFFECT OF CONFIRMATION

### A.    Discharge

The rights under the Plan and the treatment of Claims under the Plan will be in exchange for, and in complete satisfaction, discharge, and release of, all Claims of any nature whatsoever (including, without limitation, any interest accrued on Claims from and after the Petition Date) against the Debtor, the Reorganized Debtor, or their property. Except as otherwise provided in the Plan or the Confirmation Order, and to the extent provided in further Court order pursuant to Bankruptcy Code § 1141(d)(5):

1.    To the fullest extent permitted by Bankruptcy Code § 1141, the Debtor, the Debtor's Estate, the Reorganized Debtor, and their property will  be deemed discharged and released from any and all Claims, including, without limitation, all demands, liabilities, Claims, that arose before the Confirmation

Date or that are based upon or otherwise relate to acts, events, omissions, transactions or other activities of any kind that occurred before the Confirmation Date, and all debts of the kind specified in Bankruptcy Code §§ 502(g), 502(h), or 502(l) regardless of whether: (1) a Proof of Claim based on such a debt is Filed or deemed Filed; (2) a Claim based on such a debt is allowable under Bankruptcy Code § 502; or (3) the Person Holding the Claim based on such a debt has accepted the Plan;

2.    All Persons will be precluded from asserting against the Debtor, the Estate, the Reorganized Debtor, or their property any other or further Claims based on, arising from, or in connection with any act, event, omission, transaction, or other activity of any kind that occurred before the Confirmation Date;

3.    Any debt of the Debtor, whether secured or unsecured, which was in default as of or at any time prior to the Confirmation Date, will no longer be deemed in default.  Moreover, to the extent that the Debtor complies with the terms and conditions of the Plan, these obligations will be deemed in good standing; and

4.    Subject to the limitations and conditions imposed under Bankruptcy Code § 1125(e), Persons who - in good faith and in compliance with applicable Bankruptcy Code provisions - solicit Plan acceptances or rejections will not be liable on account of their solicitation for violation of any applicable law, rule, or regulation governing the solicitation of Plan acceptances or rejections.

**B.    Exculpation and Releases**

Effective upon the entry of the Confirmation Order, neither the Debtor, the Reorganized Debtor, the Professionals, nor any of their respective members, officers, directors, shareholders, employees, or agents, shall have or incur any liability to any Persons, including any creditor of the Debtor for any act taken or omission made in

connection with or related to the negotiation, formulation, or preparation of the Plan and the Disclosure Statement, the approval of the Disclosure Statement, the confirmation of the Plan, the consummation of the Plan, or the administration of the Plan, the Case, or the property to be distributed under the Plan, to the fullest extent permitted by applicable statutes and case law, except that the Reorganized Debtor will be liable for performance and obligations assumed by his or imposed upon him under or by the Plan.

**C.    Vesting of the Assets**

On the Effective Date, all property of the Estate will vest in the Reorganized Debtor pursuant to § 1141(b), free and clear of all claims and interests except as provided in the Plan.

**D.    Plan Creates New Obligations**

Except as otherwise stated in the Plan, the payments promised in the Plan constitute new contractual obligations that replace those obligations to creditors that existed prior to the Effective Date.

**E.    Creditor Action Restrained**

Creditors may not take any action to enforce either preconfirmation obligations or obligations due under the Plan, so long as the Debtor is not in material default under the Plan.  If the Debtor is in material default under the Plan, affected creditors may: (i) take any action permitted under nonbankruptcy law to enforce the terms of the Plan; or (ii) move to dismiss this case or to convert this case to a chapter 7 bankruptcy case.

**F.    Material Default Defined**

If the Debtor fails to make any payment required under the Plan, or to perform any other obligation required under the Plan for more than fourteen (14) days after the time specified in the Plan, the affected creditor may serve upon the Debtor and the Debtor's attorney a written notice of default.  The Debtor is in material default under the Plan if the Debtor fails within twenty-one (21) days of the service of such notice of default, plus three

(3) additional days if served by mail, either: (i) to cure the default or (ii) to obtain from the Court an extension of time to cure the default or a determination that no default occurred.

### G.    Modification of the Plan

The Debtor may modify the Plan at any time before confirmation subject to Bankruptcy Code § 1127(a).  If the Plan is modified, however, the Court may require a new disclosure statement or re-voting on the Plan depending upon the nature of the modifications and their effect on parties in interest.  The Reorganized Debtor may also seek to modify the Plan at any time after confirmation subject to Bankruptcy Code § 1127(b), if: (a) the Plan has not been substantially consummated; and (b) the Court, after notice and a hearing, authorizes the proposed modification.

### H.    Post-Confirmation Status Report

Within 120 days of the entry of the Confirmation Order, the Reorganized Debtor shall file a status report with the Court explaining what progress has been made towards consummation of the confirmed Plan.  The status report shall be served on the OUST and the parties who have requested special notice.  Further status reports shall be filed every 120 days and served on the same entities.

### I.    Quarterly Fees

Quarterly fees accruing under 28 U.S.C. § 1930(a)(6) prior to confirmation shall be paid to the OUST on or before the Effective Date.  Quarterly fees accruing under 28 U.S.C. § 1930(a)(6) after confirmation shall be paid to the OUST by the Reorganized Debtor until a final decree, or the entry of an order dismissing the case or converting the case to chapter 7, at the rate in effect at the time such fees are due.

### J.    Post-Confirmation Conversion/Dismissal

After the Plan is confirmed, the Court, upon a motion by a creditor or party in interest and after notice and a hearing, may convert this case to one under chapter 7 of the Bankruptcy Code or dismiss this case under Bankruptcy Code § 1112(b) upon a showing of cause therefore, including, without limitation, if there is a material default by

1   the Reorganized Debtor with respect to the confirmed Plan.  If the Court orders the case

2   converted to chapter 7 after the Plan is confirmed, then all property that had been property

3   of the Estate and that has not been distributed under the Plan will revest in the chapter 7

4   estate.  The automatic stay provisions of § 362(a) of the Bankruptcy Code will be

5   reimposed upon the revested property only to the extent that relief from stay was not

6   previously authorized by the Court during the case.

7        The Confirmation Order may also be revoked under very limited circumstances.

8   Pursuant to § 1144 of the Bankruptcy Code, the Court may revoke the Confirmation Order

9   if it was procured by fraud and if a party in interest brings an adversary proceeding to

10  revoke the confirmation within 180 days after the entry of the Confirmation Order.

11       **K.**    **Final Decree**

12       Pursuant to Bankruptcy Rule 3022, a Final Decree may be not be entered until a

13  bankruptcy case is fully administered.  The Court may, however, allow a Final Decree to

14  be entered at an earlier date if requested, or for cause shown.

15  Dated:  September 8, 2017

Respectfully submitted,
LOBEL WEILAND GOLDEN FRIEDMAN LLP

16

17

18  By:  */s/ Alan J. Friedman*
        JEFFREY I. GOLDEN

19      ALAN J. FRIEDMAN
        BETH E. GASCHEN

20      Attorneys for David Tudor Chamberlain,
        Debtor and Debtor-in-Possession

21

22

23

24

25

26

27

28

1131251.1

79

## TABLE OF DEFINITIONS

**"8479 Cedarview Court Property"** means the real property located at 8479 Cedarview Court, Cypress, California 90630, as more fully described in Section II.A.14 of the Disclosure Statement.

**"8475 Cedarview Court Property"** means the real property located at 8475 Cedarview Court, Cypress, California 90630, as more fully described in Section II.A.15 of the Disclosure Statement.

**"Administrative Claim"** means a Claim against the Debtor for administrative costs or expenses that are allowable under Bankruptcy Code § 503(b).

**"Administrative Tax Claim"** means an Administrative Claim or other Claim that is not an Allowed Secured Claim that a government unit asserts against the Debtor for taxes (or for related interest or penalties) for any tax period that, either in whole or in part, falls within the period beginning on the Petition Date and ending on the Effective Date.

**"Allowed Claim"** means a Claim against the Debtor, other than an Administrative Claim, to the extent that:

    a.    Either: (i) a Proof of Claim was Filed by the Bar Date; or (ii) a Proof of Claim is deemed timely Filed either under Bankruptcy Rule 3003(b)(1) or by a Final Order; and

    b.    Either: (i) the Claim is not a Disputed Claim; (ii) the Claim is allowed by a Final Order; or (iii) the Claim is allowed under the Plan.

**"Allowed [Class Designation and/or Secured, Priority, or General Unsecured] Claim"** means an Allowed Claim in the specified Class and/or of the specified type.

**"Amended Schedules I and J"** means the Debtor's amended Schedules I and J filed with the Court on June 5, 2017 [Docket No. 98].

**"Appeal"** means the Debtor's appeal of the Tarnutzer Judgment, as discussed in Section II.E.2. of the Disclosure Statement.

80

**"Appellate Court"** means the appellate court entering a Final Order with respect to the Appeal or in connection with the Fern Litigation.

**"Assets"** means all tangible and intangible assets and property of every kind and nature of the Debtor and/or his Estate, and all proceeds thereof, existing as of the Effective Date.

**"Avoidance Action"** means Causes of Action arising under 11 U.S.C. §§ 510, 541, 542, 544, 547, 548, 549, 550, 551, and/or 553, or under related state or federal statutes and common law, including, without limitation, fraudulent transfer laws, whether or not litigation is commenced to prosecute such Causes of Action.

**"Bankruptcy Code" or "Code"** means Title 11 of the United States Code, as amended.

**"Bankruptcy Rules"** means the Federal Rules of Bankruptcy Procedure.

**"Bar Date"** means the last date for filing Proofs of Claim in the Debtor's Case.  The Bar Date has been established as June 26, 2017 (as to creditors other than governmental units) and October 6, 2017 (as to governmental units).

**"Bar Date Notice"** means the notice of the Bar Date served on creditors of the Estate on May 22, 2017.

**"Bishop Street Property"** means the real property located at 5532 Bishop Street, Cypress, California 90630, as more fully described in Section II.A.11 of the Disclosure Statement.

**"Business Day"** means any day, other than a Saturday, a Sunday or a "legal holiday" as defined in Rule 9006(a) of the Bankruptcy Rules.

**"Case"** means the Debtor's case under chapter 11 of the Bankruptcy Code that is pending before the United States Bankruptcy Court for the Central District of California, Santa Ana Division, as Case No. 8:15-bk-11370-CB.

**"Cash"** means legal tender of the United States of America.

1131251.1

SECOND AMENDED
DISCLOSURE STATEMENT

1   **"Cash Collateral Motions"** has the meaning ascribed to such term in Section
2   II.E.1.b. of the Disclosure Statement.

3   **"Cause of Action"** means, without limitation, any and all actions, causes of action,
4   controversies, liabilities, obligations, rights, suits, damages, judgments, Claims (as defined
5   in Code § 101(5)) and demands whatsoever, whether known or unknown, reduced to
6   judgment, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed
7   or undisputed, secured or unsecured, assertable directly or derivatively, existing or
8   hereafter arising, in law, equity, or otherwise that the Debtor and/or the Estate may hold
9   against any Person as of the Effective Date, including, without limitation, the Tarnutzer
10  Litigation and the Appeal.

11  **"CFTB"** means the California Franchise Tax Board.

12  **"Claim"** means a claim, as the term "claim" is defined in Bankruptcy Code
13  § 101(5), against the Debtor.

14  **"Class"** or **"Class of Claims"** means a group of Claims as classified in the Plan.

15  **"Comstock Avenue Property"** means the real property located at 7632 Comstock
16  Avenue, Whittier, California 90602, as more fully described in Section II.A.3 of the
17  Disclosure Statement.

18  **"Confirmation Date"** means the date on which the Court enters the Confirmation
19  Order on its docket.

20  **"Confirmation Hearing"** means the hearing held by the Court on the confirmation
21  of the Plan.

22  **"Confirmation Order"** means the Court order confirming the Plan under
23  Bankruptcy Code § 1129.

24  **"Court"** means the United States Bankruptcy Court for the Central District of
25  California, Santa Ana Division.

26  **"Debtor"** refers to David Tudor Chamberlain.

27

28

1131251.1

82

1   **"Debtor's Commissions"** means the monthly gross wages and commissions

2   earned by the Debtor as discussed in Section II.C. of the Disclosure Statement and as

3   reflected on Exhibit "1" to the Disclosure Statement.

4   **"Debtor's Income"** means, collectively, the Debtor's Commissions, the OCTSC

5   Income and the Net Real Property Income as discussed in Section II.C. of the Disclosure

6   Statement and as reflected on Exhibit "1" to the Disclosure.

7   **"Del Amo Blvd. Property"** means the real property located at 12350 Del Amo

8   Blvd., Suite 169, Lakewood, California 90713, as more fully described in Section II.A.9 of

9   the Disclosure Statement.

10   **"Denni Street Property"** means the real property located at 9062-9062.5 Denni

11   Street, Cypress, California 90630, as more fully described in Section II.A.10 of the

12   Disclosure Statement.

13   **"Disclosure Statement"** means the Debtor's Second Amended Disclosure

14   Statement Describing Second Amended Chapter 11 Plan of Reorganization, including any

15   modifications or amendments to the Disclosure Statement.

16   **"Disputed Claim"** means a Claim that has not been allowed or disallowed and to

17   which either: (i) a Proof of Claim has been Filed or deemed Filed and the Debtor or

18   another party in interest has Filed an objection; (ii) no Proof of Claim has been Filed and

19   the Claim was not scheduled or the Debtor has scheduled such claim as disputed,

20   contingent, unliquidated or unknown.

21   **"Distribution"** means any distribution pursuant to the Plan to the Holders of an

22   Allowed Claim.

23   **"Distribution Date"** means the date upon which the Distribution was made.

24   **"Domingo Villas"** means Domingo Villas, Inc.

25   **"DV Bankruptcy Case"** means that chapter 11 bankruptcy case filed by Domingo

26   Villas on September 1, 2011 in the United States Bankruptcy Court for the Central District

27

28

1131251.1

83

1  of California, Case No. 8:11-bk-22391-CB, which bankruptcy case was closed in June
2  2012.

3      **"DV Property"** means the real property previously owned by Domingo Villas, and
4  sold in the DV Bankruptcy Case.

5      **"DV Sale Proceeds"** means the proceeds from the sale of the DV Property in the
6  DV Bankruptcy Case.

7      **"Effective Date"** means the first Business Date that is at least 15 days after the
8  entry of the Confirmation Order.

9      **"Effective Date Payments"** means Distributions or payments required by the Plan
10  to be made by the Debtor on the Effective Date.

11      **"Estate"** means the bankruptcy estate created in the Debtor's case under
12  Bankruptcy Code § 541.

13      **"Fern"** means, collectively, Martin D. Fern and Linda Taylor-Fern, individually and
14  as Trustees of the Fern-Taylor Family Trust.

15      **"Fern State Court Action"** means that action commenced by the Debtor against
16  Fern and First Realm on December 22, 2015, in the Orange County Superior Court,
17  entitled <u>Chamberlain v. Fern, et. al</u>, Case No. 30-2015-00826601-CU-BC-CJC, as
18  discussed in Section II.E.3. of the Disclosure Statement.

19      **"Fern Non-Dischargeablility Action"** means that Complaint to Determine
20  Nondischargeability of Debts Pursuant to 11 U.S.C. §§ 523(a) and 524(a)(3), filed by Fern
21  on June 9, 2017, with respect to Fern's claims against the Debtor, as discussed in Section
22  II.E.3. of the Disclosure Statement.

23      **"Fern Litigation"** means, collectively, the Fern State Court Action, the Fern Non-
24  Dischargeablility Action and any claims against the Debtor asserted by Fern by way of a
25  Proof of Claim in the Debtor's Case [Claim No. 12], or otherwise, as discussed in Section
26  II.E.3. of the Disclosure Statement.

27

28

"**File**," "**Filed**," or "**Filing**" means duly and properly filed with the Court and reflected on the Court's official docket.

"**Final Order**" means an order or judgment of the Court or the Appellate Court entered on the Court's or the Appellate Court's docket.

   a.   That has not been reversed, rescinded, stayed, modified, or amended;

   b.   That is in full force and effect; and

   c.   With respect to which (i) the time for appeal or to seek review, remand, rehearing, or a writ of certiorari has expired and as to which no timely Filed appeal or petition for review, rehearing, remand, or writ of certiorari is pending, or (ii) any such appeal or petition has been dismissed or resolved by the highest court to which the order or judgment was appealed or from which review, rehearing, remand, or a writ of certiorari was sought.

"**First Realm**" means First Realm, LLC.

"**Force 10**" means Force 10 Partners LLC.

"**General Unsecured Claim**" means an unsecured Claim against the Debtor, however arising, not entitled to priority under Section 507 of the Bankruptcy Code.

"**Holder**" means an entity holding a Claim.

"**Interpled DV Sale Proceeds**" means the DV Sale Proceeds that were interpled in the State Court Action which are held in an interest-bearing account and total approximately $1.82 million, as discussed in Section II.E.2. of the Disclosure Statement.

"**IRS**" means the Internal Revenue Service.

"**LaSalle Street Property**" means the real property located at 8832-8846 LaSalle Street, Cypress, California 90630, as more fully described in Section II.A.2 of the Disclosure Statement.

"**Liquidating Agent**" means the person that may be, under the circumstances set forth in Article II.D.1.b. of the Plan, appointed to conduct the Sale and/or Refinancing of the Real Property in place of the Debtor.  Prior to the Confirmation Hearing, the Debtor

1   shall submit to the Court the identity of the Liquidating Agent and an agreement with the

2   Liquidating Agent setting forth the terms of such appointment.

3        **"LWGF"** means Lobel Weiland Golden Friedman LLP.

4        **"N. Olive Street Property"** means the real property located at 728 N. Olive Street,

5   Anaheim, California 92805, as more fully described in Section II.A.7 of the Disclosure

6   Statement.

7        **"Nevada Property"** means the real property located at 321-325 Cincinnati Avenue,

8   Las Vegas, Nevada, as more fully described in Section II.A.5 of the Disclosure Statement.

9        **"New Hampshire Property"** means the real property located at 281-289

10  Merrimack & 274 Amory, Manchester, New Hampshire, as more fully described in Section

11  II.A.4 of the Disclosure Statement.

12       **"Newman Street Property"** means the real property located at 5623 Newman

13  Street, Cypress, California 90630, as more fully described in Section II.A.8 of the

14  Disclosure Statement.

15       **"OCTSC Income"** means the Debtor's monthly income from OCTSC Partners I,

16  LLC as discussed in Section II.C. of the Disclosure Statement and as reflected on Exhibit

17  "1" to the Disclosure Statement.

18       **"ORAP Lien"** means that the lien allegedly created on certain of the Debtor's pre-

19  petition non-exempt personal property by the service of an order to appear for a judgment

20  debtor exam by Tarnutzer related to the Tarnutzer Judgment.

21       **"Net Real Property Income"** means the Debtor's monthly net income from the

22  Real Property as discussed in Section II.C. of the Disclosure Statement and as reflected

23  on Exhibit "1" to the Disclosure Statement.

24       **"Non-Ordinary Course Administrative Claims"** means Administrative Claims

25  that are not Ordinary Course Administrative Claims, Administrative Tax Claims, or

26  Professional Fee Claims, including Claims that may arise from agreements entered into

27  with the Estate after the Petition Date other than trade agreements.

28

1131251.1

SECOND AMENDED
DISCLOSURE STATEMENT

**"Ordinary Course Administrative Claims"** means Administrative Claims other than Administrative Tax Claims, Professional Fee Claims, and Non-Ordinary Course Administrative Claims, based upon liabilities that the Debtor incurs in the ordinary course.

**"OUST"** means the Office of the United States Trustee, Santa Ana Division.

**"Pacific Time"** means the time in Orange County, California.

**"Page Firm"** means The Law Office of Gregory S. Page.

**"Person"** means any individual, corporation, general partnership, limited partnership, limited liability company, association, joint-stock company, joint venture, estate, trust, government, political subdivision, governmental unit (as defined in the Bankruptcy Code), official committee appointed by the OUST, unofficial committee of creditors, or entity.

**"Petition Date"** refers to the petition date of the Debtor, April 9, 2017.

**"Plan"** means the Debtor's Second Amended Chapter 11 Plan of Reorganization, including any modifications or amendments to the Plan.

**"PPB Cash Collateral Stipulation"** has the meaning ascribed to such term in Section II.E.1.b. of the Disclosure Statement.

**"PPB Cross-Collateralized Secured Claim"** means the secured claim asserted by Pacific Premier Bank against the Newman Street Property, the Bishop Street Property, the Del Amo Blvd. Property and the Denni Street Property, as discussed in Sections II.A.8.-11. of the Disclosure Statement.

**"PPB UCC-1"** means the UCC-1 filed by Pacific Premier Bank with the California Secretary of State on December 4, 2014, as Instrument No. 13-7389473570, against personal property related to the Newman Street Property, the Bishop Street Property, the Del Amo Blvd. Property and the Denni Street Property, as discussed in Sections II.A.8.-11. of the Disclosure Statement.

**"Priority Claim"** means an Allowed Claim entitled to priority against the Estate under Bankruptcy Code §§ 507(a)(3)-(7).

1  **"Priority Tax Claim"** means an Allowed Claim entitled to priority against the Estate

2  under Bankruptcy Code § 507(a)(8).

3  **"Professionals"** collectively means the persons and entities employed by the

4  Debtor pursuant to order of the Court in accordance with Bankruptcy Code §§ 327 or

5  1103.

6  **"Professional-Fee Claim"** means:

7  a.      A Claim under Bankruptcy Code §§ 327, 328, 330, 331, 503, or 1103 for

8          compensation for professional services rendered or expenses incurred on

9          the Estate's behalf, or

10 b.      A Claim either under Bankruptcy Code § 503(b)(4) for compensation for

11         professional services rendered or under Bankruptcy Code § 503(b)(3)(D) for

12         expenses incurred in making a substantial contribution to the Estate.

13 **"Proof of Claim"** means a written statement filed in a Case by a creditor in which

14 the creditor sets forth the amount of its Claim, in accordance with Rule 3001 of the

15 Bankruptcy Rules.

16 **"Real Property"** means, collectively, the Surfside Property, the LaSalle Street

17 Property, the Comstock Avenue Property, the New Hampshire Property, the Nevada

18 Property, the Vonnie Lane Property, the N. Olive Street Property, the Newman Street

19 Property, the Del Amo Blvd. Property, the Denni Street Property, the Bishop Street

20 Property, the San Alto Way Property, the Stratton Court Property, the 8479 Cedarview

21 Court Property and the 8475 Cedarview Court Property, each as more particularly

22 described in Section II.A. of the Disclosure Statement.

23 **"Real Property Income"** means the monthly gross income from the Real Property

24 as discussed in Section II.C. of the Disclosure Statement and as reflected on Exhibit "1" to

25 the Disclosure Statement.

26 **"Real Property Lenders"** means, collectively, the lenders with respect to each of

27 the Real Property.

28

1131251.1                                    88                        SECOND AMENDED
                                                                       DISCLOSURE STATEMENT

1    **"Refinance"** means the refinancing of some or all of the Real Property to pay the

2    Allowed Claims of Tarnutzer, Fern and/or Effective Date payments, in full, as provided by

3    the Plan.

4    **"Reorganized Debtor"** means the Debtor post-confirmation.

5    **"Request for Payment"** means a request for the payment of an Ordinary Course

6    Administrative Claim or a Non-Ordinary Course Administrative Claim as described in

7    Section II.B.1 of the Plan.

8    **"Sale"** means the sale of some or all of the Real Property to pay the Allowed

9    Claims of Tarnutzer, Fern and/or Effective Date payments, in full, as provided by the Plan.

10    **"San Alto Way Property"** means the real property located at 6844 San Alto Way,

11    Buena Park, California 90620, as more fully described in Section II.A.12 of the Disclosure

12    Statement.

13    **"Schedules"** means the Schedules of Assets and Liabilities filed by the Debtor in

14    the Case, as required by § 521(1) of the Code, Bankruptcy Rules 1007(a)(3) and (b)(l),

15    and Official Bankruptcy Form No. 106, as the Schedules may be amended from time to

16    time.

17    **"Secured Claim"** means a Claim that is secured by a valid and unavoidable lien

18    against property in which the Estate has an interest or that is subject to setoff under

19    Bankruptcy Code § 553.  A Claim is a Secured Claim only to the extent of the value of the

20    Claim Holder's interest in that property or to the extent of the amount subject to setoff, as

21    applicable, as determined under Bankruptcy Code § 506(a).

22    **"SOFA"** means the Debtor's statements of financial affairs.

23    **"Stratton Court Property"** means the real property located at 10418 Stratton

24    Court, Cypress, California 90630, as more fully described in Section II.A.13 of the

25    Disclosure Statement.

26

27

28

1131251.1

89

**"Surfside Property"** means the real property located at 103 Surfside Avenue A, Surfside, California 90743, as more fully described in Section II.A.1 of the Disclosure Statement.

**"Tarnutzer"** means Rick Tarnutzer, as trustee of the 1997 Troy Trust.

**"Tarnutzer Judgment"** means the judgment against the Debtor in favor of Tarnutzer in the Tarnutzer Litigation, entered in the State Court Action on October 16, 2016, as thereafter amended by order entered April 10, 2017, as discussed in Section II.E.2. of the Disclosure Statement.

**"Tarnutzer Lien"** means that the lien allegedly created by the recording of the abstract of judgment by Tarnutzer related to the Tarnutzer Judgment in Orange, Los Angeles, Riverside and San Bernardino counties.

**"Tarnutzer Litigation"** or **"State Court Action"** means that action commenced by Domingo Villas on June 15, 2011, in the Orange County Superior Court, Central Justice Center, entitled <u>Domingo Villas, Inc. v. Rick Tarnutzer, et. al</u>, Case No. 30-2011-00484245, as discussed in Section II.E.2. of the Disclosure Statement.

**"Tarnutzer Loan"** means that $2.6 million loan to Domingo Villas by Tarnutzer, secured by the DV Property and personally guaranteed by the Debtor, as discussed in Section II.E.2. of the Disclosure Statement.

**"Tax Code"** means the Internal Revenue Code.

**"Undeliverable Distribution"** means a Distribution to any Holder of an Allowed Claim that is returned to the Reorganized Debtor as undeliverable or otherwise unclaimed.

**"Vogele Firm"** means Thomas Vogele & Associates, APC.

**"Vonnie Lane Property"** means the real property located at 5641-5643 Vonnie Lane, Cypress, California 90630, as more fully described in Section II.A.6 of the Disclosure Statement.

# EXHIBIT "1"

| PLAN PROJECTIONS | Oct-17 | Nov-17 | Dec-17 | Jan-18 | Feb-18 | Mar-18 | Apr-18 | May-18 | Jun-18 | Jul-18 | Aug-18 | Sep-18 | Oct-18 | Nov-18 | Dec-18 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Sources of Cash** | | | | | | | | | | | | | | | |
| Gross Income from RE brokerage and related activities | $ 47,870 | $ 25,524 | $ 36,134 | $ 14,967 | $ 22,781 | $ 13,504 | $ 28,408 | $ 22,077 | $ 77,924 | $ 29,491 | $ 75,146 | $ 50,174 | $ 47,870 | $ 25,524 | $ 36,134 |
| Gross Rental Income | 70,997 | 70,997 | 70,997 | 70,997 | 70,997 | 70,997 | 70,997 | 70,997 | 70,997 | 70,997 | 70,997 | 70,997 | 70,997 | 70,997 | 70,997 |
| Other Income: OCTSC | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 |
| Other Income: PT Partners Settlement | 100,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 |
| Other Income: Other | | | | | | | | | | | | | | | |
| **Total Income** | 219,467 | 107,121 | 117,732 | 96,564 | 104,378 | 95,101 | 110,006 | 103,674 | 159,521 | 111,088 | 156,744 | 131,771 | 129,467 | 107,121 | 117,732 |
| | | | | | | | | | | | | | | | |
| **Uses of Cash** | | | | | | | | | | | | | | | |
| Brokerage expenses (50% of Gross Income) | 23,935 | 12,762 | 18,067 | 7,483 | 11,390 | 6,752 | 14,204 | 11,039 | 38,962 | 14,745 | 37,573 | 25,087 | 23,935 | 12,762 | 18,067 |
| Rental Expenses | 4,857 | 4,857 | 4,857 | 4,857 | 4,857 | 4,857 | 4,857 | 4,857 | 4,857 | 4,857 | 4,857 | 4,857 | 4,857 | 4,857 | 4,857 |
| | | | | | | | | | | | | | | | |
| *Primary Residence* | | | | | | | | | | | | | | | |
| Insurance | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 |
| Maintenance | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| Utilities | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 |
| | | | | | | | | | | | | | | | |
| *Other* | | | | | | | | | | | | | | | |
| Income Tax @ 15% effective rate | 32,920 | 16,068 | 17,660 | 14,485 | 15,657 | 14,265 | 16,501 | 15,551 | 23,928 | 16,663 | 23,512 | 19,766 | 19,420 | 16,068 | 17,660 |
| Groceries | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 |
| Housekeeping | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 |
| Clothing | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 |
| Personal Care | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 |
| Out-of-pocket medical | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 |
| Transportation | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 |
| Entertainment | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 |
| Charity | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 |
| Life Insurance | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 |
| Health Insurance | 205 | 205 | 205 | 205 | 205 | 205 | 205 | 205 | 205 | 205 | 205 | 205 | 205 | 205 | 205 |
| | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| Family obligations | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 |
| | | | | | | | | | | | | | | | |
| **Total Uses of Cash** | 69,568 | 41,543 | 48,440 | 34,681 | 39,760 | 33,730 | 43,418 | 39,302 | 75,603 | 44,121 | 73,798 | 57,565 | 56,868 | 41,543 | 48,440 |
| | | | | | | | | | | | | | | | |
| **Net cash flow before New Borrowings and Plan Payments ("Operating")[1]** | 149,899 | 65,578 | 69,292 | 61,883 | 64,618 | 61,371 | 66,588 | 64,372 | 83,918 | 66,967 | 82,946 | 74,206 | 73,399 | 65,578 | 69,292 |
| | | | | | | | | | | | | | | | |
| **Proceeds from Net New Borrowings** | 750,000 | | | | | | | | | | | | | | |

[1] This represents 100% of the income and expense from the
Debtor and spouse's investment properties and 50% of real estate
commission and related income and expenses.

EXHIBIT "1"
Page 91

| PLAN PROJECTIONS | Q4-17 | Q1-18 | Q2-18 | Q3-18 | Q4-18 | Q1-19 | Q2-19 | Q3-19 | Q4-19 | Q1-20 | Q2-20 | Q3-20 | Q4-20 | Q1-21 | Q2-21 | Q3-21 | Q4-21 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Sources of Cash* | | | | | | | | | | | | | | | | | |
| Gross Income from RE brokerage and related activities | $ 109,528 | $ 51,252 | $ 128,409 | $ 154,811 | $ 109,528 | $ 51,252 | $ 128,409 | $ 154,811 | $ 109,528 | $ 51,252 | $ 128,409 | $ 154,811 | $ 109,528 | $ 51,252 | $ 128,409 | $ 154,811 | $ 109,528 |
| Gross Rental Income | 212,992 | 212,992 | 212,992 | 212,992 | 212,992 | 212,992 | 212,992 | 212,992 | 212,992 | 212,992 | 212,992 | 212,992 | 212,992 | 212,992 | 212,992 | 212,992 | 212,992 |
| Other Income: OCTSC | 1,800 | 1,800 | 1,800 | 1,800 | 1,800 | 1,800 | 1,800 | 1,800 | 1,800 | 1,800 | 1,800 | 1,800 | 1,800 | 1,800 | 1,800 | 1,800 | 1,800 |
| Other Income: PT Partners Settlement | - | | | | | | | | | | | | | | | | |
| Other Income: Other | - | | | | | | | | | | | | | | | | |
| **Total Income** | 444,320 | 296,044 | 373,201 | 399,603 | 354,320 | 296,044 | 367,535 | 369,603 | 324,320 | 266,044 | 343,201 | 369,603 | 324,320 | 266,044 | 343,201 | 369,603 | 324,320 |
| | | | | | | | | | | | | | | | | | |
| *Uses of Cash* | | | | | | | | | | | | | | | | | |
| Brokerage expenses (50% of Gross Income) | 54,764 | 25,626 | 64,205 | 77,405 | 54,764 | 25,626 | 64,205 | 77,405 | 54,764 | 25,626 | 64,205 | 77,405 | 54,764 | 25,626 | 64,205 | 77,405 | 54,764 |
| Rental Expenses | 14,572 | 14,572 | 14,572 | 14,572 | 14,572 | 14,572 | 14,572 | 14,572 | 14,572 | 14,572 | 14,572 | 14,572 | 14,572 | 14,572 | 14,572 | 14,572 | 14,572 |
| | | | | | | | | | | | | | | | | | |
| *Primary Residence* | | | | | | | | | | | | | | | | | |
| Insurance | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 |
| Maintenance | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 |
| Utilities | 1,350 | 1,350 | 1,350 | 1,350 | 1,350 | 1,350 | 1,350 | 1,350 | 1,350 | 1,350 | 1,350 | 1,350 | 1,350 | 1,350 | 1,350 | 1,350 | 1,350 |
| | | | | | | | | | | | | | | | | | |
| *Other* | | | | | | | | | | | | | | | | | |
| Income Tax @ 15% effective rate | 66,648 | 44,407 | 55,980 | 59,940 | 53,148 | 44,407 | 55,130 | 55,440 | 48,648 | 39,907 | 51,480 | 55,440 | 48,648 | 39,907 | 51,480 | 55,440 | 48,644 |
| Groceries | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 |
| Housekeeping | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 |
| Clothing | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 |
| Personal Care | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 |
| Out-of-pocket medical | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 |
| Transportation | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 |
| Entertainment | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 |
| Charity | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 |
| Life Insurance | 616 | 616 | 616 | 616 | 616 | 616 | 616 | 616 | 616 | 616 | 616 | 616 | 616 | 616 | 616 | 616 | 616 |
| Health Insurance | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 |
| Family obligations | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 |
| | | | | | | | | | | | | | | | | | |
| **Total Uses of Cash** | 159,550 | 108,171 | 158,323 | 175,484 | 146,050 | 108,171 | 157,473 | 170,984 | 141,550 | 103,671 | 153,823 | 170,984 | 141,550 | 103,671 | 153,823 | 170,984 | 141,546 |
| | | | | | | | | | | | | | | | | | |
| **Net cash flow before New Borrowings and Plan Payments ("Operating")[1]** | 284,769 | 187,873 | 214,878 | 224,118 | 208,269 | 187,873 | 210,062 | 198,618 | 182,769 | 162,373 | 189,378 | 198,618 | 182,769 | 162,373 | 189,378 | 198,618 | 182,774 |
| | | | | | | | | | | | | | | | | | |
| **Proceeds from Net New Borrowings** | 750,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

[1] This represent's 100% of the income and expense from the
Debtor and spouse's investment properties and 50% of real estate
commission and related income and expenses.

EXHIBIT "1"
Page 92

| PLAN PROJECTIONS | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|
| *Sources of Cash* | | | | | |
| Gross Income from RE brokerage and related activities | $ 109,528 | $ 444,000 | $ 444,000 | $ 444,000 | $ 444,000 |
| Gross Rental Income | 212,992 | 851,967 | 851,967 | 851,967 | 851,967 |
| Other Income: OCTSC | | | | | |
| Other Income: PT Partners Settlement | 1,800 | 7,200 | 7,200 | 7,200 | 7,200 |
| Other Income: Other | | | | | |
| **Total Income** | 444,320 | 1,423,167 | 1,357,501 | 1,303,167 | 1,303,167 |
| | | | | | |
| *Uses of Cash* | | | | | |
| Brokerage expenses (50% of Gross Income) | 54,764 | 222,000 | 222,000 | 222,000 | 222,000 |
| Rental Expenses | 14,572 | 14,572 | 14,572 | 14,572 | 14,572 |
| | | | | | |
| *Primary Residence* | | | | | |
| Insurance | 450 | 1,800 | 1,800 | 1,800 | 1,800 |
| Maintenance | 300 | 1,200 | 1,200 | 1,200 | 1,200 |
| Utilities | 1,350 | 5,400 | 5,400 | 5,400 | 5,400 |
| | | | | | |
| *Other* | | | | | |
| Income Tax @ 15% effective rate | 66,648 | 213,475 | 203,625 | 195,475 | 195,475 |
| Groceries | 1,500 | 6,000 | 6,000 | 6,000 | 6,000 |
| Housekeeping | 1,500 | 6,000 | 6,000 | 6,000 | 6,000 |
| Clothing | 1,500 | 6,000 | 6,000 | 6,000 | 6,000 |
| Personal Care | 750 | 3,000 | 3,000 | 3,000 | 3,000 |
| Out-of-pocket medical | 1,500 | 6,000 | 6,000 | 6,000 | 6,000 |
| Transportation | 1,500 | 6,000 | 6,000 | 6,000 | 6,000 |
| Entertainment | 4,500 | 18,000 | 18,000 | 18,000 | 18,000 |
| Charity | 600 | 2,400 | 2,400 | 2,400 | 2,400 |
| Life Insurance | 616 | 2,465 | 2,465 | 2,465 | 2,465 |
| Health Insurance | 3,000 | 12,000 | 12,000 | 12,000 | 12,000 |
| Family obligations | 4,500 | 18,000 | 18,000 | 18,000 | 18,000 |
| | | | | | |
| **Total Uses of Cash** | 159,550 | 588,028 | 578,178 | 570,028 | 570,028 |
| | | | | | |
| Net cash flow before New Borrowings and Plan Payments ("Operating")[1] | 284,769 | 835,139 | 779,322 | 733,139 | 733,139 |
| | | | | | |
| **Proceeds from Net New Borrowings** | 750,000 | 0 | 0 | 0 | 0 |

[1] This represent's 100% of the income and expense from the Debtor and spouse's investment properties and 50% of real estate commission and related income and expenses.

EXHIBIT "1"
Page 93

## PLAN PROJECTIONS

### Plan Payments

| Class / Secured | Current Claim | PF Rate | PF P&I | Tax/Insurance | Oct-17 | Nov-17 | Dec-17 | Jan-18 | Feb-18 | Mar-18 | Apr-18 | May-18 | Jun-18 | Jul-18 | Aug-18 | Sep-18 | Oct-18 | Nov-18 | Dec-18 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **1** Secured Claim of Secured Claim of Roundpoint Mortgage (1st Trust Deed Surfside Property) | 1,494,115 | 3.75% | 4,669 | 1,105 | | | | | | | | | 9,964 | 9,964 | 9,964 | 9,964 | 9,964 | 9,964 | 9,964 |
| **1 Total** | 1,494,115 | 3.75% | 4,669 | 1,105 | 5,774 | 5,774 | 5,774 | 5,774 | 5,774 | 5,774 | 5,774 | 5,774 | | | | | | | |
| **2** Secured Claim of Wells Fargo Bank (2nd Trust Deed Surfside Property) | 196,765 | 6.03% | 1,032 | - | 1,032 | 1,032 | 1,032 | 1,032 | 1,032 | 1,032 | 1,032 | 1,032 | 1,032 | 1,032 | 1,032 | 1,032 | 1,032 | 1,032 | 1,032 |
| **2 Total** | 196,765 | 6.03% | 1,032 | - | 1,032 | 1,032 | 1,032 | 1,032 | 1,032 | 1,032 | 1,032 | 1,032 | 1,032 | 1,032 | 1,032 | 1,032 | 1,032 | 1,032 | 1,032 |
| **3** Secured Claim of Chase Commercial Bank (1st Trust Deed LaSalle Street Property) | 577,533 | 4.25% | 2,841 | 774 | 3,616 | 3,616 | 3,616 | 3,616 | 3,616 | 3,616 | 3,616 | 3,616 | 3,616 | 3,616 | 3,616 | 3,616 | 3,616 | 3,616 | 3,616 |
| **3 Total** | 577,533 | 4.25% | 2,841 | 774 | 3,616 | 3,616 | 3,616 | 3,616 | 3,616 | 3,616 | 3,616 | 3,616 | 3,616 | 3,616 | 3,616 | 3,616 | 3,616 | 3,616 | 3,616 |
| **4** Secured Claim of Ann Leisy (2nd Trust deed of LaSalle Street Property) | 162,342 | 0.00% | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **4 Total** | 162,342 | 0.00% | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **5** Secured Claim of Chase Commercial Bank (1st Trust Deed Comstock Avenue Property) | 380,355 | 3.31% | 2,450 | 1,081 | 3,531 | 3,531 | 3,531 | 3,531 | 3,531 | 3,531 | 3,531 | 3,531 | 3,531 | 3,531 | 3,531 | 3,531 | 3,531 | 3,531 | 3,531 |
| **5 Total** | 380,355 | 3.31% | 2,450 | 1,081 | 3,531 | 3,531 | 3,531 | 3,531 | 3,531 | 3,531 | 3,531 | 3,531 | 3,531 | 3,531 | 3,531 | 3,531 | 3,531 | 3,531 | 3,531 |
| **6** Secured Claim of Digital Federal Credit Union (1st Trust Deed NH Property) | 378,485 | 4.75% | 7,099 | 1,544 | 8,643 | 8,643 | 8,643 | 8,643 | 8,643 | 8,643 | 8,643 | 8,643 | 8,643 | 8,643 | 8,643 | 8,643 | 8,643 | 8,643 | 8,643 |
| **6 Total** | 378,485 | 4.75% | 7,099 | 1,544 | 8,643 | 8,643 | 8,643 | 8,643 | 8,643 | 8,643 | 8,643 | 8,643 | 8,643 | 8,643 | 8,643 | 8,643 | 8,643 | 8,643 | 8,643 |
| **7** Secured Claim of U.S. Bank (1st Trust Deed Nevada Property) | 209,343 | 4.00% | 2,119 | 584 | 2,704 | 2,704 | 2,704 | 2,704 | 2,704 | 2,704 | 2,704 | 2,704 | 2,704 | 2,704 | 2,704 | 2,704 | 2,704 | 2,704 | 2,704 |
| **7 Total** | 209,343 | 4.00% | 2,119 | 584 | 2,704 | 2,704 | 2,704 | 2,704 | 2,704 | 2,704 | 2,704 | 2,704 | 2,704 | 2,704 | 2,704 | 2,704 | 2,704 | 2,704 | 2,704 |
| **8** Secured Claim of Wells Fargo Bank (1st Trust Deed Vonnie Lane Property) | 444,048 | 4.25% | 2,184 | 365 | 2,550 | 2,550 | 2,550 | 2,550 | 2,550 | 2,550 | 2,550 | 2,550 | 2,550 | 2,550 | 2,550 | 2,550 | 2,550 | 2,550 | 2,550 |
| **8 Total** | 444,048 | 4.25% | 2,184 | 365 | 2,550 | 2,550 | 2,550 | 2,550 | 2,550 | 2,550 | 2,550 | 2,550 | 2,550 | 2,550 | 2,550 | 2,550 | 2,550 | 2,550 | 2,550 |
| **9** Secured Claim of Wells Fargo Bank (1st Trust Deed N. Olive Street Property) | 187,283 | 4.25% | 921 | 397 | 1,319 | 1,319 | 1,319 | 1,319 | 1,319 | 1,319 | 1,319 | 1,319 | 1,319 | 1,319 | 1,319 | 1,319 | 1,319 | 1,319 | 1,319 |
| **9 Total** | 187,283 | 4.25% | 921 | 397 | 1,319 | 1,319 | 1,319 | 1,319 | 1,319 | 1,319 | 1,319 | 1,319 | 1,319 | 1,319 | 1,319 | 1,319 | 1,319 | 1,319 | 1,319 |
| **10** Secured Claim of Pacific Premier Bank (2nd Trust Deed N. Olive Street Property) | 150,321 | 5.75% | 720 | - | 720 | 720 | 720 | 720 | 720 | 720 | 720 | 720 | 720 | 720 | 720 | 720 | 720 | 720 | 720 |
| **10 Total** | 150,321 | 5.75% | 720 | - | 720 | 720 | 720 | 720 | 720 | 720 | 720 | 720 | 720 | 720 | 720 | 720 | 720 | 720 | 720 |
| **11** Secured Claim of Pacific Premier Bank (1st Trust Deed on Newman, Del Amo, Denni, Bishop) | 1,142,254 | 5.25% | 6,643 | 1,574 | 8,217 | 8,217 | 8,217 | 8,217 | 8,217 | 8,217 | 8,217 | 8,217 | 8,217 | 8,217 | 8,217 | 8,217 | 8,217 | 8,217 | 8,217 |
| **11 Total** | 1,142,254 | 5.25% | 6,643 | 1,574 | 8,217 | 8,217 | 8,217 | 8,217 | 8,217 | 8,217 | 8,217 | 8,217 | 8,217 | 8,217 | 8,217 | 8,217 | 8,217 | 8,217 | 8,217 |
| **12** Secured Claim of OCWEN (1st Trust Deed San Alto Way Property) | 260,867 | 5.50% | 1,481 | 217 | 1,698 | 1,698 | 1,698 | 1,698 | 1,698 | 1,698 | 1,698 | 1,698 | 1,698 | 1,698 | 1,698 | 1,698 | 1,698 | 1,698 | 1,698 |
| **12 Total** | 260,867 | 5.50% | 1,481 | 217 | 1,698 | 1,698 | 1,698 | 1,698 | 1,698 | 1,698 | 1,698 | 1,698 | 1,698 | 1,698 | 1,698 | 1,698 | 1,698 | 1,698 | 1,698 |
| **13** Secured Claim of OCWEN (1st Trust Deed Stratton Property) | 270,160 | 5.50% | 1,534 | 176 | 1,710 | 1,710 | 1,710 | 1,710 | 1,710 | 1,710 | 1,710 | 1,710 | 1,710 | 1,710 | 1,710 | 1,710 | 1,710 | 1,710 | 1,710 |
| **13 Total** | 270,160 | 5.50% | 1,534 | 176 | 1,710 | 1,710 | 1,710 | 1,710 | 1,710 | 1,710 | 1,710 | 1,710 | 1,710 | 1,710 | 1,710 | 1,710 | 1,710 | 1,710 | 1,710 |
| **14** Secured Claim of OCWEN (1st Trust Deed 8479 Cedarview Court Property) | 237,521 | 5.50% | 1,349 | 164 | 1,513 | 1,513 | 1,513 | 1,513 | 1,513 | 1,513 | 1,513 | 1,513 | 1,513 | 1,513 | 1,513 | 1,513 | 1,513 | 1,513 | 1,513 |
| **14 Total** | 237,521 | 5.50% | 1,349 | 164 | 1,513 | 1,513 | 1,513 | 1,513 | 1,513 | 1,513 | 1,513 | 1,513 | 1,513 | 1,513 | 1,513 | 1,513 | 1,513 | 1,513 | 1,513 |
| **15** Secured Claim of OCWEN (1st Trust Deed 8475 Cedarview Court Property) | 237,521 | 5.50% | 1,349 | 147 | 1,496 | 1,496 | 1,496 | 1,496 | 1,496 | 1,496 | 1,496 | 1,496 | 1,496 | 1,496 | 1,496 | 1,496 | 1,496 | 1,496 | 1,496 |
| **15 Total** | 237,521 | 5.50% | 1,349 | 147 | 1,496 | 1,496 | 1,496 | 1,496 | 1,496 | 1,496 | 1,496 | 1,496 | 1,496 | 1,496 | 1,496 | 1,496 | 1,496 | 1,496 | 1,496 |

**PLAN PROJECTIONS**

**Plan Payments**

| Class / Secured | Current Claim | Q4-17 | Q1-18 | Q2-18 | Q3-18 | Q4-18 | Q1-19 | Q2-19 | Q3-19 | Q4-19 | Q1-20 | Q2-20 | Q3-20 | Q4-20 | Q1-21 | Q2-21 | Q3-21 | Q4-21 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | | | | | | | | | | | |
| Secured Claim of Secured Claim of Roundpoint Mortgage (1st Trust Deed Surfside Property) | 1,494,115 | | | | | | | | | | | | | | | | | |
| **1 Total** | **1,494,115** | 17,323 | 17,323 | 21,512 | 29,891 | 29,891 | 29,891 | 29,891 | 29,891 | 29,891 | 29,891 | 29,891 | 29,891 | 29,891 | 29,891 | 29,891 | 29,891 | 29,891 |
| 2 | | | | | | | | | | | | | | | | | | |
| Secured Claim of Wells Fargo Bank (2nd Trust Deed Surfside Property) | 196,765 | | | | | | | | | | | | | | | | | |
| **2 Total** | **196,765** | 3,096 | 3,096 | 3,096 | 3,096 | 3,096 | 3,096 | 3,096 | 3,096 | 3,096 | 3,096 | 3,096 | 3,096 | 3,096 | 3,096 | 3,096 | 3,096 | 3,096 |
| 3 | | | | | | | | | | | | | | | | | | |
| Secured Claim of Chase Commercial Bank (1st Trust Deed LaSalle Street Property) | 577,533 | | | | | | | | | | | | | | | | | |
| **3 Total** | **577,533** | 10,847 | 10,847 | 10,847 | 10,847 | 10,847 | 10,847 | 10,847 | 10,847 | 10,847 | 10,847 | 10,847 | 10,847 | 10,847 | 10,847 | 10,847 | 10,847 | 10,847 |
| 4 | | | | | | | | | | | | | | | | | | |
| Secured Claim of Ann Leivy (2nd trust deed of LaSalle Street Property) | 162,342 | | | | | | | | | | | | | | | | | |
| **4 Total** | **162,342** | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 5 | | | | | | | | | | | | | | | | | | |
| Secured Claim of Chase Commercial Bank (1st Trust Deed Comstock Avenue Property) | 380,355 | | | | | | | | | | | | | | | | | |
| **5 Total** | **380,355** | 10,594 | 10,594 | 10,594 | 10,594 | 10,594 | 10,594 | 10,594 | 10,594 | 10,594 | 10,594 | 10,594 | 10,594 | 10,594 | 10,594 | 10,594 | 10,594 | 10,594 |
| 6 | | | | | | | | | | | | | | | | | | |
| Secured Claim of Digital Federal Credit Union (1st Trust Deed NH Property) | 378,485 | | | | | | | | | | | | | | | | | |
| **6 Total** | **378,485** | 25,930 | 25,930 | 25,930 | 25,930 | 25,930 | 25,930 | 25,930 | 25,930 | 25,930 | 25,930 | 25,930 | 25,930 | 25,930 | 25,930 | 25,930 | 25,930 | 25,930 |
| 7 | | | | | | | | | | | | | | | | | | |
| Secured Claim of U.S. Bank (1st Trust Deed Nevada Property) | 209,343 | | | | | | | | | | | | | | | | | |
| **7 Total** | **209,343** | 8,111 | 8,111 | 8,111 | 8,111 | 8,111 | 8,111 | 8,111 | 8,111 | 8,111 | 8,111 | 8,111 | 8,111 | 8,111 | 8,111 | 8,111 | 8,111 | 8,111 |
| 8 | | | | | | | | | | | | | | | | | | |
| Secured Claim of Wells Fargo Bank (1st Trust Deed Vonnie Lane Property) | 444,048 | | | | | | | | | | | | | | | | | |
| **8 Total** | **444,048** | 7,650 | 7,650 | 7,650 | 7,650 | 7,650 | 7,650 | 7,650 | 7,650 | 7,650 | 7,650 | 7,650 | 7,650 | 7,650 | 7,650 | 7,650 | 7,650 | 7,650 |
| 9 | | | | | | | | | | | | | | | | | | |
| Secured Claim of Wells Fargo Bank (1st Trust Deed N. Olive Street Property) | 187,283 | | | | | | | | | | | | | | | | | |
| **9 Total** | **187,283** | 3,956 | 3,956 | 3,956 | 3,956 | 3,956 | 3,956 | 3,956 | 3,956 | 3,956 | 3,956 | 3,956 | 3,956 | 3,956 | 3,956 | 3,956 | 3,956 | 3,956 |
| 10 | | | | | | | | | | | | | | | | | | |
| Secured Claim of Pacific Premier Bank (2nd Trust Deed N. Olive Street Property) | 150,321 | | | | | | | | | | | | | | | | | |
| **10 Total** | **150,321** | 2,161 | 2,161 | 2,161 | 2,161 | 2,161 | 2,161 | 2,161 | 2,161 | 2,161 | 2,161 | 2,161 | 2,161 | 2,161 | 2,161 | 2,161 | 2,161 | 2,161 |
| 11 | | | | | | | | | | | | | | | | | | |
| Secured Claim of Pacific Premier Bank (1st Trust Deed on Newman, Del Amo, Denni, Bishop) | 1,142,254 | | | | | | | | | | | | | | | | | |
| **11 Total** | **1,142,254** | 24,652 | 24,652 | 24,652 | 24,652 | 24,652 | 24,652 | 24,652 | 24,652 | 24,652 | 24,652 | 24,652 | 24,652 | 24,652 | 24,652 | 24,652 | 24,652 | 24,652 |
| 12 | | | | | | | | | | | | | | | | | | |
| Secured Claim of OCWEN (1st Trust Deed San Alto Way Property) | 260,867 | | | | | | | | | | | | | | | | | |
| **12 Total** | **260,867** | 5,093 | 5,093 | 5,093 | 5,093 | 5,093 | 5,093 | 5,093 | 5,093 | 5,093 | 5,093 | 5,093 | 5,093 | 5,093 | 5,093 | 5,093 | 5,093 | 5,093 |
| 13 | | | | | | | | | | | | | | | | | | |
| Secured Claim of OCWEN (1st Trust Deed Stratton Court Property) | 270,160 | | | | | | | | | | | | | | | | | |
| **13 Total** | **270,160** | 5,130 | 5,130 | 5,130 | 5,130 | 5,130 | 5,130 | 5,130 | 5,130 | 5,130 | 5,130 | 5,130 | 5,130 | 5,130 | 5,130 | 5,130 | 5,130 | 5,130 |
| 14 | | | | | | | | | | | | | | | | | | |
| Secured Claim of OCWEN (1st Trust Deed 8479 Cedarview Court Property) | 237,521 | | | | | | | | | | | | | | | | | |
| **14 Total** | **237,521** | 4,538 | 4,538 | 4,538 | 4,538 | 4,538 | 4,538 | 4,538 | 4,538 | 4,538 | 4,538 | 4,538 | 4,538 | 4,538 | 4,538 | 4,538 | 4,538 | 4,538 |
| 15 | | | | | | | | | | | | | | | | | | |
| Secured Claim of OCWEN (1st Trust Deed 8475 Cedarview Court Property) | 237,521 | | | | | | | | | | | | | | | | | |
| **15 Total** | **237,521** | 4,487 | 4,487 | 4,487 | 4,487 | 4,487 | 4,487 | 4,487 | 4,487 | 4,487 | 4,487 | 4,487 | 4,487 | 4,487 | 4,487 | 4,487 | 4,487 | 4,487 |

EXHIBIT 5
Page 95

**PLAN PROJECTIONS**

**Plan Payments**

| Class / Secured | Current Claim | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|
| 1  Secured Claim of Secured Claim of Roundpoint Mortgage (1st Trust Deed Surfside Property) | 1,494,115 | 17,323 | 98,616 | 119,562 | 119,562 | 119,562 |
| 1 Total | 1,494,115 | | | | | |
| 2  Secured Claim of Wells Fargo Bank (2nd Trust Deed Surfside Property) | 196,765 | 3,096 | 12,383 | 12,383 | 12,383 | 12,383 |
| 2 Total | 196,765 | | | | | |
| 3  Secured Claim of Chase Commercial Bank (1st Trust Deed LaSalle Street Property) | 577,533 | 10,847 | 43,387 | 43,387 | 43,387 | 43,387 |
| 3 Total | 577,533 | | | | | |
| 4  Secured Claim of Ann Leisy (2nd trust deed of LaSalle Street Property) | 162,342 | - | - | - | - | - |
| 4 Total | 162,342 | | | | | |
| 5  Secured Claim of Chase Commercial Bank (1st Trust Deed Comstock Avenue Property) | 380,355 | 10,594 | 42,375 | 42,375 | 42,375 | 42,375 |
| 5 Total | 380,355 | | | | | |
| 6  Secured Claim of Digital Federal Credit Union (1st Trust Deed NH Property) | 378,485 | 25,930 | 103,720 | 103,720 | 103,720 | 103,720 |
| 6 Total | 378,485 | | | | | |
| 7  Secured Claim of U.S. Bank (1st Trust Deed Nevada Property) | 209,343 | 8,111 | 32,445 | 32,445 | 32,445 | 32,445 |
| 7 Total | 209,343 | | | | | |
| 8  Secured Claim of Wells Fargo Bank (1st Trust Deed Vonnie Lane Property) | 444,048 | 7,650 | 30,598 | 30,598 | 30,598 | 30,598 |
| 8 Total | 444,048 | | | | | |
| 9  Secured Claim of Wells Fargo Bank (1st Trust Deed N. Olive Street Property) | 187,283 | 3,956 | 15,823 | 15,823 | 15,823 | 15,823 |
| 9 Total | 187,283 | | | | | |
| 10  Secured Claim of Pacific Premier Bank (2nd Trust Deed N. Olive Street Property) | 150,321 | 2,161 | 8,643 | 8,643 | 8,643 | 8,643 |
| 10 Total | 150,321 | | | | | |
| 11  Secured Claim of Pacific Premier Bank (1st Trust Deed on Newman, Del Amo, Denni, Bishop) | 1,142,254 | 24,652 | 98,607 | 98,607 | 98,607 | 98,607 |
| 11 Total | 1,142,254 | | | | | |
| 12  Secured Claim of OCWEN (1st Trust Deed San Alto Way Property) | 260,867 | 5,093 | 20,374 | 20,374 | 20,374 | 20,374 |
| 12 Total | 260,867 | | | | | |
| 13  Secured Claim of OCWEN (1st Trust Deed Stratton Court Property) | 270,160 | 5,130 | 20,521 | 20,521 | 20,521 | 20,521 |
| 13 Total | 270,160 | | | | | |
| 14  Secured Claim of OCWEN (1st Trust Deed 8479 Cedarview Court Property) | 237,521 | 4,538 | 18,151 | 18,151 | 18,151 | 18,151 |
| 14 Total | 237,521 | | | | | |
| 15  Secured Claim of OCWEN (1st Trust Deed 8475 Cedarview Court Property) | 237,521 | 4,487 | 17,949 | 17,949 | 17,949 | 17,949 |
| 15 Total | 237,521 | | | | | |

| PLAN PROJECTIONS | Amount | Rate | | | Oct-17 | Nov-17 | Dec-17 | Jan-18 | Feb-18 | Mar-18 | Apr-18 | May-18 | Jun-18 | Jul-18 | Aug-18 | Sep-18 | Oct-18 | Nov-18 | Dec-18 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **16** | | | | | | | | | | | | | | | | | | | |
| Rick Tamutzer | 3,353,010 | | | | | | | | | | | | | | | | | | |
| **16 Total** | **3,353,010** | | | | | | | | | | | | | | | | | | |
| **17** | | | | | | | | | | | | | | | | | | | |
| 2016 Tesla X | 86,648 | | | 1,349 | | | | | | | | | | | | | | | |
| **17 Total** | **86,648** | | | **1,349** | 1,349 | 1,349 | 1,349 | 1,349 | 1,349 | 1,349 | 1,349 | 1,349 | 1,349 | 1,349 | 1,349 | 1,349 | 1,349 | 1,349 | 1,349 |
| **18** | | | | | | | | | | | | | | | | | | | |
| LA County Tax | 12,761 | | | | | | | | | | | | | | | | | | |
| OC County Tax | 51,854 | | | | | | | | | | | | | | | | | | |
| **18 Total** | **64,614** | | | | | | | | | | | | | | | | | | |
| **Exit Financing** | | | | | | | | | | | | | | | | | | | |
| New Loan Proceeds | 750,000 | 7.50% | 4,688 | | | | | | | | | | | | | | | | |
| **Exit Financing Total** | **750,000** | 7.50% | **4,688** | | 4,688 | 4,688 | 4,688 | 4,688 | 4,688 | 4,688 | 4,688 | 4,688 | 4,688 | 4,688 | 4,688 | 4,688 | 4,688 | 4,688 | 4,688 |
| **Secured Total** | **10,583,184** | 4.78% | 42,429 | 8,130 | 50,559 | 50,559 | 50,559 | 50,559 | 50,559 | 50,559 | 50,559 | 50,559 | 54,748 | 54,748 | 54,748 | 54,748 | 54,748 | 54,748 | 54,748 |
| **Admin** | | | | | | | | | | | | | | | | | | | |
| **507(a)(2)** | | | | | | | | | | | | | | | | | | | |
| Clerk's Office Fees | | | | | 1 | | | | | | | | | | | | | | |
| Force 10 | 60,000 | | | | | | | | | | | | | | | | | | |
| Gregory Page | 30,000 | | | | | | | | | | | | | | | | | | |
| LWGF | 500,000 | | | | | | | | | | | | | | | | | | |
| OUST | 1,950 | | | | | | | 1,950 | | | | | | | | | | | |
| The Vagle Firm | 50,000 | | | | | | | | | | | | | | | | | | |
| **507(a)(2) Total** | **641,950** | | | | 641,951 | | | 1,950 | | | | | | | | | | | |
| **Admin Total** | **641,950** | | | | 641,951 | - | - | 1,950 | - | - | - | | - | - | - | - | - | - | - |
| **GUC** | | | | | | | | | | | | | | | | | | | |
| **20** | | | | | | | | | | | | | | | | | | | |
| Barclays Bank, DE | 15,328 | | | | | | | | | | | | | | | | | | |
| Citibank (Costco Adv.) | 717 | | | | | | | | | | | | | | | | | | |
| Citibank Visa - 2800 | 17,228 | | | | | | | | | | | | | | | | | | |
| Eileen Cathro | 100,000 | | | | | | | | | | | | | | | | | | |
| Gregory Page | 97,368 | | | | | | | | | | | | | | | | | | |
| Joseph Coyne | 41,000 | | | | | | | | | | | | | | | | | | |
| **20 Total** | **271,641** | | | | 271,641 | | | | | | | | | | | | | | |
| **21** | | | | | | | | | | | | | | | | | | | |
| Intentionally Omitted | - | | | | | | | | | | | | | | | | | | |
| **21 Total** | **-** | | | | | | | | | | | | | | | | | | |
| **22** | | | | | | | | | | | | | | | | | | | |
| Fern, et al. | 4,132,500 | | | | | | | | | | | | | | | | | | |
| **22 Total** | **4,132,500** | | | | | | | | | | | | | | | | | | |
| **GUC Total** | **4,404,141** | | | | | | | | | | | | | | | | | | |
| **Grand Total** | **15,629,275** | 4.78% | 42,429 | 8,130 | 964,151 | 50,559 | 50,559 | 52,509 | 50,559 | 50,559 | 50,559 | 50,559 | 54,748 | 54,748 | 54,748 | 54,748 | 54,748 | 54,748 | 54,748 |
| | | | | | | | | | | | | | | | | | | | |
| Cash at beginning of period(1) | | | | | $100,000 | $35,749 | $50,768 | $69,501 | $78,876 | $92,935 | $103,748 | $119,777 | $133,590 | $162,760 | $174,979 | $203,177 | $222,634 | $241,286 | $252,116 |
| Net cash flow from Operating activities | | | | | 149,899 | 65,578 | 69,292 | 61,883 | 64,618 | 61,371 | 66,588 | 64,372 | 83,918 | 66,967 | 82,946 | 74,206 | 73,399 | 65,578 | 69,292 |
| Net cash flow from new borrowings | | | | | 750,000 | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Net cash flow used by Plan Payments | | | | | (964,151) | (50,559) | (50,559) | (52,509) | (50,559) | (50,559) | (50,559) | (50,559) | (54,748) | (54,748) | (54,748) | (54,748) | (54,748) | (54,748) | (54,748) |
| Cash at end of period | | | | | $ 35,749 | $ 50,768 | $ 69,501 | $ 78,876 | $ 92,935 | $103,748 | $119,777 | $133,590 | $162,760 | $174,979 | $203,177 | $222,634 | $241,286 | $252,116 | $266,660 |

| PLAN PROJECTIONS | Total | Q4-17 | Q1-18 | Q2-18 | Q3-18 | Q4-18 | Q1-19 | Q2-19 | Q3-19 | Q4-19 | Q1-20 | Q2-20 | Q3-20 | Q4-20 | Q1-21 | Q2-21 | Q3-21 | Q4-21 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **16** | | | | | | | | | | | | | | | | | | |
| Rick Tamutzer | 3,353,010 | | | | | | | | | | | | | | | | | |
| **16 Total** | 3,353,010 | | | | | | | | | | | | | | | | | |
| **17** | | | | | | | | | | | | | | | | | | |
| 2016 Tesla X | 86,648 | 4,047 | 4,047 | 4,047 | 4,047 | 4,047 | 4,047 | 4,047 | 4,047 | 4,047 | 4,047 | 4,047 | 4,047 | 4,047 | 4,047 | 4,047 | 4,047 | 4,047 |
| **17 Total** | 86,648 | 4,047 | 4,047 | 4,047 | 4,047 | 4,047 | 4,047 | 4,047 | 4,047 | 4,047 | 4,047 | 4,047 | 4,047 | 4,047 | 4,047 | 4,047 | 4,047 | 4,047 |
| **18** | | | | | | | | | | | | | | | | | | |
| LA County Tax | 12,761 | | | | | | | | | | | | | | | | | |
| OC County Tax | 51,854 | | | | | | | | | | | | | | | | | |
| **18 Total** | 64,614 | 14,063 | 14,063 | 14,063 | 14,063 | 14,063 | 14,063 | 14,063 | 14,063 | 14,063 | 14,063 | 14,063 | 14,063 | 14,063 | 14,063 | 14,063 | 14,063 | 14,063 |
| **Exit Financing** | | | | | | | | | | | | | | | | | | |
| New Loan Proceeds | 750,000 | | | | | | | | | | | | | | | | | |
| **Exit Financing Total** | 750,000 | | | | | | | | | | | | | | | | | |
| **Secured Total** | 10,583,184 | 151,676 | 151,676 | 155,866 | 164,244 | 164,244 | 164,244 | 164,244 | 164,244 | 164,244 | 164,244 | 164,244 | 164,244 | 164,244 | 164,244 | 164,244 | 164,244 | 164,244 |
| **Admin** | | | | | | | | | | | | | | | | | | |
| **507(a)(2)** | | | | | | | | | | | | | | | | | | |
| Clerk's Office Fees | 1 | 1 | | | | | | | | | | | | | | | | |
| Force 10 | 60,000 | | | | | | | | | | | | | | | | | |
| Gregory Page | 30,000 | | | | | | | | | | | | | | | | | |
| LWGF | 500,000 | | | | | | | | | | | | | | | | | |
| OUST | 1,950 | 1,950 | | | | | | | | | | | | | | | | |
| The Vogle Firm | 50,000 | | 1,950 | | | | | | | | | | | | | | | |
| **507(a)(2) Total** | 641,950 | 641,951 | 1,950 | | | | | | | | | | | | | | | |
| **Admin Total** | 641,951 | 641,951 | 1,950 | | | | | | | | | | | | | | | |
| **GUC** | | | | | | | | | | | | | | | | | | |
| **20** | | | | | | | | | | | | | | | | | | |
| Barclays Bank, DE | 15,328 | | | | | | | | | | | | | | | | | |
| Citibank (Costco Adv) | 717 | | | | | | | | | | | | | | | | | |
| Citibank Visa - 2800 | 17,228 | | | | | | | | | | | | | | | | | |
| Eileen Cathro | 100,000 | | | | | | | | | | | | | | | | | |
| Gregory Page | 97,368 | | | | | | | | | | | | | | | | | |
| Joseph Coyne | 41,000 | | | | | | | | | | | | | | | | | |
| **20 Total** | 271,641 | 271,641 | | | | | | | | | | | | | | | | |
| **21** | | | | | | | | | | | | | | | | | | |
| Intentionally Omitted | | | | | | | | | | | | | | | | | | |
| **21 Total** | - | | | | | | | | | | | | | | | | | |
| **22** | | | | | | | | | | | | | | | | | | |
| Fenn, et al. | 4,132,500 | | | | | | | | | | | | | | | | | |
| **22 Total** | 4,132,500 | | | | | | | | | | | | | | | | | |
| **GUC Total** | 4,404,141 | 271,641 | | | | | | | | | | | | | | | | |
| **Grand Total** | 15,629,275 | 1,065,268 | 153,626 | 155,866 | 164,244 | 164,244 | 164,244 | 164,244 | 164,244 | 164,244 | 164,244 | 164,244 | 164,244 | 164,244 | 164,244 | 164,244 | 164,244 | 164,244 |
| | | | | | | | | | | | | | | | | | | |
| Cash at beginning of period(1) | 100,000 | $69,501 | $103,748 | $162,760 | $222,634 | $266,660 | $290,288 | $336,106 | $370,480 | $389,005 | $387,134 | $412,268 | $446,642 | $465,167 | $463,296 | $488,430 | $522,804 | |
| Net cash flow from Operating activities | 284,769 | 187,873 | 214,878 | 224,118 | 208,269 | 187,873 | 210,062 | 198,618 | 182,769 | 162,373 | 189,378 | 198,618 | 182,769 | 162,373 | 189,378 | 198,618 | 182,769 | |
| Net cash flow from new borrowings | 750,000 | | | | | | | | | | | | | | | | | |
| Net cash flow used by Plan Payments | (1,065,268) | (153,626) | (155,866) | (164,244) | (164,244) | (164,244) | (164,244) | (164,244) | (164,244) | (164,244) | (164,244) | (164,244) | (164,244) | (164,244) | (164,244) | (164,244) | (164,244) | |
| Cash at end of period | $69,501 | $103,748 | $162,760 | $222,634 | $266,660 | $290,288 | $336,106 | $370,480 | $389,005 | $387,134 | $412,268 | $446,642 | $465,167 | $463,296 | $488,430 | $522,804 | $541,329 | |

| PLAN PROJECTIONS | Amount | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|
| **16** | | | | | | |
| Rick Tamutzer | 3,353,010 | 14,063 | 14,063 | 14,063 | 14,063 | 14,063 |
| **16 Total** | **3,353,010** | | | | | |
| **17** | | | | | | |
| 2016 Tesla X | 86,648 | | 4,047 | 4,047 | 4,047 | 4,047 |
| **17 Total** | **86,648** | | 4,047 | 4,047 | 4,047 | 4,047 |
| **18** | | | | | | |
| LA County Tax | 12,761 | | | | | |
| OC County Tax | 51,854 | | | | | |
| **18 Total** | **64,614** | | | | | |
| **Exit Financing** | | | | | | |
| New Loan Proceeds | 750,000 | | | | | |
| **Exit Financing Total** | **750,000** | | | | | |
| **Secured Total** | **10,583,184** | 151,676 | 636,030 | 656,977 | 656,977 | 656,977 |
| **Admin** | | | | | | |
| **507(a)(2)** | | | | | | |
| Clerk's Office Fees | | 1 | | | | |
| Force 10 | 60,000 | 60,000 | | | | |
| Gregory Page | 30,000 | 30,000 | | | | |
| LWGF | 500,000 | 500,000 | | | | |
| OUST | 1,950 | 1,950 | 1,950 | | | |
| The Vagle Firm | 50,000 | 50,000 | | | | |
| **507(a)(2) Total** | **641,950** | 641,951 | 1,950 | | | |
| **Admin Total** | **641,950** | 641,951 | 1,950 | | | |
| **GUC** | | | | | | |
| **20** | | | | | | |
| Barclays Bank, DE | 15,328 | 15,328 | | | | |
| Citibank (Costco Adv.) | 717 | 717 | | | | |
| Citibank Visa - 2800 | 17,228 | 17,228 | | | | |
| Eileen Cathro | 100,000 | 100,000 | | | | |
| Gregory Page | 97,368 | 97,368 | | | | |
| Joseph Coyne | 41,000 | 41,000 | | | | |
| **20 Total** | **271,641** | 271,641 | | | | |
| **21** | | | | | | |
| Intentionally Omitted | | | | | | |
| **21 Total** | **-** | | | | | |
| **22** | | | | | | |
| Fern, et al. | 4,132,500 | | | | | |
| **22 Total** | **4,132,500** | | | | | |
| **GUC Total** | **4,404,141** | 271,641 | | | | |
| **Grand Total** | **15,629,275** | 1,065,268 | 637,980 | 656,977 | 656,977 | 656,977 |

| | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|
| Cash at beginning of period(1) | $ 100,000 | $ 69,501 | $ 266,660 | $ 389,005 | $ 465,167 |
| Net cash flow from Operating activities | 284,769 | 835,139 | 779,322 | 733,139 | 733,139 |
| Net cash flow from new borrowings | 750,000 | - | - | - | - |
| Net cash flow used by Plan Payments | (1,065,268) | (637,980) | (656,977) | (656,977) | (656,977) |
| Cash at end of period | $ 69,501 | $ 266,660 | $ 389,005 | $ 465,167 | $ 541,329 |

**NET ASSET VALUE**

| | FMV | Claims | NAV | Note |
|---|---|---|---|---|
| **Secured** | | | | |
| **Real Property** | | | | |
| Surfside | $3,500,000 | $1,705,674 | $1,809,121 | (1) |
| Comstock | 1,800,000 | 380,355 | 1,419,645 | |
| LaSalle | 2,000,000 | 746,519 | 1,260,125 | |
| Newman | 1,250,000 | 485,584 | 771,669 | |
| Cincinnatti | 860,000 | 209,343 | 650,657 | |
| Merrimack | 1,000,000 | 378,485 | 621,515 | |
| Del Amo | 620,000 | 250,013 | 382,748 | |
| Denni | 600,000 | 233,378 | 370,401 | |
| Olive | 660,000 | 341,451 | 322,396 | |
| Bishop | 515,000 | 200,762 | 317,928 | |
| Vonnie | 700,000 | 447,520 | 255,952 | |
| San Alto | 500,000 | 263,239 | 239,133 | |
| Stratton | 436,000 | 272,345 | 165,840 | |
| Cedarview - 8479 | 400,000 | 239,528 | 162,479 | |
| Cedarview - 8475 | 375,000 | 239,330 | 137,479 | |
| New Loan Proceeds | | 750,000 | (750,000) | (2) |
| Rick Tarnutzer | | 3,353,010 | (3,353,010) | |
| **Real Property Total** | **15,216,000** | **10,496,536** | **4,784,078** | |
| **Other Assets** | | | | |
| 2016 Tesla X | 73,000 | 86,648 | (13,648) | |
| **Other Assets Total** | **73,000** | **86,648** | **(13,648)** | |
| **Secured Total** | **15,289,000** | **10,583,184** | **4,770,430** | |
| **Asset** | | | | |
| **Other Assets** | | | | |
| DV Interpled Funds (Not Debtc | 1,800,000 | | 1,800,000 | (3) |
| Judgement - Wakim, et al. | 275,660 | | 275,660 | |
| First Choice Escrow | 150,000 | - | 150,000 | |
| Polar Power (Stock) | 47,100 | | 47,100 | |
| Jewelry | 50,300 | 6,000 | 44,300 | |
| Orange Coast Title | 40,000 | - | 40,000 | |
| Other Automobiles | 40,500 | 3,050 | 37,450 | |
| **Other Assets Total** | **2,403,560** | **9,050** | **2,394,510** | |
| **Asset Total** | **2,403,560** | **9,050** | **2,394,510** | |
| **Grand Total** | **17,692,560** | **10,592,234** | **7,164,940** | |

**NET ASSET VALUE**

| Creditors | Claims |
|---|---|
| **Admin** | |
| LWGF | $ 500,000 |
| Force 10 | 60,000 |
| The Vogle Firm | 50,000 |
| Gregory Page | 30,000 |
| OUST | 1,950 |
| Clerk's Office Fees | - |
| **Admin Total** | **641,950** |
| **PUC** | |
| IRS | 693 |
| **PUC Total** | **693** |
| **GUC** | |
| Fern, et al. | 4,132,500 |
| Eileen Cathro | 100,000 |
| Gregory Page | 97,368 |
| Joseph Coyne | 41,000 |
| Citibank Visa - 2800 | 17,228 |
| Barclays Bank, DE | 15,328 |
| Citibank (Costco Adv.) - 8972 | 717 |
| Intentionally Omitted | - |
| **GUC Total** | **4,404,141** |
| **Grand Total** | **$ 5,046,784** |

| Net Asset Value (NAV) | $ 2,118,156 |
|---|---|

(1) Claims figures include the claims of the Real Property Lenders and secured tax claims.

(2) Proceeds from new secured loan used to meet effective date payments.

(3) Amounts listed in Claims column are claimed exemptions.

(4) If exemption equals the FMV, then not listed.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

650 Town Center Drive, Suite 950, Costa Mesa, CA 92626

A true and correct copy of the foregoing document entitled: **SECOND AMENDED DISCLOSURE STATEMENT DESCRIBING SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document.  On **September 8, 2017**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒    Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On **September 8, 2017**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☒    Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **September 8, 2017**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

<u>SERVED VIA PERSONAL DELIVERY/ATTORNEY SERVICE</u>
The Honorable Catherine E. Bauer
United States Bankruptcy Court
Central District of California
Ronald Reagan Federal Building and Courthouse
411 West Fourth Street, Suite 5165/Courtesy Bin
Santa Ana, CA 92701-4593

☐    Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 9/8/2017 | Nancy Lockwood | /s/ Nancy Lockwood |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

#1120447

**SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:

- **Julian K Bach**     Julian@Jbachlaw.com, julianbach@sbcglobal.net
- **Frank Cadigan**     frank.cadigan@usdoj.gov
- **Matthew R. Clark**     bkyecf@rasflaw.com, mclark@ecf.courtdrive.com;mclark@rasflaw.com
- **Sean C Ferry**     sferry@ecf.courtdrive.com, bkyecf@rasflaw.com
- **Alan J Friedman**     afriedman@lwgfllp.com,
  nlockwood@lwgfllp.com;jokeefe@lwgfllp.com;banavim@lwgfllp.com;lgauthier@lwgfllp.com
- **Joseph Garibyan**     joegaribyan@gmail.com, joe.garibyan@swmllp.com
- **Beth Gaschen**     bgaschen@wgllp.com,
  kadele@wgllp.com;lfisk@wgllp.com;lgauthier@lwgfllp.com;nlockwood@lwgfllp.com
- **David Gill**     dag@dgdk.com, DanningGill@gmail.com;dgill@ecf.inforuptcy.com
- **Jeffrey I Golden**     jgolden@wgllp.com, kadele@wgllp.com;lfisk@wgllp.com
- **Eric P Israel**     eisrael@dgdk.com, danninggill@gmail.com;eisrael@ecf.inforuptcy.com
- **Byron B Mauss**     efilings@amlegalgroup.com
- **Thomas J Polis**     tom@polis-law.com, paralegal@polis-law.com;r59042@notify.bestcase.com
- **Sonia Singh**     ss@dgdk.com, DanningGill@gmail.com,SSingh@ECF.Inforuptcy.com
- **Douglas G Tennant**     dtennant@frankel-tennant.com
- **United States Trustee (SA)**     ustpregion16.sa.ecf@usdoj.gov

## SERVED VIA FIRST-CLASS MAIL

David Tudor Chamberlain
103 Surfside Avenue A
Surfside, CA 90743

Office of the United States Trustee
411 W. Fourth Street
Suite 7160
Santa Ana, CA 927601-4593

U.S. Securities & Exchange Commission
Attn: BK Counsel
444 South Flower St., Ste. 900
Los Angeles, CA 90071-9591